**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| TONYA HILLS and OKLAHOMA LAW ENFORCEMENT RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, <br><br>                Plaintiffs, <br><br>    v. <br><br> BIOXCEL THERAPEUTICS, INC., VIMAL MEHTA, RICHARD STEINHART, and ROBERT RISINGER, <br><br>                Defendants. | Civil Action No.: 3:23-cv-00915-SVN |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ....................................................................................1

II.  SUMMARY OF THE FACTS....................................................................4

     A.   BioXcel Develops BXCL501 in Hopes of Reviving its Failing Business...4

     B.   BioXcel Enters into Financing Agreements Contingent on Reaching
          Certain Regulatory Milestones ....................................................5

     C.   BioXcel Fails to Comply with Regulatory Requirements, Resulting in
          FDA Issuance of a Form 483 .......................................................6

     D.   Defendants Were Aware of and Concealed the Company's Form 483
          Catastrophe from Investors While Repeatedly Touting the Success of
          TRANQUILITY II.......................................................................8

     E.   Defendants Reveal the Truth ......................................................10

III. LEGAL STANDARD...............................................................................11

IV.  ARGUMENT.........................................................................................12

     A.   The Complaint Pleads Actionable Misstatements and Omissions.............12

          1.   Defendants' Statements Concerning the Clinical Development of
               TRANQUILITY II Are Actionable. ...............................................13

          2.   Defendants' Statements Concerning BioXcel's Financial Condition
               and Access to Funding under Strategic Financing Are
               Actionable..............................................................................22

          3.   Defendants' Materially False and Misleading Statements Are Not
               Protected Under the PSLRA Safe Harbor.....................................25

     B.   The Complaint Pleads a Strong Inference of Scienter..............................29

          1.   Defendants Admit They Knew About the FDA's Inspection, Form
               483, and Dr. Meyer's Fabricated Adverse Event Reporting..........30

          2.   Defendants' "Confidential Witness" Arguments Do Not Detract
               from Plaintiffs' Inference of Scienter ...........................................32

          3.   Defendants Do Not Offer a Plausible Nonculpable Inference.......34

          4.     Defendants' Lucrative Insider Trading Further Supports an Inference of Scienter ........................................................................37

   C.     The Complaint Pleads Loss Causation ......................................................38

   D.     The Complaint Pleads Defendants Are Liable As "Control Persons" Under Section 20(a) of the Exchange Act ..........................................................40

V.    CONCLUSION...............................................................................................40

# TABLE OF AUTHORITIES

**Cases**

*Abu Dhabi Commer. Bank v. Morgan Stanley & Co.*,
    651 F. Supp. 2d 155 (S.D.N.Y. 2009)............................................................................. 34

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
    19 F.4th 145 (2d Cir. 2021) ................................................................................... 12, 40

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...................................................................................................... 11

*In re Bank of Am. Corp. Sec., Derivatives & ERISA Litig.*,
    757 F. Supp. 2d 260 (S.D.N.Y. 2010)........................................................................... 21

*In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011)........................................................................... 27

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
    851 F. Supp. 2d 746 (S.D.N.Y. 2012)........................................................................... 33

*Bergeron v. Ridgewood Sec. Corp.*,
    610 F. Supp. 2d 113 (D. Mass. 2009) ........................................................................... 20

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
    2018 WL 2382600 (S.D.N.Y. May 24, 2018) ............................................................... 26

*Christiansen v. Spectrum Pharmaceuticals, Inc.*,
    2024 WL 246020 (S.D.N.Y. Jan. 23, 2024) ........................................................... 18, 30

*Cohen v. Kitov Pharms. Holdings, Ltd.*,
    2018 WL 1406619 (S.D.N.Y. Mar. 20, 2018) ............................................................... 15

*In re Delcath Sys., Inc. Secs. Litig.*,
    36 F. Supp. 3d 320 (S.D.N.Y. 2014)....................................................................... 15, 32

*In re Dr. Reddy's Lab. Ltd. Sec. Litig.*,
    2019 WL 1299673 (D.N.J. Mar. 21, 2019).................................................................... 33

*In re Dynagas LNG Partners LP Sec. Litig.*,
    504 F. Supp. 3d 289 (S.D.N.Y. 2020)........................................................................... 29

*Employees' Ret. Sys. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015)................................................................................. *passim*

*In re EZCorp, Inc. Sec. Litigs.*,
    181 F. Supp. 3d 197 (S.D.N.Y. 2016)........................................................................... 33

*In re Fairway Group Holding Corp. Secs. Litig.*,
   2015 WL 249508 (S.D.N.Y. Jan. 20, 2015) ...................................................................... 39

*Freudenberg v. E\*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010) ....................................................................... 26, 38

*In re Gen. Elec. Co. Sec. Litig.*,
   857 F. Supp. 2d 367 (S.D.N.Y. 2012) ............................................................................. 20

*George v. China Auto Sys., Inc.*,
   2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012) ................................................................... 38

*Illinois State Bd. of Inv. v. Authentidate Holding Corp.*,
   369 F. App'x 260 (2d Cir. 2010) ..................................................................................... 28

*Inst. Investors Group v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009) ...................................................................................... 27, 32

*Litwin v. Blackstone Group, L.P.*,
   634 F.3d 706 (2d Cir. 2011) ............................................................................................ 19

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160, 187 (2d Cir. 2015) ............................................................................... 39, 40

*Lozada v. TaskUs, Inc.*,
   2024 WL 68571 (S.D.N.Y. Jan. 5, 2024) ........................................................................ 40

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ........................................................................................... 35

*McDermid v. Inovio Pharms., Inc.*,
   520 F. Supp. 3d 652 (E.D. Pa. 2021) .............................................................................. 34

*McGuire v. Dendreon Corp.*,
   2008 WL 5130042 (W.D. Wash. Dec. 5, 2008) .............................................................. 17

*In re MELA Scis. Inc. Sec. Litig.*,
   2012 WL 4466604 (S.D.N.Y. Sept. 19, 2012) ................................................................ 18

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010) ............................................................................................ 15

*In re Mylan N.V. Sec. Litig*,
   2023 WL 3539371 (W.D. Pa. May 18, 2023) .................................................................. 18

*In re Mylan N.V. Sec. Litig.*,
   2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ................................................................. 22

*Nguyen v. New Link Genetics Corp.*,
    297 F. Supp. 3d 472 (S.D.N.Y. 2018)................................................................................ 17

*Novak v. Kasaks,*
    216 F.3d 300 (2d Cir. 2000).................................................................................... *passim*

*Odeh v. Immunomedics, Inc.,*
    2020 WL 4381924 (D.N.J. July 31, 2020)........................................................................ 16

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.,*
    367 F. Supp. 3d 16 (S.D.N.Y. 2019)................................................................................ 30

*Okla. Police Pension Fund and Ret. Sys. v. Teligent, Inc.,*
    2020 WL 3268531 (S.D.N.Y. June 17, 2020) ................................................................. 18

*Omnicare, Inc. v. Laborers Dist. Council Indus. Pension Fund*,
    575 U.S. 175 (2015).......................................................................................................... 23

*Ont. Teachers' Pension Plan Bd. v. Teva Pharm. Indus.*,
    432 F. Supp. 3d 131 (D. Conn. 2019).................................................................. 11, 29, 40

*Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC,*
    595 F.3d 86 (2d Cir. 2010)............................................................................................... 15

*Rosen v. Textron, Inc.,*
    321 F. Supp. 2d 308 (D. R.I. 2004).................................................................................. 20

*Rosi v. Aclaris Therapeutics, Inc.,*
    2021 WL 1177505 (S.D.N.Y. Mar. 29, 2021) ........................................................... 30, 40

*In re Salix Pharms., Ltd.,*
    2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)................................................................... 31

*In re Sanofi*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015)................................................................................ 18

*Schaeffer v. Nabriva Therapeutics plc*,
    2020 WL 7701463 (S.D.N.Y. Apr. 28, 2020)................................................................... 19

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)................................................................................... 24, 37, 38

*Setzer v. Omega Healthcare Invs., Inc.,*
    968 F.3d 204 (2d Cir. 2020)............................................................................................. 13

*Shanawaz v. Intellipharmaceutics Int'l Inc.*,
    348 F. Supp. 3d 313 (S.D.N.Y. 2018).............................................................................. 25

*Skiadas v. Acer Therapeutics Inc.*,
  2020 WL 3268495 (S.D.N.Y. June 16, 2020) ................................................................ 35

*Slayton v. Am. Exp. Co.*,
  604 F.3d 758 (2d Cir. 2010)........................................................................................ 27

*Stratte-McClure v. Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015) ......................................................................................... 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)................................................................................. 11, 29, 34, 36

*Tomaszewski v. Trevena, Inc.*,
  482 F. Supp. 3d 317 (E.D. Pa. 2020) .......................................................................... 37

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
  625 F. Supp. 3d 164 (S.D.N.Y. 2022).................................................................... 20, 27

*In re Twinlab Corp. Sec. Litig.*,
  103 F. Supp. 2d 193 (E.D.N.Y. 2000) ......................................................................... 19

*In re Urban Outfitters, Inc. Sec. Litig.*,
  103 F. Supp. 3d 635 (E.D. Pa. 2015) .......................................................................... 32

*In re Vivendi, S.A. Securities Litigation*,
  838 F.3d 223 (2d Cir. 2016)................................................................................ *passim*

*Yanek v. Staar Surgical Co.*,
  388 F. Supp. 2d 1110 (C.D. Cal. 2005) ....................................................................... 17

**Statutes**
15 U.S.C. § 78t(a) ........................................................................................................... 12

15 U.S.C. § 78u-4(b)(1) ................................................................................................... 12

15 U.S.C. §78u-5(c)(2)(B) ............................................................................................... 29

**Other Authorities**
Restatement (Second) of Torts, § 529 (1977) ................................................................... 15

**Rules**
17 C.F.R. § 240.10b-5...................................................................................................... 12

I.    INTRODUCTION

Defendants lied to investors about one of the most important events in the entire corporate history of BioXcel Therapeutics, Inc. ("BioXcel" or the "Company"). In response to growing operational expenses and lagging revenue, BioXcel announced plans to market its lead drug, BXCL501 (also known as IGALMI), to additional patient populations. The announcement sparked unprecedented interest from analysts who immediately increased their price targets for BioXcel's stock in recognition of the new "blockbuster" market opportunity. For context, H.C. Wainwright & Co., one of America's most venerable investment banks, raised its 12-month target to $140 per share—more than *6x* what BioXcel was trading for at the time. To realize this opportunity, BioXcel first needed to conduct a clinical trial showing the drug was safe and effective in the new patient population. Defendants told the market that the clinical trial was a success. In truth, it was a regulatory nightmare that ultimately brought BioXcel to the brink of collapse.

During the Class Period, Defendants repeatedly assured investors that their clinical trial—dubbed the "TRANQUILITY II" trial—was in "advanced stages of enrollment," "progressing well," and provided a "strong foundation" for the Company's request to expand the "patient indication" for BXCL501. Defendants offered no words of caution and said nothing negative about TRANQUILITY II whatsoever, leaving investors with an unrealistic view of what was occurring internally. Unbeknownst to investors at the time, Defendants knowingly retained an unqualified and inexperienced principal investigator, Dr. Caitlin Meyer at Segal Trials in North Miami, Florida, to handle approximately 40% of the clinical trial. Dr. Meyer ran a shoddy trial. More than two-thirds of the patients did not have sufficient documentation showing they met the inclusion criteria, and at least three out of 37 patients should have been excluded. Dr. Meyer also violated a number of the FDA approved trial protocols ranging from failing to have patients sign informed consent forms to outright fabricating serious adverse event reports.

1

Dr. Meyer's numerous trial protocol violations prompted the FDA to inspect her North Miami site. Between December 5 and 21, 2022, the FDA conducted its inspection and ultimately decided to take the drastic action of issuing a formal "Form 483". Defendants knew about both the inspection and the Form 483 in real-time. They also knew that it would delay (if not completely jeopardize) BioXcel's ability to timely complete the TRANQUILITY II study, apply for BXCL501's expanded "patient indication," and meet the necessary development milestones to obtain working capital under their financing agreements with their private lenders. Nevertheless, while all this was occurring, BioXcel's CEO, Vimal Mehta, its CFO, Richard Steinhart, and its CMO, Robert Risinger, promoted the TRANQUILITY II study at analyst conferences while remaining silent about the infractions occurring behind the scenes.

Defendants hid the Form 483 and related study transgressions for *six months* while they conducted the TRANQUILITY II trial. Then, on June 29, 2023, with results finally in hand, Defendants trumpeted purported "positive" topline data in press releases while quietly disclosing the FDA's Form 483 and related protocol violations in a Form 8-K filing. Not to be fooled, analysts immediately grew concerned about the integrity of the underlying trial data and how long it would delay BioXcel's application for the expanded "patient indication." Heavy selling that day drove the price of BioXcel's stock down by 63.8%. Investors, however, did not discover the whole truth until August 14, 2023, when BioXcel announced its decision to pause the TRANQUILITY program indefinitely, would be undergoing a commercial reorganization, and had "substantial doubt" as to its ability to continue as a "going concern." From highs above $30 per share, BioXcel's stock price crashed to just over $4 per share at the end of the Class Period.

Defendants provide predictably weak responses to Plaintiffs' allegations. First, they argue that none of their statements about TRANQUILITY II are actionable because they were "literally

true." But they ignore that their many "half-truths" – unqualified positive statements about TRANQUILITY II – are actionable because they concealed the numerous trial protocol violations identified by the FDA in the Form 483. Defendants also argue that they had no duty to disclose the Form 483 because it was not clear whether the problems identified by the FDA would delay or otherwise jeopardize the trial. But the law requires Defendants to disclose material information as measured by a reasonable investor, not by Defendants' beliefs about what would ultimately occur. There are overwhelming allegations demonstrating the materiality of the Form 483 letter, which in any event, is a determination that is rarely decided on a motion to dismiss. Defendants also argue that the statements are inactionable puffery. But the context of the statements compels the opposite conclusion. Defendants' statements about the timing and projected results of TRANQUILITY II were made specifically to assure investors that their prior projections were "on track." Finally, Defendants argue that certain statements were forward-looking, but in fact they were not, and even if they were, they were not accompanied by meaningful cautionary language.

Defendants' scienter arguments fare no better. This case presents the rare instance where Defendants *admit* to being in possession of the concealed adverse information, *i.e.*, the Form 483 and underlying trial protocol violations. Indeed, Defendants do not dispute that they were aware of the Form 483 when it was issued in December 2022 at the start of the Class Period. Instead, they try to justify their decision not to disclose it. While Defendants claim they believed the problems identified by the FDA could be remedied, that is no excuse for their failure to disclose them. Thus, the scienter inquiry is an open-and-shut question here, especially in light of Plaintiffs' additional alleged facts which buttress Defendants' admission, including that (i) FDA protocol required BioXcel to take a hands-on approach with TRANQUILITY II once the problems were identified; (ii) the Company's ability to continue as a going concern depended on the success of

3

TRANQUILITY II, so that it could secure funding from its private lenders; (iii) the Individual Defendants engaged in numerous colloquies with analysts asking specific questions about TRANQUILITY II; and (iv) Defendants Mehta and Risinger were hands-on managers.

Defendants also take a swing – and a miss – at loss causation. Importantly, they do not dispute or challenge that Plaintiffs have pleaded the element of loss causation for their claim, but instead argue improperly that Plaintiffs should not be entitled to recover damages relating to the decline in BioXcel's stock price that occurred on August 14, 2023. On that date, BioXcel disclosed that it was pausing indefinitely the TRANQUILITY program, undergoing a corporate restructuring, and including a qualification in its quarterly report warning investors that its auditors had substantial doubts about the Company's ability to remain a "going concern". Defendants' argument ignores that loss causation is subject to standard notice pleading, and Plaintiffs have drawn a connection between that disclosure, the resulting stock price drop, and Defendants' Class Period statements about its cash flow runway for the prospective twelve months. Defendants' actions caused Plaintiffs and other BioXcel investors significant losses. Defendants should compensate those investors for the losses they caused.

Respectfully, Defendants' motion to dismiss should be denied in its entirety.

## II.      SUMMARY OF THE FACTS

### A.      BIOXCEL DEVELOPS BXCL501 IN HOPES OF REVIVING ITS FAILING BUSINESS.

BioXcel's primary focus throughout the Class Period was the development and commercialization of BXCL501 (also known as IGALMI). ¶¶60-62.[1] BioXcel originally developed BXCL501 to treat agitation in patients with schizophrenia and bipolar disorder. ¶61. However, from April 2022, when the FDA first approved BXCL501 for the treatment of

---

[1] Citations to "¶__" refer to Plaintiffs' Amended Class Action Complaint for Violations of Federal Securities Laws (Dkt. No. 90) (the "Complaint").

schizophrenia and bipolar related agitation, through the first half of 2023, the drug barely generated $1 million in revenue. ¶¶63-64, 72. This was insufficient to support BioXcel's operating expenses; indeed, for 2022 alone, the Company's operating expenses exceeded $160 million. ¶¶87-89.

To create additional revenue, BioXcel sought to capitalize on an untapped market and sell BXCL501 as a treatment for agitation in patients with Alzheimer's disease and dementia. ¶¶65-68. This new patient population presented significant revenue opportunities for the Company. According to BioXcel, 12 million Americans over the age of 65 were expected to be impacted by Alzheimer's by 2040 with an "estimated 100 million agitation episodes occurring in the United States every year." ¶66. Market analysts from leading investment banks underscored the importance of the drug's expansion for BioXcel, noting that it "present[ed] a significantly larger market opportunity than Igalmi's approved indication" and that it could be a "blockbuster opportunity" if approved. *See* ¶¶97-99 (quoting analyst commentary from Canaccord Genuity, Berenberg Capital, HC Wainwright, UBS, and Guggenheim).

### B. BIOXCEL ENTERS INTO FINANCING AGREEMENTS CONTINGENT ON REACHING CERTAIN REGULATORY MILESTONES.

In order to fund the development and commercialization of this new indication for BXCL501, BioXcel relied on private loans from just two investors, Oaktree Capital Management, L.P. ("Oaktree") and the Qatar Investment Authority ("Qatar"). ¶¶4, 73-83. On April 19, 2022, the Company announced that it had entered into a "$260 million strategic financing" with these investors that would "extend [its] cash runway into 2025." ¶¶74-76. This additional funding, however, came with several strings attached. Importantly, BioXcel's ability to access the cash in its financing agreement depended on receiving approval from the FDA to market BXCL501 as a treatment for "agitation" in patients with Alzheimer's and dementia. ¶¶79-84.

C.    **BIOXCEL FAILS TO COMPLY WITH REGULATORY REQUIREMENTS, RESULTING IN FDA ISSUANCE OF A FORM 483.**

To obtain the FDA's approval for this expanded patient indication, BioXcel needed to conduct a clinical trial to demonstrate BXCL501's benefits, *i.e.*, that it was both a safe and effective treatment for agitation in patients with Alzheimer's and dementia. The trial program, dubbed "TRANQUILITY" by BioXcel, was split into two parts: TRANQUILITY II and TRANQUILITY III. ¶68. Each trial would enroll 150 dementia patients aged 65 years or older, with TRANQUILITY II consisting of patients in assisted living or residential facilities and TRANQUILITY III consisting of patients in nursing homes. ¶68. The trials were set to take place over 12 weeks with participants receiving doses of BXCL501 or a placebo. ¶69.

As BXCL501's sponsor, BioXel was required to ensure the clinical trial was being conducted in accordance with the FDA's regulations. ¶¶108-13. However, financial pressure caused BioXcel to disregard its oversight duties and clinical operations responsibilities in favor of hasty results. ¶¶90-95, 108-13. BioXcel had not enrolled any patients in the TRANQUILITY trial as of April 2022 when it entered into its financing agreement with Oaktree and Qatar. Consequently, Defendants needed to move rapidly to meet its milestone requirements for additional funding. *See* ¶¶32, 85-86, 93 (confidential witnesses confirming pressure from executives, including Defendant Mehta, to complete clinical studies to obtain funding for operations). This led BioXcel to engage Dr. Caitlin Meyer of Segal Trials, a second-rate clinical trial company known to operate as a research mill, to serve as its principal investigator for approximately 40% of the patients enrolled in the TRANQUILITY II trial. ¶¶90-91. BioXcel's employees, including the Company's Head of Medical Science Liaisons and various Senior Directors, were shocked when they found out that Defendant Mehta approved Dr. Meyer as its principal investigator given her lack of experience and the overall importance of the trial to the

6

Company. ¶¶30, 35, 40-41, 92-93. According to these employees, it was "common knowledge" that Defendant Mehta had a preexisting relationship with Dr. Meyer and that there was "a lot of skepticism" from BioXcel's executives concerning the engagement. ¶¶40-41.

Sure enough, BioXcel's decision to enlist Segal Trials and Dr. Meyer resulted in the TRANQUILITY II trial failing to meet regulatory requirements for good clinical practices ("GCP"). ¶¶94, 100-03. It also resulted in BioXcel failing to perform its responsibilities as a drug sponsor, including the monitoring of its clinical trial sites and principal investigator. ¶¶108-13. These failures led to the FDA's inspection of BioXcel's primary trial site for TRANQUILITY II in December 2022 and the subsequent issuance of a Form 483. ¶¶104-07, 114-22.

On December 5, 2022, unbeknownst to the public, the FDA began an on-site inspection at BioXcel's North Miami trial site, *i.e.*, Dr. Meyer's trial site, for compliance with GCP and approved study protocols. ¶¶7, 115. Prior to the submission of an NDA, the FDA rarely, if ever, conducts onsite inspections of clinical trial sites unless prompted by concerns regarding data integrity and/or patient enrollment. ¶¶7, 37, 100-03, 181. Dr. Meyer was required to notify BioXcel of the inspector's arrival and upon notification, the Company was required to have staff on site, including during the close out meeting with the FDA where the inspector discusses observations made and any regulatory action taken. ¶¶182, 184. In rare instances, following pre-NDA onsite inspections, the FDA will issue a Form 483 letter if the inspector identifies observations of noncompliance with GCP and/or approved study protocols. ¶¶7, 104-05. That is exactly what happened here following the FDA's inspection of BioXcel's North Miami trial site.

The FDA's pre-NDA onsite inspection at BioXcel's North Miami trial site lasted nearly *three weeks* before concluding on December 21, 2022, at which point, the agency issued a Form

7

483 letter based on several severe trial protocol and GCP violations. ¶¶8, 115-22. Specifically, the

Form 483 confirmed the following violations:

- 25 of 37 patients did **not have sufficient documentation showing they met all inclusion criteria.** Three of these patients' files demonstrated they potentially **met exclusion criteria of having memory impairment or cognitive impairment unrelated to Alzheimer's Disease.**

- The clinical trial was **not being conducted in accordance with the approved protocol** in certain instances.

- **At least one Serious Adverse Event occurred that was not timely reported** to the medical monitor or safety team.

- Certain study participants did **not sign a proper consent form** which meant they might have to be excluded from the study, resulting in insufficient participation.

¶¶8, 115-22.

Upon receipt of the Form 483, BioXcel and Dr. Meyer were expected to cooperate fully with the FDA to determine the cause and scope of these deficiencies and to assess their effect on the safety, efficacy, or quality of the data submitted to the FDA and the effect on the rights, safety, and welfare of patients enrolled in TRANQUILITY II. ¶185. The FDA also required corrective action be taken to address each inspectional observation of noncompliance. ¶¶106, 186. Given Defendants' receipt of the Form 483, they knew TRANQUILITY II would be delayed and that BioXcel would be unable to seek approval for BXCL501's expanded patient indication as previously intended. ¶¶187-91. This, in turn, threatened the Company's ability to achieve developmental milestones required under its strategic financing, adversely impacting BioXcel's financial stability. ¶¶202-06.

D.   **DEFENDANTS WERE AWARE OF AND CONCEALED THE COMPANY'S FORM 483 CATASTROPHE FROM INVESTORS WHILE REPEATEDLY TOUTING THE SUCCESS OF TRANQUILITY II.**

Defendants knew about the FDA inspection and resulting Form 483 but said nothing of it to the public. In fact, in June of 2023, Defendant Risinger himself admitted that the Company had

known of the Form 483 since December 2022. ¶180. However, Defendants never disclosed this because the possibility of achieving FDA-approval for an expanded patient indication for BXCL501 was, as explained earlier, an incredibly lucrative opportunity for BioXcel. Following the Company's December 15, 2021 press release announcing the initiation of the TRANQUILITY trial program, analysts immediately raised their 12-month price targets, substantially too. HC Wainwright, for example, increased its target for BioXcel to $140 per share—BioXcel's stock at the time was trading at just $22.30 per share. ¶3.

With BioXcel's stock price on the rise (trading above $30 per share) and analyst sentiment at an all-time high, Defendants decisively concealed a critical event in the TRANQUILITY clinical development program, *i.e.*, the FDA's inspection of BioXcel's primary research site for TRANQUILITY II and the Form 483 that ensued. ¶¶114-22. Instead, they actively misled investors about the progress and strength of TRANQUILITY II. ¶¶144-76. For example, on January 11, 2023, a few weeks after Defendants received the Form 483, Defendants presented a PowerPoint that stated that TRANQUILITY II was "on Track in 1H 2023" and had a "Strong Foundation". ¶¶146-48. On May 8, 2023, Defendant Mehta told investors that BXCL501's "data readouts are on track and expected to enable significant potential market expansion … our TRANQUILITY II program continues to advance…" ¶¶162-63. On June 14, 2023, Defendant Risinger told investors that BioXcel had "a lot of confidence in being able to demonstrate both efficacy and safety" through TRANQUILITY II. ¶¶175-76. Defendants made these statements notwithstanding the fact that BioXcel, during the course of its inspection, had discovered additional protocol violations in May 2023, including "fabricated" adverse event reports passed off by Dr. Meyer to the FDA. ¶124.

Defendants, despite knowing that TRANQUILITY II faced serious compliance issues, lied to the public while continually raising additional funding from private investors and the public equity markets. ¶¶38, 44-45, 202-06. During this time, Defendants also took advantage of the Company's artificially inflated stock price, cashing out millions of dollars in personal investments in BioXcel. ¶¶16, 207-22.

### E.    DEFENDANTS REVEAL THE TRUTH.

Defendants concealed the Form 483 for six months, during which time they emphasized the strength and significance of TRANQUILITY II, and assured investors that it was proceeding on schedule, and in turn, supported BioXcel's ability to obtain additional funding from its lenders. ¶¶144-76. Thus, when Defendants finally revealed what had happened and that their clinical development program for BXCL501 was at risk, the market was shocked. ¶¶124-141.

On June 29, 2023, Defendants issued a widely disseminated press release touting "positive topline results" from TRANQUILITY II, while also disclosing the FDA's inspection and resulting Form 483 in a much less publicized Form 8-K filed with the SEC. ¶¶10, 124-26. The Form 8-K also disclosed the additional protocol and GCP violations, including the finding that Dr. Meyer had "fabricated email correspondence" concerning the reporting of adverse events to the FDA. ¶124. Investors were not fooled, and quickly determined that the Form 483 and other protocol violations undermined the accuracy and integrity of the trial data collected during the TRANQUILITY II study. ¶¶128-33. As Canaccord Genuity put it, "any enthusiasm around the data was overwhelmed by the revelation in an 8-K filing that a principal investigator's (PI) actions at a site that enrolled 40% of study participants had led to an unresolved FDA Form 483, and a more recent incident that [BioXcel] reported to the FDA." ¶128. The price of BioXcel's stock plummeted nearly 65%, from $11.28 to $6.39, following this news. ¶¶11, 127.

10

Analysts and investors alike were left with concerns about the overall integrity of TRANQUILITY II and the Company's ability to meet its funding milestones with its lenders. ¶¶128-33. Those risks materialized when, before the market opened on August 14, 2023, BioXcel announced it had halted TRANQUILITY entirely and had "substantial doubt about [its] ability to continue as a going concern for a period of at least 12 months." ¶¶134-40. Specifically, Defendant Steinhart stated that "the Company's previously disclosed cash runway projection assumed a full utilization of its strategic financing agreements of $155 million with Oaktree and [Qatar]. Based on recent events, the Company is not likely to be in a position to meet the milestones to access the additional capital under the financing agreements." ¶136. Defendant Mehta also announced a "commercial reorganization" which would involve a 50% reduction in the Company's workforce. ¶137. On this news, BioXcel's stock price plummeted another 50%, from $7.40 to $4.33. ¶141.

## III.   LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss for failure to state a claim is designed "merely to assess the legal feasibility of the complaint, not to assay the weight of evidence which might be offered in support thereof." *Ont. Teachers' Pension Plan Bd. v. Teva Pharm. Indus.*, 432 F. Supp. 3d 131, 151 (D. Conn. 2019). To survive a motion to dismiss, a complaint must "state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts must "accept all factual allegations in the complaint as true," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), and "draw[] all reasonable inferences in the plaintiff's favor," *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). "[D]ismissal is appropriate only where appellants can prove no set of facts consistent with the complaint that would entitle them to relief." *Id.* (quoting *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 249 (2d Cir. 2014)). Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") impose a heightened pleading standard in securities fraud actions with respect

11

to certain elements of the claim (falsity and scienter). *See* 15 U.S.C. § 78u-4(b)(1). However, courts "must be careful not to mistake heightened pleading standards for impossible ones." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021).

## IV.    ARGUMENT

To support a claim for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must allege that the defendant "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *Employees' Ret. Sys. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015). Section 20(a) of the Exchange Act extends liability for Section 10(b) violations to those who "directly or indirectly[ ] control[ ] any person liable" for the alleged violations. 15 U.S.C. § 78t(a). For the following reasons, Plaintiffs have pled these elements.

### A.    THE COMPLAINT PLEADS ACTIONABLE MISSTATEMENTS AND OMISSIONS.

Rule 10b-5 makes it unlawful to make (1) "any untrue statement of a material fact" or (2) "omit to state a material fact." 17 C.F.R. § 240.10b-5. To satisfy the pleading standard for falsity, "plaintiffs need only plead with particularity *sufficient* facts to support th[eir] beliefs…as to the misleading nature of the statement or omission." *Novak v. Kasaks*, 216 F.3d 300, 313-14 (2d Cir. 2000). An omission is actionable if disclosure was necessary "to make the statements made, in the light of the circumstances under which they were made, not misleading." *Id.* Rule 10b-5 imposes a duty to disclose omitted facts "when there is … a corporate statement that would otherwise be inaccurate, incomplete, or misleading." *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 214 n.15 (2d Cir. 2020) (alteration in original) (quoting *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015)). "Even when there is no existing independent duty to disclose information,

12

once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014).

### 1.    Defendants' Statements Concerning the Clinical Development of TRANQUILITY II Are Actionable.

Defendants made numerous false and misleading statements throughout the Class Period regarding TRANQUILITY II. They spoke in unqualified, positive terms about the trial without referencing that the FDA had discovered serious infractions with the study, including enrollment of patients who should have been excluded from the study and deviations from the study protocols. Specifically, Defendants stated the following while omitting these negative facts:

- "*TRANQUILITY 2 is in advanced stages of enrollment, and it's progressing well*." ¶144;

- "*Phase 3 TRANQUILITY II Pivotal Trial*" was "*on Track in 1H 2023*" and listed the "*Progressed*" TRANQUILITY II trial as demonstrative of a "*Strong Foundation*." ¶146;

- "There is no current approved therapy. … Like antipsychotics, benzodiazepine, we have a completely novel mechanism … target[ing] the causal mechanism of agitation. *So we are very excited about TRANQUILITY II data*. That is expected again in first half of 2023." ¶147;

- "*One is Alzheimer's-related agitation, TRANQUILITY II* [and] *data readouts are on track.*" ¶149;

- "*[W]e believe the upcoming quarter may represent a watershed moment for the company . . . The TRANQUILITY II trial is fully enrolled and then – and the data cleaning and verification process has begun.*" ¶156;

- "*[D]aily work by many people to make sure our data is accurate, correct and precise.*" ¶160;

- "*These data readouts are on track and expected to enable significant potential market expansion*", ¶162;

- "*From what we've seen so far, we're confident that we'll be able to take this package*", ¶167;

- "*We are confident in the TRANQUILITY II design and plan*", ¶171;

13

- "*a lot of confidence in being able to demonstrate both efficiency and safety*", ¶175.

Defendants' positive statements regarding TRANQUILITY II were classic, actionable, "half-truths." They spoke in positive, unqualified terms about the progress, design, and data integrity of the trial. They did not disclose that, in fact, the FDA had investigated TRANQUILITY II and uncovered serious violations which undermined the integrity of the entire trial, including: (i) three patients were enrolled in the study who should have been included; (ii) two-third of the patients who were enrolled did not have proper documentation demonstrating that they met the inclusion criteria; (iii) there were deviations from the study protocol; and (iv) participant consent forms were unsigned. ¶¶8, 115-22. They also did not disclose that, through BioXcel's own investigation, it was discovered that Dr. Meyer fabricated an email to BioXcel's independent safety monitor to (falsely) demonstrate that she had timely reported serious adverse events. ¶¶94, 124.

In light of these omissions, Defendants' statements are misleading and actionable. They are statements that "state the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter." *See Universal Health Services, Inc. v. U.S.*, 579 U.S. 176, 188-89 (2016) (describing what constitutes an actionable misrepresentation in the common law); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239-40 (2d Cir. 2016) (securities fraud action relying on *Universal Health* for definition of misleading omission). "The rule against half-truths, or statements that are misleading by omission, comports with the common-law tort of fraudulent misrepresentation, according to which 'a statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue.'" *Id.* at 240 (citing Restatement (Second) of Torts, § 529 cmt. a (1977)).

14

### a.    Defendants' "Literal Truth" Arguments Are Premised on an Overly Narrow View of the Misleading Statements.

Defendants do not dispute the protocol violations observed in the Form 483, nor do they deny knowledge of the FDA's inspection when it began on December 5, 2022 and the resulting Form 483. Instead, they argue that their Class Period statements were literally true. Mot. at 16-23.[2] This interpretation, however, ignores that, "[t]he veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010); *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) ("The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context."). Courts have held literally true statements to be actionable under nearly identical circumstances. *See Cohen v. Kitov Pharms. Holdings, Ltd.*, 2018 WL 1406619, at *5 (S.D.N.Y. Mar. 20, 2018) (literally true statements about results of a Phase 3 clinical trial were actionable because they omitted to disclose that study included falsified data submitted to the company's independent data monitoring committee); *In re Delcath Sys., Inc. Secs. Litig.*, 36 F. Supp. 3d 320, 331-32 (S.D.N.Y. 2014) (same because defendants' failure to disclose certain data, "combined with" misleading statements, gave a false impression of the drug's safety).

Faced with the body of law recognizing that half-truths are actionable, Defendants urge the Court to adopt a narrow view of their misleading statements. If accepted, however, such statements would only be misleading if they were the mirror image of the omitted information. But if that is required, the statement would simply be false, and not misleading. For example, Defendants assert

---

[2] Citations to "Mot. at __" refer to Defendants' Motion to Dismiss (Dkt. No. 106).

the statement that, a data verification process was being conducted to "make sure our data is accurate, correct and precise," is not actionable because it was not "prospectively asserting that the data was accurate." Mot. at 17. Nevertheless, the statement is misleading. It was made after the Form 483 had been issued and failed to disclose that the FDA had already concluded the TRANQUILITY II data was not "accurate, correct and precise" because, among other reasons, there were questions about whether the proper patients were included in the study and whether the study protocols were being followed. To take another example, Defendants argue that statements regarding their confidence in the data were not actionable because their confidence was real and borne out by topline results that came later. Mot. at 19. But again, they fail to recognize "a statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue." *Vivendi*, 838 F.3d at 240. Thus, regardless of whether it was literally true that Defendants had "confidence" in the study, their statements were actionable half-truths. Defendants' arguments that their statements were "literally true" ring hollow in light of the material information they omitted.

### b.   Defendants Had a Duty to Disclose the Form 483 When They Learned About It in December 2022.

Defendants argue that because the Form 483 was an "interim" FDA finding, they did not have a duty to disclose it. Mot. at 25-28. That is incorrect. The issuance of a Form 483 is routinely determined to be material at the motion to dismiss phase. *See Odeh v. Immunomedics, Inc.*, 2020 WL 4381924, at *7 (D.N.J. July 31, 2020) ("a reasonable shareholder could consider the omitted information about ... the Form 483 to be important when making an investment decision"); *McGuire v. Dendreon Corp.*, 2008 WL 5130042, at *6 (W.D. Wash. Dec. 5, 2008) ("Although the observations in the Form 483 are not final agency determinations ... the disclosure of 'significant objectionable conditions' would significantly alter the total mix of information available to the

16

reasonable investor because it bears on potential delays in the approval of [BioXcel]'s [primary] near-commercial status product."); *Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1129 (C.D. Cal. 2005) (Form 483 material to statements about timing of FDA approval because issuance of Form 483 was a "fact[ ] bearing on possible delays in FDA approval").

*Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472 (S.D.N.Y. 2018) *aff'd in part, vacated in part, remanded sub nom. Abramson*, *v. Newlink Genetics Corp.*, 965 F.3d 165, 178-79 (2d Cir. 2020), is instructive because it involved nearly identical facts to those here. The court concluded that defendants' representations regarding patient enrollment in the Phase 3 trial were misleading because, as here, the trial included patients who did not meet the enrollment criteria under the study protocol. *Id.* at 483-84. The *Nguyen* court concluded that "[t]he inclusion of ineligible patients in the Phase 3 trial is something that is not 'so obviously unimportant to a reasonable investor' that it should be disregarded on a motion to dismiss." *Id.* at 485. The *Nguyen* court relied on similar allegations that defendants were pressured to expedite patient enrollment causing defendants to disregard certain enrollment guidelines and resulted in pervasive GCP violations at one of its Phase 3 clinical sites. *Compare id*. at 479, 483, *with* ¶¶30, 32, 35, 40-41, 85-86, 90-95, 100-22. The *Nguyen* court also squarely rejected the Defendants' argument that there was no duty to disclose enrollment of ineligible participants because there was no proof that this fact compromised the integrity of the trial, holding that "ineligible patient enrollment not only meant there was a tainted pool of participants but that NewLink's representations about achieving Phase 3's first milestone—in spite of the highly selective and stringent design of the study—were false." *Nguyen*, 297 F. Supp. 3d. at 485. *Christiansen v. Spectrum Pharmaceuticals, Inc.*, also supports this conclusion. There the court held defendants' statement describing patient enrollment as "very active" to be actionable because it "falsely implied that the [clinical trial] was sufficiently

17

underway" when, in fact, it had not yet enrolled any patients. 2024 WL 246020, at *9-*10 (S.D.N.Y. Jan. 23, 2024); *see also Okla. Police Pension Fund and Ret. Sys. v. Teligent, Inc.*, 2020 WL 3268531, at *13-*14 (S.D.N.Y. June 17, 2020) (finding that "to a 'reasonable investor,' there was a 'substantial likelihood that the disclosure of the omitted fact' – here, the existence of the September 2016 [Form] 483 Letter – 'would have been viewed ... as having significantly altered the 'total mix' of information made available.'") (internal quotations omitted). [3]

Defendants also continue to press for an overly narrow interpretation of the alleged misleading statements that is not supported by the law. They state that "[n]one of the challenged statements were inconsistent with the existence of a Form 483" because BioXcel did not explicitly state that it "hadn't received such a notice, nor did it promise full compliance with all clinical practice requirements at any point in time." Mot. at 26. But Defendants did not have to state explicitly that they did not receive a Form 483 in order for unqualified, positive statements about TRANQUILITY II to be misleading. Indeed, if Defendants had stated that they had not received a Form 483, that statement would be literally false, not misleading.

To support their argument that they did not have to disclose the Form 483 because it was not a final FDA determination, Defendants misstate the holding of *Schaeffer v. Nabriva*

---

[3] Defendants' cases on this point are distinguishable. *In re Mylan N.V. Sec. Litig*, 2023 WL 3539371, at * 14 (W.D. Pa. May 18, 2023) (Form 483 pertained to quality of manufacturing process, and alleged statements were about company's business strategy); *In re Sanofi*, 87 F. Supp. 3d 510, 541-42 (S.D.N.Y. 2015) (dismissing action because the allegedly omitted information (i.e., that the FDA preferred double-blind methodology) was already in the public domain, and thus investors understood that the single-blind method would yield results that were "less significant"); *In re MELA Scis. Inc. Sec. Litig.*, 2012 WL 4466604, at *13 (S.D.N.Y. Sept. 19, 2012) (claims dismissed because class period began prior to issuance of FDA letter, and subsequent disclosures by company explicitly referenced the FDA letter); *In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31, 42 & n.4 (1st Cir. 2014) (noting that the purported materiality of a single "Form 483" inspection report regarding one of Genzyme's several manufacturing facilities "need not be reached," clarifying that a Form 483 may very well be material depending on the facts of the case, but because, unlike here, an advisory panel gave a favorable recommendation at roughly the same time as the Form 483 was received, and because of Genzyme's extensive efforts to "keep the market informed...of relevant and important exchanges it had with the FDA," the First Circuit suggested that nondisclosure of the Form 483 on the date it was received did not violate securities laws under the facts of that case, and affirmed dismissal for lack of scienter).

18

*Therapeutics plc*, 2020 WL 7701463, at \*9 (S.D.N.Y. Apr. 28, 2020). *Shaeffer* did not stand for the proposition that a Form 483 was never material. In fact, it stated the opposite – "a Form 483 is likely ***not per se immaterial***," (emphasis added), and the *Shaeffer* court declined to dismiss the action on this basis alone. *Id.* ("Under the circumstances of this case, the Court cannot conclude that the Form 483 is" immaterial as a matter of law). The *Schaeffer* court went on to analyze whether statements were misleading in light of a Form 483 but determined they were inactionable puffery or forward-looking statements, which is not the case here. *Compare id.* at \*9-\*11, *with infra* at § IV.A.1.c. & § IV.A.3.

Defendants' argument that the Form 483 need not be disclosed because it was not a final agency determination boils down to a question of materiality, which is not appropriately determined at the motion to dismiss phase. *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706 (2d Cir. 2011) (materiality is inherently fact specific and rarely resolved on a motion to dismiss); *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 201 (E.D.N.Y. 2000) ("Because materiality is generally a question of fact, it is unlikely that a cause of action turning on materiality would be dismissed as a matter of law.").

### c.   Defendants' Statements Are Not Inactionable Puffery.

Defendants assert that their clinical development statements that "reflected their excitement" or "express[ed] confidence" in the trial results are inactionable puffery or vague statements of optimism. Mot. at 18, 20. These are context-specific, fact-based disputes that cannot be resolved in their favor on this motion. *See Vivendi*, 838 F.3d at 245 ("Puffery encompasses statements that are too general to cause a reasonable investor to rely upon them, and thus cannot have misled a reasonable investor.") (internal quotation omitted); *see also In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 384 (S.D.N.Y. 2012) ("[T]he mere fact that a statement uses

19

conclusory, indefinite, and unverifiable terms, rather than expressing a reason in dollars and cents, does not compel a conclusion that it is immaterial as a matter of law.").

Statements that TRANQUILITY II was "on track" are actionable. *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 228 (S.D.N.Y. 2022) (statements that a project was "on plan and on budget" were not puffery because they were made in the context of prior specific statements about what the schedule was). Here too, statements that the BXCL501 topline data would be provided in the first half of 2023 render statements that TRANQUILITY II was "on track" to be actionable, and not puffery. ¶5 (Defendants promised topline data in the second quarter of 2023); ¶194 (analyst questions regarding timing of TRANQUILITY II results).

Moreover, Defendants' puffery argument relies on a sweeping generalization seeking to insulate roughly six months of their public statements in SEC filings, at analyst conferences, and on earnings calls with analysts and investors, and should be rejected outright. Defendants improperly quote, in isolation, single word or two-word phrases from four larger alleged misstatements – the BofA Conference (¶144), J.P. Morgan Conference (¶146), the KOL event (¶149), and BioXcel's 1Q23 earnings call (¶162). *See Rosen v. Textron, Inc.*, 321 F. Supp. 2d 308, 320 (D. R.I. 2004) ("[W]hether a particular statement is mere puffery or an actionable misstatement must be determined by looking not only to the challenged language itself, but also the context in which the statement was made."); *see also Bergeron v. Ridgewood Sec. Corp.*, 610 F. Supp. 2d 113, 135 (D. Mass. 2009) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation."). Even assuming *arguendo*, these isolated snippets could be seen as puffery (they were not), the context in which they appeared made them especially material to investors and, consequently, actionable. *In re Bank*

20

*of Am. Corp. Sec., Derivatives & ERISA Litig.*, 757 F. Supp. 2d 260, 310 (S.D.N.Y. 2010) ("[T]here is a difference between enthusiastic statements amounting to general puffery and opinion-based statements that are anchored in misrepresentations of existing facts.") (internal quotations omitted); *see e.g.*, *Novak*, 216 F.3d at 315 (holding no puffery where "the defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true").

### d.    Defendants' Risk Disclosures Were Misleading.

The Complaint alleges that the following risk warning in the Company's FY 2022 Form 10-K was misleading: "We rely on third parties to conduct our preclinical and clinical trials. If these third parties do not successfully perform their contractual legal and regulatory duties or meet expected deadlines, we may not be able to obtain regulatory approval for or commercialize our product candidates, and our business could be substantially harmed." ¶151. It further states, "[i]f we or any of our CROs fail to comply with applicable GCPs, the clinical data generated in our clinical trials may be deemed unreliable and the FDA, the EMA or comparable foreign regulatory authorities may require us to perform additional clinical trials before approving our marketing applications." *Id.* Defendants claim that this is not misleading because the statement pertains to the Company's ability to obtain regulatory approval and not regulatory compliance. *See* Mot. at 21, 28. But the second half of the statement – which Defendants ignore – does speak directly to compliance with applicable GCPs. *See* ¶151.

Moreover, contrary to Defendants' assertion that the risks warned of had not materialized, Mot. at 21, they, in fact, had already come to fruition. When Defendants "warned" of ***possible*** third-party noncompliance with contractual duties and regulatory obligations, this had already occurred. ¶¶115-22. When Defendants "warned" that failures to comply with applicable GCPs ***may*** lead to data generated from its clinical trials being deemed unreliable, this had already

21

occurred. ¶¶116-22. And when Defendants "warned" of ***potential*** compromise to the quality or accuracy of the clinical data collected by third-parties due to their failure to adhere to the Company's clinical protocols or regulatory requirements, this had already occurred. ¶¶116-22, 124-25. As the *In re Mylan N.V. Sec. Litig.* court stated, "to warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." 2018 WL 1595985, at *10 (S.D.N.Y. Mar. 28, 2018).[4]

### 2.     Defendants' Statements Concerning BioXcel's Financial Condition and Access to Funding Under Strategic Financing Are Actionable.

The Complaint adequately alleges that Defendants' Class Period statements concerning BioXcel's financial condition and ability to access additional funding under its strategic financing agreement were materially misleading. BioXcel's cash would be inadequate (¶¶32, 44-45, 71, 87-89, 202-06) because the FDA had already observed several study protocol and regulatory noncompliance violations which threatened the integrity and accuracy of the data collected from TRANQUILITY II (¶¶115-22, 94, 122, 124, 180-88) and, in turn, jeopardized the Company's ability to meet its development milestones, obtain additional funding under its financing agreement, and secure expanded FDA approval for BXCL501 (¶¶72-86, 95, 189-91). Defendants

---

[4] Once again, *Shaeffer* does not help Defendants. Mot. at 28. There, the court concluded that "the Form 483's observations alone do not provide sufficient basis to draw th[e] inference" that commercialization of the product at issue was "no longer realistic," meaning that the challenged "risk that the FDA will delay or deny marketing approval" had not materialized. 2020 WL 7701463 at *10. Here, the challenged warning relates to BioXcel and its third-party clinical investigator's inability to comply with study protocols and regulatory requirements, which materially contradicted the FDA's findings such that the risk of unreliable and compromised clinical data had effectively materialized. ¶¶151-52. Consequently, regulatory compliance and/or reliable uncompromised clinical data was no longer possible. *See* ¶¶115-22. *Teligent* is also inapposite. There, the court concluded that the company's description of obligations to comply with "cGMPs" and submit to FDA inspections were "statements of fact". 2020 WL 3268531, at *12. Here, the challenged warning explicitly describes BioXcel's reliance on third parties to conduct its clinical trials and details the specific risks it faced in the event that the Company or any of these contracted third parties failed to comply with their contractual legal and regulatory duties. ¶151.

mentioned none of these risks (¶¶154, 158, 164, 169), and did not warn the market of the threat to the Company's liquidity (¶¶155, 159, 165, 170).

As with the TRANQUILITY II clinical development statements, Defendants assert that their statements concerning the financial health of the Company were literally true because BioXcel never restated its financial metrics. Mot. at 22. Defendants' argument is illogical. Plaintiffs did not allege that any of BioXcel's financial statements were false or misleading. Therefore, a restatement of those financial statements is irrelevant. Instead, Plaintiffs alleged that Defendants materially misrepresented BioXcel's liquidity and ability to obtain funding under its financing agreement, as discussed above. Defendants' argument mischaracterizes Plaintiffs' allegations and ignores the statements that were plead as actionable.

Defendants also assert that statements concerning the Company's ability to continue as a "going concern" are inactionable opinions. *See id*. Opinion statements are actionable if: (i) Defendants did not subjectively believe the opinion; (ii) the opinion contained one or more embedded factual statements that was false; or (iii) the statement failed to provide "critical context," meaning that the speaker implied he or she had a reasonable basis for the opinion but in fact did not. *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020) (citing *Omnicare, Inc. v. Laborers Dist. Council Indus. Pension Fund*, 575 U.S. 175, 188 (2015)). Here, even assuming these are opinion statements, they are actionable under subpart (i) of *Omnicare* because Defendants could not have subjectively believed in BioXcel's ability to extend its cash runway until 2025 because by March 9, 2023 (the date of the first challenged statement concerning BioXcel's financial health), Defendants were aware of the dismal revenue growth of IGAMLI following FDA approval and were aware of the material risks posed to BioXcel's ability to achieve its developmental milestones under its strategic financing agreement. ¶¶32, 63-64, 72, 85-86, 93,

23

95, 104-07, 115-22. Moreover, in May 2023, Defendants were aware of additional adverse information impacting the integrity and accuracy of data collected in TRANQUILITY II, which further threatened the Company's ability to achieve its developmental milestones under its strategic financing agreement. ¶¶94, 122, 124. Accordingly, they could not have reasonably believed that achieving full execution under the Company's strategic financing agreement was possible. Indeed, just weeks later, Defendants announced the Company's inability to satisfy the development milestones under its financing agreement with Oaktree and Qatar and confessed "substantial doubts" about BioXcel's ability to remain a "going concern." ¶¶134-37. Such a stark revelation so close in time to the alleged misleading statements suggests strongly that the statements were materially misleading when made. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 73 (2d Cir. 2001) ("[P]ost-class period data may be relevant to determining what a defendant knew or should have known during the class period.").

The statements are also actionable under subpart (iii) of *Omnicare* because they failed to provide the "critical context" of problems underlying TRANQUILITY II, which could have caused the Company to miss deadlines set by its financial backers. Either: (1) Defendants did not assess the material risks posed to the Company's ability to achieve its development milestones before making the purported opinion statements; or (2) they did assess the increased risks but intentionally omitted this information when making positive statements about the Company's ability to extend its cash runway into 2025. Either way, the opinion statements failed to provide "critical context" that implied Defendants had a reasonable basis for the opinion but did not. *Abramson*, 965 F.3d at 175. "This context, including the specificity of the representation and the authority with which [they] w[ere] made, could lead 'a reasonable person [to] think that a more detailed investigation lay behind the ... statement[s].'" *Abramson*, 965 F.3d at 177. Steinhart also "made his statement[s]

24

during [BioXcel's] scheduled presentation" to investors, ¶¶158, 164, so that "[i]nvestors in attendance reasonably would not have interpreted [Steinhart's] statement[s] as a 'baseless, off the cuff judgment;' instead, they would have credited his statement[s] as researched and intentional, part of a well-prepared professional presentation." *Abramson*, 965 F.3d at 177.

### 3. Defendants' Materially False and Misleading Statements Are Not Protected Under the PSLRA Safe Harbor.

Defendants argue all but three of their Class Period statements are protected by the PSLRA safe harbor for forward looking statements. Mot. at 23-25 (invoking safe harbor protection for every statement except those alleged in ¶¶151, 160, and part of the statement alleged in ¶146). Not so. Plaintiffs do not allege any statements as false and misleading because they misled investors about the timing or completion of the TRANQUILITY II trial. Instead, the Complaint alleges that Defendants concealed study protocol and regulatory noncompliance violations relating to patient enrollment, exclusion criteria, patient safety and timely reporting of SAEs, which had already occurred at that time, rendering their statements about the clinical development of TRANQUILITY II and the data collected false and misleading. *See, e.g.*, ¶¶145, 148, 150, 157, 163, 168, 172, 174, 176 (allegations explaining why Defendants statements were false and misleading); *see also Shanawaz v. Intellipharmaceutics Int'l Inc.*, 348 F. Supp. 3d 313, 324-25 (S.D.N.Y. 2018) ("At issue here are not Defendants' opinions about the NDA's prospects before the FDA, but [their] allegedly false descriptions of the contents of the NDA itself.").

Further, as a facial matter, these statements were presented in the present, or even past, tense. ¶144 (TRANQUILITY 2 *is in advanced stages of enrollment*, and *it's progressing well*."); ¶146 ("Phase 3 TRANQUILITY II Pivotal Trial" was "on Track in 1H 2023."); ¶ 147 ("We *are* very excited about TRANQUILTY II data."); ¶149 ("There *are* multiple opportunities to expand the market potential for this product . . . data readouts *are on track* and we *are excited to announce*

25

*that in the first half of 2023*); ¶162 ("These data readouts *are on track* and expected to enable significant market expansion . . . our TRANQUILITY II program *continues to advance, and we are on track to report top line data in June*."); ¶166 ("*That trial is completed . . . The data is locked and undergoing verification*."); ¶167 ("From what we *have seen so far,* we are confident that we'll be able to take this package."); ¶¶171, 175 (statements about current levels of confidence in the statements). Statements referring to existing conditions surrounding TRANQUILITY II or Defendants' existing confidence in the trial are not forward looking. *Vivendi*, 838 F.3d at 246 ("non-forward looking elements of" projections, alleged to be misleading as "present representations" of fact, are "not entitled to the safe harbor" protection); *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *8 (S.D.N.Y. May 24, 2018) ("'[I]t is well recognized that … when an allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply" to the non-forward-looking aspect).

Statements about whether the Company had enough cash to fund operations, as well as its ability to secure additional funding, are likewise not forward-looking. These statements related to the Company's then-current cash status and its then-current ability to continue operations. And in fact, the Company was not, even then, able to continue operations for twelve months, as stated, without third-party funding, which was not guaranteed. *See In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 211-13 (1st Cir. 2005) (reversing district court where statements concerning company's "access to sufficient sources of funds" were not entitled to safe-harbor protection). To the extent they are forward-looking, they are nevertheless actionable because Defendants knew they were false. *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 194 (S.D.N.Y. 2010) ("Because Defendants are alleged to have made knowingly false statements[,] they are not

26

protected by the PSLRA safe harbor provision."). Defendants knew about the Form 483 since December 2022, and knew that it would affect the Company's ability to satisfy its financing agreements, yet repeated statements that they were adequately funded. *See* § IV.B., *infra*.

None of Defendants' statements – whether they are deemed forward-looking or not – were accompanied by meaningful cautionary language. *See* Mot. at 24. First, Defendants have not proffered *any* evidence that four of the fifteen challenged statements were accompanied by any cautionary language, meaningful or otherwise. *See* Mot. at 24 & n.12 (arguing "cautionary language" accompanied challenged statements in ¶¶146-47, 149, 154, 156, 158, 162, 164, 169, 171, 173, without mention of challenged statements in ¶¶144, 166-67, 175); *see also In re Turquoise Hill Res. Ltd. Sec. Litig.,* 625 F. Supp. 3d at 227 (denying PSLRA safe harbor protection "[b]ecause [] Defendants have not proffered any evidence that meaningful cautionary language accompanied [forward-looking] statements").

Second, for cautionary language to protect false statements, it cannot be boilerplate, it "must be substantive and tailored to the specific" statements challenged. *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772 (2d Cir. 2010) (quoting *Inst. Investors Group v. Avaya, Inc.*, 564 F.3d 242, 256 (3d Cir. 2009); *In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*, 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011) ("To be 'meaningful,' a cautionary statement must discredit the alleged misrepresentations to such an extent that the 'risk of real deceptions drops to nil'" and even "warnings of specific risks...do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described") (collecting cases). Defendants here fall short. They point to *fifty* pages of risk disclosures that either accompanied the challenged

statements[5] or were incorporated therein by a boilerplate reference,[6] yet Defendants do not highlight any particular language they claim warned investors of risks at issue here. And while they generally reference that those fifty pages of warnings "expressly included the risk that BioXcel's business could be harmed if third parties running its clinical trials failed to adhere to applicable regulations," Mot. at 24-25, this purported "cautionary language" was not meaningful. In fact, Plaintiffs allege the same risk warning was in and of itself false and misleading (*see* ¶151) because, at the time the challenged statements were made, such risks which they purportedly warned "may," "might," or "could" occur, had already transpired (*see* ¶¶115-22, 124-25).

Third, the purported "cautionary language" was not adequately incorporated by reference in the conference calls containing the challenged statements in ¶¶147, 149, 173. *See* Ex. A at 4 (Mehta stating, "[b]efore I begin, I'd like to remind everyone that I will be making forward-looking statements"), Ex. B at 4 (moderator stating, "[s]o just a reminder that we may make during discussions [] forward-looking statements, and these are subject to risks and uncertainty, subject to change depending on market conditions, et cetera.")[7]; Dkt. No. 106-20 at 9 (boilerplate warning of forward-looking statements provided by unrelated third-party, Refinitiv); *see also Illinois State Bd. of Inv. v. Authentidate Holding Corp.*, 369 F. App'x 260, 264 (2d Cir. 2010) (finding conference calls were not accompanied by sufficient cautionary language, "[a]lthough Authentidate began the call with a boilerplate warning that forward-looking statements were 'subject to certain risks and uncertainties,' [] the warning did not put investors on notice of the

---

[5] *See* Mot. at 24 n.12 identifying Ex. 1 at 55-104 as the "cautionary language" accompanying the challenged statement in ¶154 and Ex. 15 at 51-101 for challenged statement in ¶169.

[6] *See* Mot. at 24 n.12 identifying Ex. 2 at 50-101 as the "same or similar cautionary language" incorporated by reference in the challenged statements in ¶¶146-47 (Ex. 13 at 2); ¶149 (Ex. 14 at 2); ¶¶156, 158 (Ex. 10 at 4); ¶¶162, 164 (Ex. 11 at 4); ¶171 (Ex. 16 at 4); and ¶173 (Ex. 17 at 9).

[7] Exhibits A and B are attached to the accompanying Declaration of Adam M. Apton.

particular risk at issue."); *cf. In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289, 319 (S.D.N.Y. 2020) (concluding conference calls "contained meaningful cautionary language about the nature of the forward-looking statements, both expressly made on the call and on the contemporaneously filed press releases, which were … directly referenced at the beginning of the [] calls").[8]

### B.    THE COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER.

Scienter is pled "where the complaint alleges facts showing either: 1) a motive and opportunity to commit the fraud; or 2) strong circumstantial evidence of conscious misbehavior or recklessness. Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Blanford*, 794 F.3d at 306; *see also Novak*, 216 F.3d at 311; *Teva Pharm. Indus.*, 432 F. Supp. 3d at 168. Scienter is pled "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. "While robust, this pleading standard does not involve applying the more probing test used at the summary judgment or judgment as a matter of law stage of litigation, as the court is 'unaided by discovery' at the motion to dismiss stage." *Blanford*, 794 F.3d at 306 (quoting *Tellabs*, 551 U.S. at 324 n.5).

---

[8] Defendants improperly identify "cautionary language" contained in the investor presentations purportedly shown to investors during the 41st J.P. Morgan Healthcare Conference and the KOL Event to protect their oral statements made during these calls. *See* Mot. at 24 n.12. But this "cautionary language" was not communicated orally to analysts or investors and, therefore, cannot support Defendants' safe harbor defense. *See* 15 U.S.C. §78u-5(c)(2)(B) (requiring speaker of statement to identify orally the "document . . . that contains the additional information" concerning factors that could "cause actual results to materially differ").

### 1.    Defendants Admit They Knew About the FDA's Inspection, Form 483, and Dr. Meyer's Fabricated Adverse Event Reporting.

The allegations supporting scienter here are clear cut: Defendants *admitted that they knew of the Form 483 when it was first issued, six months before they disclosed it to investors.* ¶13. Specifically, when news of the inspection and Form 483 broke, analysts asked Defendants why they did not disclose it sooner; in response, Defendant Risinger said: "The FDA did the audit back in December. *We were aware of it, and we've been monitoring that site even more closely*." ¶180; *see also* ¶¶182, 184 (alleging Dr. Meyer notified BioXcel about inspection and Form 483 upon FDA's arrival). The scienter inquiry with regard to the Form 483, and the flaws in TRANQUILITY II outlined therein, can begin and end with this admission.

If the admission were not enough (and it is), Plaintiffs have pleaded additional facts evidencing scienter: (1) the typical protocol following Form 483 issuance includes close monitoring by the target company (¶¶100-113, 183-188); (2) the Company's continued existence depended on the success of TRANQUILITY II (¶¶189-191); (3) analysts and investors were acutely tuned into the results of TRANQUILITY II, which Defendants knew (¶¶192-194); and (4) the Individual Defendants were "very involved" "on a "microscopic level" with the day to day operations of BioXcel (¶¶195-198). These facts are strong evidence of scienter. *See Christiansen*, 2024 WL 246020, at *16 (plaintiff alleged scienter where company executives met with the FDA to discuss concerns over trial design); *Rosi v. Aclaris Therapeutics, Inc.*, 2021 WL 1177505, at *22 (S.D.N.Y. Mar. 29, 2021) (scienter alleged where defendants attended meetings with FDA to discuss concerns about company's product); *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 36-37 (S.D.N.Y. 2019) (scienter alleged based on attendance at meetings discussing rising inventory levels); *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *14

30

(S.D.N.Y. Apr. 22, 2016) (knowledge of adverse information evident from executive's discussion of topic with analysts).

In light of their admission and these additional facts, Defendants cannot now plausibly argue that they did ***not*** know about the inspection or Form 483. Thus, they repeat their argument that the Form 483 violations were not "so serious and uncorrectable" as to warrant disclosure. Mot. at 32-33. This argument fails. To begin, it does not even address the scienter element of securities fraud; it pertains to materiality, which for the reasons explained above, cannot be resolved on a motion to dismiss. Moreover, it does not matter what Defendants believed about the importance of the Form 483. Materiality and the resulting duty to disclose is measured from the reasonable investor point of view.

Furthermore, Defendants' materiality argument does not withstand scrutiny. It ignores that BioXcel's continued existence depended on its ability to secure approval for an expanded patient indication for BXCL501. *See* ¶¶189-91. The outcome of TRANQUILITY II was central to this plan. The FDA's inspection and Form 483 foreclosed the Company from executing its plan by delaying the completion of TRANQUILITY II, undermining the credibility of the trial data, and, in turn, preventing BioXcel from meeting development milestones necessary to access funding under its financing agreement with Oaktree and Qatar. ¶190. Indeed, one cause of the issues in TRANQUILITY II was the Company's decision to engage an inexperienced investigator whom it believed would be able to deliver results faster, in order to satisfy its funders. ¶¶32, 85-86, 90-95. Thus, the Form 483 had an outsized material impact on BioXcel's clinical operations, liquidity, and overall business strategy. This is evident from both 1) the massive sell-off of BioXcel's stock that ensued after Defendants disclosed the Form 483 and Dr. Meyer's fabrication of adverse event

31

reporting (¶127); and 2) analyst scrutiny on the Form 483 and questioning over why the protocol violations were not disclosed when they occurred (¶¶128-33).

Defendants' argument that they honestly believed the regulatory and protocol violations jeopardizing the study, its results, and the Company's ability to ultimately obtain the expanded patient indication for BXCL501, was of such little importance that it did not warrant disclosure is not credible. They knew that analysts and investors placed paramount importance on TRANQUILITY II. ¶192. Throughout the Class Period, analysts repeatedly questioned Defendants about TRANQUILITY II's progress, timing for completion, and feedback from the FDA. ¶¶193-94. *See Avaya, Inc.*, 564 F.3d at 269-70 (CFO's responses to "repeated questions" from analysts was "powerful evidence of scienter"); *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653 (E.D. Pa. 2015) ("In the context of specific inquiries . . . defendants' omission of actual circumstances that were contrary to their answers presents 'an obvious risk of misleading investors.'"); *Delcath Sys.*, 36 F. Supp. 3d at 335-36 (holding plaintiffs adequately pleaded scienter where "[a]pproval of product . . . turned on the product's performance in clinical trials" and defendant's "public statements evinced a familiarity with the data in the trials").

### 2. Defendants' "Confidential Witness" Arguments Do Not Detract from Plaintiffs' Inference of Scienter.

Although Plaintiffs plead scienter merely by referencing Defendants' admission that they knew about the Form 483 in December 2022, Plaintiffs provide first-hand accounts from former employees of BioXcel to lend context and further support for scienter. The Court may consider these allegations. First, Plaintiffs allege that each former employee was in a position to know the information attributed to them, which is the only requirement at this stage of the proceedings. *See Novak*, 216 F.3d at 314 (". . . there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in

32

the position occupied by the source would possess the information alleged."). Plaintiffs identify the dates of employment and job titles for each confidential witness. *See* ¶¶29-56. These allegations, along with Plaintiffs' other "corroborative facts that reinforce the claims made by the confidential sources," are enough to warrant their consideration at the pleading stage. *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 767 n.23 (S.D.N.Y. 2012) (CW allegations considered where plaintiff provided job title and duration of employment).

Defendants argue that the Court should disregard the confidential witness allegations *in toto* simply because none of them spoke directly with Defendants Mehta, Steinhart, or Risinger and/or were unequipped to opine on the Form 483's severity. Mot. at 33-36. Defendants' argument fails to consider the totality of the information provided by the confidential witnesses and the conclusion that Defendants intentionally selected Segal Trials and Dr. Meyer to speed the progression of TRANQUILITY II. *See Novak*, 216 F.3d at 308 ("egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness"); *In re Dr. Reddy's Lab. Ltd. Sec. Litig.*, 2019 WL 1299673, at *16 (D.N.J. Mar. 21, 2019) (scienter where defendants failed to investigate warnings); *In re EZCorp, Inc. Sec. Litig.*, 181 F. Supp. 3d 197, 209 (S.D.N.Y. 2016) (scienter supported by "collective picture painted by the confidential witnesses: a culture of unscrupulous [] practices and lax oversight that was so widespread as to be 'a matter of course'"). Viewing the allegations holistically and in the light most favorable to Plaintiffs, they demonstrate that Defendants knew Segal Trials and Dr. Meyer were unqualified to conduct TRANQUILITY II but selected them anyway in an effort to secure quick (and favorable) results. *See*, *e.g.*, ¶¶29-42 (CW1, CW2, and CW3 describing internal response to BioXcel's retention of Segal Trials and Dr. Meyer).

The confidential witnesses also provided information concerning BioXcel's worsening cash burn and the Company's increasing need to secure the expanded patient indication for BXCL501. They confirm that BioXcel was hyper-focused on raising capital because of concerns about its ability to maintain access to funding under its financing agreement with Oaktree and Qatar. *See* ¶¶43-56 (CW4, CW5, CW6, and CW7 discussing Defendants' need for capital). Importantly, these allegations demonstrate that Defendants were motivated to complete TRAQNUILITY as quickly as possible and ignored red flags in the process. Contrary to Defendants' argument, Mot. at 30, these motive allegations exceed the ordinary "generic" corporate motive of simply wanting to raise "funding." *See McDermid v. Inovio Pharms., Inc.*, 520 F. Supp. 3d 652, 664 (E.D. Pa. 2021) (allegations concerning company's attempt to "raise capital through at-the-market stock offerings" supported scienter when "considered in the context of Plaintiffs' claims"); *Abu Dhabi Commer. Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 179-180 (S.D.N.Y. 2009) (scienter adequately pleaded where defendant corporations engaged in scheme in order to receive excessive fees).

### 3.    Defendants Do Not Offer a Plausible Nonculpable Inference.

Plaintiffs adequately pled scienter because "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Blanford*, 794 F.3d at 306 (citing *Tellabs*, 551 U.S. at 324). The allegations support an inference that Defendants, faced with dim commercial prospects and a growing cash crisis (¶¶72-73, 87-90), tapped an underqualified and ill-equipped research mill to lead a critical clinical trial to secure an expanded "patient indication" for the Company's lead drug candidate, BXCL501 (¶¶90-95). Internally, employees across all levels of seniority were concerned about Defendant Mehta's decision to engage Segal Trials and Dr. Meyer (¶¶29-42) and, as predicted, the trial spurred investigation by the FDA and ultimately resulted in a Form 483 (¶¶114-22). The

34

ramifications of the regulatory violations jeopardized BioXcel's ability to complete the trial on time and prevented it from accessing additional funding from its lenders to sustain normal operations. ¶¶77-86. When news of the Form 483 and additional protocol violations emerged (*i.e.*, Dr. Meyer's fabrication of serious adverse event reporting), analysts questioned why Defendants withheld the information for as long as they did, and BioXcel's stock price plummeted. ¶¶126-33. Concerns over the integrity of TRANQUILITY II data persisted until BioXcel revealed it had stopped the entire TRANQUILITY program pending further FDA clearance and was undergoing a strategic restructuring. ¶¶134-41.

In response, Defendants proffer a counter-narrative that defies logic. They claim that the observations were preliminary, and the Company "still believed that it could submit an sNDA, achieve FDA approval, and hit the milestones in its financing agreements." Mot. at 37. But concealing bad news in hopes of good news taking over constitutes a "reckless gamble" that actually *supports* a strong, cogent and compelling inference of scienter. "The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008); *see Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *11 (S.D.N.Y. June 16, 2020) ("executive has a stronger incentive to bet the farm in a reckless gamble because the alternative is certain failure. And [plaintiff] has alleged that Defendants had that incentive in this case. That allegation supports [plaintiff's] theory of scienter."). Accordingly, when reviewing all the facts collectively, the inference that Defendants knowingly or recklessly

made material misstatements is at least as, if not far more, compelling than any inference Defendants ask the Court to accept. *See Tellabs*, 551 U.S. at 322-24.

Further, Defendants' counter-narrative is supported by erroneous facts and loose claims. For example, Dr. Segal's North Miami site was not just "one of [BioXcel's] eleven trial sites" as Defendants claim, Mot. at 36, but instead the primary trial site that was responsible for over 40% of all TRANQUILITY II patients. ¶91. Further, Defendants' claim that they had no reason to suspect the Form 483 would "call[] into question the integrity of the data from the TRANQUILITY II trial," Mot. at 36, is belied by Defendants Mehta and Risinger longstanding experience in the biopharmaceutical industry and prior clinical operations roles. ¶¶26, 28. Defendants also misstate the record when claiming they "promptly disclosed" Dr. Meyer's "fabricated email" to investors after discovering it. Mot. at 37. In fact, Defendants discovered it in May 2023 and then sat on it for *at least* one month to disclose it alongside purported "positive" topline results on June 29, 2023. ¶¶124, 126.

Defendants also attempt to defeat scienter by asking the Court to consider purported facts that are not in the Complaint. Most egregiously, Defendants claim that their decision to halt TRANQUILITY was based on "unexpected developments" having nothing to do with the conclusions of the FDA's inspection and BioXcel's investigation of TRANQUILITY II, Mot. at 37; there is *nothing* in the record to support that claim. To the contrary, the record contradicts this conclusion given that *inter alia* TRANQUILITY II violated inclusion/exclusion criteria and involved serious adverse events (that were not reported timely to the FDA). *See*, *e.g.*, ¶¶114-22, 124. They also claim, without any support, that Dr. Meyer responded to the Form 483, that her response addressed the Form 483's violations, and that the FDA did not take any further action. Mot. at 27, 36. Defendants also reference events that occurred after the Class Period that are not

36

referred to in the Complaint, such as the supposed third-party audit BioXcel completed before TRANQUILITY was paused indefinitely. Mot. at 37. These facts are not in the Complaint or in any documents cited therein and cannot be considered. *See Alberici v. Recro Pharma, Inc.*, 2021 WL 798299, at \*8 (E.D. Pa. Mar. 1, 2021) ("The FDA's actions in 2020 do not obviate Plaintiff's allegations regarding 2017 or 2018, nor do they render any allegedly false statements from that time true."); *see also Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 703, 710 (9th Cir. 2016) (finding that defendants misled investors about the risks related to approval, despite post-class period events); *Tomaszewski v. Trevena, Inc.*, 482 F. Supp. 3d 317, 334 n.100 (E.D. Pa. 2020) (FDA approval after the class period "has no bearing on Plaintiffs' allegation that during the class period Defendants deceived investors"). Defendants' admission to knowing about the Form 483 since December 2022 cannot be overcome by the insertion of their preferred factual narrative or a claim that they did not believe the underlying problems were serious enough to warrant disclosure.

### 4. Defendants' Lucrative Insider Trading Further Supports an Inference of Scienter.

"The motive and opportunity element is generally met when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit." *Scholastic Corp.*, 252 F.3d at 74 (citing *Novak*, 216 F.3d at 307-08). Defendant Mehta's sales of BioXcel stock at "opportune moments throughout the Class Period at significant personal gain further evinces Defendant's intent to deceive or defraud." *Blanford*, 794 F.3d at 308 (2d Cir. 2015). Mehta sold just over $3.75 million of stock during the Class Period, including $1.1 million at the outset of the Class Period just as the FDA was completing its inspection of Dr. Meyer's trial site, $1.2 million after certifying BioXcel's year-end financial earning report, and another $1.4 million after learning that Dr. Meyer had fabricated correspondence with the FDA. ¶210. Similarly, Defendant Steinhart sold over $175,000. ¶218. These were the only shares Mehta and Steinhart

had ever sold and, in both instances, they sold the vast majority of the shares they had in their possession. *See* ¶¶211, 219 (Mehta's sales accounted for 91.8% of his available holdings and Steinhart's accounted for 93.1%). Defendants' insider sales qualify as "unusual" for the purposes of demonstrating scienter under the Second Circuit's *Scholastic* standard. *See* 52 F.3d at 74-76 (plaintiffs adequately alleged "motive and opportunity" where defendant who was "in a position both to access confidential information and to control the extent to which it was released to the public" sold 80% of holdings after "having sold no Scholastic stock" in recent years).

Defendants argue that these sales occurred while a "10b5-1 trading plan" was in effect. Mot. at 30-31. But a "10b5-1 trading plan" does not immunize insider sales from supporting an inference of scienter, especially when the plans and sales are suspicious in light of their surrounding circumstances. Specifically, the insiders entered into their "10b5-1 trading plans" in June and August 2022, ***after*** BioXcel announced TRANQUILITY, which resulted in significant increases in the price of the stock. ¶¶3, 65-67, 220. This chronology rebuts Defendants' "trading plan" defense. *See Blanford*, 794 F.3d at 309 ("When executives enter into a trading plan during the Class Period and the Complaint sufficiently alleges that the purpose of the plan was to take advantage of an inflated stock price, the plan provides no defense to scienter allegations."); *George v. China Auto Sys., Inc.*, 2012 WL 3205062, at *9 (S.D.N.Y. Aug. 8, 2012) (rejecting "trading plan" defense); *Freudenberg*, 712 F. Supp. 2d at 200-01 (same); *see also Scholastic Corp.*, 252 F.3d at 75 ("Although defendants contest this information, whether plaintiffs can prove their [insider trading] allegations is not to be resolved on a Rule 12(b)(6) motion.").

## C.    THE COMPLAINT PLEADS LOSS CAUSATION.

Defendants do not challenge the June 29, 2023 disclosure regarding the Form 483 Letter and resulting investigation. Mot. at 38. Defendants only argue that Plaintiffs should not be allowed to recover damages they sustained in connection with the August 14, 2023 corrective disclosure,

Mot. at 38-40, in which BioXcel revealed it had halted TRANQUILITY entirely, had substantial doubts about its ability to continue as a "going concern," and was unable to meet milestones under its financing agreement. ¶¶134-40. Loss causation is "evaluated under the notice pleading standard in Federal Rule of Civil Procedure Rule 8." *See In re Fairway Group Holding Corp. Secs. Litig.*, 2015 WL 249508, at *16 (S.D.N.Y. Jan. 20, 2015); *accord Gormley v. Magicjack Vocaltec Ltd.*, 220 F. Supp. 3d 510, 517 (S.D.N.Y. 2016). Thus, pleading loss causation is "not a heavy [burden]," and the complaint "must simply give Defendants 'some indication' of the actual loss suffered and of a plausible causal link between the loss and the alleged misrepresentations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015). Loss causation can be pleaded through either a "corrective disclosure" theory or a "materialization of the risk" theory. *Vivendi*, 838 F.3d at 260-62. The latter refers to scenarios where investors sustain losses following "events constructively disclosing the fraud." *Id.* at 261-62.

Plaintiffs' allegations meet this standard. First, Plaintiffs challenged statements concerning the Company's financial health and its ability to continue as a "going concern." *See* ¶¶154, 169 (expecting that "cash and cash equivalents" will be "sufficient to fund ongoing research and development efforts and commercialization efforts" well into 2024); ¶158 (referencing cash runway into 2025). The Company's August 14, 2023 disclosure of concerns about its ability to continue to fund its operations are classic, mirror-image corrections of these statements. ¶135.

Second, the Company's determination in August 2023 that it might not be able to continue as a "going concern" is the materialization of the risks associated with the flaws in TRANQUILITY II. Defendants concealed BioXcel's growing liquidity crisis as a result of not being able to meet development milestones under their financing agreement with Oaktree and Qatar. *See* ¶143. Even after the June 29, 2023 disclosure, Defendants said nothing of the delay that

would be caused by the Form 483 and, in turn, the likelihood that BioXcel would be unable to continue as a "going concern" for the next 12 months. *See* ¶¶124-33. The liquidity risk created by the Form 483 materialized almost immediately thereafter, resulting in BioXcel's disclosure on August 14, 2023 and the consequent decline in the Company's stock price. *See* ¶¶134-41; *see also Rosi*, 2021 WL 1177505, at *25-*26 (denying motion to dismiss where plaintiff alleged "materialization of the risk" based on false statements that concealed risk of discontinuation of drug); *Teva Pharm. Indus.*, 432 F. Supp. 3d at 173-74 (plaintiffs pleaded loss causation where risks relating to price-fixing and price-hike strategies materialized over several corrective events).

### D. THE COMPLAINT PLEADS DEFENDANTS ARE LIABLE AS "CONTROL PERSONS" UNDER SECTION 20(a) OF THE EXCHANGE ACT.

Plaintiffs have alleged Section 10(b) and Rule 10b-5 violations against BioXcel. Thus, Defendants' argument for dismissal of Plaintiffs' "control persons" claims should be denied. *See Altimeo Asset Mgmt.*, 19 F.4th at 152 (vacating dismissal of Section 20(a) claim because plaintiffs adequately alleged a material misstatement or omission); *see also Lozada v. TaskUs, Inc.*, 2024 WL 68571, at *28 (S.D.N.Y. Jan. 5, 2024) (denying dismissal of plaintiffs' Section 20(a) claims because plaintiffs sufficiently pled Section 10(b) claims as to a primary violator).

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion in its entirety.[9]

//

//

//

---

[9] In the alternative, Plaintiffs' respectfully request that any dismissal of the Complaint be done so with leave to amend to address any deficiencies in the current allegations. *Loreley*, 797 F.3d at 190-91 (instructing the district court to grant plaintiffs leave to amend to cure remaining defects identified as its dismissal without leave to amend "not only violated the liberal spirit of Rule 15, [] it also skirted the key issue of futility") (internal citation omitted).

40

Dated: March 5, 2024

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

/s/  Adam M. Apton
Adam M. Apton (*pro hac vice*)
Devyn R. Glass (*pro hac vice* forthcoming)
33 Whitehall Street, 17th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com
Email: dglass@zlk.com

*Counsel for Tonya Hills and Co-Lead
Counsel for the Class*

**GRANT & EISENHOFER P.A.**
Daniel L. Berger (*pro hac vice*)
Caitlin M. Moyna (*pro hac vice*)
Alexandra E. Forgione (*pro hac vice* forthcoming)
485 Lexington Avenue
New York, NY 10017
Tel.: (646) 722-8500
Fax: (646) 722-8501
Email: dberger@gelaw.com
Email: cmoyna@gelaw.com
Email: aforgione@gelaw.com

*Counsel for Oklahoma Law Enforcement
Retirement System and Co-Lead Counsel for the
Class*

41