UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

_____

Tonya Hills and Oklahoma Law      NO. 3:23-CV-915-SVN
Enforcement Retirement System,
Individually and on Behalf of
All Others Similarly Situated,


                Plaintiff(s),   MOTION HEARING

v.

BioXcel Therapeutics, Inc.,      HARTFORD, CONNECTICUT
Vimal Mehta, Richard
Steinhart, and Robert Risinger,

                Defendant(s).   June 24, 2024

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE SARALA NAGALA
UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

For the Plaintiff(s):  Alexandra E. Forgione
                       Caitlin Moyna
                       Grant & Eisenhofer PA
                       485 Lexington Ave., 29th Floor
                       New York, NY 10017

                       Adam M. Apton
                       Levi & Korsinsky, LLP
                       33 Whitehall Street, 17th Floor
                       New York, NY 10004

For the Defendant(s):  Colleen Smith
                       Latham & Watkins, LLP
                       12670 High Bluff Drive
                       San Diego, CA 92130

Sarah A. Tomkowiak
Richard Frohlichstein
Latham & Watkins, LLP
555 11th Street NW, Ste. 1000
Washington, DC 2004

Reported by:            Denae Hovland, RPR, RMR, CRR
                        Federal Court Reporter
                        701.840.9786
                        denae_hovland@ctd.uscourts.gov

THE COURT:  Good afternoon.  We're here in Case No. 23-CV-915, which is still captioned Martin vs. BioXcel and other defendants, although I recognize that the lead plaintiffs have been substituted for Ms. Martin.  Let me begin with an appearance of counsel for the plaintiffs, please.

MS. FORGIONE:  Good afternoon, Your Honor, Alexandra Forgione on behalf of the plaintiffs.

MS. MOYNA:  Good afternoon, Your Honor, Caitlin Moyna from Grant & Eisenhofer on behalf of the plaintiffs.

MR. APTON:  And good afternoon, Your Honor, Adam Apton from Levi & Korsinsky for lead plaintiffs.

THE COURT:  All right.  Good afternoon to all of you.

Just as a housekeeping matter, Attorney Forgione, although you were admitted pro hac vice, we don't have a notice of appearance on the docket for you, so if you could file one after the hearing, I'd appreciate it.

MS. FORGIONE:  I will.

THE COURT:  All right.  And an appearance of counsel for defendants, please.

MS. SMITH:  Good afternoon, Your Honor, Colleen Smith of Latham & Watkins on behalf of the defendants.

MS. TOMKOWIAK:  Sarah Tomkowiak, also with

Latham & Watkins on behalf of the defendants.

MR. FROHLICHSTEIN:  Richard Frohlichstein of Latham & Watkins on behalf of the defendants.

THE COURT:  Good afternoon to all of you.  Just give me one moment to get my computer up and running.

All right.  So we're here for an argument on defendants' motion to dismiss the Amended Complaint.  So Attorney Smith, or whoever on defendants' behalf would like to argue, you're welcome to go ahead.  I understand you have a PowerPoint presentation.  I was given a copy of it and we'll mark it as Defendants' Exhibit 1 for purposes of this hearing.

MS. SMITH:  Great.  Thank you, Your Honor.  And I think plaintiffs might want to be heard on the slides as well.

THE COURT:  Okay.

MS. MOYNA:  Yes, thank you, Ms. Smith.  We just wanted to note for the record and actually object to use of this PowerPoint presentation.  We only received it at about 1:40 today, so we have not had a chance to really review it.  In the few minutes we've had, we note that, for example, it quotes snippets of our alleged false statements taken out of context outside of the full statement.  It misstates the standard for inclusion or consideration of confidential witness allegations, and we

think it's highly unfair and prejudicial to be given this so soon before the hearing, not really having a chance to comment on it, and so we would request that it not be considered if Your Honor deems that appropriate.

THE COURT:  Okay.  I'll take that objection under consideration.  Obviously I haven't seen it yet so I don't know what's in it, but as we go along and in your argument if there are particular things that plaintiffs want to point my attention to as objectionable, that would be helpful, but I'll just take the argument under consideration at the moment and I'll use it as we go along and will let you know if I find things that are objectionable in it.

MS. SMITH:  Great.  Thank you, Your Honor.  I appreciate that.

Again, my name is Colleen Smith, counsel for defendants, BioXcel Therapeutics, Vimal Mehta, Richard Steinhart, and Rob Risinger.

First let me start by saying we thank you very much, Your Honor, for allowing us to have argument.  This is an important matter and we appreciate the time and attention that the court is putting into it.

I'd like to introduce my clients who are actually in the courtroom here today.  From left to right, Dr. Vimal Mehta, the General Counsel of the company,

Javier Rodriguez, and Mr. Richard Steinhart, so thank you, Your Honor.

All right. Because I don't like to take chances with electronic equipment, I am just going to use the slides and hard copy if that's okay with Your Honor.

THE COURT: Sure.

MS. SMITH: Okay, great.

So I thought it would be important to start with level-setting on a few key facts now. Obviously I think we're going to focus here today on the law. This is actually a case in which the law is a pretty significant part of the motion to dismiss analysis I think, which is not the case for all securities cases, but I do think there are a few key facts that are worth kind of walking through at the beginning.

So again, BioXcel Therapeutics is a local biotechnology company that seeks to -- that has an approved drug for the treatment of agitation in patients with schizophrenia and bipolar disorder, and it seeks to extend the use of its drug into other patient populations to level-set. You've already met some of the defendants who are here in the room.

Now, on slide three I think it's important to remember the TRANQUILITY II study, which is the subject of much of the Complaint and much of the motion to dismiss,

is one of three clinical studies that the company had ongoing at the time.

There is also TRANQUILITY III, which will become relevant when we talk about the August 14 disclosures, but this is just one of the three studies that was going on. I think the key slide and the key thing to level-set on in terms of the facts are the timeline.

So on slide four, I believe it is, is a timeline, and I just wanted to go through that before we get into the law, because I do think these dates and how facts unfolded is particularly important here.

So again, in most of the month of December, the FDA conducted an inspection of Dr. Meyer's trial site. The FDA did not issue its Form 483 to Dr. Meyer until December 21, 2022.  That is important because there is one challenged statement that predates the Form 483, so I just wanted to flag that for Your Honor.

Then what happens next, Dr. Meyer actually responds to the observations that are in the Form 483, and between December 21, 2022 and the end of the class period, the FDA takes no further action on the Form 483.  There is no warning letter.  There is no follow-up letter of any sort from the FDA.

And I'll just note for Your Honor where the record reflects that Dr. Meyer responded, that's in the

Form 8-K filed on June 29, 2023, which is cited in the Complaint at paragraph 124, so that is in the record.

Then the company gets to the point of beginning to review its data for the TRANQUILITY II study that it is about to read out, and in the course of reviewing the data, it's checking the data, making sure it has all of the right paperwork and so forth.  At that point in time the company uncovers a potential discrepancy, and the discrepancy is they have an e-mail -- or there is supposedly an e-mail that provides notice to the FDA of a severe adverse event, but the company and the company's research organization does not have a copy of that e-mail. So Dr. Meyer has a copy, but the company doesn't, and the CRO doesn't.

Then they start to investigate.  Why do we not have a copy of this e-mail?  The company conducts its own internal investigation that's reflected in -- again, this is all in the 8-K.

They hire outside counsel to help them with the investigation.  The company ultimately interviews Dr. Meyer, who admits that she falsified a document to the FDA.  The company promptly discloses that to the market. So this is -- this is the arc.

A couple of other key facts to know.  The patient whose records -- whose serious adverse event

report prompted the June 8-K, the falsified reporting document, that is not a patient who was identified in the Form 483.  Those are two different --

THE COURT:  I think you're going quite far afield of the Amended Complaint here.  I'd like you to stick to what is in the Complaint because that's what I need to address.

MS. SMITH:  Sure, happy to, Your Honor.  And just on that last point, the fact that the patients are -- that this patient who prompted the falsified record is different, that is in the record.  That's in paragraph 124 of the Amended Complaint.  It's in the June 29th, 2023 8-K, and it's also in Exhibit 3 at page nine, so just to provide Your Honor with that context.  But I will move along.

So there are three core reasons why the court should dismiss the complaint:  Falsity, scienter and loss causation.

I'll start with falsity.  There are, I think, really three buckets, I guess, of arguments on falsity: Forward-looking statements, puffery, and misstatements are simply not false.  There is one group of statements that are opinion statements.  I'll talk about those as well.

If you look on the slides, the first slide in the falsity section -- I'll give you the slide number.  I

apologize. Mine do not have slide numbers. Slides eight to ten highlight the statements that are forward looking.

On slide eight you'll see several of the statements reflect that the trial was on track and expected to read out in the first half of 2023, as well as expected to enable significant potential market expansion. Statements that a project is on track or on schedule are quintessential forward-looking statements. That's black letter law and those cases are cited in our brief.

Then on the next slide we have several statements listed here, statements one, four, seven, eight, nine and twelve, all of which relate to expectations for the future and use the word "we expect," the phrase "we expect," again quintessential forward-looking statements under the law.

And then the last category on slide ten, statements 15, 16 and 17 that relate to expectations for the future, and again quintessential forward-looking statements under the law.

I think plaintiffs -- on slide 11, plaintiffs' primary argument on the forward-looking statements as I understand it is that the statements are not accompanied by meaningful cautionary language. We think that's wrong for all of the reasons reflected in our brief.

Significant risk factors disclosed both in the

2023 10-K and in the 2022 third quarter 10-Q before the class period, and the K is obviously March of 2023, it's the same risk factors.

If you look at slide 12 -- I think it's slide 12. Sorry. Slide 11, we've got a number of risk factors here, including specific risk factors as to -- thank you -- as to how long the company expected to have a cash runway. The company was quite clear, our projections about how much cash we're going to have are based on assumptions that could turn out to be incorrect. We could use more cash and capital than we are currently expecting. Those are exactly on point for these forward-looking statements about the cash runway.

And then with respect to the forward-looking statements about the clinical trial, the cautionary language is very specific. If our contractors do not comply with their regulatory duties or meet expected deadlines, we may not be able to obtain regulatory approval or to commercialize our product candidates, and they also warn we may not be able to use some or all of the data. So it's hard to imagine a risk factor that's more on point than the risk factors that the company had here.

THE COURT: Well, so I think that your weakest argument is related to these disclosures regarding the

third party who conducted the trial, and plaintiffs are arguing obviously that by including this risk disclosure when the risk had already materialized because of Dr. Meyer's failings, that this was misleading.  Why isn't that a strong argument?

MS. SMITH:  So it's a great question.  I actually think this is the most interesting issue in the case.  It ties back to -- I am going it wind up a little bit and then I will answer directly Your Honor's question.

There is a circuit split on this issue as to when risk factor statements are false or misleading or not, and as noted in the supplemental authority that we submitted I think this morning or last night, the Supreme Court is taking that up.

THE COURT:  Well, they are taking it up as to whether they -- as to whether the business would be harmed, whether it has to be disclosed if there would be no resulting harm to the business.  This disclosure specifically says "and our business could be substantially harmed," so I don't know that we're even in the *Facebook* category, are we?

MS. SMITH:  So I actually agree with that.  I don't think we're quite in the *Facebook* category because the risks that are being warned of in these risk factors had not materialized.  So if you think about risk factors

--

THE COURT:  Why is that?  I mean it says, "If the third parties do not successfully perform their contractual legal and regulatory duties," and by this point that this statement was made, we know that Dr. Meyer had failed to timely report a serious adverse event.  And we also know that the company knew about the Form 483, which result -- which notified them of, among other things, that three people might have been inappropriately included in the study.  So those are regulatory duties, I assume, to comply with the study protocols, and you're disclosing that they -- that if the company -- if the third party didn't comply with them, then they might not meet their deadlines.  I mean I --

MS. SMITH:  It is a question that the courts have addressed.  It's a great question.  It's a question that the courts have addressed specifically.  I actually think the three court cases in this -- for the court's consideration are -- actually, one of them is probably *ImmunityBio*.  But in this circuit, in the Southern District of New York, the *Nabriva* case and the *Teligent* case.  And if you look at -- I've got a slide on this.  Because I think the risk warning here is exactly like the risk warning in *Nabriva* and in *Teligent*.  It is -- Hold on a second.  Maybe my team will tell me what page it is.

They are exactly like the risk factors that the court dismissed in both of those cases, and it's a little bit nuanced because there are two risk factors in *Nabriva*, one of which was -- it's slide 27 -- one of which was dismissed and one of which was not dismissed.

So if you focus on slide 27, in *Nabriva*, almost exactly the same language, basically says if our third-party manufacturers fail to comply with applicable regulations, we could be sanctioned, including delay.

And in *Teligent*, if our manufacturers deviate from cGMPs or other applicable requirements, that may result in enforcement actions, warning letters, delay, et cetera. It's exactly the same risk factor that we have here, which is if our contract clinical trial providers do not comply with their regulatory obligations, these risks could unfold.

And in the Second Circuit the focus is on whether the risk has transpired, not -- if I could put it this way. It's on the "then" part of the statement, not the "if" part of the statement. The court is looking at has the risk that's being warned of materialized or not. And here, the risks that are being warned of had not, just like in *Nabriva*, just like in *Teligent*.

THE COURT: But *Nabriva*, which I've been referring to them as *Schaeffer*, so you have to sort of

make the connection there, if I'm remembering it right, the district court said that this statement was misleading because the risk had already materialized.

MS. SMITH:  Two different -- You're right, Your Honor.  There are two different risk warnings at issue in *Nabriva*.  So I'll use *Schaeffer*.  I often refer to the company name because the plaintiffs sometimes are the same.  There are A, B, C and D statements in *Schaeffer*.  Statement C is a risk warning and Statement D is a risk warning.  The Statement C risk warning is the one that's on this slide that's the most analogous to BioXcel.

Statement D risk warning is the one the court held was false or misleading, and that statement is quite a bit different because the risk it warns of is that we might get letters from the FDA.  And I've got that here.  The statement is "if these things happen," and I'm quoting, "that may yield warning or untitled letters," end quote, from the FDA.

So that statement, the risk, the very risk that was being warned of had materialized.  They had a letter from the FDA.

Whereas Statement C, which the court held was not false or misleading, related to other consequences, delays, FDA approval, et cetera.  The court said that is not false or misleading.  This other statement that

specifically referred to warning letters is.

THE COURT:  And so walk me through how that applies here.

MS. SMITH:  Yes.  So again, if you look at the BioXcel risk warning, what the company is warning about are two things, really.

One, we may not be able to obtain regulatory approval.  So if this happens, FDA approval may be jeopardized, and that has not materialized.  It's not alleged to have materialized in any class period.

And then, two, if this happens, the data generated in our clinical trials may be deemed unreliable and the FDA, the EMA, or comparable foreign regulatory authorities may require us to perform additional clinical trials.  Again, that is not alleged to have happened during the class period.  The company was not required to perform additional clinical trials, and that's the risk that's being warned of.

So the difference again is the very risk that's being warned of hasn't happened.  That's parallel to *Nabriva* Statement C.  It's exactly parallel to the *Teligent* statement.

The *Nabriva* -- I'm repeating myself, but I think it's important.  In the *Nabriva* Statement D, the risk that was being warned of had come to pass, which is they had

letters in their hand.

THE COURT:  So how does that square with the standard for being misleading, which is not that it has to be, you know, black on one side and white on the other, but rather that in the total mix of information that the investors received, it could be misleading to a reasonable investor?

MS. SMITH:  Right.  So the total mix standard is, as Your Honor knows, materiality, and materiality is a hard issue at the motion to dismiss stage.  It's not actually -- I think the plaintiffs argue in their briefs that we're arguing materiality.  Therefore, we lose.

We're not actually arguing materiality.  We're arguing falsity.  And to determine falsity, you have to go statement-by-statement, as Your Honor has clearly done.  For the risk factor statements, they are subject to a special standard, which is that the risk itself has to have materialized.

And I can give you -- I can give the court a cite from the Second Circuit on this.  It's one of the cases that was presented in the cert petition for *Facebook*.  This is not in our briefs, but that's because this is a somewhat new issue, so I apologize to my colleagues at counsel table.  The Second Circuit case is *Set Capital LLC v. Credit Suisse Group AG*, 996 F.3d 64,

Second Circuit 2021, and the standard for a risk factor statement as articulated by the Second Circuit is that the company has to know with virtual certainty that the risk warned of is going to materialize.  And as the court describes it, describing the difference between a risk factor and kind of the standard that we're talking about, here's a quote.  "There is a critical distinction between disclosing the risk a future event might occur and disclosing actual knowledge that the event will occur."  So that's the framing in the Second Circuit.

Now, in that case the Second Circuit held that that particular risk factor was false or misleading, and that was because the allegations were sufficient to establish that the defendants knew the risk that they were warning of was virtually certain to occur.  Here, we don't have those allegations because, again, the risks being warned of are the FDA are going to reject our data so we'll have to run another trial, or the FDA is not going to approve our drug, neither of which is alleged to have happened in this case.

THE COURT:  And tell me again why it's the "then" part of the statement as opposed to the "if" that renders this not misleading.

MS. SMITH:  Another excellent question.  So the reason is because -- is based on almost a policy analysis.

What risk factors are doing are providing investors with obviously risk, right, and so it's a specific part of the disclosure, the purpose of which is to tell people this bad stuff could happen and we want to make sure you know that.

I think the Sixth Circuit decision on this issue, also not in the briefs for the same reason, and again I apologize, explains why this is the case.  The rule is premised on the notion that risk factors are designed to warn about future risks, not about every single past or present fact that might impact the risk.  And the quote is "Risk disclosures warn an investor of what harms may come to their investment.  They are not meant to educate investors on what harms are currently affecting the company."

Now, the Sixth Circuit standard is the most defendant friendly.  I will concede that.  That's a -- like, risk factors are basically almost never false in the Sixth Circuit.

That's not the standard in the Second Circuit, but the reasoning applies, which is risk factors are performing a different function.  They are not telling you what has happened.  They are telling you what could happen in the future.  So that's the reason for the standard.

All right.  So just to go back maybe a little

bit.  Because the risk -- so we went off on a little bit of a tangent, but an important one.  I think Your Honor correctly noted that the plaintiffs' main argument as to why the cautionary language is insufficient is because it's false, so we've dealt with that issue.

Assuming -- so the forward-looking statements are, in fact, accompanied by meaningful cautionary language.  Even if the cautionary language is not meaningful, the plaintiffs have not alleged that each defendant made the statements with actual knowledge of their falsity, so that would be the other prong of the forward-looking statements test that applies even if the cautionary language is not sufficient.

And the actual knowledge standard is quite high.  It's higher than scienter.  It has to be specific facts showing the defendants actually knew their statements were false.

So we would submit all of the statements identified as forward-looking statements meet that test under either prong.

I will also note that a large number of the challenge statements are puffery statements.  I won't go through all of those again for the court, but that is an issue with a significant number of the challenged false statements, that they are immaterial and inactionable

puffery.

And then I just thought it would be useful to highlight -- again, we've talked about *Nabriva* or *Schaeffer* and *Teligent*, but I wanted to go back to what are the four -- I think the four core cases for the court's evaluation on this Form 483 issue, and that's *Genzyme*, the First Circuit case, *Schaeffer*, *ImmunityBio*, which the plaintiffs just submitted, *and Teligent*.

If we start with *Genzyme*, that's a First Circuit case that I know Your Honor is familiar with in which the court dismissed the motion, and that case is I would submit the most analogous case to this case. So in that case the company received one Form 483, which it did not disclose. It then went about its business. There is no allegation about what happened sort of in response to it. And a few months later the company then received a warning letter.

And as the First Circuit explains in *Genzyme*, which it disclosed, and as the First Circuit explained, that was exactly the right thing to do. It didn't have a duty to disclose the Form 483, but when the warning letter came on the heels of the Form 483 making the company clearer that there were going to be FDA consequences for those violations, it promptly disclosed. And the language in that case is very relevant here; right? When more

facts came to light that crystalized the situation, the company disclosed it and did the right thing.  That we think is the most analogous case to this one.  In --

THE COURT:  So one of the inferences that plaintiff wants the court to draw is that the timing of the topline -- that basically BioXcel hid the Form 483 until they had the topline data for TRANQUILITY II and decided to pair those two things together, the good news outweighing the bad news for lack of a better analogy.

From that premise, I mean, why shouldn't I be drawing that inference, that when they knew about this in December of 2022 and they are on various calls, they acknowledged knowing about it, the fact that they sort of waited until they had positive data to report could go to whether it was misleading and to scienter, really.

MS. SMITH:  Yes, great question.  So first of all, that is the inference the plaintiffs would like the court to draw, but there are no facts establishing that to be the case.  There is no allegation, no confidential witness, no specific fact alleged that anybody -- any defendant said the company was waiting to disclose its data.

THE COURT:  But I have to draw all reasonable inferences in the plaintiffs' favor at this point; right?

MS. SMITH:  Yes, based on the facts that they

allege, but actually -- and I was looking at this last night, as my colleagues know.  When there are no facts, the inference goes to defendants, and that's from the Supreme Court in *Tellabs*.  I'll give the court the cite.

THE COURT:  We can find that.

MS. SMITH:  And the court actually says silence goes to the defendant.  Here's the quote.  "Omissions and ambiguities count against inferring scienter" from *Tellabs* at the Supreme Court.  So they do have to do the work of pleading the facts.  The court can draw reasonable inferences from the facts pled, but it can't draw inference in favor of the plaintiffs based on no facts.  That inference gets drawn in favor of the defendants under *Tellabs*.

THE COURT:  For scienter.

MS. SMITH:  Yeah, exactly.  So just to answer the court's question, the absence of facts is important, but further, as I mentioned at the outset, it is in the record that Dr. Meyer responded to the Form 483.  And so a reasonable inference from that could be that the defendants believed the response was sufficient.  We don't know.  We don't have facts --

THE COURT:  That the FDA believed, you mean?

MS. SMITH:  Well, I actually meant the defendants because their state of mind is relevant, but

certainly perhaps the FDA, because we didn't hear anything further from the FDA.  There is no allegation of follow-up.

The other important fact is the company has said all along that it was on track to report its data for TRANQUILITY II in the middle of 2023, so that date was not changed.  That was always part of the plan and had nothing to do with the -- the timing of that readout had nothing to do with the Form 483.  It was already there.

I think that answers Your Honor's question.

THE COURT:  Yes.  I interrupted.  You were talking about *Genzyme*.

MS. SMITH:  I was, and I was going to move on from *Genzyme* to *Schaeffer* or *Nabriva* because I do think there are some statements.  So again, the standard -- it's very helpful I think that we have these many 483 cases, well reasoned, and the courts go statement-by-statement, and Your Honor will obviously do the same.  And I think if you look at the statements in these cases, they are more analogous to -- well, in *Nabriva*, in *Genzyme* to BioXcel statements.  Statements in *Teligent* and *ImmunityBio* are more analogous in a lot of respects to -- not to BioXcel statements, right, to different facts.  Let me just go through these.

So in *Nabriva*, statements that the court held

were not false:  "The data are solid."  "The NDA is based on a robust data package."  "The product is first in class."  "We think they will win FDA approval."  And as already discussed, one of the risk factor statements, all held not to be false or misleading.  And those are very analogous to our facts.

In *ImmunityBio*, in contrast, the company made statements about its compliance with good manufacturing practices, so specifically "We have established good manufacturing practices at scale."  "We have cGMP compliant facilities."  And a warning.  "Our ability to provide adequate supply of our product candidates could be delayed."  Those were the statements that were false or misleading.

The facts were three Form 483 notices over two years, not one of which was disclosed.  The first Form 483 had 16 observations.  Ours has three.  The company committed to a corrective action plan, which it did not satisfy, and the issues persisted for two years.  They were so significant that the CEO flew to the site, the manufacturing site.  Your Honor has clearly read the case; right?  Very unusual facts.  And these issues resulted in frequent supply delays that lasted months.  So its risk factor saying our ability to provide adequate supply means we could be delayed, that had already happened.  So those

are clearly not our facts.

And I like Judge Curiel's conclusion in that case, which I think is very helpful. He says, "This court holds only that a company suffering from severe and persistent manufacturing deficiencies must provide investors with some idea of the full picture if it chooses to boast of its manufacturing prowess." So it's a nice recap of actually what he's held, which is on a very unique I think troubling set of facts.

And then *Teligent* actually might be my favorite case. It's very well-reasoned. In fact, it's interesting. Judge Marrero of the Southern District decided both *Teligent* and *Schaeffer* within two months of each other, so he got a lot of Form 483 cases. But I will note in that case, *Teligent's* statements about its products being on track, its ability to meet its time lines, those were held not to be false or misleading.

A statement that it was subject to periodic inspection by the FDA also held not to be false or misleading by the judge.

The statements that were false or misleading were that it had not had a Form 483. So specifically the company said we have a track record of successful audits with, quote, "no 483 observations." And another statement that said "Over the last three audits over the past five

years, there have been no Form 483 observations."  Again, clearly directly in conflict with the fact that it had received a Form 483, so very analogous to our case.

Okay.  I think we've talked about the risk factors a little bit.

And I just want to touch -- before we move to scienter, I would like to touch briefly on the cash flow statements.  Those statements -- there are four challenge statements about the company's cash flows.  Two, we expect to have enough money for the next 12 months, and two that say we believe if we meet all of the milestones in our funding agreements, that we'll have money into 2025.

As to the cash flow statements, there are no alleged facts that when those statements were made, defendants actually knew that they were not going to have cash flows of 12 months at the time those statements were made.

And then the statements about the funding arrangements are belief statements, statements of opinion, and there are no alleged facts establishing that the defendants did not have a reasonable basis for their belief that if they hit all of the milestones in those agreements, they would have funding into 2025.  They weren't saying they were going to hit all of the milestones or making that promise.  They were just telling

investors, hey, if we hit everything, we think that will keep us running until 2025, and nothing in the Complaint alleges any facts that contradicted the accuracy of those statements when they were made.

THE COURT:  So one of the things I'm trying to disentangle in my own head is the 483 -- you know, what might have resulted from the 483 and these milestones and the financing arrangements.  I think plaintiffs' basic premise is more heavily weighted towards the 483 because they don't really allege what the milestones were, and they are trying to get that August 14, 2023 disclosure that had to do with the company not being a going concern, trying to shoe horn that in somehow.  But I just want to hear your perspective on how the pieces relate to one another, if at all, 483 and the financing and ability for the company to make money.

MS. SMITH:  It's a great question, Your Honor. I think the answer to that question is embedded in your question, which is they don't allege what the milestones are.  And so if the argument is the Form 483 observations were going to result in a delay to the readout of the trial or to the approval program, then -- and if those were milestones, then, you know, that's the connection they are trying to make, but the milestones themselves are not alleged of course in the Complaint, and the data are

read out on time, so any way you slice it, there is we think no connection.

I will acknowledge I think -- I mean in fairness to me, I have access to the company, so I understand the facts and the business. I think the plaintiffs muddle up TRANQUILITY II and TRANQUILITY III a little bit when they are talking about the consequences of the Form 483 on the company's cash flow.

So one of the allegations that plaintiffs make about the August 14th, 2023 disclosures is that the company disclosed it had to pause its TRANQUILITY program, and that's not actually accurate. What the disclosure says is we're pausing TRANQUILITY III, which is a different study, different focus for reasons that had nothing to do with the Form 483. This is disclosed, by the way. It's in the disclosure, the actual August 14, 2023 10-Q.

The reason the trial was stopped is because the patients in TRANQUILITY III were experiencing more frequent agitation episodes and the company, as disclosed, said we don't think this trial design is right for this patient population. We don't want to spend more money on this trial because the design is not meshing with the actual experience of the patients, so we're pausing it. That's what's disclosed, which has nothing to do with the

Form 483 observations on TRANQUILITY II.  But I think in the Complaint those get a little bit muddled, and that's one of the connections they are trying to make between the cash flow and the --

THE COURT:  Is it a connection, though, between the amount of money that the company was spending to get TRANQUILITY II up to wherever it needed to be and, you know, run TRANQUILITY III, and the cash outflow was much greater than the cash inflow because IGALMI was not as profitable as they had hoped?

MS. SMITH:  Yes, so plaintiffs make that allegation.  I would say biotech companies spend lots of money on clinical trials.  That's a fact.  They are very expensive, as I'm sure Your Honor knows, and so if -- to me, the allegation that the company was spending a lot of money on clinical trials, they were very expensive, they might have been more expensive than anticipated, that's all disclosed; right?  The company says these are super expensive.  This is what we think, but we could be wrong. All clearly disclosed in risk factors, so nobody was promising that the cash flow couldn't -- that it couldn't actually be a situation in which the company was spending more on clinical trials.

Plaintiffs also don't allege any particular facts establishing that at the time these statements were

made, the company believed it was going to be spending more money on clinical trials that would impact that cash flow.

THE COURT:  Okay.  Then let me ask you the flip side of that question, which is that plaintiffs allege that Segal Trials was engaged because it could do things faster, cheaper, you know, what have you.  And so perhaps that goes more to scienter again, I think, but tell me your observations about their requests that I draw the inference that because a shoddy third-party company was hired to conduct this trial, that is showing that defendants were rushing this and they really were trying to mislead investors at the end of the day.

MS. SMITH:  So great question, Your Honor.  I think that allegation comes from -- really only from a couple of the confidential witnesses.  There is no other source for those allegations.  And I'll just start by saying there are no facts alleged at any point that Segal Trials was a shoddy organization -- it was or is a shoddy organization.  Dr. Meyer, of course, made some mistakes, which was disclosed, but nobody ever said -- there is nothing in the record that Segal Trials has lost its ability to do clinical trials or, you know, some other penalty or consequence; right?  So I just want to make that clear.  It's Dr. Meyer who's employed by Segal

Trials, but nothing in the record establishing that those facts are true.

And then if you look at the basis for that particular theory, it's primarily confidential witness number two and confidential witness number three, and these are really the opinions of confidential witnesses.

So confidential witness two, who was not even at the company during the class period, said Segal Trials was not legit and was used for expediency. But that's just his or her opinion. There is no -- it doesn't say where that came from. It certainly offers no allegations that that view was shared by senior leadership with the company or anybody else. I venture to guess this is a hindsight observation. But that's one confidential witness' opinion, which is not a fact.

And then the same thing with CW3 who wasn't at the company during the class period and simply said there was a lot of skepticism about Dr. Meyer, but again doesn't say who had the -- when that happened or who had the skepticism or whether that was communicated to the senior leadership.

So I would say first and foremost that theory is based on a very thin set of alleged facts that don't connect to the defendants.

But in any event, that's really not the heart of

the case; right?  The case is about Dr. Meyer and what happened with her.  And sort of whether or not the company hired a clinical research organization that was less expensive than another one is not -- there are no allegations in this case that there are false statements about that issue.

All right.  So with that, and I'm going a little out of order on the slides, which is good.  That's what I hoped would happen as I answered Your Honor's questions.  I will jump quickly to scienter.  I think the plaintiffs start from the position that knowledge of the Form 483 is enough for scienter.  They say -- I think it's the first paragraph in the opposition brief.

It isn't.  Nobody is disputing that the defendants had knowledge of the Form 483.  That's not the fight.  And clearly the cases establish that knowledge of a Form 483 is not sufficient.  It's not sufficient for falsity unless you go out to the market and say we don't have a Form 483.  And they also clearly say it's not sufficient for scienter.  You have to look at the facts on a case-by-case basis.  So that's not enough.

So what do they need to allege?  What they need to allege is that the defendants knew or were conscientiously reckless about whether the statements they did make were true.  And this Complaint is pretty devoid

of scienter allegations making that connection.

One of my favorite slides, I'll just go through it, is showing the court what isn't alleged.  So slide 33 reflects a number of facts that are arguably alleged in the other Form 483 cases in various forms or fashions, but none of these are present here.  So there is no allegation that the Form 483 observations would derail the TRANQUILITY II trial readout, or that defendants believed the trial readout would be derailed and, in fact, the TRANQUILITY II trial readout happened, just as promised, on time.

There are no allegations that the Form 483 was going to impair FDA approval or that defendants believed that was the case, and again nothing -- that didn't actually happen.

No allegations that Dr. Meyer's response to the FDA was insufficient.  So we have her response.  Presumably defendants and others were aware of what was in the response.  Plaintiffs don't allege what was in it.  Now, again, my hands are tied behind my back.  I can't allege what was in it either, but that is a compelling fact.

No allegations of repeated violations of FDA regulations, no follow-up Form 483, no warning letter, no nothing from the FDA.

No allegations from any confidential witness that the paperwork, the observations in the form -- the specific observations in the Form 483 actually couldn't be remedied, that the paperwork was missing.  There are no facts in the record that establish that.

Now, obviously we have the Form 483, which speaks for itself, but beyond that, no indication that they couldn't be fixed or that the paperwork couldn't be found in the record.

And no allegations that the defendants were concerned that the Form 483 would lead to any of these negative consequences, so no connection to the defendants' state of mind.  The absence of those allegations I think is conclusive on the scienter inquiry.

And then in terms of motive, two motive allegations.  One is, you know, wanting corporate funding.  Numerous courts have rejected that flavor of scienter allegations.

And then the other are the trades.  One of the defendants didn't trade at all.  The two others traded pursuant to 10b5-1 plans that were put in place before the class period, so those trades were self-executed.

THE COURT:  So on those trading plans, though, a large percentage of those defendants' holdings were sold pursuant to the trading plans.  Is there an inference to

be drawn from the fact that I think in one case it was 91 percent of the current holdings were sold?  Is there an inference to be drawn from that, even though they were executed based on plans put in place before these events occurred, that they knew or at least had inklings that this might occur and they wanted to sell when the price was still high?

MS. SMITH:  So great question.  So when the plans were put in place, plaintiffs agree on this, it was mid 2022.

THE COURT:  Yep.

MS. SMITH:  So no one could possibly have known about the Form 484 observations or the Dr. Meyer falsification.  So that's point one.

Point two, we're sort of limited to the class period.  That allegation is based on trades that happened during the class period and doesn't take into account pre-class period trading, post-class period trading so, you know, we're sort of stuck with what is reflected in the class period, but based on the current record, so for what that's worth.

THE COURT:  So it's 91 percent of holdings during the class period, but may not have been 91 percent of the person's entire holdings?

MS. SMITH:  That's right, Your Honor.  And then

thirdly I guess I'd say even if the court believes that that's motive to commit securities fraud, which frankly given the trades and the amounts at stake I highly doubt, they still -- they can't get past the scienter hurdle just on insider trades; right?  They have to allege something else, and the other allegations that they have offered are threadbare.  There is no allegation that defendants knew the statements they were making were false.  So it matters not that they were selling if they thought that the statements they were making were complete and in good faith and not being made with reckless disregard for their truth.

THE COURT:  Okay.

MS. SMITH:  Finally on scienter, I just would point Your Honor again to the good faith inference.  So the court does have to weigh the competing inferences based on the holistic record.  Plaintiffs do win a tie, but the court can weigh all of the competing inferences as well.  And we've been talking about a lot of things from which the court can find good faith, not fraud.

I do think it's compelling how the company reacted to the situation with which it was presented, conducted a thorough investigation, hired outside counsel to help it conduct an investigation, promptly and thoroughly disclosed the issues of Dr. Meyer, hired

several third-party -- I am not going to get to past the class period. This is just in the class period. Hired several third-party auditors to audit the data, and that was for not just for this particular patient, but all of the patients at the Segal Trials Dr. Meyer site, spent a lot of money doing that.

By the way, the company discloses in its August 14, 2023 10-Q that part of the reason it was spending more cash than it had anticipated is because it had to spend all that money on lawyers and auditors and so forth, right, to make sure that it was doing the right thing with respect to the data and making sure it was accurate and complete. So to me that's a company trying to do the right thing, not a company that was engaged in hiding and sort of covering up traditional securities fraud. Those are compelling good faith inferences the court can weigh.

THE COURT: On that point let me ask you about your Exhibit 12, which is the September 30, 2023 10-Q. Plaintiffs don't really address your incorporation by reference argument. I have a question as to whether there was a material typographical error in the Complaint that caused that document to be referenced, which I'll ask plaintiffs about, but why should I be considering the effective counter-narrative that the third-party audit

showed there was actually no issue with the Segal Trials that's disclosed in that 10-Q?

MS. SMITH:  So great question.  So I think first the court can consider the counter-narrative that the company hired auditors without that document because that --

THE COURT:  Well, I think I can consider the -- So this is a distinction between what can be actually judicially noticed, and my understanding of the law is that it can be judicially noticed that the company said this or reported this in its 10-Q.  I can't, though, take it for its truth and know that the company actually did that and consider that as sort of substantive evidence of the company's reaction to these events.  Right?

MS. SMITH:  A hundred percent correct, Your Honor.  Of course, yes.  But to your point, I guess that's the question, incorporation by reference, you can take it for its truth.

THE COURT:  Yeah, that is the difference I think.

MS. SMITH:  Yeah, and it is a corrective disclosure that is a core part of the Complaint, that particular document, Exhibit 4, the August 14th.

THE COURT:  No, no, I'm talking about the Exhibit 12.

MS. SMITH:  The November 2023, yes.

THE COURT:  Yes.

MS. SMITH:  And actually with Your Honor's indulgence, Attorney Tomkowiak is prepared to address that issue.  We could do it now or we could do it --

THE COURT:  Oh, sure.  Let's finish up on loss causation and then I'll hear from her on the other issue.

MS. SMITH:  Great.  Thank you, Your Honor. Okay.  Turning to loss causation, obviously we hope you don't get to this, but just in case, we think the August 14, 2023 corrective disclosure is our out on loss causation.  There are really two principle reasons.

The first is there is a disconnect between the alleged false statements and the corrective disclosure in two respects.  One is the cash position statements.  Those are simply recitations as we have been saying about what the company then thought its cash runway looked like.

The disclosure in August is new stuff has happened.  This is now what our cash position looks like. But those are not inconsistent.  The disclosure of a new cash situation is not corrective of what the company's prior cash situation was.

THE COURT:  So if I were to -- if I find that the statements about cash position and runway until 2025 are not misleading, I stop there; right?  I don't get into

loss causation on this issue?

MS. SMITH:  Correct, Your Honor.  Yes, we agree. And then the second disclosure on August 14th is the disclosure, as I mentioned previously, about pausing the TRANQUILITY program.  And again that one, it's clear on the face of the documents what is disclosed is a pause of TRANQUILITY III, completely different trial, not related at all to TRANQUILITY II or any of the Form 483 issues, Dr. Meyer issues.  They are just completely separate, so it can't be corrective.

And then finally we would say on the cash flow statements, to the extent the company did not meet its cash expectations, those are also the materialization of a known risk because the company did disclose that it might not meet those projections, that it was making an estimate -- best estimate we could at the time, but we're not promising you that this is going to come true.  Things could change.  So it's a risk that materialized that was known and disclosed to the market.

THE COURT:  Okay.

MS. SMITH:  And unless Your Honor has any other burning questions, I'm happy to cede the mike.

THE COURT:  Okay.  I think that's it except for a couple questions on the motion to strike.

MS. SMITH:  Okay, great.  Thank you, Your Honor.

I appreciate it.

THE COURT:  Sure.  I'll give you an opportunity for reply as well.

MS. SMITH:  Thank you.

MS. TOMKOWIAK:  Would Your Honor like me to address those questions now?

THE COURT:  Sure, we'll hear from you now, and then plaintiffs can respond to everything.  And tell me how you pronounce your last name again.

MS. TOMKOWIAK:  Tomkowiak.  The 'W' is like a 'V'.

THE COURT:  So my major question to you is that all of these exhibits seem designed to present a counter-narrative to the Complaint, and with the SEC filings, it's more permissible, but with some of the FDA filings and the number, for instance, the document that has the number of FDA Forms 483 filed in a particular year, the only inference I can draw is that you want me to say they are not, in fact, rare when the plaintiffs say they are rare.  So why is that permissible on a motion to dismiss?

MS. TOMKOWIAK:  Well, I think as Your Honor said, a lot of this stuff is pretty typical for you to look at on a motion to dismiss.  Fourteen of the exhibits are expressly incorporated by reference, 14 or 15 I think.

It might be a typo, so you can ask them about it.  It probably is.  But, you know, this stuff is very common in these types of cases to submit.  I mean, these are the challenge statements, the corrective disclosures.  The Form 483, I think it's really important that Your Honor look at the Form 483.

THE COURT:  I don't dispute those.  Let's focus on the two specific ones that plaintiff -- Well, let me ask you a more general question.  First of all, I think your brief is just sort of a footnote saying the court can consider this, and plaintiffs respond and say, well, you haven't done your job of explaining why each particular document can be considered by the court and so they are arguing it's waiver.  I'm not sure I completely buy that but I do think defendants didn't do as much as they could have to explain why any particular document should be considered.  Do you want to respond to that argument, I guess?

MS. TOMKOWIAK:  Yes, Your Honor.  I think in hindsight we could have listed -- in the declaration that we submitted, we could have been more express about this doctrine applies to this one or both, right, in some cases.  I think the reason we didn't do it is, again, a lot of these are fairly non-controversial.  We cited some cases in our brief that says that courts frequently

consider these types of documents even when, you know, requests are made in footnotes.

So in the Second Circuit in these types of cases, there is a lot of precedent for doing it the way that we did it. There is rarely a request for formal judicial notice or anything like that that's submitted in this circuit, unlike in some other circuits like the Ninth Circuit. So it was really just precedent, and I agree with Your Honor, we could have delineated between the various documents.

THE COURT: Okay. So setting that aside, then, let's talk about each -- the two specific ones that plaintiffs challenge. So Exhibit 7 again is that list of how many Form 483's the FDA has put out in particular years.

MS. TOMKOWIAK: Yep. Sure.

THE COURT: I don't have any context for knowing whether 4000 of these in a year is rare or is a lot. It's a high number, but I don't know how many inspections the FDA does. If they do a hundred thousand inspections, then perhaps 4000 of them being issued is actually somewhat rare. So I guess why can I consider this and draw the inference that you want me to draw?

MS. TOMKOWIAK: Candidly, Your Honor, I think you can draw whatever inference you would want to draw

from it.  We think that the data from the FDA's website is judicially noticeable.  I don't think that plaintiffs are really questioning the accuracy of it.  I think, as you say, they are taking issue with the inference that we want to draw from it, but you don't have to take judicial notice of our inference.

And again, just to be clear, we think that both this exhibit and Exhibit 12 are somewhat inconsequential to our motion.  You can consider them.  We think that they are important context.  We draw certain inferences from them perhaps, but it is not necessary to look at or consider either of those documents in order to grant our motion to dismiss.  You can still grant our motion to dismiss even if you do not take judicial notice of either document.

THE COURT:  Okay.  All right.  So then but Exhibit 12, let's just talk about that one briefly.  This is a 10-Q from after the class period, so for what purposes can I consider this given that it is after the class period, but assuming it wasn't properly incorporated by reference?

MS. TOMKOWIAK:  So I don't think there is a magical cutoff with the class period.  Courts do take judicial notice of SEC filings that postdate the class period.  We cited one case.  It's the In re *AppHarvest*

*Securities Litigation* case where the court did that. Sometimes the plaintiffs themselves cite post class period documents because they like them because bad things happen after class periods. So I don't think there is a magical cutoff with the class period.

I think you can consider the document for the fact that public statements were made, so they were out there. We made them. They are in the public. And in our opinion those statements, regardless of whether they are true or not, are consistent with our class period statements. They are consistent with what defendant said at the time they made the challenge statements, which are we have confidence in the data. We believe in the integrity of the data.

They are consistent with what they said at the end of the class period when they said we're looking into the data, but we continue to have confidence in the data.

So we believe that there is -- you could take notice of that SEC filing for the fact that those statements were made and their consistency with the defendants' class period statements, which kind of support the reasonableness of the beliefs of the defendants at the time that they made them.

THE COURT: Okay. All right. Thank you.

All right. Attorney Forgione -- and I saw

plaintiffs' counsel looking sort of quizzically about these references to the typographical error, so let me just give you a heads-up as to what I'm talking about here.

MS. FORGIONE:  That would be great, Your Honor.

THE COURT:  So it's Complaint paragraph 134 and 135.  So these fall under the heading of August 14, 2023, and in 134 you're referencing second quarter 2023 results.  Then in 135 you talk about the 10-Q for the third quarter of 2023, which would be this September 30, 2023 10-Q that is Exhibit 12.  So, you know, these are publicly available and what we did before the hearing today was look at what was publicly filed because what defendants provided weren't the full 10-Q's.  The language that you cite in 135 actually appears in the second quarter 10-Q, not the third quarter 10-Q.  The only difference as far as we could tell is that in the third quarter 10-Q, it says as defined in note nine rather than note eight.  So that's why I'm asking whether that was a typographical error or whether you intended to incorporate by reference the third quarter 10-Q.

MS. FORGIONE:  Yes, Your Honor, it was a typo.

THE COURT:  Okay.  You should have noticed that and responded that way to the defendants' opposition to your motion to strike.

MS. FORGIONE:  Correct.

THE COURT:  It shouldn't have been on us to find it, but it is what it is.

MS. FORGIONE:  Okay.  Yes, Your Honor.  Well, we were under the assumption that we hadn't incorporated the document by reference.  You're correct, we should have noticed the typo, but thanks for the clarification.

So I think I'll start with the motion to strike since we just heard that, if that's okay with Your Honor.

THE COURT:  Sure.

MS. FORGIONE:  So as we talked about, we moved to strike Exhibit 7 and Exhibit 12 from defendants' motion to dismiss and we echo all the statements that Your Honor just made to opposing counsel.  These documents are extrinsic evidence used by plaintiffs to create a counter-narrative to plaintiffs' well-pled factual allegations, which is wholly inappropriate on a motion to dismiss.

So Exhibit 7, which is the FDA excerpt of Form 483's, we agree that first of all it doesn't actually speak to whether or not Form 483's are rare.  1900 Form 483's issued over the past decade doesn't -- we don't know how many inspections there were or what percentage of inspections resulted in the FDA form.

And second, we don't -- in order for the court

to take judicial notice of these facts, it has to be integral to the Complaint, and how many Form 483's were issued over the past decade is not integral to our allegations.  While it lends context and support, it's not -- for example, we don't allege the defendants lied about how many Form 483's were issued over the past ten years.  And opposing counsel even just said that Exhibit 7 and Exhibit 12 are inconsequential to their motion and not necessary, showing that they are not integral to our allegations as well and can't be judicially noticed.

THE COURT:  So let me just ask also about your choice of procedure as a motion to strike.  I know that you've cited some cases entertaining a motion to strike, but if you actually look at what a motion to strike is, it's a motion to strike pleadings, and so why the choice of a motion to strike versus just a section of your opposition brief that said these documents shouldn't be considered by the court for these various reasons?

MS. FORGIONE:  Yes, Your Honor.  Well, I think we wanted to dedicate enough time and space to explaining why these exhibits should not have been considered in connection with the motion to dismiss.  And again, like you noted, courts in the Second Circuit frequently entertain motions to strike on motions to dismiss.  Even if they aren't literally -- even if the exhibits aren't

literally attached to pleadings, they still consider and have granted motions to strike in this, so we took the time and space to explain why exactly these exhibits weren't relevant instead of, say, just dropping a footnote in our brief.

So moving on to Exhibit 12, which is the Form 10-Q that was filed ten months after our -- after the class period ends, it's again not integral to any of the allegations in our Complaint.  In fact, it's wholly irrelevant what happened three months after the end of the class period.  Whether or not a third-party auditor found TRANQUILITY II data to be okay to go forward with or not is not relevant to falsity at the time that the statement was made.  It does not matter when defendants made their original statements.  It does not matter what this third-party auditor said.

THE COURT:  What about as to scienter and the reasonableness of their beliefs and actions?

MS. FORGIONE:  Well, again, it's an ex ante understanding.  It was after the class period.  And as I'll get into when I talk about the motion to dismiss, the violations listed out in the Form 483 were serious, egregious, and they seriously undermined the data integrity.

I mean, honestly, we don't know what this

third-party auditor found.  We don't know exactly what they said.  We just have defendants' allegations, defendants' statements as to what they said and what they found.  We don't know if it proves their point, and it can't be considered on a motion to dismiss because it's outside of the Complaint and it's a counter-narrative to our allegations.

Further, while defendants are right that courts can take judicial notice of SEC filings, the courts can only take judicial notice of SEC filings for the fact that they existed, for the fact that they were filed, not for the truth of the matter asserted within them.  So the court can't take judicial notice of this Form 10-Q for the truth of the matter that the third-party auditors found that the data was okay to go forward with.

And defendants mentioned *In re AppHarvest*. There, the court did take judicial notice of SEC filings after the class period of Form 4's, but the court explicitly noted that we are taking judicial notice that these forms exist, not for the truth of their contents within.  So if anything, the court here can take judicial notice of the fact that the Form 10-Q was filed, but not of anything within the Form 10-Q, and certainly not to prove plaintiffs' allegations of a non-culpable inference of scienter.

And unless Your Honor has any more questions about the motion to strike, I'll move --

THE COURT:  I think that answers it.  Well, let me ask you about you only challenged 7 and 12 specifically.

MS. FORGIONE:  Yeah.

THE COURT:  Are you essentially conceding that the rest are proper subjects of judicial notice?

MS. FORGIONE:  The rest of the exhibits are defendants' public filings during the class period that plaintiffs allude to or transcripts from conference calls and the Form 483.  We're not disputing any of those exhibits, just Exhibits 7 and 12.

THE COURT:  Okay.

MS. FORGIONE:  So moving on to the motion to dismiss, we heard a lot of argument from defendants, but I just want to take a step back and ground us in the facts and hopefully answer some of Your Honor's questions in the process.

BioXcel began the development of BXCL501 or 501 to treat agitation in patients with acute -- with Alzheimer's disease.  BioXcel launched the clinical trials TRANQUILITY II and TRANQUILITY III to test the safety and efficacy of that drug.

Now, 501 was fundamentally important to BioXcel

because, one, it needed cash and it wasn't getting revenues from its only commercially viable drug.  And two, the ability of 501 which was being tested by TRANQUILITY II to achieve certain regulatory milestones would unlock strategic financing from its financiers, and this was life-sustaining financing for BioXcel.

So BioXcel began down the path towards regulatory approval.  However, the company played fast and loose with the clinical trials.  It hired an inexperienced and underqualified principle investigator, Dr. Caitlin Meyer, to run the most important clinical trial site of its most important clinical trial, TRANQUILITY II.  This is where 40 percent of the patients enrolled in TRANQUILITY II were enrolled.

After the inspection at that site, the FDA issued a Form 483.  And defendants spoke about some of the violations in the Form 483, but I want to underscore the most egregious one of them all, which is that 25 of the 37 patients that the FDA reviewed didn't have the proper documentation to meet the very specific inclusion criteria and to prove that they didn't meet the very specific exclusion criteria for the trial.

Now, just to again underscore how important this was, inclusion and exclusion criteria for a clinical trial is a barrier to entry.  No patient could be enrolled in

this trial without showing that they, for example, had symptoms of agitation or that they had a probable diagnosis of Alzheimer's disease.

The FDA found that 25 of these patients didn't have the documentation to prove that, and at least three of them might have met the exclusion criteria, which was that their memory loss was due to something else besides dementia, for example, acute intoxication.

This is important because the FDA would never accept a new drug application based on the data from these patients. BioXcel wanted to test -- wanted to treat agitation in patients with Alzheimer's disease, so they needed to prove that they were testing patients who had agitation and Alzheimer's disease.

THE COURT: So then because the Form 483 is an interim finding and because Dr. Meyer responded to the finding, and there is nothing alleged about a warning letter or any other follow-up from the FDA, why are the resulting disclosures made by the defendants misleading?

MS. FORGIONE: Well, first, Your Honor, we don't know what Dr. Meyer said to the FDA. That's not alleged in the Complaint. Defendants reference her response, but we don't know what she said. She could have said we don't know where the documents are. I don't know if these patients have Alzheimer's disease. We can't speculate as

to what's in the letter.

THE COURT:  But there is no allegation that the FDA followed up with anything; correct?

MS. FORGIONE:  That's -- Your Honor, after -- and defendants have this in their exhibits.  BioXcel had expressed that they were meeting with the FDA explicitly to discuss TRANQUILITY II.  And in the Complaint it's alleged on June 29th when defendants disclosed the Form 483, they also said that the FDA investigation remains open, so it wasn't a concluded event.  It was still happening and defendants were working through it still with the FDA.

The Form 483 is an interim report, but all the violations noted in the Form 483 are very serious.  It just means that they need to take more time to investigate them, but they wouldn't have been noted in the first place if they didn't present a serious problem of data integrity to the trial.

THE COURT:  But they were correctable; correct?

MS. FORGIONE:  The fact that 25 of the patients enrolled in the trial couldn't prove that they should have been enrolled in the trial is not really a correctable issue.  The data had to come from these patients and they needed this specific amount of patients to show statistical significance in the trial.

THE COURT:  I think that it's a little more specific than what you're saying it is.  Wasn't it that they didn't have the documentation when the files were reviewed that these patients were eligible, which is different from the patients were not eligible?

MS. FORGIONE:  The patients needed the documentation to be enrolled in the trial.  You can't enroll -- again, it's a barrier to entry.  You can't enroll patients in a trial without proving that they belong there.

THE COURT:  Right, but it's an issue of -- it's potentially an issue of documentation as opposed to an issue of actual eligibility.

MS. FORGIONE:  Well, we don't know because we don't have the documentations.  I mean, it's possible that all of those 25 patients didn't have probable Alzheimer's disease, and that's why it's such a serious allegation from the FDA.  They needed those documentations to show that they belonged in the trial, and the --

THE COURT:  That's correctable then; right?  If they get the documentation, it's correctable?

MS. FORGIONE:  Well, Your Honor, the FDA was at the clinical trial site for all of December.  If the documents --

THE COURT:  Isn't it only five or six days?

MS. FORGIONE:  It was from December 5th -- it was from December 5th to December 21st is when they conducted the allegations, so for at least two weeks.  And the documents didn't show up.  And ultimately, if there were no documents, they shouldn't have been enrolled in the trial.  If there were no documents, they were not eligible to be in the trial.

The reason why this was detrimental to 501's sNDA, it was also detrimental to BioXcel's ability to get strategic financing, and this hopefully addresses your question to defendants' counsel that the strategic financing agreement was -- in order to unlock financing from its investors, it was dependent on 501's ability to reach regulatory milestones and reach financial milestones, which means that it had to get approved and get on the market to start earning revenues.

THE COURT:  So without allegations of what those milestones are, how am I to draw the conclusion that any of what defendant said was false, because I don't know that -- you know, without knowing -- you're basically asking me to conclude that they wouldn't have met these milestones, and they said that they could have, but I don't know what the milestones are.

MS. FORGIONE:  Right, Your Honor.  Well, we know, for example, that the milestones are not the data

readouts because the data readouts happened in June, but they still hadn't met the strategic milestones.  And we know that because defendants in August 14th of 2023 announced that they were not able to meet those regulatory milestones that were required.  So without 501, without TRANQUILITY II, it would be impossible for BioXcel to meet those regulatory milestones.

So I think that there is a lot -- I think that I'll move on to why -- to a few of the statements that were made throughout the class period to underscore why they were false and misleading, and I'll talk about the full execution of the strategic financing agreements as well a little bit more, but I want to start first on March 9th of 2023 as alleged in paragraph 156 of the Complaint during BioXcel's fourth quarter 2022 earnings calls.  When defendant Mehta told investors that TRANQUILITY II was "fully enrolled," he was lying. TRANQUILITY II was not fully enrolled because 25 of the patients that were included in the trial should not have been included in the trial.  Defendant Mehta then goes on to --

THE COURT:  Those are two different things, though.  Being fully enrolled is different from lacking documentation as to the eligibility of some of the participants; right?

MS. FORGIONE:  Not really, Your Honor, because if you don't have documents, you can't be in the trial.

THE COURT:  But then why didn't the FDA say in the Form 483 these 25 patients have to come out of the trial?

MS. FORGIONE:  Possibly defendants could have addressed the issues.  They could have maybe found the documentation, but they hadn't, and to this day defendants still have not submitted or been able to submit the sNDA. They had spent time meeting with the FDA to talk about whether or not this data was allowed to be used.  It was an ongoing process.  It was an ongoing investigation.  And like you noted, the Form 483 is an interim report.  So the defendants had to keep talking and stay in conversation. They didn't make the final determination yet that those patients had to be excluded, but it doesn't preclude the possibility that they would in the future.  But again, it's just serious enough that these patients shouldn't have been included in the first place because they didn't have the documentation, again because it's a barrier to entry.

So then moving on to March 16th of 2023, a couple of days later, defendants in their Form 10-K filed with the SEC on March 16, 2023 as I just said, and as alleged in paragraph 151 of the Complaint, which Your

Honor had addressed earlier, defendants file a risk disclosure that was false and misleading. And I am going to read exactly what the risk disclosure says. It says that "We rely on third parties to conduct our preclinical and clinical trials. If these third parties do not successfully perform their contractual legal and regulatory duties or meet expected deadlines, we may not be able to obtain regulatory approval for or commercialize our product candidates and our business could be substantially harmed."

As you addressed earlier, this statement is false and misleading because BioXcel warns of the possibility of third-party non-compliance, but at this point, which was over two months later, BioXcel already knew about the very -- the reality of third-party non-compliance. It had already occurred. So to warn that it was a possible event when it had already occurred was misleading.

THE COURT: So what's the response to defendants' argument that I should be focusing on the "then" part of that statement, that they fully disclosed the risk that it could harm the business and not on the lack of third-party compliance in the "if" part of the statement?

MS. FORGIONE: So the risk in the statement is

the lack of third-party compliance.  The consequence of this statement is potentially that the business could be substantially harmed.  We have alleged that the risk was misleading and we're not -- it -- you don't have to show that also the consequence is misleading, as is the case in *ImmunityBio*, which we submitted a couple days ago.  And also as in the case in the Southern District of New York, for example, *In re Mylan*, where the court there held that -- upheld that a risk disclosure was actionable when they warned of non-compliance that could result in substantial business harm, but all they focused on was the fact of the non-compliance and that defendants at that time already knew that they were not complying.

So again, there is a distinction between the risk and the consequence, and the risk had already materialized.  The risk of third-party non-compliance had materialized, and so for that reason the statement is misleading.

THE COURT:  So if we're focusing in on that language, then, "if the third parties do not successfully perform their contractual legal and regulatory duties," so what had Dr. Meyer done that would qualify as not successfully performing contractual legal and regulatory duties?

MS. FORGIONE:  Well, for example, there is an

investigational protocol in place at the clinical trial site that is in place that Dr. Meyer had violated. She violated her regulatory duties there.

THE COURT: That's the fabricated e-mail?

MS. FORGIONE: Correct, that's one instance of it, yes.

THE COURT: But they didn't know about that yet by March of 2023; right?

MS. FORGIONE: So in December the FDA had noticed that she failed to report a serious adverse event within 24 hours at that point. And then in May they had discovered another instance of her failing to report a serious adverse event within 24 hours, and that was the time that she fabricated the e-mail.

THE COURT: Okay, so there is two failures to report?

MS. FORGIONE: Yes. So again, just violating the investigational protocol there and by admitting people without the proper documentation and by failing to maintain adequate case histories for the patients, Dr. Meyer failed to perform her regulatory duties.

So moving on, again, defendants' statements over the six months from when they got the Form 483 to when they finally disclosed it, they were also asked a bunch of questions from analysts specifically about TRANQUILITY II,

and even in the face of questions from analysts, defendants did not disclose the Form 483.

So, for example, as alleged in paragraph 166 of the Complaint, on May 9, 2023 during the Bank of America Global Healthcare Conference, an analyst first noted that TRANQUILITY II was "a big focus among investors," and then asked, "What should we be looking for in this update and setting?"

Now, defendant responded the last -- sorry. "The trial is completed.  The last patient has completed. The data is being locked and undergoing verification." Again, this statement was false and misleading because the trial couldn't have been considered complete because it faced the outstanding issue of the Form 483 that needed to be addressed.  And in fact, like I mentioned before, defendants even disclosed that the FDA investigation still remained open as to this specific trial.

Again, because 25 patients were enrolled without showing the proper documentation, they couldn't have considered that the trial was completed.  They needed to fix it.  They needed to correct it.  So it was misleading to represent that to investors.

And then just a little bit, a couple weeks later, again in the face of questions from analysts, one more example is alleged in paragraph 173 of the Complaint

where on June 8th of 2023 during the Jefferies Healthcare Conference, an analyst states, "Let's save them all. We're going to get those stupendous data at the end of this month.  Can you file an sNDA right after that?  Or I guess what would be the regulatory expectations of that?"

And defendant made a response, "It depends on the data.  How well is efficacy data as well as safety?" He then goes on to tell investors that "We will have a conversation with the FDA and ask them what -- do we need to file the sNDA, and then fill those gaps and file it. If they allow us to file it with TRANQUILITY II, we'll be ready to go basically if we don't need to generate anything."

Defendants weren't ready to go again because of the outstanding issue of the Form 483.  They had already been in conversation with the FDA because of the Form 483 and they already knew about the gaps that they had to fill to file the sNDA.  As it stood right now, the FDA would not accept the sNDA, but defendants didn't disclose that even in the face of questions about regulatory expectations of TRANQUILITY II.

THE COURT:  And where is that alleged in the Complaint that the FDA wouldn't have accepted it?

MS. FORGIONE:  Well, Your Honor, the data from this trial was again based on patients that couldn't --

that Dr. Meyer couldn't show were enrolled in the trial.

THE COURT:  But this sort of goes back to the issue of correctability and the 483 being interim.  I mean, there is a period of six months between the December 483 and the June disclosure, and the Complaint doesn't plead that the FDA followed up, that there was a warning letter, that -- you know, for all I can infer, the defendants during that period of time fixed things.

MS. FORGIONE:  Well, Your Honor, again to this day and in defendants' most recent Form 10-Q they are still saying that we're not sure if the data that we have can support an sNDA.

THE COURT:  So now you want me to rely on things you didn't put into the record but defendants did?

MS. FORGIONE:  No, but even within the class period, even in their Form 10-Q's, they still say that we don't know if the data could support an sNDA for the FDA.

THE COURT:  Right, but those are things defendants put before me; right?  They weren't part of the Amended Complaint?

MS. FORGIONE:  They were referenced -- the documents were referenced in the Amended Complaint.

THE COURT:  Right.  So it was plaintiffs' position that I was supposed to go there to look at those documents to get that -- to get that information, because

it's not in the Amended Complaint.

MS. FORGIONE:  Okay.  Taking a step back from that, Your Honor, whether or not these issues could be corrected is not relevant to the fact that the statements were made during the class period.

*ImmunityBio* in fact just dealt with this issue. It said that the fact that defendants believed that it could be corrected sometime in the future doesn't change the fact that it wasn't corrected in the moment that they made the statements.  So when they made the statement that the trial was complete when it wasn't complete, it's still false and misleading even if at some point in the future they believed that the issues could have been corrected. They needed to fully disclose to investors the Form 483 because it was material and it had a material impact on TRANQUILITY II.

THE COURT:  So is your position basically that Form 483's always have to be disclosed and that there is a duty to disclose them?

MS. FORGIONE:  No, Your Honor, there is no affirmative duty to disclose Form 483's, but once a defendant speaks on a subject, they have a duty to disclose everything that's material about that subject.

For example, the defendants can't say things and hold back another that would create a materially

misleading impression on investors.  Those are called half-truths if you say things that are literally accurate but don't fully disclose everything about it, and that was recently upheld in *Moab v. Macquarie Industries* in the Supreme Court where Justice Sotomayor likened half-truths to the example of a child telling his parents that he only had desert when, in fact, he ate a whole cake for desert; right?  So he spoke on the broader topic of desert and then under the securities laws had a duty to disclose that by desert he meant a whole cake.

The same is true with BioXcel.  When they decided to speak on TRANQUILITY II, its enrollment, its progress, its design and data, they had a full duty to disclose everything that affected that.  And the Form 483 here affected TRANQUILITY II data and progress.

So again, there is no affirmative duty to disclose a Form 483, but courts have held that depending on the Form 483's seriousness, they should have disclosed it, which is what we're alleging here.

THE COURT:  And how does the Form 483 relate to the financing milestones?

MS. FORGIONE:  So the only way for BioXcel to achieve the strategic financing agreement, the only way for them to fully execute it was through 501, the drug which was being tested by TRANQUILITY II.

The Form 483 significantly impacted TRANQUILITY II and its progress, and so when defendants talked about full execution of their strategic financing agreements, that meant -- full execution of strategic financing agreements means it's essentially them saying us reaching regulatory milestones.  It's one and the same because the only way for them to receive the financing, the full execution is through regulatory milestones of 501, which again was being tested by TRANQUILITY II, and because the Form 483 directly impacted TRANQUILITY II and 501's development and its ability to reach regulatory milestones, for example, for filing -- like filing an sNDA, it directly impacted defendants' ability to fully execute their strategic financing agreements.

Now, I want to address just some of defendants' other arguments as to falsity.  So, for example, defendants argue that some of these statements were puffery or that they were opinion statements and that they were forward looking.

Now, first for puffery, the main inquiry under puffery is whether or not a statement is so vague that an investor could not rely on it.  Because of this, it's a highly contextual inquiry and you can't look just to the challenge language alone.  The court should look to the full context of the statement, when it was made and what

circumstances it was made.

Defendants excise single words from their larger context in an attempt to make this puffery argument.  As you can see on the slides that they gave you, they just pick out one or two words, but all these statements are accompanied by much larger context.

First, the context of just in fact that TRANQUILITY II was the company's most important clinical trial at this time and that investors were consistently asking about TRANQUILITY II.  They wanted to know about TRANQUILITY II's progress, how it was doing, when the data readouts would be.  Investors were keenly interested in TRANQUILITY II and as such it would be reasonable that they would rely on defendants' statements about TRANQUILITY II.

For example, defendants challenge the statement alleged in 146 of the Complaint that TRANQUILITY II had a strong foundation as puffery, but this was made during a healthcare conference and it's more than reasonable that investors would rely on defendants' assertion of TRANQUILITY II being a strong foundation even though that wasn't true at the time because it had the Form 483 and was suffering trial integrity issues.

The same is true with defendants' statements expressing confidence in TRANQUILITY II.  They omit the

larger context of the statement, which is usually, for example, when Defendant Mehta expresses confidence in TRANQUILITY II's design and plan, that is made in the larger context of him talking about TRANQUILITY II, the exposure levels of different doses, the efficacy end points, and requirements and efficacy end points of the trial. And then immediately after all those very specific statements, Defendant Mehta says I have confidence in TRANQUILITY II's design and plan.

Again, within the context of the larger statement and within the context of the fact that TRANQUILITY II was a very important clinical trial to the company, it is reasonable that investors would rely on these statements.

THE COURT: Why don't we move to the forward looking.

MS. FORGIONE: Sure, Your Honor, and I just want to make one point, that defendants point out that TRANQUILITY II is only one of three clinical trials, but TRANQUILITY II was the most important clinical trial again because of the strategic financing agreement. None of the other clinical trials had any relation to whether or not defendants got strategic financing. It was just TRANQUILITY II because it was testing 501, which is what would unlock the financing. So moving --

THE COURT:  TRANQUILITY III wasn't --

MS. FORGIONE:  Sorry, the TRANQUILITY as a whole, the TRANQUILITY trials.  Defendants point to other trials in oncology departments for example but that's just not relevant here.

So for defendants' forward-looking arguments, a majority of the statements that they challenge as forward looking are just simply not forward looking as a facial matter.  They just are made in the present or past tense.  And again, defendants excise these statements from their larger context but, for example, in paragraph 156 that TRANQUILITY II is fully enrolled, that's not a forward-looking statement in any sense of the matter.  And in paragraph 166 that the trial is completed, again not a forward-looking statement.

Then defendants make arguments that their on-track statements are forward looking, but again -- I mean, plaintiffs don't allege that these statements are -- that the on-track -- the data on-track statements are false and misleading because the data readouts weren't on track.  Instead, we allege that these statements are false and misleading because they talk about data readouts without disclosing everything that could impact those data readouts being the fact that the trial was already currently experiencing data integrity issues that they

were aware of pursuant to the Form 483.

Now, with statements about cash and financing and belief of full execution on the defendants' strategic financing agreements, these statements were about defendants' then current ability to fully execute their strategic financing agreements and they had knowledge of facts that significantly hindered their ability to fully execute these financing agreements.

And if these statements could be considered forward looking, they are still actionable because they weren't accompanied by meaningful cautionary language.

Defendants point to some cautionary language in their risk disclosures, but these risk disclosures are by definition boilerplate.  They are copy and pasted from one form SEC filing to another and they don't warn of a specific risk here, which is required.  The cautionary language must be specifically tailored to the risk that occurred here.  And even in defendants' slides, none of the risks say anything specific about TRANQUILITY II and TRANQUILITY II's ability or hinderance for defendants to meet their strategic financing agreements.

And, yes, so again these risk disclosures, they are just general.  They are kitchen-sink disclosures. They stretch over fifty pages which defendants say -- admit themselves.  And it's well settled in this circuit

that boilerplate disclosures cannot serve as meaningful cautionary language.

And the risk disclosures -- further, defendants point to the risk disclosure that we allege is false and misleading as meaningful cautionary language, but again, because that statement was false and misleading at the time it was made, it can't actually serve to meaningfully caution investors as to the risks involved in their investments.

THE COURT:  All right.  Can I ask you a few questions about scienter?

MS. FORGIONE:  Sure.

THE COURT:  So how do you get around the fact that all the trades were made according to a trading plan that was entered into before any of these events occurred?

MS. FORGIONE:  Your Honor, we don't believe that the trading plan is an absolute defense to the trades, especially in light of how suspicious these trades are.

The defendants allege that -- I mean, the trading plan was entered into in August of 2022. Defendant Mehta did not make one trade from August of 2022 until December 15th of 2022, a couple days after the FDA showed up to inspect the trial site.

And then after that, Defendant Mehta disposed of ninety percent of his holdings at the time, which again is

highly suspicious, especially in other cases that found it was enough for defendants to have disposed of only 80 percent of their holdings at the time.

THE COURT:  So forgive my ignorance on what a 10b-5 trading plan is, but if it was entered into in June, does it set a specific date like you will sell this amount of stock on December 15th regardless of what events occur?

MS. FORGIONE:  That is the normal understanding of a 10b-5 trading plan, but we don't have --

THE COURT:  So then why could it be suspicious? If in June Defendant Mehta said the plan said I will sell this amount of stock on December 15th, isn't it just coincidence?

MS. FORGIONE:  We don't know that that's what the 10b-5 trading plan says.  So it's again suspicious that the 10b-5 trading plan would be set up to stop Defendant Mehta from trading for a couple months and then only trade a couple days after the FDA showed up at their front door.

THE COURT:  But if it's pursuant to a plan, do you have any allegation that he either did or could have done something to trigger the December 15th sale after the FDA showed up?

MS. FORGIONE:  No, Your Honor, we don't actually know what the 10b-5 trading plan says, just that it's

not -- it can't be an absolute defense and that the trades can still be suspicious in light of the 10b-5 trading plan.  And it just doesn't really make sense for a 10b-5 trading plan to hold that a defendant would dispose of ninety percent of their holdings only within six months.

Defendant Mehta also profited 3.75 million, which almost doubled his executive compensation of that year.  And the same with Defendant Steinhart as well where he disposed of ninety percent of his holdings during the class period.

And further, Defendant Mehta's trading history is suspicious also in light of the fact that he sold on June 16th and that the corrective disclosure was done on June 29th.

And defendants argue that they promptly disclosed the FDA investigation.  They got the FDA investigation.  They did an investigation.  They probably enclosed it, but it's plausible that defendants waited to disclose, and it's possible and it's likely that defendants waited to disclose the Form 483 in light of the data readouts and the positive data in hopes that it would overwhelm the news of the Form 483, but that didn't work.

And it's also possible because Defendant Mehta didn't -- if this was pursuant to a 10b-5 trading plan, possibly wanted to wait to announce the news until after

he could sell all of his stock on June 16th supports an inference of scienter.

But again, the motive and opportunity, insider trading, while it looks very suspicious, is only just one allegation of scienter.  Defendants have pled more, which is first that defendants had actual knowledge of the Form 483, which made their statements false and misleading.

Second, that they in the face of questions from investors throughout the period, they had plenty of time to disclose the Form 483 and they didn't, even in the face of questions from investors.  Yeah.  So actual knowledge of information that contradicts defendants' statement does support an inference of scienter.

For example, in *Rosi v. Aclaris Therapeutics*, the court there found that defendants' knowledge of a warning letter from the FDA recommending that they revise their marketing campaign supported an inference of scienter.

Courts have also found specifically that actual knowledge of a Form 483 helped with allegations of scienter in *Salzman v. ImmunityBio*, in *Yanek v. Staar Surgical*, and in *McGuire v. Dendreon*.

Courts have also found that by failing to promptly disclose the Form 483, that also supports this inference of scienter.  And like I had mentioned,

defendants sat on the Form 483 for six months.  They had plenty of opportunity to disclose it to investors, especially when they asked about regulatory expectations of TRANQUILITY II and 501, but they didn't.

*Salzman v. ImmunityBio* is one of those cases that found that defendants' failure to promptly disclose the case supported an inference of scienter.  The same with *McGuire v. Dendreon Corporation*.

So also the confidential witness allegations that Defendant Mehta was very hands-on and that they were highly interested in this study, consistently talking about it, there were time pressures, there were needs to get this trial done, to get the data done so they could submit the sNDA all shows that defendants -- this trial was crucially important to defendants, that they would have been following the trial closely.

We also have the allegations that they were there for the Form 483 when it was issued, that they were there when the FDA showed up on their door early, said they were notified of it, and that they were there for the close-out meeting.  So they knew about the Form 483.  They knew how serious these violations were, but they continued to make false and misleading statements throughout the rest of the class period.

So as to the confidential witnesses, all that

plaintiffs have to allege at this point is that the allegations that we attribute to them could have possibly come from them.  This could be done by showing their position and tenure at the corporation, which is what we did.  It shows all the -- each of the CW's positions support that they would have known the facts that were alleged to them.  For example --

THE COURT:  I don't need you to read them.  But none of the CWs deal with the Form 483.  They don't talk about that or weren't involved in the conversations about the company's reaction to the 483; right?

MS. FORGIONE:  That's true, but that's not fatal to our allegations.  The CWs were used to lend context in further support of scienter, and they express how important TRANQUILITY II was to the company, how badly the company wanted to get it done on time, and also they express how frantic the company was in being able to fully execute their strategic financing agreements, constantly analyzing whether or not they could survive with or without the funding.  So again, it's not fatal to defendants' allegations that the CWs weren't involved in the FDA inspection in TRANQUILITY II.

So then I'll address loss causation.

THE COURT:  Sure.

MS. FORGIONE:  So defendants don't challenge

loss causation for June 29th, only for August 14th.  As an initial matter, loss causation is not a heavy burden.  It's subject to the pleading notice standard and all plaintiffs need to do is give defendants an indication of actual loss suffered and of a plausible causal link between the alleged misrepresentations and the loss suffered.

THE COURT:  But your allegations are really heavily focused on Form 483, and the August 14th disclosure relates to the inability to unlock the financing and to continue being a going concern, so how do you connect the two?

MS. FORGIONE:  So the Form 483 was issued in TRANQUILITY II.  TRANQUILITY II was necessary for defendants to unlock the strategic financing.  When the Form 483 was disclosed on June 29th, investors still had questions about how this would impact BioXcel.  They asked about what would -- what were the expectations after receiving this Form 483.  And defendants in August of -- August 14th of 2023 fully disclosed -- then disclosed what the actual -- the further implications of this Form 483 was, meaning that it was delaying the trial because defendants needed to do investigations.  They did their own internal investigations.  They hired a third-party auditor, and they said that the FDA investigation still

remained open.  They also said that they were still talking to the FDA in regards to the data, and that because of all these reasons, they weren't able to meet their strategic financing goals.

So the disclosure on August 14th was the materialization of the risk of the Form 483.  It was a domino effect of defendants receiving a Form 483, noting that there are data integrity issues, and then realizing that because of this Form 483 in TRANQUILITY II, they weren't able to reach the strategic financing goals of regulatory milestones and financing milestones as well. So this -- it's a plausible causal link between the alleged misrepresentations in the statements.

And also just to address something -- an argument with opposing counsel, if Your Honor does not find that the full execution statements are actionable, you still have to get to loss causation for the August 14, 2023 statement because this corrected -- and this was the materialization of the risk of all the statements in the case, not just the full execution one.  So, for example, when defendants said the trial is fully complete, but it actually wasn't, them not being able to meet the regulatory milestones was the materialization of the risk of the fact that the trial wasn't complete because of the Form 483 was still outstanding and because they still

needed to have conversations with the FDA.

THE COURT:  So I guess I'm a little confused because defendants are saying that they had always targeted June of 2023 as the data readout for TRANQUILITY II and they met that target, so what regulatory milestone did they not meet that is alleged in the Complaint?

MS. FORGIONE:  Well, we know that the regulatory milestones required for them to meet couldn't have been the data readouts because they disclosed that they weren't able to meet the regulatory milestones in August.  So the regulatory milestones have not been met by August even though they had the data readouts in June.  Sorry, Your Honor.  Was there a second question to that?

THE COURT:  No, that was it.

MS. FORGIONE:  Okay.  So again, it's the plausible causal link between their misrepresentations about TRANQUILITY II which was fundamental to their full execution of their strategic financing agreement.  Without TRANQUILITY II, they couldn't execute it because TRANQUILITY II was testing the one drug that was important for defendants to receive their financing.  So this loss causation was a materialization of the risk.

THE COURT:  Okay.  Thank you, Attorney Forgione.

MS. FORGIONE:  Thank you, Your Honor.

THE COURT:  Attorney Smith, I have a couple of

follow-up questions for you.  So plaintiffs have argued that the conversation with the FDA was ongoing and that that is contained in some of Defendant BioXcel's disclosures.  So I think the relevance of that is that these issues weren't resolved, and I want to hear your response to that argument.

MS. SMITH:  Yes, Your Honor.  So, again, I think it's muddling of a few different things.  So just to remember what happened, the Form 483 -- I think I heard -- and by the way, let me first of all start by commending Attorney Forgione for arguing.  It's hard to do, so great job.  I know that's hard when you're getting started, so I wanted to start with that.

I think she muddled one important point, which is the Form 483 observations related to the documentation issues that Your Honor has correctly identified.  One of the documentation issues was that the doctor had not reported a serious adverse event within 24 hours.  It wasn't that she did it -- she lied about doing it.  It was she didn't do it.  So that's the Form 483.

What happens later is we find out the lead investigator has actually lied about making a report on time.  It's a different patient.  It's a different event.  She's fabricated an e-mail that she then gave to the regulator.

So one issue is we have a correctable problem. We're missing some documentation.  Let's go see if we can find it and submit it to the FDA.

The other is you have a lead investigator who literally just fabricated a document.  Now the question is, okay, maybe we have the documentation, but how reliable is it, because do we have a doctor, right, who has now fabricated a bunch of other things.  It's a problem of a different magnitude for the company, which is why it is going and doing this detailed investigation, why it's now hiring an independent auditor to audit the data independently of the doctor, et cetera.  It's a much bigger problem for them from the FDA perspective than can we find the paperwork.  Now we're like --

THE COURT:  Well, but Attorney Forgione is arguing that the problems that were brought to light in the Form 483 included that certain patients were not potentially properly included in the test or in the trial, so she's characterizing that as a fundamental flaw in the integrity of the trial, and that's what she's saying is the basis for the allegations that saying that the trial was fully enrolled, for instance, was false because it couldn't have been fully enrolled when, in fact, there were issues that related to enrollment.  Right?

MS. SMITH:  Right, understood, and I understand

that argument.  I'm setting up this juxtaposition because that informs the discussions that the company is having with the FDA.

THE COURT:  Okay.

MS. SMITH:  So I just wanted to answer Your Honor's question on that because I'm looking at -- I'm looking at Exhibit 4, which is the August 14, 2023 10-K, and at internal page 26 about the middle of the page is where the company talks about the meetings it's going to have with the FDA -- actually, it's a little bit toward the bottom of the page -- about the TRANQUILITY program, and what it's saying is we're requesting feedback from the FDA --

THE COURT:  Sorry.  I just want to make sure I'm locating the page.  You said page 26.  You mean on the top?

MS. SMITH:  Exhibit 4, page 36, internal page 36, top page 14 of 27.

THE COURT:  Okay, I got it.  Yeah.  Okay.  So what --

MS. SMITH:  So it's the second -- it's really the second to last paragraph on the bottom there, Your Honor, and you'll see -- and I'm not going to read it all, but there is a discussion of the fact that the company has requested a meeting with the FDA to discuss the

TRANQUILITY I and TRANQUILITY II data.  And in about the middle of the paragraph it says "subject to completion of the data audit."  So what the company is saying here is we need to find out from the FDA if it's going to let us submit this data package now that we know we have an investigator who fabricated a document in the trial.

The company is not saying we have a problem with the documentation that was listed in the Form 483.  Now, I understand it's a little -- it's not crystal clear, but obviously the court will look at this carefully.  But that's what the company is saying, we don't know if the FDA is going to let us submit this data because we have a doctor who fabricated the document in the trial.  It's currently being audited so we need to figure that out.

So then back to the question you just asked, Your Honor, which is in response to the argument that the entire trial was at risk because certain patients didn't meet the inclusion criteria, again it comes back to the Form 483 itself is clear that this is a documentation issue.  That again is Exhibit 5.

The second page, it's observation number two, it says the patients didn't have sufficient documentation, and then there is a table that says here are the subjects who did not have sufficient documentation.  And so it is a correctable problem, and I don't think there are any

allegations that say it wasn't a correctable problem as Your Honor has I think rightly pointed out.  So that's the answer on that one.

THE COURT:  So it's a documentation problem, not -- which is distinct from whether these patients were actually eligible?  It's just whether they had the documentation that they were eligible?

MS. SMITH:  That's the deficiency that's being identified, correct, Your Honor.  Now, it could be maybe they can't correct it, but that -- we don't have those facts; right?

THE COURT:  What about as to the three, though, three of the files, subjects' files, so they had the documentation, and it says they potentially met exclusion criteria.

MS. SMITH:  Right.  So again, a problem that could -- and you're looking at I think observation three?

THE COURT:  It's observation two.  It's just the latter part of it.

MS. SMITH:  Oh, right, I see, yes.  Yes.  And so again, I think correctable in that there is documentation in the files that they potentially met the exclusion criteria.  There could be documentation showing that they in fact did not meet exclusion criteria.  That could be correctable as well, but we don't have the response.

THE COURT:  Okay.

MS. SMITH:  And only three patients as well.

THE COURT:  Okay.

MS. SMITH:  But a correctable problem like the other cases.

I'm happy to respond to Your Honor's questions, but there are a couple of things I wanted to respond to, but I do want to focus on the things the court is most interested in.

THE COURT:  Yes.  I do have one more, which is the trading dates for Defendant Mehta and the fact that one was a week before this Form 483 was issued and another was 13 days before the corrective disclosure.

MS. SMITH:  Yes.

THE COURT:  They were pursuant to a trading plan and I don't have a lot of information about what the trading plan entailed, but plaintiffs want me to draw the inference that these are suspicious because of the timing.  A couple days after the FDA knocks, there is a big sell-off, and then a large sell-off a couple weeks before the announcement.

MS. SMITH:  Yes, Your Honor.  So on the first sale, there are no allegations -- well, again, this is a 10b5-1 plan.  The trades are executed when they are executed and they aren't just on December 15th and

June 15th.  The Complaint reflects other dates.

I will say I think Attorney Forgione said there were no sales in 2022 before the class period.  The Complaint actually doesn't say that, so she said that but the Complaint doesn't say that.  That's not in the record.

And then there are no allegations that Dr. Mehta knew that the FDA was inspecting Dr. Meyer's site at the time of the December 15th sale.  Remember, the 483 is December 21.  And even if he knows the site is being inspected, he certainly doesn't know that there is a Form 483 because it doesn't exist as of that date.

And then on the June 15th date, that is during a period of time when the company was investigating what was going on with Dr. Meyer, but remember the disclosure about Dr. Meyer was June 29th, 2023, and if you look at the call transcript, which is Exhibit 3, and on page ten of 13 by the docket numbering, at the bottom Dr. Mehta is asked when did the company find out about this, and he confirms we learned of this situation as -- almost as late as last week, so it's a very recent event and that's why we reported it.  So that's referring to when the company got an admission from Dr. Meyer that she had, in fact, fabricated the e-mail.  But that's the timing issue to answer that question.

THE COURT:  Okay.  All right.  You can go ahead

and respond to --

MS. SMITH:  Okay.  Thank you, Your Honor.  I just have a few points.  I heard Ms. Forgione -- or Attorney Forgione say that BioXcel did not submit the documents to the FDA, that the FDA conducted a week's long investigation specifically focused on the observations in the Form 483 and that they couldn't find the documents and that nobody submitted them.  None of that is in the Complaint.  The inspection is an inspection.  It's not necessarily specific to these issues; right?  There is a whole inspection.  It's actually there are eight business days in this time period, not weeks, and the most important thing is there are no facts alleged that establish that nobody submitted documents to the FDA.  That's just not in the record.  It's not in the allegations.

THE COURT:  Following the Form 483?

MS. SMITH:  Following the Form 483, correct, yeah.

And then on the -- these are serious observation issues while we're on the Form 483.  Again, I would point Your Honor to the *Schaeffer* vs. *Nabriva* case and the *Genzyme* case, both of which say that the mere conclusory assertion that the Form 483 is a serious event or contains serious potential regulatory violations is not sufficient

for either falsity or scienter.  That's in both of those cases.

On the duty to disclose --

THE COURT:  In any of those cases was the drug that was being tested the linchpin of the company's future success?

MS. SMITH:  I believe that's the case in *Nabriva*.  I don't want to misrepresent something to the court, obviously.  I believe that's the case in *Nabriva*.

THE COURT:  Okay.

MS. SMITH:  Yeah.  And I think Ms. Forgione misstated the disclosure obligations under the federal securities laws.  She said once you speak on something, you have to disclose everything that is material about that subject, which is not actually the law.  I mean, that would be a quite sweeping statement if that were in fact the state of federal securities laws, which it is not.  *Macquarie*, of course, the recent Supreme Court case states the standard.

But I also think the standard is very well put in *Teligent* specific to the Form 483.  This is *Teligent* at 16.  A failure to disclose a Form 483 is "actionable only if disclosure was necessary to render the statements at issue not misleading."  That's also citing *Nabriva*.  By the way, that is my understanding of what's required under

the federal securities laws generally, but I thought that would be helpful to point out.

On the milestones, we keep --

THE COURT:  That's Judge Marrero's citing? Judge Marrero?

MS. SMITH:  Well, okay, fair, yes.  You're exactly right, Your Honor.

On the milestones, again I think we're stuck in this sort of circular argument where we don't know what the milestones are, but I did just want to correct one thing.  Again, there was reference to TRANQUILITY.  I think it was clarified that the milestones only related supposedly to TRANQUILITY II and TRANQUILITY III.  There are three clinical programs that relate to 501.  Serenity, TRANQUILITY II and TRANQUILITY III.  So there are other drugs treating other things, but for 501 there are actually three programs, and I don't think we know at all what the milestones are for any one of those programs, so to say that some risk to the data for TRANQUILITY II put all of the funding at risk, there is no support for that. We don't know what they are.  So that's a leap, I think illogical leap that the Complaint does not support.

On the puffery statements, we didn't spend a lot of time on that during the main argument.  I think the main objection that plaintiffs have is the statements are

supposedly taken out of context. I would just say, Your Honor, the -- several of the statements that we quoted are short because those are the statements that are challenged. They haven't given us the context of those statements, so for what that's worth.

And then I think Attorney Forgione suggested that defendants were there. I wrote it down. They were there, meaning defendants were at Dr. Meyer's site for the FDA inspection or for, you know, any responses to the Form 483. There is actually no facts in the record alleged that the defendants were physically at her site, which is in Florida. The company is here. So I don't think there is support for that statement.

And I think those were the main points to respond to unless Your Honor has any other questions.

THE COURT: I just wanted to follow up on I think you had said earlier that there was no allegation that Defendant Mehta did not trade earlier in 2022, but you've got paragraph 209. It says he did not make any sales of shares of BioXcel stock prior to the class period. So you have no sales and then you have a sale six days before the Form 483.

MS. SMITH: Oh, I see it. I apologize, Your Honor. When I was doing my review, I did not see that statement, so I stand corrected.

THE COURT:  Okay.  But still you think that there is -- the trading pattern doesn't -- is not suspicious enough to meet plaintiffs' bar for scienter?

MS. SMITH:  Regular trades under 10b5-1 plan, it's standard, you know, standard fair for lack of motive, lack of scienter.  But even so, more importantly, there is no indication of any conscious misstatement or any recklessness with respect to the statements themselves.

THE COURT:  Okay.  All right.  Well, thank you to both counsel for your arguments today, and thank you, Attorney Forgione.

MS. MOYNA:  Excuse me, Your Honor.  Do you mind if we just take a couple minutes to make some additional points?

THE COURT:  Are they responsive just to the reply?

MS. MOYNA:  Yes, just to what was just said.

THE COURT:  Okay.  You can have a few minutes.

MS. MOYNA:  Thank you, just a couple minutes.

THE COURT:  You can do it from there, that's fine, unless you're more comfortable here.  Sure.

MS. FORGIONE:  Yes, Your Honor.  So I just want to address a few things, and quickly.  First, as to the fact of whether or not documentation would be found or the issues could be correctable, the fact that defendants hope

that good news would eventually overtake the bad news of receiving the Form 483 is not actually a defense to scienter and, in fact, supports an inference of scienter because it shows on defendants' part a calculated effort to hide their fraud from investors.  It's as the Seventh Circuit said in *Tellabs v. Makor*, that embezzling in hopes that the funds that you raised from the race track would replace embezzled funds doesn't mean that you didn't embezzle.  So this doesn't defeat plaintiffs' inference of scienter, and if anything, plaintiffs' inference is just as compelling as the opposing inference and a tie goes to the plaintiffs as opposing counsel had mentioned before.

I also wanted to point out, which Your Honor already did point out, was that we did have allegations in the Complaint that Defendant Mehta did not trade before the class period, and we also think that the dates of the trading is relevant because it affected when defendants wanted to disclose the Form 483.  So if Defendant Mehta could sell out on June 16th, he would want to wait to disclose the Form 483 so he could cash out on the high stock price before the Form 483 tanked it.

And I think just two more points and then that's it, just to distinguish with *Schaeffer* and *Nabriva*.  The Form 483 was about manufacturing issues and defendants' statements were about approval, and the court there found

that the manufacturing issues weren't sufficient enough -- weren't direct enough to contradict statements about approval.

But here, we have statements in the Form 483 about data integrity, about enrollment, about the completion of the trial, and the facts in the Form 483 directly contradicts that.

Same with *In re Genzyme*.  A Form 483 was issued to Genzyme's manufacturing facilities and didn't even explicitly mention the drug that the defendants were producing or that the plaintiffs allege defendants were misrepresenting, so the Form 483 only mentioned manufacturing issues but didn't mention the specific drug relevant to the case.  So the court there found that the Form 483 was not direct enough to conflict statements about a specific drug where the Form 483 didn't mention the specific drug, only mentioned the manufacturing facility that was in charge of manufacturing other drugs as well.

THE COURT:  I think your co-counsel has a message.

MS. MOYNA:  Yeah, just one more point.  I'm sorry.  On the point of linking the failure to meet the milestones with the financing, I mean, they say this themselves.  On August 14th -- and we have this in

paragraph 136 -- they say, "Based on recent events," meaning the Form 483, "the company is not likely to be in a position to meet the milestones required to access the additional capital under the financing agreements."  So I think that links it up pretty clearly.  Thank you, Your Honor.

THE COURT:  All right.  Thank you to counsel for the arguments.  I am going to ask that counsel order the transcript of the argument from the court reporter and split the cost evenly, and I will take the matter under submission.  Thank you.  The court will stand in recess.

THE CLERK:  All rise.  The Honorable United States District Court is now in recess.

(The proceedings ended at 4:14 p.m.)

                          C E R T I F I C A T E

I, Denae L. Hovland, RPR, CRR, RMR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

proceedings of a hearing which was held in the

above-entitled action on June 24, 2024, were recorded by

Denae L. Hovland by stenograph; that thereafter I

transcribed in typewriting the foregoing transcript to the

best of my ability; that the foregoing transcript

constitutes a true and accurate transcription of the

proceedings of such hearing.


_Denae L Hovland_
Denae L. Hovland, RPR, CRR, RMR
Official Court Reporter
United States District Court
450 Main Street
Hartford, CT  06103