## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| TONYA HILLS and OKLAHOMA LAW ENFORCEMENT RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>     Plaintiffs,<br><br>  v.<br><br>BIOXCEL THERAPEUTICS, INC., VIMAL MEHTA, RICHARD STEINHART, AND ROBERT RISINGER,<br><br>     Defendants. | Civil Action No.: 3:23-cv-00915-SVN |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................... iii

I.     PRELIMINARY STATEMENT ................................................................................. 1

II.    FACTS ........................................................................................................................ 6

     A.     BIOXCEL'S FUNDING DEPENDED ON FDA APPROVAL FOR A NEW
        INDICATION FOR BXCL501 ....................................................................... 6

     B.     THE INCLUSION/EXCLUSION CRITERIA FOR THE TRANQUILITY II TRIAL
        REQUIRED ASSESSMENT OF MULTIPLE TESTS PRIOR TO ADMITTANCE IN THE
        STUDY ........................................................................................................ 7

     C.     BIOXCEL ENTRUSTED THE TRANQUILITY II CLINICAL TRIAL TO A
        NOVICE INVESTIGATOR ............................................................................. 8

     D.     THE FDA ISSUED A FORM 483 TO DR. MEYER'S TRIAL SITE .................................. 8

     E.     DR. MEYER SUBMITTED A RESPONSE TO THE FDA ADMITTING TO THE
        VIOLATIONS CITED IN THE FORM 483 ....................................................... 9

     F.     BIOXCEL FINALLY DISCLOSED THE FORM 483 SHORTLY AFTER SELLING
        THEIR SHARES AND FINISHING THE STUDY .............................................. 11

     G.     BIOXCEL STATED THAT IT WILL NOT RECEIVE FUNDING, JEOPARDIZING
        ITS ABILITY TO CONTINUE AS A GOING CONCERN ................................. 12

     H.     AFTER REPEATED MEETINGS WITH THE FDA, BIOXCEL WAS FORCED TO
        REPEAT THE TRANQUILITY II TRIAL ....................................................... 13

III.   ARGUMENT .............................................................................................................. 14

     A.     STANDARD ON A MOTION TO DISMISS ................................................... 14

     B.     THE NEW FACTS CONFIRM THAT THE PATIENTS CITED IN THE FORM 483
        WOULD HAVE TO BE EXCLUDED FROM THE TRANQUILITY II TRIAL ................. 14

     C.     THE COMPLAINT ALLEGES SIX FALSE AND MISLEADING STATEMENTS .................. 19

        1.     The Court Sustained the March 2023 Risk Disclosure Statement ............ 19

        2.     The Court Sustained the May 9, 2023 Statement That the
            Tranquility II Trial "Is Complete" ............................................................ 21

3.      The March 2023 Statements Regarding Completion of TRANQUILITY II Enrollment Were False or Misleading ...................... 22

4.      The June 2023 Statement About the Ability to Use TRANQUILITY II in an sNDA Was Misleading.................................... 23

5.      The March 2023 Cash Runway Statement Was False or Misleading....... 24

6.      The Issues Cited in the Form 483 Were "Serious" .................................. 26

D.      THE COMPLAINT ALLEGES THAT DEFENDANTS ACTED WITH SCIENTER ............. 27

1.      The Complaint Alleges Circumstantial Evidence of Scienter .................. 28

a.      Defendants Knew Facts Undermining the Accuracy of Their Public Statements ................................................................ 30

i.      Scienter for Statements Previously Held to Be Misleading......................................................................... 30

ii.      Scienter for Remaining Alleged Statements ..................... 31

iii.      Defendants' Competing Inference Is Not Plausible.......... 32

b.      Defendants' Experience in Clinical Trials.................................... 33

c.      Post Class Period Events Further Support the Inference that Defendants Knew That the Meyer Response Was Insufficient ................................................................................. 34

d.      The Fraud Involved THE Core Operation of the Company ......... 35

2.      The Complaint Alleges Motive and Opportunity ..................................... 36

E.      THE COMPLAINT ALLEGES LOSS CAUSATION FOR THE AUGUST 2023 STOCK PRICE DECLINE ................................................................................................. 38

F.      THE COMPLAINT PLEADS A SECTION 20(A) CLAIM................................................. 40

CONCLUSION............................................................................................................... 40

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*In re Able Labs Sec. Litig.*,
2008 WL 1967509 (D.N.J. Marc 24, 2008) ...............................................................................29

*Abramson v. NewLink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020).....................................................................................................23

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
19 F.4th 145 (2d Cir. 2021) .................................................................................14, 19, 28, 40

*In re Ambac Fin. Group, Inc. Sec. Litig.*,
693 F. Supp. 2d 241 (S.D.N.Y. 2010).......................................................................................18

*In re AppHarvest Sec. Litig.*,
684 F. Supp. 3d 201 (S.D.N.Y. 2023).......................................................................................19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...................................................................................................................14

*Azar v. Yelp, Inc.*,
2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) .........................................................................37

*Barrie v. Intervoice-Brite, Inc.*,
397 F.3d 249 (5th Cir. 2005) ....................................................................................................18

*In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*,
763 F. Supp. 2d 423 (S.D.N.Y. 2011).......................................................................................26

*In re Biomarin Pharm. Inc. Sec. Litig.*,
2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ..............................................................................37

*Campo v. Sears Holdings Corp.*,
371 Fed. App'x. 212 (2d Cir. 2010)...........................................................................................34

*DeMarco v. DepoTech Corp.*,
149 F.Supp.2d 1212 (S.D. Cal. 2001).......................................................................................18

*In re Dentsply Dirona, Inc. Sec. Litig.*,
665 F. Supp. 3d 255 (E.D.N.Y. 2023) ......................................................................................28

*In re Emergent Biosolutions Inc. Sec. Litig.*,
2023 WL 5671608 (D. Md. Sept. 1, 2023) ...............................................................................30

*Empls' Ret. Sys. of Government of the Virgin Islands v. Blanford*,
794 F.3d 297 (2d Cir. 2015)......................................................................19, 27, 28, 36

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
270 F.3d 645 (8th Cir. 2001) ...........................................................................................18

*Galestan v. OneMain Holdings, Inc.*,
348 F. Supp. 3d 282 (S.D.N.Y. 2018)..............................................................................14

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000).............................................................................................17

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011)..............................................................................34

*In re Guilford Mills, Inc. Sec. Litig.*,
1999 U.S. Dist. LEXIS 21690 (S.D.N.Y. July 21, 1999) ...............................................37

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
20 F.4th 131 (2d Cir. 2021) .............................................................................................29

*Highland Cap. Mgmt., L.P. v. Schneider*,
2004 WL 2029406 (S.D.N.Y. Sept. 9, 2004)...................................................................18

*Homyk v. Chemocentryx, Inc.*,
2023 WL 3579440 (N.D. Cal. Feb. 23, 2023) .................................................................36

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001).......................................................................................27, 31

*Lozada v. TaskUS, Inc.*,
710 F. Supp. 3d 283 (S.D.N.Y. 2024)..............................................................................40

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
601 U.S. 257 (2024).........................................................................................................27

*In re MannKind Sec. Actions*,
835 F. Supp. 2d 797 (C.D. Cal. 2011) .............................................................................18

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
761 F.3d 245 (2d Cir. 2014).............................................................................................19

*Mulligan v. Impax Labs, Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2016) ...............................................................................36

*Nguyen v. New Link Genetics Corp.*,
297 F. Supp. 3d 472 (S.D.N.Y. 2018)..............................................................................36

iv

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
   367 F. Supp. 3d 16 (S.D.N.Y. 2019).................................................................. *passim*

*Ong v. Chipotle Mexican Grill, Inc.*,
   294 F.Supp.3d 199 (S.D.N.Y. 2018)........................................................................18

*In re Oxford Health Plans, Inc.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) ...............................................................................37

*Rosi v. Aclaris Therapeutics, Inc.*,
   2021 WL 1177505 (S.D.NY. March 29, 2021) .........................................................29

*Salzman v. ImmunityBio, Inc.*,
   2024 WL 3100274 (S.D. Cal. June 20, 2024)......................................................29, 36

*San Antonio Fire & Police Pension Fund v. Dentsply*,
   2024 WL 1898512 (S.D.N.Y. May 1, 2024) ............................................................19

*Senn v. Hickey*,
   2005 WL 3465657 (D.N.J. Dec. 19, 2005)...............................................................37

*Set Cap. LLC v. Credit Suisse Grp. AG*,
   996 F.3d 64 (2d Cir. 2021).......................................................................................21

*Setzer v. Omega Healthcare Invs. Inc.*,
   968 F.3d 204 (2d Cir. 2020)................................................................................27, 28

*In re Shanda Games Ltd. Sec. Litig.*,
   2022 WL 992794 (S.D.N.Y. Mar. 31, 2022) ............................................................18

*Sills and Dick v. United Natural Foods, Inc.*,
   2024 WL 4188324 (S.D.N.Y. Sept. 13, 2024)................................................... *passim*

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
   2024 WL 456745 (S.D.N.Y. Feb. 5, 2024)...............................................................29

*In re Teva Sec. Litig.*,
   671 F. Supp. 3d 147 (D. Conn. 2023)......................................................................38

*Todd v. Staar Surgical Co.*,
   2016 WL 6699284 (C.D. Cal. April 12, 2016) ...................................................30, 33

*Tung v. Bristol-Myers Squibb Co.*,
   2020 WL 5849220 (S.D.N.Y. Sept. 30, 2020)..........................................................18

*United States v. Harra*,
   985 F.3d 196 (3d Cir. 2021).....................................................................................18

v

*In re Viropharma Inc. Sec. Litig.*,
    21 F. Supp. 3d 458 (E.D. Pa. 2014) ......................................................................................37

*Weston v. DocuSign, Inc.*,
    669 F. Supp. 3d 849 (N.D. Cal. 2023) ...................................................................................36

**Other Authorities**

Allan Horwich, *The Origin, Application, Validity, and Potential Misuse of Rule
    10b5-1*, 62 Bus. Law. 913, 949-50 (2007)...............................................................................38

Lead Plaintiffs Tonya Hills and Oklahoma Law Enforcement Retirement System ("OLERS") (together with Ms. Hills, "Plaintiffs") respectfully submit this Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Second Amended Complaint for Violations of the Federal Securities Laws (ECF No. 134). For the foregoing reasons, Defendants' Motion to Dismiss should be dismissed in its entirety.

## I.    PRELIMINARY STATEMENT

Plaintiffs' Second Amended Class Action Complaint for Violation of the Federal Securities Laws ("Complaint") pleads new, game-changing facts that answer questions the Court raised in Plaintiffs' favor and cures the defects that the Court identified in its Ruling on Defendants' Motion to Dismiss the Amended Class Action Complaint (ECF No. 128) ("Op.").

*First*, the Complaint pleads Dr. Caitlin Meyer's response (the "Meyer Response") to the FDA's Form 483 Letter ("Form 483"), which Plaintiffs received in response to a FOIA request just two days before filing the Complaint. During the hearing the Court held on June 24, 2024, both the Court and Defendants' counsel posited that the Meyer Response might answer a key question pertaining to the actionability of certain statements as well as Defendants' scienter: whether or not the issues cited in the Form 483 were "correctable." Tr. at 35:2-5; 55:19; 56:20-21).[1] The Meyer Response and other new facts demonstrate that in fact, the issues identified in the Form 483 could not be fixed, meaning that Defendants knew they would need to either repeat the TRANQUILITY II trial or conduct another clinical trial to collect additional data.

Specifically, the Meyer Response admits that *sufficient documentation did not exist* to demonstrate that 25 of the 37 patients whose files the FDA reviewed (and 25 out of 60 total patients at Dr. Meyer's trial site) met the inclusion and exclusion criteria for TRANQUILITY II at the time

---

[1] Cites to "Tr. at __" are to the Verbatim Report of Proceedings Before the Honorable Sarala Nagala, dated June 24, 2024, attached to the Declaration of Caitlin M. Moyna as Exhibit A.

they were admitted to the trial. Nor did documentation exist in December 2023 when the FDA conducted its site investigation. Dr. Meyer did not, therefore, simply misplace or fail to procure adequate documents – rather, the documents did not exist at all.

Dr. Meyer's fix for this problem was no solution at all: she retroactively created "notes to file" purporting to summarize factors that led her to conclude that the TRANQUILITY II patients had probable Alzheimer's Disease (the key inclusion criteria for the study). This was much too little, much too late. The determination and documentation of whether the patients had probable Alzheimer's Disease was required to have been done prior to study admittance, particularly where, as here, an inexperienced doctor, who called TRANQUILITY II a "learning experience," was evaluating multiple tests to determine if patients met the inclusion and exclusion criteria. It was therefore **impossible** for Dr. Meyer to reverse time and demonstrate that her purported observations – in some instances made seven months earlier – were true and accurate. Further, because evidence demonstrating that the patients met the inclusion and exclusion criteria **did not exist at the time the patients were admitted to TRANQUILITY II, and the problem therefore could not be corrected,** the FDA would not – and, in fact, did not – accept data from these patients, thereby necessitating additional clinical trials – including a TRANQUILITY II do over – for BioXcel's regulatory package.

**Second**, the Complaint pleads that if a Form 483 response cures the FDA's observations, the FDA will issue an Establishment Inspection Report ("EIR") within 45 days after closing the investigation. The Meyer Response was submitted on January 13, 2023; thus, if it had cured the Form 483 defects, the FDA would have issued an EIR by February 27, 2023. But no EIR has issued even to this day, demonstrating that the Meyer Response failed to correct the infractions. Defendants were on notice of this fact by no later than February 27, 2023, and therefore knew that

2

data from the 32 patients cited in the Form 483, and perhaps others from Dr. Meyer's trial site, would have to be excluded, leaving TRANQUILITY II underpowered, and requiring BioXcel either to re-do the study or conduct additional clinical trials to get a new indication for BXCL501.

*Third*, the Complaint pleads that the FDA has, in fact, excluded Dr. Meyer's patients from the TRANQUILITY II study analysis and required BioXcel to conduct additional clinical trials. TRANQUILITY II was designed with the FDA's input, and included enough patients to be sufficiently "powered," so that conclusions could be drawn from any observed differences between patients receiving BXCL501 and the placebo group. The Company told investors that it would be able to apply for a supplemental new drug application ("sNDA") for BXCL501 if the results TRANQUILITY II were successful. The Company announced such positive results on June 29, 2023. Thus, assuming that the problems with the Form 483 had been or could have been corrected, the Company would have been able to apply for an sNDA using TRANQUILITY II (and other studies it had already conducted). But that is not what happened. As evidenced by Defendants' own descriptions of two "Type B" meetings in October 2023 and February 2024, the FDA told BioXcel that it had to either re-do the TRANQUILITY II study or conduct a new trial to generate additional efficacy data for BXCL501 in the inpatient setting, *i.e.*, the same patient setting as TRANQUILITY II. Indeed, in April 2024, the Company announced that it was beginning the TRANQUILITY In Care study, which replicates TRANQUILITY II.

*Fourth*, Plaintiffs add new facts confirming that Defendants' statements about BioXcel's liquidity were materially misleading given the terms of their financing agreements. Defendants previously faulted Plaintiffs for failing to allege the precise "regulatory milestones" that rendered these statements false if left unmet or unsatisfied. *See*, *e.g.*, Transcript at 28, 57, 81; *see also* Op. at 26. Plaintiffs now plead that Defendants would be unable to access up to $65 million in funding

3

from BioXcel's two private investors, Oaktree Fund Administration LLC ("Oaktree") and Qatar Investment Authority ("Qatar"), because BioXcel was unable to secure FDA approval based on the TRANQUILITY II trial alone.  The problems cited in the Form 483 necessitated additional clinical trial research before BioXcel could submit its sNDA for BXCL501.  This was, in fact, the "regulatory milestone" standing in the way of BioXcel obtaining funds to continue operations.  Thus, BioXcel misled investors when it told them it had sufficient cash runway for 12 months, because it omitted to disclose the problems in TRANQUILITY II, which impeded its ability to obtain its funding from Qatar and Oaktree.

*Fifth*, the Complaint provides additional support for the "motive" allegations giving rise to Chief Executive Officer ("CEO") Vimal Mehta's scienter.  While his 10b5-1 trading plan prevented him from dumping his shares immediately after receiving the Form 483, he intentionally timed the disclosure of the Form 483 so as to avoid losses he otherwise would have incurred.  The trading plan called for Mehta to sell predetermined amounts at predetermined times; approximately 65,000 shares in March 2023 and 60,000 shares in June 2023.  Had Mehta disclosed the Form 483 and, relatedly, the need to conduct additional clinical trials and the delay it would cause in terms of obtaining regulatory approval for BXCL501, BioXcel's stock price would have declined prior to his 10b5-1 sales.  Consequently, by concealing the Form 483 for as long as he did, Mehta kept BioXcel's stock price intact and avoided nearly $2 million in losses.

Viewed collectively, and together with the facts alleged in the First Amended Complaint ("FAC"), these new facts state a claim for securities fraud against BioXcel and three of its corporate officers: CEO Vimal Mehta ("Mehta"); Chief Financial Officer ("CFO") Robert Steinhart; and Chief Medical Officer ("CMO") Robert Risinger ("Risinger").  Specifically, the Complaint alleges that Defendants materially misled investors on the following occasions:  (1)

4

twice in March 2023, when they told investors that patient enrollment in TRANQUILITY II was "fully enrolled" and "complete"; (2) in March 2023, when they described third-party non-compliance as a mere "risk" to its ability to commercialize its product; (3) in March 2023, when they told investors that BioXcel had sufficient cash runway to fund its operations for a year; (4) in May 2023, when they told investors that TRANQUILITY II was "complete"; and (5) in June 2023, when they told investors that TRANQUILITY II might be used to support an sNDA. As the Meyer Response demonstrates, the issues cited in the Form 483 were not correctable and thus, the FDA excluded data from those patients, leaving TRANQUILITY II under-enrolled and insufficiently powered, rendering false or misleading any statements about enrollment, study completion, or the use of TRANQUILITY II to support an sNDA. And because Defendants' ability to unlock its strategic financing agreements was thwarted by the problems in the Form 483, its cash runway statement was also misleading.

The Court previously held that two statements were materially misleading because Defendants had failed to disclose the Form 483: (1) BioXcel's risk disclosure about third-party compliance and (2) Risinger's statement in May 2023 that TRANQUILITY II was "complete." Op. at 23-25, 31. The Court nevertheless dismissed all claims because it found that scienter was lacking. Op. at 35. The new facts cure this defect, for both these statements and the other four statements pled in the Complaint. There is in fact, no dispute that Defendants knew about the Form 483, knew about the Meyer Response, and did not receive word from the FDA in the form of an EIR that the Meyer Response cured the Form 483 observations. Allegations that Defendants knew facts that undermine or belie public statements is enough to allege circumstantial evidence of their scienter in misleading-by-omission cases. *See Sills and Dick v. United Natural Foods,*

5

*Inc.*, 2024 WL 4188324, at *11 (S.D.N.Y. Sept. 13, 2024); *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 31 (S.D.N.Y. 2019).

Finally, the Complaint pleads a connection between the problems in TRANQUILITY II and BioXcel's disclosure on August 14, 2023 that it doubted its ability to continue as a going concern, thus satisfying loss causation for this corrective disclosure. Specifically, the Company stated that "recent events" threatened its ability to unlock funding. While the Company did not define specifically what "recent events" it was referring to, analysts understood this to mean the problems associated with TRANQUILITY II.

## II.    FACTS

### A.    BIOXCEL'S FUNDING DEPENDED ON FDA APPROVAL FOR A NEW INDICATION FOR BXCL501

BioXcel is a pharmaceutical company that uses AI to identify new therapies for existing chemical compounds. ¶¶ 49, 51.[2] During the Class Period, BioXcel's entire product line came from just four chemical compounds, and its only commercially viable product was IGALMI, or "BXCL501," which is used to treat agitation in patients with schizophrenia and bipolar disorder. ¶¶ 52, 53. IGALMI had limited commercial success. ¶¶ 55-56, 82.

On December 15, 2021, BioXcel announced that it was planning to test BXCL501 in two "pivotal [clinical] trials" for the treatment of agitation in patients with Alzheimer's Disease. ¶¶ 57-59. These Phase 3 clinical trials – TRANQUILITY II and TRANQUILITY III – were developed following "multiple meetings with the FDA." ¶ 59. Defendants told investors that it intended for the TRANQUILITY II and III trials to support an sNDA with the FDA. ¶¶ 71-74. Specifically, it told investors that the "Alzheimer's program is progressing, ***and we will be ready to file an sNDA in that program after completion of 2 pivotal trials***", i.e., TRANQUILITY II and

---

[2] Citations to "¶ __" are to paragraphs in the Complaint.

III. ¶ 74. Thus, Defendants did not expect to have to conduct any additional trials if TRANQUILITY II and III yielded positive results.

To fund the clinical trials, the Company entered into a $260 million strategic financing agreement with Oaktree and Qatar. ¶ 84. This would "extend[] [the] Company's cash runway into 2025." ¶ 84. The Company disclosed the terms of the credit agreement with Oaktree and Qatar in its form 10-K filed with the SEC on March 16, 2023. ¶ 85. The credit agreement required BioXcel to meet certain milestones before the funding would be released. ¶¶ 88-89. Specifically, $35 million in funding would be released only when "certain regulatory and financial milestones" were met. ¶ 89. One of the "regulatory milestones" was "the receipt of approval from the FDA of an NDA in respect of the use of BXCL501 for the acute treatment of agitation associated with Alzheimer's Disease." *Id.* An additional $30 million would become available when the Company achieved certain sales milestones for BXCL501. ¶ 90. Because IGALMI sales to bipoloar and schizophrenia patients were so low, BioXcel could only meet the sales milestones once BXCL501 was approved for Alzheimer's patients. Thus, $65 million in funding was riding on the outcome of the TRANQUILITY II trial.

### B. THE INCLUSION/EXCLUSION CRITERIA FOR THE TRANQUILITY II TRIAL REQUIRED ASSESSMENT OF MULTIPLE TESTS PRIOR TO ADMITTANCE IN THE STUDY

TRANQUILITY II required enrollment of 150 patients: 50 receiving 40 mcg of BXCL501; 50 receiving 60 mcg of BXCL501; and 50 receiving a placebo. ¶ 61. These numbers were selected in consultation with the FDA to ensure that the study would be adequately "powered," meaning that investigators could draw conclusions about differences among the various study groups. ¶ 61.

The inclusion and exclusion criteria were extensive and required assessment of a host of medical conditions. Specifically, patients admitted into TRANQUILITY II had to be diagnosed with probable Alzheimer's Disease based on the National Institution on Aging and Alzheimer's

7

Association criteria, which requires examining whether patients had amyloid plaques and tau tangles, which are abnormal brain structures. ¶ 64. They also had to show behavior consistent with the International Psychogeriatric Association criteria for agitation, and had to have a score of 15 to 23 on the Mini-Mental Sate Exam, an 11-question test measuring 5 areas of cognitive function. ¶¶ 62-63. Patients also had to meet ten exclusion criteria. They could not have dementia or memory problems unrelated to Alzheimer's Disease, evidence of cerebrovascular incident, a history of significant syncope or syncopal attacks, or a high risk fall score on the Johns Hopkins Fall Risk Assessment Test. ¶¶ 65, 66.

### C. BIOXCEL ENTRUSTED THE TRANQUILITY II CLINICAL TRIAL TO A NOVICE INVESTIGATOR

The Company engaged Segal Trials to conduct a portion of the TRANQUILITY II trial. ¶ 75. Dr. Caitlin Meyer was the principal investigator for a trial site in South Florida where 40% of the patients were enrolled, making it the largest trial site for TRANQUILITY II. ¶ 75. Dr. Meyer's areas of expertise do not include Alzheimer's Disease or dementia, and she did not become a board-certified psychiatrist until September 12, 2022, approximately four months after she began seeing and dosing TRANQUILITY II patients. ¶¶ 77, 78; ECF 130-2 (showing that 9 patients were screened and/or dosed in May 2022). TRANQUILITY II was Dr. Meyer's first experience as a principal investigator. ¶ 79.

### D. THE FDA ISSUED A FORM 483 TO DR. MEYER'S TRIAL SITE

The FDA conducts clinical trial site investigations as part of its compliance program. ¶ 110. Typically, whereas here, no NDA is pending for the drug being tested, the FDA only inspects a trial site if a whistleblower raises concerns about data integrity or patient enrollment. ¶¶ 111, 126. After conducting a trial site visit, the FDA might issue a Form 483 if it observes any regulatory violations. ¶ 112. Once a Form 483 is received, the clinical investigator must respond

addressing each violation noted. ¶ 113. If the response is acceptable to the FDA, it will issue an EIR within 45 days, confirming that the problems were resolved. ¶¶ 115, 116, 150. If no EIR is issued, the problems noted in the Form 483 are open and unresolved. ¶¶ 115, 150.

On December 5, 2022, Dr. Lyght, an experienced FDA inspector, began an investigation of Dr. Meyer's North Miami clinical trial site for TRANQUILITY II. ¶ 124, 127. He visited Dr. Meyer's trial site on 8 dates during the period of December 5, 2022 to December 21, 2022. ¶ 128. He reviewed 37 patient files of the 60 patients enrolled in Dr. Meyer's trial site, and reported violations he observed in a Form 483 dated December 21, 2022. ¶¶ 3, 129.

Specifically, Dr. Lyght observed the following:

- Four out of 37 subjects were not consented using the prior consent form. ¶¶ 130, 131.

- 25 out of 37 subjects reviewed "did not have sufficient documentation to show that they met all inclusion/exclusion criteria." Three of these subjects' files contained documentation they potentially met exclusion criteria of having memory impairment or worsening of cognitive function unrelated to probable Alzheimer's Disease. ¶¶ 133-134.

- Four out of 37 patients were randomized into one of the three study subgroups despite not having a current urinary drug screen. ¶¶138-140.

- One patient experienced a serious adverse event ("SAE") which was not reported to the medical monitor or safety team until 11/16/22, outside of the proscribed time. ¶ 142.

### E.    DR. MEYER SUBMITTED A RESPONSE TO THE FDA ADMITTING TO THE VIOLATIONS CITED IN THE FORM 483

Dr. Meyer responded to the FDA on January 23, 2023. ¶ 147. She explained that TRANQUILITY II was her "first study as Principal Investigator," and she appreciated the "opportunity to better understand [her] role as a Clinical Investigator and the practical application of the regulations and guidelines that govern the conduct and oversight of human subject research." ¶ 148. She stated that TRANQUILITY II was an "invaluable" "learning experience." ¶ 148.

9

Dr. Meyer then addressed the infractions noted in the Form 483. ¶¶151-162. Her responses admitted to the following:

- Informed Consent:  "The site did not provide the information describing the basic elements of the informed consent in Spanish by using the IRB-approved short form.  They did so verbally using the IRB – Approved English long form . . . Three (3) of 4 subjects were reconsented at a later date with the IRB approved Spanish short form."  ¶¶ 151-152.

- Failure to Document Inclusion/Exclusion Criteria:  Patients who had not previously been diagnosed with probable Alzheimer's Disease were "evaluated during a screening visit," and their "performance on testing scales were reviewed."  However, factors leading to a diagnosis of probable Alzheimer's Disease were not adequately documented.  Dr. Meyer attempted to remedy this by "generat[ing] a NTF [note to file] that summarizes the relevant information to conclude . . . that subjects met all inclusion/exclusion criteria."  ¶¶ 155-157. The FDA had noted that 25 out of the 37 patient files it reviewed had incomplete documentation.  ¶ 153.

- Urinary Drug Screening:  Four patients were dosed with BXCL501 despite that their UDS was out of date per the study protocol.  ¶¶ 158-159.

- Untimely Report of SAE:  One SAE was reported late "because of an oversight error" on her part.  ¶ 162.  She stated that "this was the only report that was submitted outside of the required timeframe stated in the protocol."  ¶ 162. However, as BioXcel and investors would later learn, Dr. Meyer fabricated an email to hide a second unreported SAE.  ¶¶ 144-146.

These infractions were serious.  Consent cannot be given retroactively, and there was no way to reverse time and determine whether the four patients who were dosed with an outdated UDS had drugs in their system that would have excluded them from TRANQUILITY II at the time of dosing.  ¶¶ 132, 141.  As to the 25 patients who had inadequate documentation in their files demonstrating that they met the inclusion and exclusion criteria, creating belated "notes to file" – in some cases up to seven months post study admittance and the purported clinical diagnosis – could never satisfy the FDA that these patients met the inclusion/exclusion criteria, particularly when the diagnoses were performed, and the notes were generated, by a first-time Principal Investigator who had yet to receive her Board certification.  ¶¶ 77-80, 157.  Plaintiffs' expert Dr.

10

Alyson Wooten confirms that patients who were not properly consented, were not properly drug screened, and were lacking documentation showing they met the inclusion/exclusion criteria would have to be excluded from TRANQUILITY II.  ¶¶ 165-169.  Thus, each of the 32[3] patients cited in the Meyer Response should have been excluded from the study analysis.  ¶¶ 165-169.

**F.    BIOXCEL FINALLY DISCLOSED THE FORM 483 SHORTLY AFTER SELLING THEIR SHARES AND FINISHING THE STUDY**

For nearly six months, Defendants said nothing of the Form 483 or Dr. Meyer's Response. During that time, CEO Vimal Mehta unloaded 125,000 shares of stock (65,000 shares in March 2023 and 60,000 shares in June 2023) through a preset 10b5-1 insider trading plan, meaning Mehta knew in advance the quantities and dates of stock to be sold.  ¶¶ 275, 277.  These sales amounted to nearly 15% of his total holdings and yielded over $2.6 million in proceeds.  ¶ 275.  Recognizing the fallout that would ensue from disclosing the Form 483, Defendants delayed the announcement until after these sales were completed and only after BioXcel was able to disclose it alongside topline results for TRANQUILITY II.  ¶¶ 185, 275, 287.  Specifically, the Company announced that the FDA had inspected the trial site "where the principal investigator enrolled approximately 40% of the subjects participating in the trial."  ¶ 185.  It issued a Form 483 "identifying three inspectional observations."  ¶ 185.  BioXcel only disclosed that the observations "related to the principal investigator's failure to adhere to the [approved] informed consent form . . . maintain adequate case histories for certain patients whose records the FDA reviewed, and adhere to the investigational plan in certain instances."  ¶ 185.  On this news, the price of BioXcel's stock sank by a whopping 63.8%.  ¶ 188.

---

[3] 25 patients that were inadequately documented for inclusion/exclusion criteria, 4 patients that did not receive drug screen at the proper time, and the 3 patients that Dr. Meyer admitted to consenting at a later time.

The Company also disclosed positive, statistically significant topline results from the TRANQUILITY study. *See* Moyna Decl. Ex. B (Form 8-K filed with the SEC on June 29, 2023). Specifically, patients dosed with 60 mcg of BXCL501 exhibited a statistically significant reduction in Positive and Negative Syndrome Scale-Excitatory Component total score and at reducing agitation symptoms at 1 hour during the first episode of agitation. *Id*. "Most patients (76%) responded to the first 60 mcg does and were determined to be 'Very Much' or 'Much Improved.'" *Id.*

Analysts mostly ignored the positive topline results and focused on the Form 483, with one noting that "trial conduct and data integrity are a key focus." ¶ 189. One asked whether "efficacy results hold up when you exclude" the 40% of patients in Dr. Meyer's trial site, and noted that she had "not seen this in [her] career." ¶ 192. Another analyst was concerned that the FDA would seek to "exclude all the patients from" Dr. Meyer's trial site. ¶ 194. Dr. Risinger admitted that the FDA might require BioXcel to "repeat the efficacy, let's say analysis with individual subjects that might be out of question." ¶ 192.

## G.    BioXcel Stated That It Will Not Receive Funding, Jeopardizing Its Ability to Continue as a Going Concern

Less than two months later, on August 14, 2023, BioXcel announced a "Strategic Reorganization." ¶ 196. The Company said it would reduce "more than 50% of its cash burn" and would reduce its workforce from 190 to 80 employees. ¶ 196. As part of this, BioXcel also announced "shifting [its] primary focus to development in the at-home setting" to treat agitation in patients with Alzheimer's Disease. ¶ 196. Defendant Mehta characterized this decision as "capital-efficient." ¶ 196. Thus, as part of its efforts to save money, the Company was shifting the focus of its TRANQUILITY program away from inpatient settings.

The Company also announced that its "previously disclosed runway projection assumed the full utilization of its strategic financing agreements ($155 million of potential additional availability) with Oaktree Fund Administration LLC and Qatar Investment Authority."  It further stated that, "*[b]ased on recent events, the Company is not likely to be in a position to meet the milestones required to access additional capital under the financing agreements*."  ¶ 196.  The Company does not identify specifically what "recent events" led to this conclusion.

Analysts were befuddled.  UBS and Cannacord Genuity expressed skepticism with the decision to focus on developing IGALMI for the at-home setting.  ¶¶ 204, 205.  They understood that the "data reporting issues" associated with TRANQUILITY II "have added a layer of risk around the regulatory pathway for this indication."  ¶ 204.  The UBS analyst explicitly connected BioXcel's financial deterioration to the TRANQUILITY II issues: "*The action was likely catalyzed by the unfortunate situation with TRANQUILITY II (T-2), in which there were data reporting issues.*"  ¶ 204 (emphasis added).

### H.   AFTER REPEATED MEETINGS WITH THE FDA, BIOXCEL WAS FORCED TO REPEAT THE TRANQUILITY II TRIAL

To this day, the FDA has not closed its investigation into the problems at Dr. Meyer's trial site, or issued an EIR signaling that the Meyer Response adequately addressed its concerns.  ¶ 170.  BioXcel met with the FDA twice – on October 11, 2023 and on February 20, 2024.  ¶¶ 177, 179.  These "Type B" meetings were in depth discussions analyzing detailed "briefing books" covering the clinical data collected to date and submitted to the FDA.  ¶ 177.  The Company reported on the two Type B meetings.  ¶ 179.  Specifically, the FDA told BioXcel that it had to "generate additional data, including repeat-dose efficacy data, to support an sNDA submission."  ¶ 179.  The FDA "indicated that our proposed efficacy database, which currently includes the 70 patients who have been treated with 60 mcg of BXCL 501 in TRANQUILITY I and TRANQUILITY II *would not*

***contain substantial evidence of effectiveness absent additional data.***" ¶ 179 (emphasis added). Further, BioXcel was not permitted to continue with its "at-home" program prior to "generat[ing] the necessary efficacy data in care facilities." ¶ 179.

On April 10, 2024, BioXcel announced its TRANQUILITY In-Care" pivotal Phase 3 trial. The new Chief of Product Development and Medical Officer, Vincent O'Neill, stated that it "largely mirrors TRANQUILITY II." ¶ 180.  Other than eliminating the 40 mcg dosing patient group, TRANQUILITY In-Care is identical to TRANQUILITY II.  ¶¶ 181-182.

## III.    ARGUMENT

### A.    STANDARD ON A MOTION TO DISMISS

Complaints must be sustained if they "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 295 (S.D.N.Y. 2018).  "This standard is met 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id*.  The Court may not "assay the weight of the evidence which might be offered in support" of the claims pled.  *Id.*  All pled facts must be accepted as true.  *Id.*  Reasonable inferences must be drawn in plaintiff's favor. *Lexmark Int'l, Inc.*, 367 F. Supp. 3d at 27.  "Although pleading standards are heightened for securities fraud claims, we must be careful not to mistake heightened pleading standards for impossible ones." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021).

### B.    THE NEW FACTS CONFIRM THAT THE PATIENTS CITED IN THE FORM 483 WOULD HAVE TO BE EXCLUDED FROM THE TRANQUILITY II TRIAL

Defendants argued that an issue critical to determinations of falsity and scienter is whether the violations cited in the Form 483 could be remedied.  This led the Court to ask during the June

28, 2024 oral argument whether the violations described in the Form 483 were "correctable." *See* Tr. 55:19, 56:2-5, 56:18-21.

Defendants' counsel also put the question of correctability squarely at issue during their counsel's oral argument regarding scienter. Specifically, Defendants' counsel posited that "[t]here are no allegations that the Form 483 was going to impair FDA approval or that defendants believed that was the case, and again nothing – that didn't actually happen. ***No allegations that Dr. Meyer's response to the FDA was insufficient***. So we have her response. ***Presumably defendants and others were aware of what was in the response. Plaintiffs don't allege what was in it***." Tr. at 34: 7-19 (emphasis added). Defendants' counsel further argued: "[There are] [n]o allegations from any confidential witness that the paperwork, the observations in the form – ***the specific observations in the Form 483 actually couldn't be remedied***, ***that the paperwork was missing***. There are no facts in the record that establish that. Now, obviously, we have the Form 483, which speaks for itself, but beyond that, ***no indication that they couldn't be fixed or that the paperwork couldn't be found in the record***." Tr. at 35:1-9 (emphasis added).

The Court concluded that statements regarding complete trial enrollment were not actionable because Plaintiffs drew "too strong an inference from the Form 483 itself, which observes only that Dr. Meyer's site did not have 'adequate case histories' or 'sufficient documentation' regarding enrollment criteria." Op. at 28.

The new facts establish that the Form 483 violations were not, in fact, "correctable", which resulted in the exclusion of patients. Specifically, "the [patients'] paperwork *was* missing," and "***couldn't be found in the record***" because it did not exist. Dr. Meyer created paperwork retroactively, in some cases seven months after patients were admitted to TRANQUILITY II. *See* ECF 130-2 (showing that nine patients cited by the FDA were admitted to the study in May 2022).

15

Thus, at a minimum, the 32 patients cited in the Form 483, and perhaps all 60 of Dr. Meyer's patients, would have to be excluded from the study analysis.  This conclusion is reasonably inferred from the following facts:

- Dr. Meyer was conducting her first trial as a principal investigator, which she characterized as a "learning experience," ¶¶ 79-80;

- Dr. Meyer was not certified as a psychiatrist until September 2022, months after her involvement in TRANQUILITY II began, and her specialties did not include Alzheimer's Disease or dementia, ¶¶ 73, 77-78, 154;

- the seven inclusion and ten exclusion criteria for TRANQUILITY II required assessments of multiple tests prior to patient enrollment, ¶¶ 62-69;

- Dr. Meyer began seeing patients as early as May 2022, ¶ 77, ECF 130-2;

- Dr. Meyer did not adequately document that the patients met the inclusion/exclusion criteria at the time of enrollment, and there is thus no contemporaneous evidence that she properly evaluated the results of the tests administered prior to admitting patients to TRANQUILITY II to determine if they met the inclusion/exclusion criteria, ¶¶ 155-156;

- Months after she began admitting patients to TRANQUILITY II, in January 2023, Dr. Meyer retroactively attempted to demonstrate that patients met the inclusion/exclusion criteria by "generat[ing] notes to file," purporting to summarize the results of the tests that had been administered up to seven months prior, ¶ 156;

- The inadequate documentation was found in 25 of 37 – or 68% – of patient files reviewed by the FDA, ¶ 134;

- Dr. Meyer admitted that three patients did not sign approved consent forms, ¶¶ 151-152;

- Dr. Meyer admitted that she did not administer the urinary drug screen for three patients during the time mandated by the study protocol, ¶¶ 158-160;

- The FDA never closed its investigation of Dr. Meyer's trial site or issued an EIR, ¶¶ 170-183;

- In February 2024, the FDA told BioXcel that it must generate additional efficacy data in care facilities prior to conducting any at-home trials, ¶ 179; and

- On April 10, 2024, BioXcel announced that it is conducting the TRANQUILITY In-Care trial, which is nearly identical to TRANQUILITY II, ¶¶ 180-182.

16

Defendants argue that Plaintiffs offer nothing but "naked conclusions" to support the inference that data from Dr. Meyer's patients should have been – and in fact were – excluded from the study analysis by the FDA.  Def. Br. at 17-18; *see also* Def. Br. at 16 (referring to Plaintiffs' "self-serving characterization of . . . the sufficiency of the Meyer Response").  But that ignores the litany of facts cited above that support this reasonable inference, which must be drawn in Plaintiffs' favor.  *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 161 (2d Cir. 2000) (Courts must "draw[] all reasonable inferences in the plaintiff's favor.").  Rather, it is Defendants who offer "naked" and "self-serving" conclusions when they argue that the Meyer Response cured the Form 483 defects.[4]

The inference that data from the Meyer trial site would be excluded is bolstered by the conclusions of Plaintiffs' clinical trials expert, Dr. Alyson Wooten.  ¶¶ 164-169.  Dr. Wooten reviewed the TRANQUILITY II trial protocol, the Form 483 Letter, and the Meyer Response.  ¶ 166.  She concluded that the 32 patients cited in the Form 483 should have been excluded from the study analysis, ¶¶ 167-169, meaning that their data could not be used to support an sNDA.  Dr. Dr. Wooten's conclusions are based on the following facts:  (i) "the form used with the four patients was not an IRB-approved consent form" and "the SOP used to consent these patients was deficient", ¶ 167; (ii) it was impossible to "rule out substance abuse or other potential conditions influencing the study results" for the patients who did not receive the urinary drug screen during the time proscribed by the study protocol, ¶ 168; and (iii) for the 25 patients that "did not have

---

[4] This inference also conflicts with argument that Defendants' counsel offered on June 24, 2024, characterizing the Form 483 citations as simply whether BioXcel could "find the paperwork."  Tr. at 83: 4-14.  Defendants' counsel also admitted that "it could be maybe that [BioXcel] can't correct [the documentation problem], but . . . we don't have those facts," Tr. at 86: 4-11, and noted that "the most important thing is that there are no facts alleged that establish that nobody submitted documents to the FDA.  That's just not in the record.  It's not in the allegations."  Tr. 89: 11-16.  Those facts are now in the Complaint, and they establish that the "paperwork" could not be "found" because it did not exist, and no additional documents were submitted to the FDA.

sufficient documentation to show they met all the inclusion/exclusion criteria," there was "no affirmative statement that these patients, at the time of enrollment, were evaluated to determine if they met the inclusion/exclusion criteria," ¶ 169. Numerous courts across the country have given weight to similar expert opinions at the pleadings stage. *See In re Ambac Fin. Group, Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 271 (S.D.N.Y. 2010) (rejecting defendants' challenge to the adequacy of expert adjustments because that "would require the Court to delve into complex factual disputes that cannot be resolved on a motion to dismiss").[5] Defendants rely on *Tung v. Bristol-Myers Squibb Co.*, 2020 WL 5849220, at *5 (S.D.N.Y. Sept. 30, 2020), to argue that Dr. Wooten's allegations should be disregarded. Def. Br. at 18. But there, the expert's conclusory opinion was based only on facts considered and ruled insufficient to state a claim for fraud. *Tung*, 28 F.4th at 354. Here, in contrast, Dr. Wooten does not conclude Defendants' statements were, in fact, misleading, but rather offers observations concerning industry practices in support of Plaintiffs' allegations. *See Tung*, 2020 WL 5849220, at *5 ("A plaintiff can rely on expert testimony to bolster the factual allegations of its complaint, but the Court may not consider any legal conclusions offered by the expert."); *see also In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 821 (C.D. Cal. 2011) (expert opinion concerning FDA practices and adequacy of defendants' studies supported sufficiency of complaint).[6]

---

[5] *Accord United States v. Harra*, 985 F.3d 196, 216 (3d Cir. 2021); *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 257-58 (5th Cir. 2005); *DeMarco v. DepoTech Corp.,* 149 F.Supp.2d 1212, 1222 (S.D. Cal. 2001), *aff'd,* 32 Fed. Appx. 260 (9th Cir. 2002); *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir. 2001).

[6] Defendants rely on additional cases which are distinguishable. *In re Shanda Games Ltd. Sec. Litig.*, 2022 WL 992794, at *4–5 (S.D.N.Y. Mar. 31, 2022) (expert analysis not considered because it offered "improper legal conclusions"); *Ong v. Chipotle Mexican Grill, Inc.*, 294 F.Supp.3d 199, 224 (S.D.N.Y. 2018) (declining to credit "legal conclusions" from expert); *Highland Cap. Mgmt., L.P. v. Schneider*, 2004 WL 2029406, at *4 (S.D.N.Y. Sept. 9, 2004) (rejecting expert allegations that merely repeat allegations found elsewhere, in a non-fraud case).

#### C.    THE COMPLAINT ALLEGES SIX FALSE AND MISLEADING STATEMENTS

To satisfy the "misleading-statement element, the complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *San Antonio Fire & Police Pension Fund v. Dentsply*, 2024 WL 1898512, at *3 (S.D.N.Y. May 1, 2024) (citing *Empls' Ret. Sys. of Government of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015). Courts must "***draw all reasonable inferences in favor of the plaintiff***" and can only dismiss when the plaintiff "***can prove no set of facts consistent with the complaint that would entitle them to relief***." *Altimeo*, 19 F.4th at 150 (emphasis added) (internal quotations omitted).

Where omissions are concerned, the test is "not whether the statement is misleading in and of itself, but whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 236 (S.D.N.Y. 2023). "Literal accuracy is not enough. An issuer must also desist from misleading investors by saying one thing and holding back another." *Id.* (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 192 (2015). "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, ***there is a duty to tell the whole truth***." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) (emphasis added). When a company "list[s] potentially positive trends and downplay[s] potentially negative ones by ***omitting the elephant in the room***, these statements are misleading." *United Natural Foods,* 2024 WL 4188324, at *7 (emphasis added).

##### 1.    The Court Sustained the March 2023 Risk Disclosure Statement

The Complaint alleges that a risk disclosure Defendants made concerning its reliance on third parties, and the need for them to "successfully perform contractual legal and regulatory duties," in its Form 10-K filed on March 16, 2023 was misleading. ¶¶ 213-215. The Court held

19

this statement was actionable, concluding that "Plaintiffs have plausibly demonstrated that one risk disclosure or risk-factor statement in BioXcel's Form 10-K for the year ending December 31, 2022 was materially misleading due to the omission of information regarding the Form 483." Op. at 22. The Court noted that "[w]hile the statement may be literally true, presenting this information as a risk disclosure – when there was evidence that these risks had already materialized by the time the disclosure was made – was misleading." Op. at 22-23. Thus, "[b]y framing the risk of third-party noncompliance as a mere possibility when they knew the FDA had issued a Form 483 observing such noncompliance at its audit, Defendants did not provide complete information to reasonable investors; thus, the statement was misleading and is actionable." Op. at 25.

Nevertheless, Defendants challenge the actionability of this statement on the sole ground that they "respectfully disagree" with the Court's holding. Def. Br. at 22. But their argument that Defendants are only required to disclose a risk if the negative consequence of that risk occurs, *id.*, ignores common sense. Risk disclosures are read in their entirety and are intended to allow investors to evaluate the likelihood that a negative outcome might occur based on particular factors. If the factor is actually occurring, then there is a greater likelihood that the negative outcome will also occur. As the Court correctly concluded, it thus is misleading for companies to pose a factor as a hypothetical when it has, in fact, already occurred, Op. at 22-23, because it does not allow the investor to properly weight the factor in determining whether the negative outcome will occur.

Defendants' argument that the "risk factor" required to be disclosed here is not whether third parties will comply with legal and regulatory duties, but whether the Company would be able to obtain regulatory approval or commercialize its products, Op. at 22, is therefore nonsensical. As BioXcel states elsewhere in its Form 10-K, a myriad of factors could affect whether it might

20

obtain regulatory approval.  What is material to investors in this particular risk disclosure, therefore, is not the ultimate outcome – the approval and commercialization of BXCL501 – but rather whether regulatory violations were already occurring.  ¶ 213.

Relying on *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 84-85 (2d Cir. 2021), Defendants also argue they were not required to disclose the issues with Dr. Meyer's trial site because they are only required to disclose *future* events they know with certainty.  Def. Br. at 22-23.  But that misinterprets *Credit Suisse*, which in any event is inapposite.  *Credit Suisse* was a market manipulation case in which defendants took advantage of market volatility to engage in hedging activities that personally benefited them but devalued securities they had issued. Defendants knew to a near certainty from three prior hedging activities that this conduct would devalue their securities.  *Id.* at 85.  The court concluded that it was improper to present the devaluation as a possibility, when three prior experiences resulted in a depression in the value of the securities.  *Id.* at 86.  Here, in contrast, the problems at Dr. Meyer's trial site were unresolved, and were therefore not past occurrences but ongoing material issues effecting the Company.

### 2. The Court Sustained the May 9, 2023 Statement That the Tranquility II Trial "Is Complete"

The Complaint also alleges that Defendant Risinger misled investors on May 9, 2023, when he stated that the TRANQUILITY II trial "is completed."  ¶¶ 223-224.  The Court found that this statement was actionable because "a reasonable investor may have understood the statement to indicate that there were no outstanding issues with the trial or loose ends to tie up."  Op. at 31.

Defendants nonetheless challenge this statement, contending that Plaintiffs assert a "new theory of liability" that is "distinct from the rationale underlying the Court's ruling."  Def. Br. at 25.  The Complaint alleges that the statement was misleading because it "created the materially misleading impression that the trial had completed as planned and in accordance with the study

21

protocol, and that the data verification process was proceeding in line with ordinary practices.  In truth, the trial had not been conducted pursuant to study protocol and the verification process that was then underway was of vital importance given the violations and fraud that had occurred earlier in the trial."  ¶ 224.  Defendants do not explain how this is "distinct" from the Court's finding that investors may have mistakenly believed that there were "no outstanding issues with the trial or loose ends to tie up."  In fact, the data verification process was not just business-as-usual; rather, it had to be conducted to clear up the "violations and fraud," i.e., the "outstanding issues with the trial or loose ends to tie up."  Op. at 31.  Defendants also distinguish between the "completion" of the data collection process and the "altogether different question of the usability of the underlying data."  Def. Br. at 26.  This also fails.  Any statement that data collection is "complete" but omits to disclose that the data cannot be "used" hides the "elephant in the room."  *United Natural Foods*, 2024 WL 4188324, at *7.

**3.     The March 2023 Statements Regarding Completion of
TRANQUILITY II Enrollment Were False or Misleading**

The Complaint alleges that two statements are false or misleading because they state that patient enrollment is "complete", ¶ 211, and that TRANQUILITY II was "fully enrolled," ¶ 209, but omitted to disclose that 32 patients at Dr. Meyer's trial site (which housed a total of 60 patients) cited in the Form 483 were not properly admitted.  *See supra* II.E.

As explained above, the Court's analysis of whether these two statements were misleading turned, at least in part, on whether the violations cited in the Form 483, and the missing documentation for 25 patients was "correctable," *supra* III.B.  The Court previously found that Plaintiffs drew "too strong an inference from the Form 483 itself," which was not a "determination that the subjects of the investigation were, in fact, not properly enrolled."  Op. at 28.  As the Meyer Response now makes clear, the violations were not "correctable," and the subjects in fact were not

22

properly enrolled, because complete documentation demonstrating they met the inclusion and exclusion criteria ***did not exist at the time of enrollment***. *See Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 178-79 (2d Cir. 2020) (affirming falsity of "enrollment" statements where defendants allegedly enrolled "ineligible individuals").

Defendants urge the Court to draw a different – implausible – inference. Without analyzing the contents of the Meyer Response, they simply conclude that it shows that "all patient files in fact had documentation (Dr. Meyer's notes to file) showing that 'all subjects met the inclusion/exclusion criteria.'" Def. Br. at 21. But Defendants ignore that these "notes to file" were generated only ***after*** the FDA issued the Form 483, and not contemporaneously with evaluation of whether patients should be admitted or excluded, which should have been conducted up to seven months prior. Defendants' inference should be rejected.

The fact that the FDA required BioXcel to repeat TRANQUILITY II confirms that TRANQUILITY II was not fully enrolled in March 2023. Defendants reported statistically significant top line results for TRANQUILITY II on June 29, 2023. They had intended that TRANQUILITY II and TRANQUILITY III – developed with the FDA's input – would allow BioXcel to file an sNDA. ¶¶ 72-74. Yet the FDA demanded that Defendants repeat TRANQUILITY II before it could move on to at-home studies – let alone file for an sNDA. ¶ 250. This further allows for the inference that Dr. Meyer's patients were not properly enrolled in the study, rendering misleading the statements that TRANQUILITY II was "fully enrolled."

### 4. The June 2023 Statement About the Ability to Use TRANQUILITY II in an sNDA Was Misleading

On June 8, 2023, Dr. Mehta was asked whether TRANQUILITY II could support an sNDA on its own. He answered, "It depends on the data. . . . We will have a conversation with the FDA, ask them what we do we need to do to file the sNDA, and then fill those gaps and file it. If they

23

allow us to file it with TRANQUILITY II, we'll be ready to go, basically, if we don't need to generate anything." ¶ 225.  This statement was misleading because it omitted to disclose that a significant portion of the patients would be excluded from the TRANQUILITY II study analysis because the Form 483 observations were not cured.  Without these patients, the trial was underpowered, making it necessary for BioXcel to generate additional data before filing an sNDA.  By presenting the need to generate additional data as a hypothetical, and not disclosing the existing facts that *necessitated* additional data, Dr. Mehta's statement was misleading.  ¶ 226.

The Court previously held this statement was not actionable based on the omission of the Form 483 alone.  Op. at 33-34.  However, the Meyer Response demonstrates that 32 of 37 patients reviewed by the FDA had problems which could not be fixed and renders the statement misleading.  The Court also concluded that the statement was mere "optimism" which was "in retrospect . . . misguided."  Op. at 34.  But the new facts allow for the inference that Defendant Risinger's "optimism" was more than just "misguided," it was unreasonable.

### 5.    The March 2023 Cash Runway Statement Was False or Misleading

The Complaint alleges that Defendants misled investors when they stated on March 16, 2023, in BioXcel's Form 10-K: "We expect that our cash and cash equivalents as of December 31, 2022 will be sufficient to fund our ongoing research and development efforts and commercialization efforts for at least twelve months from the date of the issuance of the consolidated financial statements included in this Annual Report on Form 10-K." ¶ 216.  This statement was false or misleading because on August 14, 2023, the Company revealed that this "assumed the full utilization of its strategic financing agreements with Oaktree[] and Qatar[].  Based on recent events, the Company is not likely to be in a position to meet the milestones required to access additional capital under the financing agreements." ¶ 217.  The "recent events" were the problems with the TRANQUILITY II trial exposed in the Form 483 and the Meyer

Response. *Id.* Thus, the statement – which assumed that BioXcel would access its funding from Oaktree and Qatar, which in turn assumed that it would get FDA approval to market BXCL501 to Alzheimer's patients – was at a minimum misleading for failing to disclose the Form 483 and the Meyer Response.

The Court previously dismissed this statement because "Plaintiffs have not alleged what the [regulatory] milestones were, and therefore [could] not demonstrate the requisite connection between the Form 483 letter and the inability to comply with the financing agreements." Op. at 26. The Complaint cures this, alleging that one of the regulatory milestones required to unlock that funding was "the receipt of approval from the FDA of an NDA in respect of use of BXCL501 for the acute treatment of agitation associated with Alzheimer's Disease." ¶ 89.

The Court also determined that "to the extent this statement is a statement of opinion, the Court finds it nonactionable, as Plaintiffs have not demonstrated it was insincerely or unreasonably held." Op. at 26. The Complaint cures this as well. The Meyer Response was submitted on January 13, 2023. ¶ 79. Nobody disputes that Defendants had it at that time. *See* Tr. 34:17-19. Per FDA regulations and protocol, Defendants should have expected to receive an EIR by no later than February 27, 2023, signaling that the Meyer Response satisfied the FDA, but they did not. ¶ 150. Thus, Defendants knew their funding was jeopardized, and could not have reasonably held the opinion that they had sufficient cash runway to last a year.

Finally, the Court previously found the statement to be forward-looking and accompanied by meaningful cautionary language. Op. at 33. However, the language that assumptions "may prove to be wrong" that include "the scope, progress, timing, costs, and results of clinical trials" does *not* caution that there were protocol violations, which could not be cured, affecting up to 40% of TRANQUILITY II participants, and that as a result, ***additional trials*** would have to be

25

conducted because patients in the current trials would be excluded from study analysis. Thus, the cautionary language is not specific to facts which render the statement false. *In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.,* 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011) ("To be 'meaningful,' a cautionary statement must discredit the alleged misrepresentations to such an extent that the 'risk of real deceptions drops to nil'" and even "warnings of specific risks...do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described") (collecting cases).

### 6.    The Issues Cited in the Form 483 Were "Serious"

Defendants argue that Plaintiffs do not "plead facts corroborating their characterization of the Form 483 as 'serious.'" Def. Br. at 15-18. Relying primarily on *Schaeffer v. Nabriva Therapeutics plc*, 2020 WL 7701463, at *9 (S.D.N.Y. Apr. 28, 2020), Defendants argue that "they had no duty to disclose the Form 483" because there is no "standalone duty to disclose a Form 483 in and of itself." Def. Br. at 15. Defendants posit that Plaintiffs need to plead "'additional factual matter to corroborate the allegedly serious nature of the omitted Form 483,' such that a 'strong inference' can be drawn of the misleading nature of the statement." Def. Br. at 15 (citing to *Schaeffer*, 2020 WL 7701463, at 12). This argument fails for several reasons.

*First*, the Meyer Response illustrates that necessary documentation confirming enrolled patients had probable Alzheimer's Disease did not exist at the time of study admittance and the lack of an EIR indicates that the issues identified in the Form 483 remained unresolved, and were thus "serious." Further, BioXcel's need to repeat TRANQUILITY II confirms that the protocol violations noted in the Form 483 were serious enough to warrant removal of these patients – and potentially all of Dr. Meyer's patients – from the study, leaving it underpowered. These new facts "corroborate the [] serious nature of the omitted Form 483." *Schaeffer,* 2020 WL 7701463, at *12.

26

***Second***, the Court already found that two statements were materially misleading, which gives rise to a duty to disclose. Op. at 25, 31. While there is no standalone duty to disclose a Form 483 – or any other fact for that matter – Rule 10b-5 imposes a duty to disclose all information "necessary in order to make the statements made, in light of the circumstance sunder which they were made, not misleading." 17 C.F.R. § 240.10b-5(b); *See also Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024). There is no basis in law or fact to increase Plaintiffs' pleading burden simply because the case involves a Form 483.

***Third***, Defendants suggest that *Schaeffer*'s requirement to plead "'additional factual matter to corroborate the allegedly serious nature of the omitted Form 483" pertains to its analysis of the actionability of statements. That mischaracterizes *Schaeffer*, which imposed this requirement in the *scienter* context, when the *Schaeffer* court was asking whether Defendants knew that their statements were misleading to investors, a fact it had already determined.[7]

## D.    THE COMPLAINT ALLEGES THAT DEFENDANTS ACTED WITH SCIENTER

Scienter is alleged with facts "showing that defendants had both motive and opportunity to commit the fraud or constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Setzer v. Omega Healthcare Invs. Inc.*, 968 F.3d 204, 212 (2d Cir. 2020). "While robust," the PSLRA's scienter pleading standard "does not involve applying the more probing test used at the summary judgment or judgment as a matter of law stage of litigation, as the court is 'unaided by discovery' at the motion to dismiss stage." *Blanford,* 794 F.3d at 306 (quoting *Tellabs,*

---

[7] As explained *infra* n.8, *Schaeffer*'s scienter analysis was misguided. It relied on *Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001), which was a pure omission case. There, the court observed that the duty to disclose the omitted information was not established, and therefore something else was required to be alleged on scienter. *Kalnit*, 264 F.3d at 143. Here, and in *Schaeffer*, Defendants' affirmative statements were made misleading by omitting the Form 483 and related facts, and the duty to disclose therefore attaches. Thus, no special or heightened standard exists either for scienter or duty to disclose.

551 U.S. at 324 n.5).  The heightened standard should not be "mistake[n] . . . for impossible ones." *Altimeo Asset Mgmt.*, 19 F.4th at 150.

In assessing whether the alleged facts are at least as compelling as any non-culpable inference, the inquiry is whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323; *In re Dentsply Dirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 291 (E.D.N.Y. 2023) (finding scienter pled where it could infer that Defendants had access to information).  Thus, the "job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."  *Tellabs*, 551 U.S. at 326.  Previously, despite holding that the FAC alleged two actionable statements, the Court determined that it did not allege that Defendants acted with scienter in making those statements.  Op. at 35-42.  The new facts in the Complaint cure the scienter defects that the Court identified.

### 1.      The Complaint Alleges Circumstantial Evidence of Scienter

Allegations of circumstantial evidence of scienter suffice where defendants "knew facts or had access to information suggesting that their public statements were not accurate."  *Blanford*, 794 F.3d at 305.  "Securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or information contradicting their public statements." *Setzer*, 968 F.3d at 215.

Recklessness is pled when a decision not to disclose omitted information is "a sufficiently extreme departure from the standards of ordinary care to satisfy the PSLRA's requirement for showing recklessness."  *Id.* at 215.  In omissions cases, scienter is alleged where defendants "had knowledge or access to facts that contradicted, were adverse to, ***or undermined the accuracy*** of their statements."  *United Natural Foods*, 2024 WL 4188324, at *11 (emphasis added).  Courts "focus[] on ***what information was available to the Defendants*** at the time they made their

28

plausibly misleading statements." *Id.* (emphasis added). Courts do not require that Defendants had access to omitted information that directly contradicts the misleading statements, nor could they: misleading-by-omission statements are literally true, and cannot be directly contradicted. Put differently, if there is information that directly contradicts a statement, it is simply a false statement. *See Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at *2, *5 (S.D.N.Y. Feb. 5, 2024) (scienter pled where defendants knew that demand had declined, even though such decline did not directly contradict the misleading statements). In *Lexmark International*, the court held that statements were misleading, "even if literally true," for omitting "that revenue reports reflected excessive 'sales' into channel inventory." *Lexmark Int'l, Inc.*, 367 F. Supp. 3d at 31. The court found that scienter was pled because defendants "had information ***belying the accuracy*** of their public statements" about inventory levels, and did not require knowledge of information that directly contradicted their statements. *Id.* at 37. Thus, knowledge of the omitted information that renders the statements misleading suffices. *See In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137 (2d Cir. 2021) (reversing dismissal where defendants misled investors by discussing "high sales volume" while omitting "unsustainable channel stuffing incentives").

This rule is no different in the context of FDA investigations, where cited violations constitute the omitted information that renders statements misleading. *See Salzman v. ImmunityBio, Inc.*, 2024 WL 3100274, at *5-7 (S.D. Cal. June 20, 2024) (statements about GMP compliance misleading where defendants concealed Form 483 and related manufacturing deficiencies); *Rosi v. Aclaris Therapeutics, Inc.*, 2021 WL 1177505, at *22 (S.D.NY. March 29, 2021) (allegations that Defendants "knew facts or had access to information suggesting that their public statements were not accurate" were made where allegations "had access to the FDA letters and were aware of internal concerns about misleading marketing"); *In re Able Labs Sec. Litig.*,

29

2008 WL 1967509, at *16 (D.N.J. March 24, 2008) (Form 483 and warning letter "provided notice to the defendants that serious problems existed in the manufacturing process" and failure to investigate was an "extreme departure from the standards of ordinary care" demonstrating recklessness); *In re Emergent Biosolutions Inc. Sec. Litig.*, 2023 WL 5671608, at *23-24 (D. Md. Sept. 1, 2023) (facts supporting inference that defendants knew about Form 483 and response "support a strong inference of scienter"); *Todd v. Staar Surgical Co.*, 2016 WL 6699284, at *12 (C.D. Cal. April 12, 2016) (scienter alleged where defendants were "aware of adverse observations" by the FDA even before a Form 483 issued).

### a.     Defendants Knew Facts Undermining the Accuracy of Their Public Statements

There is no dispute that Defendants knew facts that undermined the accuracy of their public statements about TRANQUILITY II.  Specifically, Defendants knew about the Form 483 when it was received on December 21, 2022.  Def. Br. at 10, 33.  Defendants had the Meyer Response when it was submitted on January 11, 2023.  Def. Br. at 10-11, 33-34; Tr. at 34:16-19 ("So we have [Dr. Meyer]s response.  Presumably defendants and others were aware of what was in the response.").  And Defendants did not receive an EIR by February 27, 2023, i.e., within the proscribed 45-day period, and thus never received confirmation from the FDA that the Meyer Response resolved its concerns.  Def. Br. at 10 (citing FDA rule requiring transmission of EIR within 45 days of closing inspection).  These facts "undermine[]" the accuracy of Defendants' public statements about TRANQUILITY II and BioXcel's cash runway. *United Natural Foods*, 2024 WL 4188324, at *11.

### i.     Scienter for Statements Previously Held to Be Misleading

The Court previously held that omitting the Form 483 rendered two of alleged statements misleading:  (1) the risk disclosure about third party compliance in March 2023, ¶ 213, Op. at 31;

and (2) the statement Defendant Risinger made on May 9, 2023 that the TRANQUILITY II trial is "completed," ¶ 223, Op. at 23-25.  Scienter is pled as to these statements because Defendants knew about the Form 483 and the Meyer Response, and that the FDA never issued an EIR, all facts that undermine these statements.  *United Natural Foods*, 2024 WL 4188324, at *11-14; *Lexmark Int'l, Inc.*, 367 F. Supp. 3d at *31-34.  Even though the Court held that these statements were misleading, and acknowledged that Defendants knew about the information that made them misleading, *i.e.*, the Form 483, the Court nevertheless determined that "awareness of the Form 483 does not demonstrate recklessness."  Op. at 41.  The Court held that the Form 483 was not "directly inconsistent" with the statement about the trial being complete.  *Id.*  However, as explained, information that is "directly inconsistent" with misleading-by-omission statements will never exist because these statements are technically true.  *Id*.  Thus, knowledge of the omitted information – here the Form 483, the Meyer Response, and the failure to receive an EIR – pleads scienter.[8]

### ii.    Scienter for Remaining Alleged Statements

The Form 483, the Meyer Response, and the failure to receive an EIR from the FDA also "undermine" the remaining alleged statements for the same reasons that omitting this information

---

[8] *Schaeffer* 2020 WL 7701463, at * 12, cited by this Court in its scienter analysis (Op. at 41), found that certain statements were made misleading by failing to disclose that the company had received a Form 483.  *Id.* at 11.  Even though defendants knew about the Form 483, *Schaeffer* nevertheless found scienter was lacking.  *Id.* at 12.  *Schaeffer* required that plaintiffs "plead something more [than knowledge of the Form 483] to indicate why Defendants' failure to mention the Form 483 was 'highly unreasonable,'" i.e., reckless.  *Id.* at *12.  As noted above, *Schaeffer* relied on *Kalnit*, 264 F.3d at 142, which is distinguishable because it involved a *pure omission* case, not as both here and in *Schaeffer*, a misleading-by-omission statement.  In *Kalnit*, therefore, the "duty to disclose" the omitted information in the first place "was not so clear," since no misleading statements were identified.  It therefore required more than knowledge of the omitted facts for scienter.  *Id.* at 143.  *Schaeffer*, therefore, applied reasoning from a pure omission case to the misleading-by-omission scenario before it, and reached a conclusion that conflicts with the weight of authority holding that knowledge of information that undermines the accuracy of public statements is enough for scienter.

made these statements misleading. *See supra* III.C.3-5. This information undermines the statements that TRANQUILITY II's "[p]atient enrollment is complete" and that TRANQUILITY II was "fully enrolled," ¶¶ 209-212, because a significant portion of the patients did not have documentation prior to enrollment showing they met the inclusion/exclusion criteria, or were not properly consented or drug tested. Similarly, these facts undermine Defendant Risinger's June 8, 2023 statement that "[i]f [the FDA] allow[s] us to file [the sNDA] with TRANQUILITY II, we'll be ready to go, basically, if we don't need to generate anything," ¶¶ 225-226, because by then, it was clear that TRANQUILITY II would not be enough to file the sNDA, and the Company would have to generate more data. Finally, these facts undermine the Company's March 16, 2023 statement that it had sufficient cash runway to last a year, ¶¶ 216-222, because the cash runway assumed that Defendants would be able to access all its funding from Oaktree and Qatar, which was impossible in light of the problems at Dr. Meyer's TRANQUILITY II trial site.

### iii.    Defendants' Competing Inference Is Not Plausible

Defendants respond to the newly alleged facts by arguing that the Meyer Response negates their scienter, positing that "it would have been completely reasonable for Defendants to conclude, based on the Meyer Response, that the observations in the Form 483 were mere documentation issues that could be remedied in advance of filing an sNDA—as the Meyer Response states." Def. Br. at 34. Far from being "completely reasonable," this is downright implausible. The Meyer Response does not "state[]" that the "documentation issues . . . could be remedied in advance of filing an sNDA." To the contrary, it indicates that documentation did not exist until Dr. Meyer created it retroactively, months after admitting patients to TRANQUILITY II. Dr. Meyer could not possibly reverse time and produce sufficient documentation when it needed to be done – prior to admitting patients into the study. And she could no less reverse time to properly consent or drug test the patients. Dr. Wooten's observations further undermine Defendants' proposed

32

interpretating of the Meyer Response.  Short of Defendants' say-so, there is nothing to support their argument.

With regard to the failure to receive an EIR, Defendants offer the baffling argument that the investigation was not closed.  Def. Br. at 16, 34.  That is exactly the point.  If the investigation had closed, the EIR would have issued, and Defendants would have known that the Form 483 issues were resolved.  Because the EIR did not issue, they knew that the investigation must still be open, and thus that the Meyer Response did not resolve the Form 483 issues.

### b.    Defendants' Experience in Clinical Trials

If there were any doubt that Defendants knew that the Meyer Response did not cure the defects in the Form 483, their professional experience with clinical trials bolsters this inference. ¶¶ 244-249.  Defendant Mehta has worked in the pharmaceutical industry since 1989.  ¶ 245. Defendant Risinger "has extensive experience leading clinical development from first in human through Phase 1-4 clinical trials."  ¶ 247.  He also served as the "study chair" or "study director" of numerous clinical trials.  ¶ 248.  These facts allow for the inference that Defendants understood that Dr. Meyer's retractive "notes to file" could not cure the Form 483 defects, which was confirmed by the FDA's failure to issue an EIR by February 27, 2023.  *See Staar Surgical Co.*, 2016 WL 6699284, at \*12 (scienter alleged for defendants who received a Form 483 letter and FDA warnings, and were "well-versed in FDA procedures").

Defendants argue that their experience with clinical trials "adds nothing," Dr. Br. at 35 because the conclusion that the issues in the Form 483 were not "fixable" was not supported by particularized facts.  Def. Br. at 35.  But that is incorrect.  *See supra* III.B.  Defendants' extensive

experience allowed them to understand the consequences of the facts.[9]

### c.     Post Class Period Events Further Support the Inference that Defendants Knew That the Meyer Response Was Insufficient

Defendants' TRANQUILITY clinical trial program has faltered since the Class Period ended. ¶¶ 170-183. Specifically, even following two "Type B Meetings" with the FDA, the FDA has still not concluded that the TRANQUILITY II trial generated the "necessary efficacy data in care facilities" to allow BioXcel to proceed with its plans to develop BXCL501 for the at-home setting as well. ¶ 179. Given that TRANQUILITY II was initially developed with sufficient patients to adequately "power" the study in connection with the FDA, ¶¶ 61, 242, the fact that the FDA now concludes that BioXcel needs additional data for efficacy in the in-care setting can only mean that either (1) the results of the study were inconclusive or (2) certain patient data had to be excluded.

The results of the study were not inconclusive. On June 29, 2023, when BioXcel announced the Form 483, it also announced that "[t]he Phase 3 trial met its primary efficacy endpoint with the 60 mcg does; a statistically significant and clinically meaningful 7.5 point reduction from baseline in Positive and Negative Syndrome Scale-Excitatory Component total score . . . The 60 mcg does also met the first key secondary endpoint of reducing agitation symptoms at 1 hour during the first episode of agitation (p=0.0185) …" It further reported that "[e]fficacy for [the 60 mcg] dose was supported by a number of secondary measures" and

---

[9] The cases Defendants rely upon do not undermine that Defendants' extensive clinical trial experience allows for the inference that they knew that patients from Dr. Meyer's trial site would be excluded. *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011) stands for the unremarkable proposition that allegations from confidential witnesses as to what defendants "would have" or "should have" known do not establish scienter. *Campo v. Sears Holdings Corp.*, 371 Fed. App'x. 212, 217 (2d Cir. 2010) simply held that confidential witness allegations were not particular enough to establish scienter. Neither case addresses an allegation of a defendant's expertise supporting an inference of scienter.

concluded that it planned to submit a sNDA in the second half of 2023. *See* Moyna Decl. Ex. B (Form 8-K filed on June 29, 2023). Thus, that leaves insufficient patient data from TRANQUILITY II as the only reason why Defendants would have had to generate additional efficacy data. And the only way that TRANQUILITY II had insufficient patient data is because some of it was excluded. The post-Class Period results thus bolster the inference that the FDA has excluded at least some of Dr. Meyer's patients from the study, which in turn bolsters the seriousness of the Form 483 violations, the deficiency of the Meyer Response, and Defendants' knowledge of same.

Defendants' entire argument concerning post-Class Period events urges the Court to make inferences that disfavor Plaintiffs. Def. Br. at 35-36. For example, they assert without explanation that the TRANQUILITY In-Care study is not a "repeat" of TRANQUILITY II, but rather is meant to "expand upon" its data. Def. Br. at 35. But the only reason they would need to "expand upon" the TRANQUILITY II data is if some of it were excluded. Defendants' attempt to have the Court draw inferences that contradict Plaintiffs' reasonable inferences should be rejected.

### d. The Fraud Involved THE Core Operation of the Company

Obtaining an sNDA for BXCL501 was *the* core operation of the BioXcel. Funding, and its entire future, depended on the ability to sell BXCL501 to patients with Alzheimer's Disease. ¶¶ 82-97. During the Class Period, the importance of a smooth and successful TRANQUILITY II clinical trial cannot be overstated. This bolsters the inference of Defendants' scienter, as "a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue." *Lexmark Int'l, Inc.*, 367 F. Supp. 3d at 37 (finding that inference of scienter was "buttressed by Plaintiffs' core operations allegations"); *see also United Natural Foods*, 2024 WL 4188324, at *13 (same). That doctrine "simply reflects the commonsense assumptions that executives are likely to know

more about things that are central to their business."  *Id.* (citing *Stadium Cap.*, 2024 WL 456745, at \*5); *see also Immunitybio, Inc.*, 2024 WL 3100274, at \*11 (holding scienter pled where a Form 483 was issued in connection with a company's "lead product candidate"); *Mulligan v. Impax Labs, Inc.*, 36 F. Supp. 3d 942, 970 (N.D. Cal. 2016) (in a Form 483 case, holding that it is "'absurd' to think that the CEO and CFO of a pharmaceutical company would be unaware" of noncompliance in the company's "manufacturing and quality control divisions," in light of Form 483 letters).

### 2.        The Complaint Alleges Motive and Opportunity

Plaintiffs plead strong circumstantial evidence of scienter by detailing Mehta's "significant personal gain" from the alleged fraud.  *Blanford*, 794 F.3d at 308.  Insider trading plans do not immunize defendants from insider trading allegations.  *See id.* at 309 ("[T]he plan provides no defense to scienter allegations" when "the purpose of the plan was to take advantage of an inflated stock price.").  More specifically, "they are not a cognizable defense to scienter allegations on a motion to dismiss . . . because a clever insider might maximize their gain from knowledge of an impending price drop over an extended amount of time, and seek to disguise their conduct with a 10b5–1 plan."  *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 494 (S.D.N.Y. 2018); *see Homyk v. Chemocentryx, Inc.*, 2023 WL 3579440, at \*19 n. 15 (N.D. Cal. Feb. 23, 2023) ("[W]here a corporate officer retains control over the timing of public disclosure of adverse facts — and withholds such disclosure until after their pre-planned stock sales have occurred — such sales may still support a finding of scienter".); *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 885 (N.D. Cal. 2023) (same).  This is precisely what occurred here.

Defendant Mehta sold approximately 65,000 shares of BioXcel stock in March 2023 and another 60,000 shares in June 2023.  ¶ 275.  Mehta made these sales pursuant to the terms of a 10b5-1 trading plan, meaning he knew the amount and timing of the sales before they occurred.

¶277. By concealing the Form 483 and the consequences it would have on BioXcel's ability to secure regulatory approval for BXCL501 from the public, Mehta prevented the stock price from declining before these sales (*i.e.*, Defendants' fraud kept BioXcel's stock price artificially inflated just long enough for Mehta to unload nearly 15% of his overall holdings).  ¶ 278; *Senn v. Hickey*, 2005 WL 3465657, at *6 (D.N.J. Dec. 19, 2005) (defendant's sale of 11.8% of holdings for proceeds of $4 million supported inference of scienter); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) (sale of 11% of an insider's stock sufficient to establish unusual or suspicious insider trading activity); *In re Guilford Mills, Inc. Sec. Litig.*, 1999 U.S. Dist. LEXIS 21690, at *12-13 (S.D.N.Y. July 21, 1999) (defendant's sale of 10% of his shares for over $1.6 million supported inference of scienter).  Had Mehta disclosed the Form 483, protocol violations, and need for additional clinical trial research to the public at any point prior to March 2023 (for example, after the Meyer Response in January 2023), BioXcel's stock price would have cratered and Mehta's stock sales would have netted approximately $2 million less in proceeds. ¶ 276. "[C]oncealing the negative information before the sale and setting the sale to occur prior to [reporting TRANQUILITY II's results] *were* discretionary choices, so it is sufficient at the pleadings stage to contribute to the plausibility of the scienter allegations." *In re Biomarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *14 (N.D. Cal. Jan. 6, 2022); *see also In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 473 (E.D. Pa. 2014) (scienter where defendants sold $8 million in stock weeks before FDA issued denial, compared with only $400,000 sold during control period); *Azar v. Yelp, Inc.*, 2018 WL 6182756, at *19-20 (N.D. Cal. Nov. 27, 2018) (Rule 10b5- 1 plan did not insulate defendant who withheld bad news to maintain share prices).

Mehta ultimately disclosed the Form 483 alongside TRANQUILITY II's topline results, which BioXcel attempted to portray as a positive development.  The timing of the disclosure

relative to both Mehta's prior stock sales and the trial results is strong evidence that Mehta intentionally withheld the negative news for personal gain. *See* Allan Horwich, *The Origin, Application, Validity, and Potential Misuse of Rule 10b5-1*, 62 Bus. Law. 913, 949-50 (2007) ("If an executive knows that his or her Plan will result in a sale of company stock on a particular date, he or she may be able to cause a delay in the disclosure of unfavorable news so that the expected stock price decline is deferred until after the sale, thereby producing larger proceeds.").[10]

### E.    THE COMPLAINT ALLEGES LOSS CAUSATION FOR THE AUGUST 2023 STOCK PRICE DECLINE

To plead loss causation, "[t]he complaint must simply give defendants 'some indication' of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentation." *In re Teva Sec. Litig.*, 671 F. Supp. 3d 147, 186-87 (D. Conn. 2023) (citations omitted). The "burden to plead loss causation is not a heavy one, and when it is unclear whether the plaintiff's losses were caused by the fraud or some other intervening event, the chain of causation is . . . not to be decided on a Rule 12(b)(6) motion to dismiss." *Id.*

Previously, the Court reserved decision on loss causation for the August 2023 disclosures. Op. at 42. During oral argument, the Court asked how Plaintiffs could connect the Form 483 with the August 14th disclosures relating to the inability to unlock the financing and to continue as a going concern. Tr. at 79: 8-12. The Court also asked "what regulatory milestone did [Defendants]

---

[10] The fraudulent nature of Mehta's stock sales is further evidenced by the fact that he ceased selling shares after the truth about the TRANQUILITY II study emerged in June 2023, despite having additional shares available for sale under the terms of his insider trading plan. ¶¶ 279-80. In fact, instead of continuing with his pre-specified 10b5-1 plan sales, Mehta canceled the plan altogether and entered into a new one that allowed him to defer sales and, consequently, avoid selling stock into a depressed market. ¶¶ 281-82.

not meet" that made it impossible for them to receive their financing.  Tr. at 81:2-6.[11]  The Complaint now alleges that BioXcel needed FDA approval for an sNDA for BXCL501 to be used to treat agitation in Alzheimer's patients in order to unlock $65 million in funding.  ¶¶ 89-90.

As far as linking their financial status to the Form 483, Defendants themselves draw that line.  They stated: "*Based on recent events*, the Company is not likely to be in a position to meet the milestones required to access additional capital under the financing agreements."  ¶ 196.  The Company does not identify specifically what "recent events" led to this conclusion.  *See* Form 8-K filed with the SEC on August 14, 2023.  There is a reasonable inference that the "recent events" at least *includes* the Form 483 and deficient Meyer Response, and such inference must be drawn in Plaintiffs' favor.   Indeed, analysts attributed this news to "the unfortunate situation with TRANQUILITY-II . . . which . . . added a layer of risk around the regulatory pathway for this indication."  ¶ 204; *see also* ¶ 205.  Defendants do not offer any other events that could be included in the "recent events," but they do provide a list of what was also disclosed on August 14, 2023.  Def. Br. at 39.  At least 2 of those – increased expenses for TRANQUILITY II and a meeting with the FDA to discuss the TRANQUILITY clinical trial – relate to TRANQUILITY II and the issues cited in the Form 483.  Further, analysts, understood that the Form 483 issues were at the root at of the Company's financial troubles.   ¶¶ 204-205 (citing the "*unfortunate situation with TRANQUILITY II (T-2), in which there were data reporting issues*").  These facts satisfy the low pleading burden for loss causation.

---

[11] During argument, Defendants' counsel argued that there were other trials that relate to BXCL501, "and I don't think we know at all what the milestones are for any one of those programs, so to say that some risk to the data for TRANQUILITY II put all of the funding at risk, there is no support for that.  We don't know what they are.  So that's a leap, I think illogical leap that the Complaint does not support."  Tr. 91:13-20.

Defendants argue that no new relevant information was disclosed on August 14, 2023 which would have caused further drops to BioXcel's stock price. Def. Br. at 39-40. Not so. Defendants newly revealed that its cash runway projections depended on fully exploiting its financing agreements, and that it doubted its ability to continue as a going concern, ¶ 216, and for the first time, investors understood BioXcel's existence depended on its ability to unlock an additional $65 million in funding, which in turn depended on obtaining an sNDA for BXCL501, an event that was jeopardized, or at a minimum delayed, in light of the Form 483 issues. Defendants' argument that analysts recognized that TRANQUILITY II was jeopardized fares no better. Def. Br. at 40. As mentioned, analysts and investors did not previously know that the cash runway projection assumed they would be able to unlock all the funding from Qatar and Oaktree.

## F.    THE COMPLAINT PLEADS A SECTION 20(A) CLAIM

Plaintiffs have alleged Section 10(b) and Rule 10b-5 violations against BioXcel. Thus, Defendants' argument for dismissing Plaintiffs' control person claims should be rejected. *See Altimeo*, 19 F.4th at 152 (reversing dismissal of Section 20(a) claim where a 10(b) claim was pled as to a primary violator); *Lozada v. TaskUS, Inc.*, 710 F. Supp. 3d 283, 328 (S.D.N.Y. 2024) (same).

## CONCLUSION

For the foregoing reasons Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss the Second Amended Complaint in its entirety.

Dated: October 11, 2024

Respectfully submitted,

**GRANT & EISENHOFER P.A.**

*/s/  Daniel L. Berger*

Daniel L. Berger (*pro hac vice*)
Caitlin M. Moyna (*pro hac vice*)
Alexandra E. Forgione (*pro hac vice*)
485 Lexington Avenue
New York, NY 10017
Tel.: (646) 722-8500
Fax: (646) 722-8501
Email: dberger@gelaw.com
Email: cmoyna@gelaw.com
Email: aforgione@gelaw.com

**LEVI & KORSINSKY, LLP**

Adam M. Apton (*pro hac vice*)
Devyn R. Glass (*pro hac vice* forthcoming)
33 Whitehall Street, 17th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com
Email: dglass@zlk.com

*Co-Lead Counsel for Plaintiffs and the Class*

41