# EXHIBIT A

Table of Contents

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

**(Mark one)**

☒ **Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
**For the year ended December 31, 2023**
**or**

☐ **Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
For the transition period from             to             .

**Commission file number 001-38410**

# BioXcel Therapeutics, Inc.

(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **82-1386754** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **555 Long Wharf Drive** | **06511** |
| **New Haven CT** | (Zip Code) |
| (Address of principal executive offices) | |

Registrant's telephone number, including area code: **(475) 238-6837**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of exchange on which registered |
|---|---|---|
| **Common Stock, par value $0.001 per share** | **BTAI** | **Nasdaq Capital Market** |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ | Non-accelerated filer ☒ | Smaller reporting company ☒ |
| | | | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements.

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b).

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

As of June 30, 2023, the last business day of the registrant's most recently completed second fiscal quarter, the aggregate market value of the registrant's common stock held by non-affiliates of the registrant was approximately $134,938,946 (based upon the closing sale price of the registrant's common stock reported on the Nasdaq Capital Market on that date). This calculation excludes shares held by the registrant's current directors and executive officers and stockholders that the registrant has concluded are affiliates of the registrant.

There were 30,576,671 shares of our common stock outstanding at March 18, 2024.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's definitive proxy statement for its 2024 annual meeting of stockholders, which the registrant intends to file pursuant to Regulation 14A with the Securities and Exchange Commission not later than 120 days after the registrant's fiscal year ended December 31, 2023, are incorporated by reference into Part III of this Annual Report on Form 10-K.

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
|  | Forward Looking Statements | 3 |
|  | Summary Risk Factors | 5 |
| **Part I.** |  |  |
| Item 1. | Business | 8 |
| Item 1A. | Risk Factors | 55 |
| Item 1B. | Unresolved Staff Comments | 117 |
| Item 1C. | Cybersecurity | 117 |
| Item 2. | Properties | 119 |
| Item 3. | Legal Proceedings | 119 |
| Item 4. | Mine Safety Disclosures | 119 |
|  |  |  |
| **Part II.** |  |  |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 119 |
| Item 6. | Reserved | 120 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 121 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 136 |
| Item 8. | Financial Statements and Supplementary Data | 136 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 137 |
| Item 9A. | Controls and Procedures | 137 |
| Item 9B. | Other Information | 137 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 139 |
|  |  |  |
| **Part III.** |  |  |
| Item 10. | Directors, Executive Officers and Corporate Governance | 140 |
| Item 11. | Executive Compensation | 140 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 141 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 141 |
| Item 14. | Principal Accounting Fees and Services | 141 |
|  |  |  |
| **Part IV.** |  |  |
| Item 15. | Exhibits and Financial Statement Schedules | 141 |
| Item 16. | Form 10-K Summary | 146 |
|  | Signatures | 147 |

Table of Contents

## FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. We intend such forward-looking statements to be covered by the safe harbor provisions for forward-looking statements contained in Section 27A of the Securities Act of 1933, as amended (the "Securities Act") and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The words "anticipate," "believe," "can," "continue," "could," "designed," "estimate," "expect," "forecast," "goal," "intend," "may," "might," "plan," "possible," "potential," "predict," "project," "should," "target," "will," "would" and similar expressions are intended to identify forward-looking statements, though not all forward-looking statements use these words or expressions. All statements contained in this Annual Report on Form 10-K, other than statements of historical fact, are forward-looking statements, including, without limitation, statements regarding:

- our sales strategy for IGALMI™;
- strategy relating to, anticipated benefits from, and cost savings from our Reprioritization (as defined herein);
- our ability to raise additional capital and continue as a going concern;
- developments relating to our TRANQUILITY program;
- the size of our total addressable markets and related underlying estimates;
- our plans relating to clinical trials and marketing applications for our product candidates;
- our plans to research, develop and commercialize our current and future product candidates;
- our plans to seek to enter into collaborations for the development and commercialization of certain product candidates;
- the potential benefits of any future collaboration;
- the timing of and our ability to obtain and maintain regulatory approvals for our product candidates;
- the timing of and results of discussions we have with regulators;
- the rate and degree of market acceptance, clinical utility, number of prescribers and formulary wins of IGALMI™ and any product candidates for which we receive marketing approval;
- our commercialization, marketing and manufacturing capabilities and strategy, including the potential benefits from any advertising campaigns;
- our participation in, and any potential benefits from, events, conferences, presentations and conventions;
- our intellectual property position and strategy;
- our estimates regarding expenses, future revenue, capital requirements and need for additional financing;
- potential investments in, or other strategic options for, our subsidiary, OnkosXcel Therapeutics, LLC ("OnkosXcel");
- developments relating to our competitors and our industry;
- compliance with covenants under our financing arrangements;
- the impact of government laws and regulations;
- developments related to legal proceedings and investigations; and
- our relationship with BioXcel LLC.

These forward-looking statements are based on management's current expectations. These statements are neither promises nor guarantees, but involve known and unknown risks, uncertainties and other important factors that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements, including, but not limited to, those listed under Part I, Item 1A. "Risk Factors," Part II, Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations" and elsewhere in this Annual Report on Form 10-K. These and other important factors discussed under the caption "Risk Factors" in our other filings with the Securities and Exchange Commission ("SEC") could cause actual results to differ materially from those indicated by the forward-looking statements made in this filing. Given these uncertainties, you should not rely on these forward-looking statements as predictions of future events. While we may elect to update such forward-looking statements at some point in the future, we disclaim any obligation to do so, even if subsequent events cause our views to change.

This Annual Report on Form 10-K also contains estimates, projections and other information concerning our industry, our business, and the markets for certain diseases, including data regarding the estimated size of those markets, and the incidence and prevalence of certain medical conditions. Information that is based on estimates, forecasts, projections, market research or similar methodologies is inherently subject to uncertainties and actual events or circumstances may differ materially from events and circumstances reflected in this information. Unless otherwise

3

Table of Contents

expressly stated, we obtained this industry, business, market and other data from reports, research surveys, studies and similar data prepared by market research firms and other third parties, industry, medical and general publications, government data and similar sources.

As used in this Annual Report on Form 10-K, unless otherwise specified or the context otherwise requires, the terms "we," "our," "us," the "Company" or "BTI" refer to BioXcel Therapeutics, Inc., and "BioXcel, LLC" refers to the Company's former parent company and significant stockholder, BioXcel LLC, and its predecessor, BioXcel Corporation. All brand names or trademarks appearing in this Annual Report on Form 10-K are the property of their respective owners, including IGALMI$^{TM}$, which is a trademark of BioXcel Therapeutics, Inc.

We may use our website as a distribution channel of material information about the Company. Financial and other important information regarding the Company is routinely posted on and accessible through the Investors & Media section of its website at *www.bioxceltherapeutics.com*. In addition, you may automatically receive email alerts and other information about the Company when you enroll your email address by visiting the "Email Alerts" option under the News / Events menu of the Investors & Media section of our website at *www.bioxceltherapeutics.com*.

4

Table of Contents

**SUMMARY RISK FACTORS**

Our business is subject to numerous risks and uncertainties, including those described in Part I, Item 1A. "Risk Factors" in this Annual Report on Form 10-K. You should carefully consider these risks and uncertainties when investing in our common stock. The principal risks and uncertainties affecting our business include the following:

- We have a limited operating history and have not generated substantial product revenues to date, which may make it difficult to evaluate the success of our business to date and to assess our future viability.

- We have incurred significant operating losses since inception and anticipate that we will continue to incur substantial operating losses for the foreseeable future and may never achieve or maintain profitability.

- Our strategic reprioritization and related reduction in force may not achieve our intended outcome.

- We will need substantial additional funding, and if we are unable to raise capital when needed, we could be forced to delay, reduce or eliminate our product development programs or commercialization efforts or otherwise seek strategic alternatives. In addition, the failure to raise additional financing in accordance with the minimum capital raising requirements of our Credit Agreement (as defined herein) would trigger an event of default thereunder.

- We have significant indebtedness and other contractual obligations that could impair our liquidity, restrict our ability to do business and thereby harm our business, results of operations and financial condition. We may not have sufficient cash flow from operations to satisfy our obligations under our financing facilities.

- We have identified conditions and events that raise substantial doubt about our ability to continue as a going concern.

- We have limited experience in drug discovery and drug development.

- Developments relating to our TRANQUILITY II Phase 3 trial may impact the timing of our development plans for, and prospects for seeking or obtaining regulatory approval of, BXCL501 for the acute treatment of agitation (non-daily) associated with dementia in patients with probable Alzheimer's disease and may also subject us to additional risks and uncertainties, including regulatory, stockholder or other actions, loss of investor confidence and negative impacts on the trading price of our common stock.

- In the near term, we are dependent on the success of IGALMI™, and four of our product candidates, BXCL501, BXCL502, BXCL701 and BXCL702. If we are unable to complete the clinical development of or obtain marketing approval for our product candidates or successfully commercialize IGALMI™ or our product candidates, either alone or with a collaborator, or if we experience significant delays in doing so, our business could be substantially harmed.

- Interim "top-line" and preliminary data from our clinical trials that we announce or publish from time to time may change as more patient data become available and are subject to audit and verification procedures that could result in material changes in the final data.

- The regulatory approval processes of the United States ("U.S.") Food and Drug Administration ("FDA"), and comparable foreign authorities are lengthy, time consuming, expensive and inherently unpredictable, and if we are ultimately unable to obtain regulatory approval for our product candidates, our business will be substantially harmed.

- Clinical trials are expensive, difficult to design, difficult to conduct and involve an uncertain outcome.

- We depend on enrollment of patients in our clinical trials to continue development of our product candidates. If we are unable to enroll patients in our clinical trials, our research and development efforts could be adversely affected.

Table of Contents

- Our estimated number of episodes of agitation and our corresponding estimated total addressable market are subject to inherent challenges and uncertainties. If we have overestimated the number of episodes or the size of our total addressable market for our current and potential future products or product candidates, or if any approval that we obtain is based on a narrower definition of the patient population, our revenue and ability to achieve profitability may be harmed.

- The discovery and development of product candidates based on EvolverAI, BioXcel LLC's proprietary pharmaceutical discovery and development engine, as well as our own AI platform is novel and unproven, and we do not know whether we will be able to develop any products of commercial value.

- Regulators may limit our ability to develop or implement our proprietary AI algorithms and/or may eliminate or restrict the confidentiality of our proprietary technology, which could have an adverse effect on our business, results of operations, and financial condition.

- Although the FDA has approved IGALMI$^{TM}$ for the acute treatment of agitation associated with schizophrenia or bipolar I or II disorder, we will still face extensive and ongoing regulatory requirements and obligations for IGALMI$^{TM}$ and for any product candidates for which we obtain approval.

- Although we obtained FDA approval for IGALMI$^{TM}$, our products and product candidates may not be accepted by physicians or the medical community in general, and there may be insufficient insurance coverage and reimbursement.

- If we are found in violation of federal, state or foreign health care "fraud and abuse" laws, we may be required to pay significant fines and penalties, which may adversely affect our business, financial condition and results of operations.

- We continue to depend on BioXcel LLC to provide us with certain services for our business.

- BioXcel LLC has significant influence over the direction of our business, and the concentrated ownership of our common stock will prevent you and other stockholders from influencing significant decisions.

- We are substantially dependent on third parties for the manufacture of our clinical supplies of our product candidates, and our commercial supplies of IGALMI$^{TM}$, and we intend to rely on third parties to produce commercial supplies of any other approved product candidate.

- We rely on third parties to conduct our preclinical and clinical trials. If these third parties do not successfully perform their contractual legal and regulatory duties or meet expected deadlines, we may not be able to obtain regulatory approval for or commercialize our product candidates and our business could be substantially harmed.

- Data breaches or cyber-attacks could disrupt our business, operations and information technology systems, and financial results, or result in the loss or exposure of confidential or sensitive Company information.

- We are and may in the future be subject to legal proceedings, claims and investigations in or outside the ordinary course of business. Such proceedings, claims and investigations could be costly and time-consuming to defend and could result in unfavorable outcomes, which may have a material adverse effect on our business, operating results and financial condition, and negatively affect the price of our common stock.

- Unfavorable global political or economic events and conditions could adversely affect our business, financial condition or results of operations.

- We face risks associated with the increased scrutiny relating to environmental, social and governance matters.

- It is difficult and costly to protect our proprietary rights, and we may not be able to ensure their protection.

6

**TRADEMARKS, TRADE NAMES AND SERVICE MARKS**

This Annual Report includes our trademarks, trade names and service marks, including, without limitation, "IGALMI™" and our logo, which are our property and are protected under applicable intellectual property laws. Solely for convenience, trademarks, trade names and service marks may appear in this Annual Report without the ®, TM and SM symbols, but such references are not intended to indicate, in any way, that we or the applicable owner forgo or will not assert, to the fullest extent permitted under applicable law, our rights or the rights of any applicable licensors to these trademarks, trade names and service marks. We do not intend our use or display of other parties' trademarks, trade names or service marks to imply, and such use or display should not be construed to imply, a relationship with, or endorsement or sponsorship of us by, these other parties.

## INDUSTRY AND OTHER DATA

Unless otherwise indicated, information contained in this Annual Report concerning our industry and the markets in which we operate, including our general expectations, market position and market opportunity, is based on our management's estimates and research, as well as industry and general publications and research, surveys and studies conducted by third parties. While we believe the information from these third-party publications, research, surveys and studies included in this Annual Report is reliable, we do not guarantee the accuracy or completeness of such information, and we have not independently verified this information. Management's estimates are derived from publicly available information, their knowledge of our industry and their assumptions based on such information and knowledge, which we believe to be reasonable. This data involves a number of assumptions and limitations which are necessarily subject to a high degree of uncertainty and risk due to a variety of factors, including those described in this Annual Report under "Forward Looking Statements," "Risk Factor Summary" and Part I, Item 1A "Risk Factors." These and other factors could cause our future performance and market expectations to differ materially from our assumptions and estimates.

Table of Contents

**PART I**

**Item 1. Business**

**Overview**

BioXcel Therapeutics, Inc. ("BTI," the "Company," "we," "us" or "our") is a biopharmaceutical company utilizing artificial intelligence ("AI") to develop transformative medicines in neuroscience and, through the Company's wholly owned subsidiary, OnkosXcel Therapeutics LLC ("OnkosXcel"), immuno-oncology. We are focused on utilizing cutting-edge technology and innovative research to develop high-value therapeutics aimed at transforming patients' lives. We employ various AI platforms to reduce therapeutic development costs and potentially accelerate development timelines. Our approach leverages existing approved drugs and/or clinically evaluated product candidates together with big data and proprietary machine learning algorithms to identify new therapeutic indications. We believe this differentiated approach has the potential to reduce the expense and time associated with drug development in diseases with substantial unmet medical needs.

On April 6, 2022, we announced that the United States ("U.S.") Food and Drug Administration ("FDA") approved IGALMI$^{TM}$ (dexmedetomidine (or "Dex")) sublingual film for the acute treatment of agitation associated with schizophrenia or bipolar I or II disorder in adults. IGALMI$^{TM}$ is approved to be self-administered by patients under the supervision of a health care provider. On July 6, 2022, we announced that IGALMI$^{TM}$ was commercially available in doses of 120 and 180 microgram ("mcg").

Our most advanced neuroscience candidate is BXCL501. In indications other than those approved by the FDA as IGALMI$^{TM,}$ BXCL501 is an investigational, proprietary, orally dissolving film formulation of Dex in development for the treatment of agitation associated with psychiatric and neurological disorders.

We are continuing to develop BXCL501 for the potential acute treatment of agitation associated with bipolar disorders or schizophrenia in the at-home setting and for the potential acute treatment of agitation (non-daily) associated with dementia due to probable Alzheimer's disease in the at-home setting and in care facilities. As described further below, we have deprioritized the development of BXCL501 for certain other proposed indications, including development of BXCL501 as a potential adjunctive treatment for major depressive disorder ("MDD"), as well as our BXCL701 program, except as noted under "Immuno-Oncology" below.

Our most advanced immuno-oncology candidate, BXCL701, is an investigational oral innate immune activator being developed by OnkosXcel as a potential therapy for the treatment of aggressive forms of prostate cancer, pancreatic cancer, and other solid and liquid tumors.

**Neuroscience**

*Our Neuroscience Strategy*

Our goal is to become the leading AI-enabled neuroscience therapeutics company. We continue to evaluate all strategic options for our neuroscience assets, which could include licensing, partnering, and co-commercialization.

*Our Novel Drug Re-Innovation Approach*

We aim to deploy and implement, throughout the drug development process, an AI ecosystem designed to rapidly identify medications related to our key focus areas of neuroscience and immuno-oncology. Our in-house, uniquely integrated AI-to-drug-development capability is complemented by the services and technology of BioXcel LLC, our former parent company. It includes a labeled properties graph (also referred to as a "knowledge graph") that visually relates collected big data in the form of entities and their properties that include neuropsychiatric symptoms, brain circuits, drug targets, and existing drugs. We believe that understanding the relation between entities relevant to drug development may lead to novel potential uses for existing drugs. Predictive algorithms or queries of the knowledge graph may uncover not only single drugs but potentially identify new combinations of drugs that we believe may be

8

Table of Contents

more effective in treating disorders than single agents. New combinations of drugs may lower tolerable doses of drugs and provide the basis for stronger intellectual property positions. Our AI team works closely with our Business Development team to prioritize in a data-driven manner the most valuable external opportunities. These opportunities may be found in new potential uses for launched drugs, in drugs that are part of pharmaceutical company pipelines no longer being pursued, or within academic efforts to develop new drug candidates.

Traditional drug development is marred by low success rates, long drug development cycles, and exorbitant development costs that are increasing year over year. In addition, many serious diseases remain unaddressed due to limitations of the current drug discovery paradigm.  The pharmacological universe spans more than 27,000 active pharmaceutical agents, of which only approximately 4,000 are approved and marketed. Marketed drugs may not be exclusively effective in the indication for which they are approved but relevant to other indications, including rare diseases, and thus represent an untapped potential for addressing unmet medical needs and recouping research and development costs. Many of the remaining agents are active clinical candidates that are shelved or have failed for reasons other than toxicity, which offers the opportunity to re-innovate for other indications or patient segments. Such agents potentially represent an unrealized investment of billions of research and development dollars by the private and public sectors, while failing to remediate immeasurable patient suffering and sacrifice during clinical development. Also, these compounds may have known pharmaco-dynamic and pharmaco-kinetic properties, potentially allowing for a more data-driven selection of appropriate doses for development programs. Finally, with respect to neuropsychiatric indications, we prioritize those compounds with structural design features that we believe may contribute to high blood-brain barrier permeability, and therefore could increase the likelihood of compound penetration into the brain. Lack of brain penetration is a common cause for failure of many drugs developed for neuropsychiatric indications. In addition, we are prioritizing compounds with available human safety data, acceptable pharmacokinetic results, and data that support a high probability of achieving reasonable brain concentrations after dosing. The compounds in our pipeline have been identified using this proprietary platform.

This drug re-innovation model has been exemplified by the successful development and commercialization of drugs such as Tecfidera® (Biogen, Inc.), Thalomid® (Celgene Corporation), and Viagra® (Pfizer, Inc.). All of these drugs were identified by insights in biology and disease pathophysiology. The successful business models of biotech companies like Axsome Therapeutics, Inc. and Karuna Therapeutics, Inc. are based on the re-innovation and combination of existing clinical candidates or marketed drugs to provide novel solutions for patients. Unfortunately, such discoveries have been severely limited in scope due to the lack of a genuinely integrated approach to mining big data and advanced analytics.

Our AI-based discovery and development process is the foundation of our drug re-innovation model for identifying the next wave of potential medicines. Our therapeutic area experts have over 200 years of combined experience across the drug discovery and development value chain. We believe that our method of finding potential product candidates gives us a higher probability of success because it combines AI expertise and intuition of human experience in drug development. We believe the combination of AI and drug discovery and development expertise facilitates the generation of therapeutic candidates and gives us a significant competitive advantage.

9

Table of Contents

Our approach is illustrated below:



We continue to integrate and evolve our neuroscience and immuno-oncology AI machine learning and drug discovery and development platform. Our platform led to the identification of Dex, the rapid development of BXCL501, and its approval by the FDA as IGALMI$^{TM}$, as well as the advancement of BXCL501 for other potential indications. We are continuing to leverage our platform to identify and develop new neuroscience and immuno-oncology programs.

10

*Our Neuroscience Programs*

The following is a summary of the status of our neuroscience clinical development programs as of the date of this Annual Report on Form 10-K:



As a selective adrenergic agent with a sublingual or buccal route of administration, BXCL501 is designed to be easy to administer and has shown a rapid onset of action in multiple clinical trials, including clinical trials studying patients with schizophrenia, bipolar disorders, and dementia. We believe the results from these studies suggest that BXCL501 has the potential to generate a calming effect without producing excessive sedation. We believe that BXCL501 is highly differentiated from antipsychotics currently used as a standard of care for the treatment of agitation that often produce unwanted side effects such as excessive sedation and extra-pyramidal motor effects. Managing patient agitation in neuropsychiatric and neurodegenerative disorders represents a significant challenge for physicians and caregivers. We believe that BXCL501 has the potential to address these challenges while providing an efficient treatment regimen for patients.

*Agitation Overview and Market Opportunity*

Agitation in patients with neuropsychiatric diseases is a serious medical condition. Agitation is characterized by feelings of unease, excessive talking, and/or unintentional and purposeless motions, such as wringing of the hands or pacing. People experiencing agitation may also express excitement, hostility, poor impulse control, tension, uncooperativeness, and occasional disruptive behavior, which may lead to aggression and violence. In many cases, people develop agitation when treatment for their underlying disorder is not working well. Stressful situations or traumatic events can also trigger agitation. Agitation can occur suddenly or slowly and vary in length, lasting for a few minutes or for an extended period.

With the agitation issues associated with schizophrenia and bipolar disease coupled with a fast-growing elderly population that is potentially likely to experience agitation associated with Alzheimer's disease, the difficulties and expenses of acute treatment of agitation are expected to grow significantly. We estimate that in the United States, there are approximately 1.9 million patients diagnosed with Alzheimer's disease-related dementia ("AAD") and that those patients experience agitation at a rate of about six episodes per month, on average. In addition, we estimate that there are approximately 1.6 million Americans diagnosed with schizophrenia or bipolar disorders and that those patients experience agitation at a rate of about three episodes per month, on average. We, therefore, believe there is significant potential market opportunity for BXCL501 if approved for use in these patient populations in the at-home setting. The

foregoing estimates of the incidence of each patient population and the number of agitation episodes experienced and potential market opportunity are based on management's estimates and third-party data, which may be materially different from actual agitation episodes and actual treatable patients. For additional information regarding risks associated with these estimates, see Part I, Item 1A, Risk Factors *"— Our estimated number of episodes of agitation and our corresponding estimated total addressable market are subject to inherent challenges and uncertainties. If we have overestimated the number of episodes or the size of our total addressable market for our current and potential future products or product candidates, or if any approval that we obtain is based on a narrower definition of the patient population, our revenue and ability to achieve profitability may be harmed."*

### *Treatments for Agitation*

Antipsychotics, the current standard of care for acute treatment of agitation in schizophrenia and bipolar disorder, are also used off-label to treat agitation in dementia and other conditions. Side effects of these medications include movement disorders, including akathisia and extrapyramidal symptoms. One of the serious limitations of these drugs is that they can sedate the patient and do not permit verbal interaction with the hospital staff to continue. Intramuscular ("IM")-delivered antipsychotics, such as haloperidol and olanzapine, are used extensively in this setting but are invasive and often require patient restraint. This type of treatment can dehumanize patients and cause trauma that could have long-term impact on them. Furthermore, these treatments include a black box warning for use in elderly patients.

While sublingual tablet formulations utilizing antipsychotics have been developed, these formulations have long half-lives (21-24 hours) and significant side effects when given acutely or chronically. Oral agents such as benzodiazepines are also used but have a slow onset of action and are consequently ineffective in the acute treatment of agitation. Side effects of these agents include sedation, amnesia, confusion, and paradoxical responses. They can intensify cognitive slowing and worsen memory and motor impairment, contributing to an increased risk of falls and fractures. In addition, long-term use of benzodiazepines has been found to be habit-forming and can cause addiction or relapse to abuse substances. Nonadherence with oral agents can also be problematic as patients may attempt to spit out these medications. We believe that, based on the current method of administration of oral medicine for agitation, an orally dissolving, mucoadhesive film could offer compliance advantages by making it less likely that patients will avoid treatment.

The sublingual or buccal route of administration is an accepted alternative to oral administration of drug delivery to the central nervous system when rapid onset or more controlled delivery is required. Currently, there are six products approved for film administration, including our product, IGALMI™. For example, BioDelivery Sciences International, Inc., a commercial-stage specialty pharmaceutical company, has developed a buccal film formulation of buprenorphine for chronic pain management and buprenorphine and naloxone for opioid dependence. We developed BXCL501 as a differentiated sublingual film dosage form of Dex, which we believe may offer benefits such as ease of use and quick absorption for rapid therapeutic effects.

### *Mechanism of Action: α2a Adrenergic Receptor and NE Role in Acute Agitation*

BXCL501 is a sublingual formulation of Dex that is designed to be easily administered and have a rapid onset of action. Dex is approved in the U.S. for the sedation of initially intubated and mechanically ventilated patients during treatment in the intensive care unit ("ICU"). It is also used in the intensive care setting for sedation of non-intubated patients prior to and/or during surgical and other invasive procedures. Dex, launched in the U.S. as Precedex™ in 1999, is a selective α2a adrenergic receptor agonist that has a strong safety record and has been studied in over 130 clinical trials to date. It has also been sold in the European Union ("EU") and other countries under the trade name Dexdor® as a sedative for intensive care patients. Dex was approved by the European Commission for sedation of adult ICU patients requiring a sedation level no deeper than arousal in response to verbal stimulation (corresponding to Richmond Agitation-Sedation Scale 0 to -3). It has been used to prevent or treat hyperactive delirium resulting from anesthesia in

12

the ICU. Given these uses of the IV formulation of Dex, we believe Dex formulated in a sublingual film and at much lower doses allows for ease of administration in settings where rapid acute treatment of agitation is needed.

### IGALMI™ Commercial Progress

We continue to support IGALMI™ in the hospital setting through limited and focused commercial activity. On August 14, 2023, the Company announced it had implemented a shift in commercial strategy for IGALMI™ in the institutional setting, a reduction of in-hospital commercialization expenses, a suspension of programs no longer deemed core to the Company's business, and a shift to focus on the development of BXCL501 for use in the at-home and care facilities in the treatment of acute agitation in schizophrenia and bipolar disorders, and in the treatment of acute agitation (non-daily) associated with dementia due to probable Alzheimer's disease (collectively, the "Reprioritization"). Following the Reprioritization, a small Corporate Account Director ("CAD") team supports current customers and targeted Integrated Delivery Networks ("IDNs") with educational support and contracting opportunities, while our trade operation supports customers with drug supply. The goal of this approach is to help maintain current business and potentially broaden IGALMI™ utilization through volume contracting. Over time, we believe the revised commercial effort is expected to allow the Company to continue to make inroads into the institutional market in a more cost-efficient manner.

Commercial efforts for the IGALMI™ launch were impacted significantly in the six months ended December 31, 2023 due to the reduction in force, which included the elimination of sales, marketing, and commercial operations staff. The realigned CAD team generated $376,000 in net revenue for the three-month period ended December 31, 2023 through legacy sales and volume-based contracts, up from $341,000 for the three-month period ended September 30, 2023. Net revenues from IGALMI™ product sales for the years ended December 31, 2023 and 2022 were $1.4 million and $375,000 respectively.

On October 30, 2023, we announced that the Centers for Medicare & Medicaid Services ("CMS") assigned a new J-Code for IGALMI™ (J1105). J-Codes are permanent codes used by healthcare providers, commercial insurance plans, and government payers to help standardize the reimbursement process. A J-Code can help simplify claims submission as compared to use of a miscellaneous or unlisted code, which in turn can streamline the billing and reimbursement process. The J-Code for IGALMI™ has been published online in the CMS HCPCS Application Summaries and Coding Recommendations, Third Quarter, 2023 HCPCS Coding Cycle. We believe this J-Code, which became effective on January 1, 2024, will facilitate access to IGALMI™ for patients with agitation associated with bipolar disorder or schizophrenia.

If IGALMI™ is approved outside the U.S., we would consider launching the product through collaborations with third parties.

Our continued commercialization efforts for IGALMI™ are designed to build the foundation to launch additional potential follow-on indications, if any, paving the way for our expanding neuroscience business.

### BXCL501 Development

In indications other than those approved by the FDA as IGALMI™, BXCL501 remains an investigational, proprietary, orally dissolving film formulation of Dex, a selective alpha-2 receptor agonist, targeting symptoms from stress-related behaviors such as agitation. BXCL501 is our most advanced neuroscience clinical program, being evaluated for the at-home acute treatment of agitation related to bipolar disorders or schizophrenia and for the acute treatment of agitation (non-daily) in patients with dementia due to probable Alzheimer's disease in care facilities and at-home settings.

As a selective adrenergic agent with a sublingual or buccal route of administration, BXCL501 is designed to be easily administered and, compared to medications that may take days or weeks, has shown a relatively rapid onset of action in multiple clinical trials, including those studying patients with bipolar disorders, schizophrenia, and Alzheimer's disease. We believe results from these studies suggest that BXCL501 has the potential to reduce agitation without producing excessive sedation. We also believe BXCL501 is highly differentiated from antipsychotics, which are

13

currently used as first-line standard-of-care treatments despite often producing unwanted side effects such as excessive sedation or extra pyramidal motor effects. Managing patient agitation in neuropsychiatric and neurodegenerative disorders represents a significant challenge for physicians and caregivers. We believe BXCL501 has the potential to address these challenges while providing an efficient treatment regimen for patients.

We also believe that BXCL501, if approved for the respective indications, has the potential to become the standard of care for the acute treatment of agitation arising from diseases such as schizophrenia and bipolar disorder and Alzheimer's disease.

In addition, given the differentiated design of BXCL501 and its potential mechanism of action, we believe BXCL501 has the potential to address several diseases or conditions for which agitation is a symptom of the condition or underlying disease, including opioid withdrawal and post-traumatic stress disorder ("PTSD"), which are being evaluated in clinical trials run by third-parties.

### BXCL501 Clinical Trials

**TRANQUILITY Program: Acute Agitation Associated with Dementia due to Probable Alzheimer's Disease (AAD)**

On June 29, 2023, we announced positive topline results from TRANQUILITY II, a randomized, double-blind, placebo-controlled, parallel group trial that evaluated the safety and efficacy of BXCL501 for the acute treatment of Alzheimer's-related agitation in adults 65 years and older with mild to moderate dementia in assisted living facilities ("ALFs") and residential care settings who required minimal assistance with activities of daily living. The trial dosed 149 patients. Randomized patients self-administered 40 mcg or 60 mcg of BXCL501 or placebo for agitation episodes that occurred over a 12-week period. The primary endpoint was the change from pre-dose in PEC total score at 2 hours post-dose for the first treated episode of agitation. The key secondary efficacy endpoints were PEC change from pre-dose at 1-hour post-dose of study treatment for the first treated episode of agitation, and PEC change from pre-dose at 30 minutes post-dose of study treatment for the first treated episode of agitation.

The Phase 3 trial met its primary efficacy endpoint with the 60 mcg dose; a statistically significant and clinically meaningful 7.5 point reduction from baseline in Positive and Negative Syndrome Scale-Excitatory Component ("PEC") total score was observed at 2 hours versus 5.4 with placebo (p=0.0112). The 60 mcg dose also met the first key secondary endpoint of reducing agitation symptoms at 1 hour during the first episode of agitation (p=0.0185) but did not meet the other key secondary endpoint of change from baseline in PEC score at 30 minutes.

Efficacy for this dose was supported by several secondary measures, including CGI-Improvement and Agitation-Calmness Evaluation Scale. Most patients (76%) responded to the first 60 mcg dose and were determined to be "Very Much" or "Much Improved" (CGI-I of 1 or 2, respectively) compared to 50% with placebo. The primary endpoint was not met for the 40 mcg dose, with a 5.7 point reduction from baseline in PEC score.

On June 29, 2023, we also announced that we had learned that an investigator in this study, who enrolled approximately 40% of the patients, engaged in misconduct. Since that time, we have taken steps to further investigate and evaluate the conduct of the TRANQUILITY II trial at this clinical site. Based on these steps to date, we believe that there have been no further instances of misconduct or fraud or other findings that adversely impact the data integrity or reliability of the eligibility, safety, and efficacy data obtained at the clinical trial site in question.

Our TRANQUILITY III trial was designed to evaluate the safety and efficacy of BXCL501 in patients residing predominantly in nursing homes with moderate to severe dementia due to Alzheimer's disease who require moderate or greater assistance with activities of daily living. We halted additional enrollment in this Phase 3 after initial enrolled patients were observed to have more frequent episodes of agitation than originally anticipated, suggesting that agitation may present chronically in this population. Due to the chronic nature of agitation episodes observed in this population thus far, we believe that continued evaluation of BXCL501 in this population would require a different development program targeting more frequent or chronic use. We have chosen to focus our development efforts on the urgent need for episodic treatment in the care facility and at-home setting.

In a Type B/Breakthrough Therapy designation meeting with the FDA on October 11, 2023, we reviewed our

TRANQUILITY clinical trial program and discussed the data package required to support submission of an sNDA for the potential approval of BXCL501 for the acute treatment of agitation in patients with mild to moderate dementia due to probable Alzheimer's disease in the ALF and at-home settings. Specifically, we sought feedback from the FDA as to whether our data package consisting of TRANQUILITY I and II, along with the clinical pharmacology and toxicology programs previously discussed with the FDA, would be sufficient to support an sNDA submission for the potential use of BXCL501 to treat agitation in patients with mild to moderate dementia due to probable Alzheimer's disease in either the at-home or ALF setting, or, if not, what additional data would be required. Based on the FDA's feedback in this meeting, we understand that the FDA will require additional efficacy data, including repeat efficacy data, and that it requested long-term safety data. We therefore requested another meeting with the FDA to further discuss the additional data that would be required to support an sNDA submission.

On February 20, 2024, we held a Type B/Breakthrough Therapy designation meeting with the FDA. The original purpose of this meeting was to obtain feedback on the design of a proposed at-home study that did not include caregiver-collected efficacy endpoints, based on our belief that obtaining caregiver assessments of efficacy would be challenging. We believe there are no validated caregiver endpoints for assessing efficacy in Alzheimer's disease patients in the at-home setting. As a result, we focused on requesting feedback from the FDA regarding our proposal for an at-home clinical study with safety as the primary objective, and to better understand what additional data would be required to submit an sNDA to support labeling for BXCL501 to include the acute treatment of agitation associated with dementia in probable Alzheimer's disease or, in the alternative, in this population in the care setting only.  In its preliminary responses, the FDA reiterated its prior comments that we generate additional efficacy data, including repeat-dose efficacy data, to support an sNDA submission, as the FDA indicated that our proposed efficacy database, which currently includes the 70 patients who have been treated with 60 mcg of BXCL501 in TRANQUILITY I and TRANQUILITY II, would not contain substantial evidence of effectiveness absent additional data. The FDA advised that we generate the necessary efficacy data in care facilities prior to conducting any trials in the at-home setting. In addition, the FDA indicated the need to generate long-term safety data to support an sNDA submission, including from probable Alzheimer's disease patients exposed to BXCL501, for up to one year. We have received the final meeting minutes from the FDA, which we believe are consistent with the FDA's preliminary responses and the subsequent meeting discussion. Based on the FDA's feedback, we are currently planning to generate additional Phase 3 efficacy and safety data, in a variety of relevant care-facility settings and across severity of dementia using the Positive and Negative Syndrome Scale-Excitatory Component ("PEC") as the primary efficacy measure, as used in the prior TRANQUILITY II study. In addition, we plan to discuss the details of the requirement for long-term safety data at a future meeting with the FDA. Also, although we announced in November 2023 that we were planning to conduct a Phase 3 trial in the at-home setting, with safety as the primary objective (TRANQUILITY At Home), given the priority to expand the database to generate additional efficacy and safety data in care facilities, we are re-evaluating the timing for initiating TRANQUILITY At Home.

**SERENITY Program: Agitation Associated with Bipolar Disorders I and II and Schizophrenia (at-home use)**

We initiated the SERENITY III clinical study of BXCL501 in patients with agitation associated with bipolar disorders or schizophrenia in SERENITY III, which consists of two parts. The first part was comparable to our pivotal SERENITY I and II studies. Using similar inclusion and exclusion criterion under a well-controlled in-patient setting, acutely agitated patients with schizophrenia or bipolar disorders were randomized to self-administer either 60 mcg of BXCL501 or placebo in a double-blind placebo-controlled trial. The primary endpoint of Part I was efficacy, as measured by the change in PEC score change from baseline at two hours post-dose. The secondary objectives of Part I were safety and tolerability.

On May 25, 2023, we reported topline results from Part I of the study. Although the trial did not meet its primary efficacy endpoint, we believe the efficacy results, observed with the 60 mcg dose, representing half of the lowest approved dose of IGALMI$^{TM}$ for in-patient use (120 mcg), were promising. Specifically, greater than 50% of individuals were responders, defined as those patients who achieved a 40% or greater reduction in PEC score. Furthermore, this population responder rate was consistent and dose-proportionate to the same response rates observed in the larger SERENITY I and II trials. Although the primary efficacy endpoint as a group mean change in PEC score from baseline at 2 hours was not statistically significant at the primary endpoint at 2 hours ($p=0.077$), BXCL501 statistically separated from placebo at 4 hours ($p=0.049$).

15