# EXHIBIT B



Reference
FOI Control #
2024-6196
Dated: 7/16/24

**July 30, 2024**

Adam M. Apton
Levi & Korsinsky, LLP
33 Whitehall Street, 17th Floor
New York, NY 10004

Via email: aapton@zlk.com

Dear Requestor,

The attached record(s) are being provided by the Office of Regulatory Affairs (ORA) Office of Partnerships Division of Information Disclosure Policy (DIDP) - Freedom of Information Act (FOIA) Branch I in response to your Freedom of Information Act request referenced above for record(s) from the Food and Drug Administration pursuant to the Freedom of Information Act regarding:

**On 12/21/2022, the FDA issued Form 483 to Caitlin C. Meyer, M.D. (FEI No. 3024668889). Pursuant to FOIA, I am requesting a copy of Dr. Meyer's response to the Form 483.**

Your request is granted in part.

After a thorough review of the responsive records, we have determined that portions of the documents are exempt from disclosure under FOIA exemptions (b)(4), (b)(6), and b(7) of the FOIA 5 U.S.C. § 552, as amended and delineated below:

➢ Exemption (b)(4) permits the withholding of trade secrets and commercial or financial information obtained from a person that is privileged or confidential. We have determined that portions of the enclosed records satisfy these criteria.

➢ Exemption (b)(6) permits the withholding of information which, if released, would constitute a clearly unwarranted invasion of personal privacy.  In this case, it was determined that there is no countervailing public interest qualifying under the standard set forth, under exemption (b)(6), to release the personal identifying information of certain third parties.

➢ Exemption (b)(7) protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be

**U.S. Food and Drug Administration**
**5630 Fishers Lane, Room 1035**
**Rockville, MD 20857**
**www.fda.gov**



expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual.

In determining to withhold such information, FDA considered 5 USC 552(a)(8)(i), when applicable, and whether FDA reasonably foresees that disclosure of such information would harm an interest protected by the relevant exemption(s) and whether disclosure is prohibited by law.

DIDP FOIA Branch 2 considers your request closed. If you have any questions about this response, you may contact me at Kimberly.morris1@fda.hhs.gov.

In accordance with 45 CFR § 5.61 and 21 CFR § 20.41(b)(5), you have the right to appeal this determination.  By filing an appeal, you preserve your rights under FOIA and give the agency a chance to review and reconsider your request and the agency's decision.  Your appeal must be mailed within 90 days from the date of this response, to: Director, Office of the Executive Secretariat, US Food & Drug Administration, 5630 Fishers Lane, Room 1050, Rockville, MD 20857, E-mail: FDAFOIA@fda.hhs.gov. Please clearly mark both the envelope and your letter "FDA Freedom of Information Act Appeal." Items arriving or delivered after 5 p.m. Eastern Time will be deemed received on the next workday.

If you would like to discuss our response before filing an appeal to attempt to resolve your dispute without going through the appeals process, please contact Charis Wilson at 301-796-3900.   You may also contact the FDA FOIA Public Liaison for assistance at: Office of the Executive Secretariat, US Food & Drug Administration, 5630 Fishers Lane, Room 1050, Rockville, MD 20857, E-mail: FDAFOIA@fda.hhs.gov.

If you are unable to resolve your FOIA dispute through our FOIA Public Liaison, the Office of Government Information Services (OGIS), the Federal FOIA Ombudsman's office, offers mediation services to help resolve disputes between FOIA requesters and Federal agencies. The contact information for OGIS is as follows:

> Office of Government Information Services
> National Archives and Records Administration
> 8601 Adelphi Road–OGIS
> College Park, MD 20740-6001
> Telephone:  202-741-5770
> Toll-Free: 1-877-684-6448

**U.S. Food and Drug Administration**
**5630 Fishers Lane, Room 1035**
**Rockville, MD 20857**
**www.fda.gov**



E-mail: ogis@nara.gov

Please do not submit payment until you receive an invoice.  The following charges for this request to date may be included in a monthly invoice:

| Fee | Count/Time | | Fee Total | Comments |
|---|---|---|---|---|
| Search ($58 hr.): | 1 | hours | $58.00 | |
| Review ($58 hr.): | 1 | hours | $58.00 | |
| Other Fee (see comments): | | | $0.00 | |
| **Total Estimated Fees:** | | | **$116.00** | |

Sincerely,

Kimberly L. Morris -S
Digitally signed by Kimberly L. Morris -S
Date: 2024.07.30 09:46:01 -04'00'

Kim Morris
Government Information Specialist
U.S. Food and Drug Administration
Office of Regulatory Affairs (ORA)
Office of Partnership (OP)
Division of Information Disclosure Programs (DIDP)

Enclosures:    483 response

**U.S. Food and Drug Administration**
**5630 Fishers Lane, Room 1035**
**Rockville, MD 20857**
**www.fda.gov**

## Agility Medical Research, Inc.

January 13th, 2023

Re: Form 483 Issued to Caitlin C. Meyer, MD

Dates of Inspection:
12/5/2022-12/21/2022

To whom it may concern,

This letter is written in response to Observations made by Investigator Dr. Richard A. Lyght and documented on the Form FDA 483 issued December 21st, 2022.

I would first like to express my appreciation to Dr. Lyght for conducting the Inspection and providing me with an opportunity to better understand my role as a Clinical Investigator and the practical application of the regulations and guidelines that govern the conduct and oversight of human subject research. Dr. Lyght's thoughtful discussion points and recommendations were received in earnest and acted on with urgency from the time of inspection and up to present day. As an early career researcher conducting my first study as Principal Investigator, this learning experience has been invaluable and I am committed to carrying the lessons learned as a result of this inspection forward in all future career endeavors. I look forward to demonstrating a robust response focusing on systems-based quality improvement.

We have provided each Observation with related Response(s). The Responses include, as appropriate, background information of the Observation, Root Cause for the occurrence, a Corrective Action to address the underlying cause of the occurrence, and a timeline for assessing efficacy of the intervention

Sincerely,

Dr. Caitlin C. Meyer
Psychiatrist and Principal Investigator
Agility Medical Research
1065 NE 125th St. Suite 221
North Miami, FL 33161-5821

Response to Form FDA 483 issued December 21, 2022

**Observation #1:**

*The IRB did not approve a written summary of what was to be said to the subject or the subject's legally authorized representative, in a situation where a short form written consent document was prepared.*

*Specifically,*

*Four out of 37 subjects reviewed were initially consented using a Spanish short form that was not approved by the IRB.  Furthermore, the short form used did not contain information describing the basic elements of informed consent to include risks and study procedures.  The subjects who were initially consented using the unapproved Spanish short from were:*

| Subject# | | Date of Screening Visit | Date of Randomization Visit/Initial Dose of Investigational Product |
|---|---|---|---|
| (b) (6), (b) (7)(C) | | 5/16/22 | 5/31/22 |
| (b) (6), (b) (7)(C) | | 5/18/22 | 5/24/22 |
| (b) (6), (b) (7)(C) | (Screen Fail) | 5/19/22 | N/A |
| (b) (6), (b) (7)(C) | | 5/23/22 | 6/2/22 |

**RESPONSE TO OBSERVATION #1**

We acknowledge some deficiencies with the use of the short form occurred at the start of the study.  Specifically, some procedures outlined in the (b) (4) , (b) (4) did not occur.  These deficiencies are addressed below in the third paragraph of this response to observation #1. They were previously identified in monitoring reports (Attachment #2 (Follow-up letter dated August 30, 2022) and (b) (4) (Attachment #3) which was initiated prior to the inspection (16NOV2022) and provided to FDA inspector in draft form.

With respect to the first part of the observation, "*The IRB did not approve a written summary of what was to be said to the subject or the subject's legally authorized representative, in a situation where a short form written consent document was prepared.*", we requested the IRB to provide us with more information on the use of the short form in August and they provided us with an email clarifying its use. (Attachment #4)   Specifically, it refers us to section 7.2 of the (b) (4) , which states,  (b) (4)

As indicated the IRB-approved long form English consent was what was approved (Attachment #5) by the IRB as the written summary.

1

Response to Form FDA 483 issued December 21, 2022

We added signature lines to the IRB-approved addendum template of the short form, (b) (4) No other additions to the IRB-approved addendum template were made.  We realize that signature lines should not have been added to a previously IRB-approved addendum template, but we did not change the content of the document or intended use.

What specifically happened that is not clear from the observation is that for the four subjects, the site actually executed the consent process by providing and using the IRB-approved English long form as a summary, instead of the correct form which is the (b) (4)

(Attachment #7).  The site then had the subjects sign the addendum to the short form that signature lines were added to and the IRB – approved English long form.  The site did not provide the information describing the basic elements of the informed consent in Spanish by using the IRB-approved short form.  They did so verbally using the IRB – Approved English long form.  Of note, all of the subjects identified in the observation are bilingual and received and signed a copy of the full IRB – Approved English long form initially.  The Spanish form should have been used because the subjects indicated they preferred Spanish language for the purposed of neurocognitive testing.  All scales were conducted in Spanish for these subjects.

It is important to note as soon as the issue was realized, we immediately notified personnel in an email on August 30, 2022 (Attachment #8) regarding the incorrect use of the short form. This email highlighted the discrepancies and afterwards there were no instances of incorrect use of short form.  Deviations for each subject were submitted to the IRB as required. (Attachment #9)

The root cause of not following the IRB procedures with respect to the short form is that our internal SOP was deficient on the use of short forms for consenting subjects.  The corrective action that was implemented was revising OPSS-100.02 - Informed Consent Process (Attachment #10) and training our personnel accordingly.  (Attachment #11)

There was no impact to subject safety, study conduct, or data integrity because the four subjects identified were bilingual and understood the information being conveyed to them during the informed consent process with the IRB-approved English long form, even though the information in the short form was not provided.  Three (3) of 4 subjects (Subject (b) (6), (b) (7)(C) was a screen fail) were reconsented at a later date with the IRB approved Spanish form.  No subjects withdrew their consent based on the information provided in the Spanish form and all three subjects continued on in the study.  The three subjects completed the study.

2

Response to Form FDA 483 issued December 21, 2022

**Observation #2:**

*Failure to prepare or maintain adequate case histories with respect to observations and data pertinent to the investigation.*

*Specifically,*
*25 out of 37 subjects reviewed and were randomized into the study and received investigational product did not have sufficient documentation to show they met all inclusion/exclusion criteria. Three of these subjects' files contained documentation they potentially met exclusion criteria of having* (b) (4) *unrelated to probable* (b) (4) *.*

*The table below shows subjects who did not have sufficient documentation to support randomization into the study:*

| Subject# | Date of Randomization Visit/Initial Dose of Investigational Product |
|---|---|
| (b) (6), (b) (7)(C) | 5/9/22 |
| | 5/31/22 |
| | 5/10/22 |
| | 5/11/22 |
| | 5/31/22 |
| | 6/14/22 |
| | 7/9/22 |
| | 7/22/22 |
| | 8/23/22 |
| | 9/20/22 |

| Subject# | Date |
|---|---|
| (b) (6), (b) (7)(C) | 9/3/22 |
| | 9/20/22 |
| | 9/13/22 |
| | 10/4/22 |
| | 10/18/22 |
| | 11/8/22 |
| | 11/3/22 |
| | 11/18/22 |
| | 11/23/22 |
| | 11/25/22 |
| | 11/25/22 |

3

Response to Form FDA 483 issued December 21, 2022

(b) (6), (b) (7)(C)

| | |
|---|---|
| | 12/1/22 |
| | 12/1/22 |
| | 12/3/22 |
| | 12/3/22 |

(b) (4)

(b) (4)                                                                      .

*Furthermore, there was no documentation to show the screening laboratory results for Subject* (b) (6), (b) (7)(C) *were reviewed to assess whether the subject met inclusion/exclusion criteria.*

**Response to Observation 2:**

As per Protocol (b) (4)       Amendment 1 May 20th, 2022 (Attachment #12), inclusion criteria #2 states that subject must meet a diagnosis of (b) (4)                based on the (b) (4)

) Please note that inclusion criteria #2 was updated in Protocol (b) (4)    Amendment 2 November 18th, 2022 to also reference the (b) (4)     criteria for clarification purposes. The criteria referenced incorporates both clinical presentation and (b) (4) specific to (b) (4)    . The (b) (4) criteria itself references that (b) (4)    assessment is not readily available in the clinical community and this is not required to determine diagnosis of (b) (4)       During the SIV dated April 18th 2022, review of inclusion and exclusion criteria related to (b) (4)                ) prompted discussion of inclusion and exclusion criteria in (b) (4)    . The Sponsor representative provided guidance to refer to protocol section 6.2 stating that when (b) (4)       is unavailable subjects with (b) (4)    as per (b) (4)       criteria meet inclusion criteria for (b) (4)    . Our approach to diagnostic clarification proceeded as follows:

- Patients with a pre-established (b) (4)        diagnosis documented in their medical chart history by a diagnosing clinical provider were considered appropriate for inclusion (b) (4)          data availability.
- Patients with a pre-established (b) (4)            documented in medical chart history by a diagnosing clinical provider and (b) (4)          were considered appropriate for inclusion (b) (4)     data availability.
- Patients with a (b) (4)            and not currently (b) (4)          were evaluated during screening visit utilizing (b) (4)   criteria for clinical diagnosis of (b) (4)    as per protocol section 6.2.

4

Response to Form FDA 483 issued December 21, 2022

Per the (b) (4)        criteria for clinical diagnosis of (b) (4)       , a patient must meet criteria for (b) (4)              and clinical presentation is consistent with clinical factors including, (b) (4)

(b) (4)       Initial and most prominent (b) (4)        are evident on history and presentation in (b) (4)                    with at least one other (b) (4)       affected including (b) (4)

(b) (4)       . Furthermore, (b) (4)        is not attributable to alternate pathological process including (b) (4)                    . All subject's performance on (b) (4)       testing scales as per protocol stipulation were reviewed and they were consistent with the diagnosis of (b) (4)        with deficits displayed in the (b) (4)  noted previously.  All laboratory and ECG results collected in screening to ensure that no other medical condition could be contributing to (b) (4)            were also reviewed.

We acknowledge that the many factors exhibited to conclude a clinical diagnosis of (b) (4)

(b) (4)           ) for each individual subject could have been summarized and documented in a clearer manner in the case histories.  Therefore, for each subject we generated a NTF that summarizes the relevant information to conclude a (b) (4)

(b) (4)           and indicated that subjects met all inclusion/exclusion criteria.  (Attachment #15)  For any new subjects the information shall be summarized a progress note by the PI or sub-I.

The observation indicated three subjects ((b) (6), (b) (7)(C)       ) contained information in their case histories there that they potentially met exclusion criteria of having (b) (4)

(b) (4)              .
We have summarized the rationale for inclusion in a NTF and below:

- (b) (6), (b) (7)(C)  - (b) (4), (b) (6), (b) (7)(C)

  As per protocol, exclusion criteria # 5 states that (b) (4)

  (b) (4)           Subject (b) (6), (b) (7)(C)

  (b) (4)  history is not considered to meet exclusionary criteria and subject is deemed appropriate for enrollment. (NTF, Attachment #16)

- (b) (6), (b) (7)(C)  – (b) (4), (b) (6), (b) (7)(C)

  (NTF, Attachment #17)

5

Response to Form FDA 483 issued December 21, 2022

- (b) (4) - (b) (4), (b) (6)

  As per protocol, exclusion criteria # 5 states that "(b) (4) ." Subject (b) (6), (b) (7)(C) (b) (4) history is not considered to meet exclusionary criteria and subject is deemed appropriate for enrollment. (Attachment #18)

With respect to screening laboratory report for subject (b) (6), (b) (7)(C), the laboratory report from (b) (4) was available on (b) (4) .  An assessment of the safety laboratory data was conducted by the PI on December 1st ,2022 by accessing the laboratory report electronically.  This assessment of eligibility criteria was documented and communicated to the site team via email on December 1, 2022 (Attachment #19) prior to randomization.  There was no printer at the (b) (4) to facilitate a printed copy of the laboratory report.  The laboratory report should have been printed by the study coordinator and placed in the subject's binder at a later date, but was not due to an oversight.  The study coordinator was instructed on December 7th 2022 that the laboratory reports are required to be placed in the subject binder in timely manner and the PI to document assessment.  (Evidence of the retraining has been filed in the regulatory binder)  There was no impact to subject safety for this specific incident because the PI was present for and conducted oversight of the randomization of this subject in entirety.  The PI was able to communicate the assessment verbally to the site team on the date in question.

There was no impact to subject safety, study conduct, or data integrity as a result of this observations, because after reviewing all the relevant information regarding a diagnosis of (b) (4) for each subject, and documenting the rationale in a NTF, all subjects met inclusion/exclusion criteria.

**Observation #3:**

*An investigation was not conducted in accordance with the signed statement of investigator and investigational plan.*

*Specifically,*
*Four of the enrolled and randomized subjects, out of 37 subjects reviewed, were initially dosed with investigational product using a urinary drug screen (UDS) completed more than* (b) (4) *prior to dosing contrary to the protocol established schedule of events used to demonstrate subjects did not meet exclusion criteria.  The table below lists the subjects who were randomized despite not having a current UDS:*

| Subject# | Date Urinary Drug Screen Completed | Date of Randomization Visit/Initial Dose of Investi2ational Product |
|---|---|---|
| (b) (6), (b) (7)(C) | 5/4/22 | 5/31/22 |

Response to Form FDA 483 issued December 21, 2022

(b) (6), (b) (7)(C)

| | | |
|---|---|---|
| | 6/7/22 | 7/19/22 |
| | Not completed at Screening Visit (6/23/22) or Unscheduled Visit (7/6/22) | 7/9/22 |
| | 6/28/22 | 7/22/22 |

B. Subject (b) (6), (b) (7)(C) experienced a Serious Adverse Event (SAE) on 11/2/22 which was not reported to the medical monitor or safety team until 11/16/22, outside of the required timeframe stated in the protocol.

**Response to Observation 3a:**

We acknowledge that per protocol a repeat UDS was not obtained prior to dosing if more than (b) (4) have passed since the initial UDS collected at screening visit, as required by the investigational plan.  The root cause of the problem was that the study coordinator at the time did not go back and check the dates of the original UDS prior to the first dosing visit.  Additionally, the source documents were not designed to prompt for assessment of a needed repeat collection.  Protocol deviations were submitted to the IRB, as required. (Attachment # 20)

The purpose of performing UDS after (b) (4) from the initial screening assessment is to ensure no new substance use disorder has developed in the screening window prior to first dose.  None of the four subjects had a history of substance use disorder and 3 of the 4 subjects were negative in their original UDS for all substances of abuse.  One subject (b) (6), (b) (7)(C)), tested positive for (b) (4) at the initial UDS.  This subject is prescribed (b) (4) by a primary care physician for treatment of (b) (4) and (b) (4) dose was stable for at least 14 days prior to subject enrollment.  Subject did not have access to self-administer (b) (4) as all medications are administered by (b) (4) thus there is negligible potential for abuse of prescribed medication in this case.  NTFs were generated and filed in the case histories for each subject. (Attachment #21)

Multiple clinical evaluations are factored into the assessment and diagnosis of substance use disorder including medical history, physical examination, vital sign assessment, neurocognitive testing, collateral reports, and laboratory assessment such as urine drug screening.  While urine drug screen results can be helpful in identifying substance abuse, a positive urine drug screen alone does not verify or exclude a diagnosis of substance use disorder.

Subjects were observed and completed multiple screening procedures during the screening window.  During this time, none of the subjects displayed signs or symptoms of intoxication or withdrawal at the time of clinical assessment.   Furthermore, at the time of pre-dose assessments, (b) (4) testing and vital sign/ ECG assessments did not display evidence of subject intoxication or withdrawal.  Each of the subjects evaluated and referred to in

7

Response to Form FDA 483 issued December 21, 2022

observation 3a did not meet (b) (4) criteria for diagnosis of a (b) (4)                thus did not meet exclusion criteria #12 as stated in the protocol.

Regarding Subject(b) (6), (b) (7)(C), referenced in the table for Observation 3a, the subject was screened on 23Jun2022 and randomized 09Jul2022.   UDS and UA were completed on the date of screening visit 23Jun2022.  The research assistant who collected the laboratory specimens made an error on submission of the lab requisition form, entering subject number (b) (6), (b) (7)(C) instead of (b) (6), (b) (7)(C).   Email documentation of the site team's awareness of the incorrect subject number label on the lab requisition form is provided in email documentation to the medical monitor at the time of screening assessment. (Attachment #22)  The clinical research coordinator was instructed to contact the central lab to correct the subject number on laboratory report however failed to do so prior to termination of her contract with our organization.  The central laboratory has been contacted to correct the discrepancy.  The laboratory results were assessed by the site team and medical monitor on June 29th ,2022 and subject met all eligibility criteria.

To ensure this type of deviation does not reoccur, as a corrective action we updated our source documents to prompt the staff to repeat UDS if initial occurred more than (b) (4) prior to the assessment of eligibility sign-off by the PI or Sub-I. (Attachment #23)

There was no impact on subject safety, subject eligibility, or data integrity because other clinical factors provided insight to the PI regarding these subjects' substance abuse history and subsequent assessments prior to dosing for substance use disorder were all negative.

**Response to Observation 3b:**

We acknowledge that the SAE was reported late because of an oversight error by the Principal Investigator who mistakenly did not submit the initial SAE report to the Sponsor, Safety Team, and IRB.  The issue was identified in CAPA 2208 (Attachment #24) on December 4, 2022 prior to the inspection and a draft copy provided to the FDA inspector.  A protocol deviation was submitted to the IRB regarding this issue for review on November 21st, 2022.  The IRB indicated that the site may continue to enroll subjects at that time.

The error was not realized until the follow-up report (Attachment #25) was submitted to the IRB and (b) (4)                                    ).  The initial SAE report for this subject was opened and signed by the Principal Investigator on November 2nd 2022. (Attachment #26)  It was entered into the electronic data collection system utilized for this study on the date of completion on November 2nd 2022.  We submitted the initial SAE report to (b) (4)          immediately upon becoming aware of this error on November 19, 2022 (Attachment #27) and the IRB on November 21, 2022. (Attachment #28)  The Sponsor and (b) (4)                        were informed, and the IRB and (b) (4)            confirmed that the subject was cleared to continue in the study.  (Attachment #29)

8

Response to Form FDA 483 issued December 21, 2022

To ensure that the issue does not reoccur, we have implemented an SAE Reporting Checklist that is referenced in SOP PROS-101.02 Site Adverse Event, Serious Adverse Event, and Concomitant Medication Reporting.  (Attachment #30)  This checklist (Attachment #31) will be completed by the Principal Investigator or Sub-I, and it will be the responsibility of the Clinical Research Coordinator to ensure each item on the checklist, as well as the checklist itself, is filled out every time a SAE occurs.  Site personnel shall be trained on this form on January 13, 2023, and the records shall be stored accordingly.

This subject population enrolled in this study has an expected high incidence of hospitalization and SAE occurrence.  Of the 14 SAEs reported to date, this was the only report that was submitted outside of the required timeframe stated in the protocol.  There was no impact to this subject's safety or welfare because the PI had proper oversight over the reporting during the SAE occurrence and the subject received appropriate medical care during hospitalization. The PI completed all required SAE documentation but was unaware the initial report hadn't been sent to the Safety Monitoring Board.  Because the SAE was not related to IP administration, the delay in reporting to the Safety Monitoring Board did not result in risk to other subjects enrolled in the study.  The subject was cleared by the Safety Monitoring Board and IRB (Attachment #32) to continue the study when the transmission issue was rectified.

9