1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - x

TONYA HILLS and OKLAHOMA LAW            No. 3:23-CV-915 (SVN)
ENFORCEMENT RETIREMENT SYSTEM,
Individually and on Behalf of           AUGUST 27, 2025
All Others Similarly Situated,

                                        2:00 P.M.

            Plaintiffs,

                                        MOTION HEARING

vs.

BIOXCEL THERAPEUTICS, INC.,
VIMAL MEHTA, RICHARD STEINHART,
and ROBERT RISINGER,

            Defendants.

- - - - - - - - - - - - - - - - - x




                        450 Main Street

                    Hartford, Connecticut




        BEFORE:   THE HONORABLE SARALA V. NAGALA, U.S.D.J.










COURT REPORTER:  Julie L. Monette, RDR, CRR, CRC
                        (860) 212-6937

Proceedings recorded by mechanical stenography, transcript
produced by computer.

APPEARANCES:

FOR THE PLAINTIFFS:

        LEVI & KORSINSKY, LLP
            33 Whitehall Street, 27th Floor
            New York, New York 10004
        BY:  ADAM M. APTON, ESQ.

        GRANT & EISENHOFER PA
            485 Lexington Avenue, 29th Floor
            New York, New York 10017
        BY:  CAITLIN MOYNA, ESQ.

FOR THE DEFENDANTS:

        LATHAM & WATKINS LLP
            12670 High Bluff Drive
            San Diego, California 92130
        BY:  COLLEEN SMITH, ESQ.

        LATHAM & WATKINS LLP
            555 11th Street NW, Suite 1000
            Washington, D.C. 20004
        BY:  SARAH A. TOMKOWIAK, ESQ.
        BY:  RICHARD FROHLICHSTEIN, ESQ.

(Call to order, 2:00 p.m.)

THE COURT:  Just give me one moment, please.

(Pause.)

THE COURT:  All right.  Good afternoon.  We're here in Case No. 23-CV-915, Hills and another plaintiff versus BioXcel Therapeutics and other defendants.  Let's begin with an appearance for plaintiffs' counsel, please.

MR. APTON:  Good afternoon, Your Honor.  Adam Apton from Levi & Korsinsky for plaintiffs.

MS. MOYNA:  Good afternoon.  Caitlin Moyna from Grant & Eisenhofer for plaintiffs.

THE COURT:  Good afternoon.  And will both of you be arguing or only one of you?

MR. APTON:  No, Your Honor.  Just me.

THE COURT:  All right.  Thank you.

And an appearance of counsel for defendants, please.

MS. SMITH:  Good afternoon, Your Honor.  Colleen Smith of Latham & Watkins on behalf of the defendants.  I'm joined by my colleagues Richard Frohlichstein and Sarah Tomkowiak and also our client, Mr. Javier Rodriguez.

THE COURT:  All right.  Good afternoon to all of you.

First, let me thank the parties for your willingness to reschedule this hearing.  I know we had a prior argument date earlier in the summer, and my schedule just didn't allow

for me to be effectively prepared for the hearing.  So I appreciate the parties' patience with the scheduling.

So the way that I'd like to proceed with the hearing this morning is that I have a number of specific questions with regard to the two pending motions, and so I'll direct my questions to each side.  At the end of my questions to a particular side, you're welcome to make whatever additional points you would like to make to the Court.

So I want to start by posing a question to both sides about the procedural posture that we find ourselves in.  And so here where we have a motion to dismiss the second amended complaint and then, before the Court could rule on that motion, also a motion for leave to amend to add additional allegations, my normal practice would be to basically look at the most potentially operative version of the complaint, the third amended complaint, incorporate any arguments that defendants made to dismiss the second amended complaint, and apply those to the third amended complaint, as well as any new arguments made in the context of the motion for leave to amend.

I think that's particularly appropriate here where the arguments against the third amended complaint rest solely on futility.  So what I'm proposing to do is effectively look at the third amended complaint and decide, based on all the arguments defendants have made to date, whether it passes muster.  And I want to know from both sides if you're aware of

any controlling Second Circuit authority that would suggest I can't do that and I instead need to take the motions serially, issue a decision on the second amended complaint and then separately take up the third amended complaint.

Let me start with defendants since it's your first motion.

MS. SMITH:  It -- thank you, Your Honor.  It's funny. Actually, Attorney Apton and I were discussing this very question in the hallway before we came in.  I think the way that the Court -- I'm -- to answer the direct question, we are not aware of any controlling Second Circuit authority that would require the Court to do something different than what the Court has just articulated.  And what Your Honor has articulated as the way to handle the motions is what we believe is the most appropriate as well.

THE COURT:  Thank you.

MS. SMITH:  Yes.

MR. APTON:  Your Honor, for plaintiffs, no, not aware of any authority saying one thing or the other.  I just would note that in preparation for today I have a bunch of paragraph cites mostly to the second amended complaint, the operative complaint.  So I apologize.

THE COURT:  Okay.  I think we can -- we can figure out where those are if we need to when you're making them.  And I appreciate that you didn't know this was the question I was

going to ask, so you might have prepared with the second amended complaint.  But I don't think that would stand in the way of proceeding substantively the way I proposed.

MR. APTON:  Very good, Your Honor.

THE COURT:  Okay.  So that's how we'll handle things then.  So then let's start with questions for defendants.

I want to jump in to questions related to whether there were material misrepresentations, and I want to start with what defendants have framed as potentially misleading statements 1 and 2.  They relate to the March 9th, 2023, earnings call where it was stated that the TRANQUILITY II trial was, quote, fully enrolled and then a March 16th, 2023, 10-K statement that patient enrollment is complete for TRANQUILITY II.

I think it would be helpful to frame this discussion if you could give me defendants' view of the TRANQUILITY trials.  What was TRANQUILITY I?  What was TRANQUILITY II? What was TRANQUILITY III?  And then what was -- what is TRANQUILITY In-Care?  Because that -- understanding that will help me understand plaintiffs' arguments and ask you specific questions about them.

MS. SMITH:  Great.  You'd like me to address this now, Your Honor?

THE COURT:  Sure, yes.

MS. SMITH:  Okay.  So my understanding, just so I

understand the question Your Honor is asking, is specifically to understand the various trials, not to take on all of the various arguments around falsity for those particular statements right now; is that correct?

THE COURT:  Not right now, yes.

MS. SMITH:  Okay, perfect.  Wonderful.  I just want to make sure I'm answering the Court's questions.

THE COURT:  It mostly relates to plaintiffs' theory that TRANQUILITY In-Care is a redo of TRANQUILITY II because, in plaintiffs' view, defendants knew that the data from Dr. Meyer's site could not be used, and so they knew at that point that they had to redo the trial with TRANQUILITY In-Care.

MS. SMITH:  So let me start by trying to describe the core distinctions between -- among the different trials.  So TRANQUILITY I I'm the least familiar with because it's not directly at issue in the case.  But it is one of the bases for the package that the companies submitted, an earlier phase trial with respect to the potential use of this drug IGALMI in a variety of patient settings.  And I'm happy to get more in detail around that if we need.

TRANQUILITY II, it was a companion to TRANQUILITY III. They were intended to go together.  And the sNDA package that the company intended to submit originally would have been a combination of TRANQUILITY II and TRANQUILITY III.  Both TRANQUILITY -- and so, just to refresh, TRANQUILITY II is,

obviously, the subject of the issues associated with Dr. Meyer's site.  TRANQUILITY III has nothing to do -- was not -- has nothing to do with Dr. Meyer and Segal trials.

TRANQUILITY II was to test two different doses, a 40 milligram dose and a 60 milligram dose.  There would be about 150 patients.  This is in the record, 150 patients, and obviously there would be a placebo group and a drug -- a drug-test group.  And within the group that was being tested, there were two different doses, 40 and 60, patients 65 and over.  And TRANQUILITY II is being tested in certain care-based settings that were less severe, patients who were less severely impaired than TRANQUILITY III.

So I need to double-check the references, but I believe it was in the residential setting and assisted living setting for TRANQUILITY II and the sort of skilled -- basically nursing homes for TRANQUILITY III.  But in those two studies those populations were separated from one another.  TRANQUILITY III, basically the same study structure, two different doses, 40 and 60, but limited to the skilled care area, the nursing home or severe centers.

Because of the way TRANQUILITY III was structured and the costs associated with -- with TRANQUILITY III, the company decided to stop TRANQUILITY III.  That was part of what was announced in August of 2023 in connection with the company's strategic reprioritization.  At that point the company needed

to go back to the FDA and say, "Okay, what do we do?  Because our original plan was II and III are going into our sNDA package, and we've lost one for reasons unrelated to the Segal studies."

TRANQUILITY In-Care, taking us to today, is essentially a combination of TRANQUILITY II and TRANQUILITY III.  It's testing the drug in all of the care settings.  So now we've combined skilled nursing, residential, and assisted living facilities into one trial.  They've also limited it to the 60 milligram dose to further test the efficacy of the 60 milligram dose versus the 40 milligram dose, given the -- to develop sort of more data around that.  And they've dropped the age of patients who could participate in the study to 55 to sort of expand the patient population.

So those are the differences.  I'm happy to answer any questions that the Court has on those.

THE COURT:  There's reference in some of the filings with the SEC to the at-home setting.  What is that, and which of these trials was testing for that setting?

MS. SMITH:  So great question, Your Honor.  None of the TRANQUILITY trials that we've just discussed were testing -- testing in the at-home setting.  What happened was company completed TRANQUILITY II and read out the data for TRANQUILITY II in June of 2023, as is pled.  Company then announces in August 2023 that it's abandoning TRANQUILITY III,

as I've just said.  They go meet with the FDA.  And these allegations are in the third amended complaint in sort of the post-class period developments.  They say, "Okay, we want to pivot to at-home care now."

THE COURT:  And the date of this meeting -- are you talking about a Type B meeting?

MS. SMITH:  The Type B meeting is the October 2023, I believe.  It's in paragraph, I think, 177 of the second amended complaint.  77 and 78 of the second amended complaint, October 11th, 2023, the company reports out on its meeting.  And what it says -- and you can see it in the complaint -- is that we've gone -- the FDA's provided feedback on our design of our proposed at-home study.  It's a complete change in direction for the company.

They say, "You know what?  We would like -- really the big market is people who are at home.  So we're going to pivot and see if we can get the FDA to pivot to a study for the at-home population."

Later meetings take place, and in some point in 2024, as a result of another meeting with the FDA, the FDA provides feedback to the company and says, "You know what?  We're not saying you can't develop this for at-home use, but we really need to see it in the care setting at first."

So this is when the company pivots to TRANQUILITY In-Care.  They say, "Great.  No problem.  We will now conduct a

new study."  That's a combination of II and III that becomes TRANQUILITY In-Care.  And it's exclusively focused on the care, you know, supervised care setting as opposed to, like, purely at-home patients with these particular conditions.

THE COURT:  And what is the date of that second meeting where the FDA says, "You need to test this more in the nursing home setting"?  Is that February 2024?

MS. SMITH:  Yes.  That's -- let me just make sure.

MR. APTON:  Your Honor, it's February 20th, 2024.

THE COURT:  Okay.

MS. SMITH:  And it's 179 in the second amended -- paragraph 179 in the second amended complaint.

MR. APTON:  Or paragraph 224 in the third complaint.

THE COURT:  Yes, okay.

MS. SMITH:  Thank you.

THE COURT:  So then let me have you focus in on paragraph 230 of the third amended complaint.  This is an August 6, 2024, 10-Q, which I don't believe I have the full version of.  I only have what's excerpted here in the TAC.

And there the company is quoted as saying "We sought feedback from the FDA about whether TRANQUILITY I and II would be sufficient to support an sNDA in either the at-home setting or the assisted living facility setting or, if not, what additional data would be required."

And the FDA told them that they would require

additional efficacy data, including repeat efficacy data.

So how does this fit in with the narrative you're talking about about the company deciding -- the company sort of going back to the FDA and saying, "Okay, since we scrapped TRANQUILITY III, what do we need to do?"

MS. SMITH:  So it -- Your Honor, there's another disclosure I think we need to look at, but I need to find it in my notes here on this, where the reference to the -- so, first of all, because we don't have TRANQUILITY III anymore, all the data the company has is TRANQUILITY I and II.  So that's what they have to bring to the FDA to see where to go from here.  So that's the reference to TRANQUILITY I and II.

And then I know Your Honor is focused on sort of the tail-end of that disclosure, including repeat efficacy data and long-term safety data.  There is another disclosure where the -- it clarifies that the repeat section is -- refers to repeat dosing.  And I just want to find my notes on that since we're a little -- taking this a little out of order.

The company's -- the disclosure is repeat dose efficacy data and additional data in addition to the 70 patients that we have from TRANQUILITY I and TRANQUILITY II. There are 20 patients from TRANQUILITY I, and there are 50 patients from TRANQUILITY II.  And we want more than that, additional data on top of that.

And let me just see if I can find, if you'll bear with

me, Your Honor, the repeat dose language that I'm thinking of. That's in my Section 3.

MR. APTON:  Your Honor, may I interject at this point or should I sit tight?

THE COURT:  You can sit tight.

MR. APTON:  Okay.

MS. SMITH:  Paragraph 231 of the proposed third amended complaint.  So the company also stated during its February 20th, 2024, meeting with the FDA, "The FDA reiterated its prior comments that we generate additional efficacy data, including repeat dose efficacy data."  That's what I was thinking of, Your Honor.  I apologize for the delay on that.

THE COURT:  Okay.  So plaintiffs want the Court to draw the inference that because in June of 2023 the company reported that TRANQUILITY BC501 whatever -- whatever the name of the drug is, that it met its primary efficacy end point, that that means that the data from TRANQUILITY II was not going to be usable and so that that's the only reason why defendants would have to generate additional efficacy data according to the FDA.

I don't think I've articulated that very well, but generally their point is if the drug tested so well in the top line results in June of 2023, then it could only be that the FDA requested new data because some of the trial results were not usable.  That's their theory.  So what is the response to

that theory?

MS. SMITH:  So the response to that is TRANQUILITY III because there was going -- the FDA was always expecting to get an application with two studies.  And basically we've given them only half the data because you would have had another 150-patient study with patients -- additional patients being dosed, including at the dose level that we're talking about now, which is 60 dose, and that's just gone.  They don't have that at all.  They can't consider it.  So they're looking at a package that has way less data than they initially expected for the sNDA.  And so it's half, right, of what the FDA suggested they needed, and we just don't have the TRANQUILITY III anymore.

THE COURT:  Okay.  All right.  So I think with that all in mind then, let's take this back to falsity of statements.

So there are two statements that relate to the trial being, quote, fully enrolled or complete.  You frame them as statements 1 and 2.  So I want to understand why you think that "fully enrolled" isn't misleading given that the company was aware of the 483 and of Dr. Meyer's response at that point.

MS. SMITH:  Yes.  Thank you, Your Honor.  So this requires, I think, a step back a little bit to the Court's initial decision on this issue.

So my understanding of Your Honor's decision was that

the "fully enrolled" statement was, um -- sorry.  The "trial is complete" statement was materially misleading because the mere existence of the Form 483 meant the trial wasn't done.

THE COURT:  Correct.

MS. SMITH:  And so if that remains the Court's position, there's nothing that changes that; right?  The trial is -- you know, we still have the Form 483.  We have the response.

I think there are scienter arguments, which we're -- like, we're not there yet, and I'm happy to tackle those in a minute.  But I think, you know, if that's still the Court's position, then that's -- you know, there's not much more that we could say about that.

I would say on the "fully enrolled" statements, Your Honor reached the conclusion that those were not false or misleading because the defendants -- there was nothing to establish that the trial was not, in fact, fully enrolled at the time.  There were questions raised about the enrollment, but there was no determination made by anyone that the trial had not actually been fully enrolled at that point in time with patients that were not enrollment eligible.

The only new fact we have on that is the Form 483, at least as it relates to what BioXcel knew.  Now, there are new facts related about what Segal knew, and maybe this means this is a more scienter question than a falsity question.  But from

BioXcel's perspective, the only thing new is the response.

And, you know, I'm happy to go through it, but I think if you go -- and I have -- I'm prepared to walk through the response on observation 2 if that would be helpful. It continues to show that there is not reason to doubt that the patients enrolled were, in fact, not eligible for enrollment at the time that they were enrolled. In other words, we're still in the land of there were some technical questions around how the enrollment was evaluated at the outset and needing to sort of back-fill and make sure that was checked, but there is no question around their eligibility.

Now, again, I'm separating the new CW allegations, Segal. That's -- they may disagree, but for us that's a different compartment. But from our perspective, Form 483 response does not change the Court's conclusion, which is there's now -- now we have the response which explains, again, the documentation that was required for the enrollment.

Does that answer the question the Court was focused on?

THE COURT: It does.

MS. SMITH: Okay. Great.

THE COURT: But then let's take up the CW allegations. There are several allegations from CW8 about what was going on at Segal trials, and then you have CW, I want to say, 10 who says that defendant met the new -- what everything that was

going on about the problems with the trial.

MS. SMITH:  Um-hmm.

THE COURT:  So putting those two pieces together, why doesn't that overcome plaintiffs' hurdle to show that the statement about being fully enrolled is false?

MS. SMITH:  Let me start with CW10.  So there are a couple problems with CW10.  First of all, CW10 doesn't discuss at all with any specificity any of the allegations raised by CW8.  If you look at the allegations with respect to CW10, they focus on the Form 483 inspection and the connection between, you know, the fact that Dr. Mehta was involved in the FDA inspection and talking to Segal during the inspection.  But that only links you to the Form 483 issues.  It doesn't link you back to the allegations raised by CW8.  So I don't think you can put CW8 and CW10 together in order to infer that Dr. Mehta had knowledge of everything that was going on alleged by CW8.  So I think that's point one.

Point two --

THE COURT:  So the sentence that obviously we're keying in on is the one that says "CW10 reported that defendant Mehta had known, quote, pretty much everything, end quote, about the problems with TRANQUILITY II."

So is it your point that that's a conclusory allegation and there are no facts to show it or that, even if that was considered a nonconclusory fact, that it wouldn't get

plaintiffs where they needed to be?

MS. SMITH:  It's a little bit of both.  So -- so the first point is the discussions -- the only thing that CW10 has knowledge of is the inspection or at least as framed here.  And the next sentence, of course, is tied specifically to the Form 483 allegations.

THE COURT:  Well, the previous paragraph CW10 says that they were providing defendant Mehta with updates about TRANQUILITY II pretty much every week.  So that goes beyond the 483 inspection.

MS. SMITH:  Yes.  That one, though, is so generic in general.  It doesn't say anything about what the nature of the updates were, what information was included in the updates.  So that one I think falls into the far too generic to establish any knowledge on the part of the defendants.

The first sentence of paragraph 78 -- sorry -- second sentence in the paragraph 78 of the proposed third amended complaint is most certainly too general and nonspecific to establish defendants' knowledge.  The only language that's quoted is that Dr. Mehta had known pretty much everything.  After that, it just says about the problems.

I can guarantee you, if CW10 said Dr. Mehta knew all of it, that would be in here; right?  So that's not here.  I think that's a pretty glaring omission.  The problems are undefined, so we don't know what those are.  And I don't think

that plaintiffs can meet their pleading burden by hand waving and say "He knew everything about the problems" without identifying what problems we're talking about.

And I think the implication is -- what I'm getting to is I think the implication is the problems that -- the logical inference would be the problems would be the Form 483 and not everything attributed to CW8.

THE COURT:  Okay.  All right.  And then the argument for CW8 is that none of the things that CW8 is alleging here came to the attention of defendants.

MS. SMITH:  That's correct, Your Honor.  That's correct.  I also think it's a more plausible inference that if Dr. Meyer was concealing all of those activities from Segal trials, FDA, and everybody else, that she was just as likely to have concealed them from BioXcel.  But we don't need to draw that inference because there's no connection between CW8 and BioXcel.

THE COURT:  This is jumping a little bit ahead to scienter, but one of the elements of circumstantial evidence for scienter is duty to monitor.  And plaintiffs have some allegations about, when a sponsor is sponsoring a trial, they have a duty to monitor the trial.

MS. SMITH:  Um-hmm.

THE COURT:  So why wouldn't that be some evidence that this was a false statement and it was made with scienter?

MS. SMITH: So I think there are three -- at least two, maybe three, if I can find my notes, responses to that question.

The first is there is -- there is a general duty of oversight with respect to the clinical operations. Um, yes, but that in itself doesn't create scienter and knowledge with respect to every single thing at a granular level that is happening underneath the company, you know, by other parties at the direction of the company. And if something is concealed from the company despite its monitoring, which is alleged happened -- there were town hall meetings, there were updates every week -- the company can't be assigned with securities fraud for having completed its monitoring duties but not having uncovered something that was concealed from it. That's, I think, point one.

Point two, it's important to remember that -- thank you -- that this was happening at a different facility and in a different state. This isn't a situation where everybody is in the same building and BioXcel can walk around the building and see what happens. Segal trials is in Florida. BioXcel is, obviously, here in Connecticut. That is, I think, a relevant fact, that there isn't sort of day-to-day oversight on that.

And then I also think on the scienter point in terms of the standard, we go back to our friend Judge Marrero in the *Schaeffer v. Nabriva* case. And there's a really excellent

articulation of the scienter standard in this particular context that I think is applicable, that I think is pretty applicable here, just as it was previously for the Court.

And if it is the case that any -- I guess I'd just say if the company is charged with scienter with respect to any set of inspection deficiencies on Form 483 as a result of its general regulatory duties to oversee a clinical trial, then scienter is always pled.  And it isn't.  For that reason, it can't be enough in and of itself that the company has that oversight-duty.  I think it's 72 of the *Schaeffer* case, but again I'll find it.

THE COURT:  All right.  I can find that cite.  I'm obviously familiar with that case.

MS. SMITH:  I'm sure you're familiar with it, yes.

THE COURT:  I've also been looking at the *NewLink Genetics* case out of the Second Circuit, 2020, which seems to be somewhat factually similar to what we're looking at here. There was a -- on this issue of full enrollment of a trial, there, there was a press release saying that the accrual goal of a certain number of subjects had been met.  And the Second Circuit affirmed the district court's holding that that was misleading because the company at that point through a CW was aware of a problem at the -- at a trial site.  And the CW had raised the same types of alarms that the Segal trial's CWs here seemed to be alleging, that people were enrolled in the trial

who shouldn't have been.

So how is *Abramson vs. NewLink Genetics* distinguishable?

MS. SMITH:  A couple grounds.

By the way, it's star 12 for *Nabriva*.

A couple of reasons.  So in the *NewLink Genetics* case, the -- first of all, there was a direct connection between the confidential witness and the defendant's CEO.  There was a specific discussion among -- between the two of them regarding enrollment in the trials.  There was information to the defendant that they were, in that trial, not able to find enough patients to enroll and a discussion wherein the defendants said "Go -- I don't care.  Get it done.  Go enroll."

THE COURT:  Push, yeah.

MS. SMITH:  I'm paraphrasing.  Exactly.

So the underlying -- so that's a little bit different here because there's a direct conversation.

The other issue to keep in mind is there's -- the sort of underlying enrollment criteria matters.  In that case it was a cancer trial, and they couldn't find enough patients that were sick enough to fulfill the enrollment criteria.  At the end of the day, the accusation was they enrolled patients who had the same type of cancer but who weren't as sick.  I might be reversing those, as sick, less sick, but I know that was the issue.  So then they go out and they enrolled patients who

don't meet the criteria.

Very different from here where there's just a question around whether or not the patients met the enrollment criteria as opposed to a directive to go find patients who don't meet the enrollment criteria so we can get the study done.  It's, I think, a material difference for purposes of the statement in that.

THE COURT:  But certainly plaintiffs are alleging that pressure from BioXcel was what was motivating Segal trials to enroll as many people as possible and, if CW8's allegations are to be believed, to change ratings and make people enrollable who otherwise may not have been.  So why doesn't -- what's the distinguishing factor between what plaintiff is alleging BioXcel did here and the allegations in *NewLink*?

MS. SMITH:  Direct conversation which the defendant instructed enrollment regardless of the criteria.  Here, the allegations, setting aside sort of the knowledge part of it, the allegations are that the company and defendant Mehta were pushing for speed of enrollment.  But there is no allegation at any point anybody at BioXcel said "You should cut corners and enroll people who are not eligible."  That's not an allegation that's tied to BioXcel at all.

Now, there are allegations that CW8 makes about Dr. Meyer doing that, but there's no direction from BioXcel to Dr. Meyer or to anybody at Segal trials to not enroll or to

enroll patients who are not eligible to be enrolled.

THE COURT:  Isn't that kind of implicit in a speed of enrolling?  You know, when you're saying "Push, push, push. Get this done as fast as possible," there's at least a chance that people may come into the trial who might not be eligible; right?

MS. SMITH:  There's a possibility.  Do I think that sends the message that the defendants are urging people to enroll patients who are not eligible?  No, because it wouldn't be in defendants' best interest to have that result.  Then they'd have those patients out of the trial.

At the end of the day, the FDA's going to look at all the data.  And if there are patients that were not eligible to be enrolled, the FDA won't -- you know, may not consider those patients.  And so there's no reason for defendants to say "Go enroll.  Hurry up.  Go enroll whoever" because they know the data are going to be checked at the end of the day.  So without that direct question, I don't think that works.

THE COURT:  Okay.  One of the central themes of plaintiffs' amended complaints is that defendants had to have known or would have known that at least some of these patients from Dr. Meyer's site would need to be excluded and thus that's why their statements about full enrollment and complete enrollment are false.  So let me hear -- I think I know the response you're going to give, but let me hear your response to

that allegation.

MS. SMITH:  Yes.  So I think -- so the -- if -- so what we have on that is the Form 483 and the Meyer response.

THE COURT:  And we have the expert testimony.

MS. SMITH:  Yes.

THE COURT:  Which I understand you disagree with.

MS. SMITH:  Yes, which is just -- which is an expert's opinion but not BioXcel's opinion.

So a couple of observations.  I think, first, important to consider what defendants knew, which is that the Form 483 existed and the Meyer response.  First of all, keep in mind, there are a couple of different alleged observations or potential discrepancies.  The big one is obviously the enrollment criteria.  The others are so small it's not clear that those are the focus.  But there are easy responses for all of those, which are outlined in the response.

So I think on the enrollment criteria, it is -- there is a reasonable basis for defendants to have believed, based on the Form 483 and the corrections and explanations given in the response, that those patients were eligible to be enrolled.  I think the big dispute on this between the two of us is -- are the sort of expert's conclusion, which we'll talk about, and also what the response says.

So plaintiffs say the response shows that there was never any documentation at the beginning before these patients

enrolled and Dr. Meyer just made it up after the fact in notes to file.

I don't think that's supported by the Meyer response, which for Observation 2 it's Docket No. 130-2 at pages 9 to 11, and the pages are the docket pages, not the internal pages, is where this is discussed.

There is, in fact, a note to file that is prepared by Dr. Meyer that is filling a documentation gap of what she should have done at the beginning; that is true. But she's basing that on documentation that was available from when the subjects enrolled.

And what the response reflects is that the subjects' performance on the relevant testing scales, as per protocol, were reviewed, as well as the lab results collected in screening were reviewed. So there's documentation that preexisted the patient's enrollment. The gap that's being filled is the doctor should have put a note in the file that they reviewed all those things and concluded that the subjects were eligible to enroll.

On those facts, it's not unreasonable for the defendants to believe that those patients were enrolled properly and met the enrollment criteria and wouldn't be excluded.

Now, now we come to sort of the expert opinion in the opinion issue. And I think here is maybe a little bit where

*Philip Morris* might come into play, although that is kind of an issue connected to the receipt of the EIR, which we'll probably talk about.

But what *Philip Morris* says is if the defendants had a reasonable belief -- so these are -- it's their opinion that the subject -- trial was fully enrolled and that there were no discrepancies in the Form 483 and response that would undermine the use of the patient data. If that opinion is sort of subjectively reasonable at the time, it's not a false statement; right? If they had a reasonable basis to believe that the trial was fully enrolled notwithstanding these issues, then under the *Philip Morris* case, that's not a false statement.

The expert has a different opinion. But the defendants don't have to agree with that opinion. There can be multiple opinions about what the implications are of the enrollment data, but it doesn't make the defendants' opinions false or misleading just because their expert has a different opinion.

And, by the way, it is an opinion. Those are not facts. Those are just expert opinions that can't be given weight at the motion to dismiss stage.

THE COURT: Okay. Is the -- I don't remember seeing the *Philip Morris* case in your briefing, but ...

MS. SMITH: So it's in the opposition to the motion

for leave to amend.

THE COURT:  Okay.

MS. SMITH:  And it is not cited on this, like, specific issue.  We tied it to the EIR response.  I'm happy to address that.

THE COURT:  Sure.  Why don't we go ahead.  I'll be posing this question to plaintiffs.  But the fact that there is now an EIR response that says the investigation is closed and there was no further action taken, it seems like that helps defendants' point.

MS. SMITH:  That -- that would be our position, Your Honor.  And on this I think the *Philip Morris* case is like almost exactly on point.  The only difference being that was an FDA approval, and this is a different flavor of FDA regulatory action.  But we now have the FDA EIR saying, as plaintiffs acknowledge, that means the investigation is resolved, complete.  The issues in the Form 483 are resolved.

And I think it's paragraph 115.  Right, paragraph 115 of the second amended complaint?  Hold on one second.

115 of both, I think, but second amended complaint.

"If the investigator's response to a Form 483 is acceptable to the FDA, the FDA will close the inspection and/or audit with the issuance of an 'Establishment Inspection Report' ('EIR').  The EIR confirms that the problems identified in the Form 483 were adequately resolved."

Those are the -- those are the plaintiffs' words in the complaint, which is a binding document for them.

So if you look at the *Philip Morris* case, you have an FDA inspection review.  The defendants make statements that relate to the -- potentially relate to the FDA inspection review.  This is more directly on point for the risk factor statement, Your Honor, but it touches on some of these issues.

Their opinion that they're holding, their subjective opinion is "We have some issues, but they're resolvable."  So they don't think their statements are false or misleading.

The FDA comes back and says, "Yeah, this is resolved."  Under *Philip Morris* that means, when they made the statements at the time, those were reasonable statements and they can't be false under *Omnicare*.

I think it's a significant problem for them.  It is a little bit of a strange animal.  As discussed in the *Philip Morris* case, you get to go way forward in time and carry that back to state of mind at the time of the statements.  But that is, in fact, what *Philip Morris* says.  It's validation of the subjective reasonableness of the beliefs of the defendants at the time.  So we do think that's incredibly helpful.

THE COURT:  Okay.  Okay.  Let me move to my other questions on scienter.

I want to know, most of the cases that I've been looking at say you can prove scienter by motive and opportunity

or strong circumstantial evidence of conscious misbehavior or recklessness.

Are there cases that you're aware of that allow a court to conclude there's scienter based on some allegations of motive and some allegations of circumstantial evidence?  Or do you have to take it in order and, if motive and opportunity doesn't clear the threshold, then move on to circumstantial evidence at which questions of motive and opportunity are not considered -- or evidence of motive and opportunity aren't considered?

MS. SMITH:  So I think from a legal framing perspective -- I'm going to say something that's probably more helpful to them than to me.  But the real answer is you have to consider all of the scienter allegations holistically.  So I don't think it's a, you know, necessarily.

The only caveat to that is under Second Circuit case law and really every circuit, the absence of motive means your circumstantial evidence has to be higher.  You have to show sort of a higher pleading burden when there's no motive.

THE COURT:  Sure.

MS. SMITH:  So that's how I would frame it.

THE COURT:  Okay.  So let's talk about motive then and plaintiffs' allegations that defendants delayed disclosure of the existence of the 483 and the fabricated e-mail until after defendant Mehta's June -- mid-June 2023 trades.

Even if he was on a trading plan, they have now sort of shifted their focus to say "Well, yes, but he would have known that the date of his trades was mid-June; and so there's a temporal proximity.  Two weeks later after those trades is when they disclosed this information."

So why doesn't that contribute to a finding of motive?

MS. SMITH:  Um, a couple of responses to that, Your Honor.  First of all, there is an allegation that the trading plans were time based.  But that's -- there's no support for that.  They actually don't know what the trading plans say because they're not public.  So that's presumed, but we don't know.  Take it -- so fine.  Take it at face value.  We'll take their allegation is true that they were time based.

THE COURT:  When you say "time based," meaning every quarter it was an unloading of a certain number of --

MS. SMITH:  Correct.

THE COURT:  -- the selling of a certain number?

MS. SMITH:  Correct, Your Honor.  10b5-1 plans could also be, like, stock price based as opposed to time based.  So when it hits $20, you sell.  It doesn't have to be date triggered.

THE COURT:  I see.

MS. SMITH:  But even if you take that at face value, I think it proves too much.

THE COURT:  Do defendants typically know what those

triggers are, whether they're time based or stock based?

MS. SMITH:  Yes.  The people who hold the plans do know, yes.

THE COURT:  Okay.

MS. SMITH:  That's correct.

So it proves too much because in that case then every time a defendant has a time-based plan, that trade -- and it just so happens that something gets disclosed that's negative news after a sale, that defendant's never going to get the benefit of the 10b5-1 plan.  That's the point of a 10b5-1 plan, which is to provide a safe harbor.  And it's not the case the defendants are -- individual executive officers are required to cancel their plans every time they think there might be bad news coming out.  Because then, what's the point of the plan?  So I think it proves too much.

But the other thing is then you need to look -- assume you think that's suspicious.  Then the Court would need to go look at the trading pattern.  And here we have a very different set of facts than was alleged originally.  Last time we were talking about defendant Mehta selling 91 percent of his available holdings.  Now we're talking about 15 percent.  And that's based on a correction of the calculation.  But selling 15 percent of your holdings during the class period, generally considered not suspicious trading.

And then the other point to note, which we made in our

briefs, is he has the opposite incentive because at the end of the class period he has more shares than he did at the beginning.  So he's a still significant holder.  And that's also been something that courts look at to conclude that the trading activity is not suspicious.

THE COURT:  Okay.  And what of the allegation that he suspended his trading plan in September and then got back into it in December?

MS. SMITH:  Yes.  Yes.  And he's -- the stock at that point was at a very different level, um, entitled to cancel plans and reissue a plan.  There aren't -- I don't know how many details there are about when the new plan was going to be triggered.  I know there's an allegation about cancellation and implementation of a new one.  But I don't think there are any allegations about when the new plan would go into effect.

And there are, of course, cooling-off periods around trading plans.  You can't just put in place and then have it execute next week.  There's a cooling-off period depending on what the law requires at the time.  It's different now than it was back then.  So cancellation of the plan in this context is not suspicious because the company is in a very different place than it was at the time, from a stock price perspective.

In theory, it also signals confidence in the company. He doesn't want to sell at that price.  He's confident it's going to be higher in the future and, therefore, cancels.

THE COURT:  Okay.  And Steinhart's trading plaintiff just says it's very suspicious because he entered -- he had a trading plan but then didn't trade until nine months later after this -- right before this announcement, I think; right? I assume their response is:  That's just conclusory.  What about it makes it suspicious?

MS. SMITH:  It's not -- it's sort of not suspicious on its face because it's 3 percent of his holdings, and it's a really not significant amount of money.  But, also, the plans have cooling-off periods.  They can't be executed right away as a matter of SEC regulation.  So that's --

THE COURT:  Do we know when that plan was entered into, Steinhart's plan?

MS. SMITH:  It is alleged in the complaint.  It was a little bit before Dr. Mehta's plan.  I want to say it was June 2022, but my colleagues will tell me.

Ooh, June 23, 2022.  So my memory is good.

THE COURT:  Oh, yes.  Okay.

Now, there -- from defendants' own disclosures there was some statements or admissions that they first learned about the potential fabricated e-mail in May.  And then in I think it's the June 29th disclosure they say, "Oh, we -- in fact, we only learned about this a week before."  So is that distinction problematic when they say it was only a week before but, in fact, they first learned about it in May?

MS. SMITH:  So the chronology as disclosed is -- so you're generally correct, Your Honor, of course.  In May of 2023 it came to the company's attention that Dr. Meyer -- they don't say "Dr. Meyer" because they didn't want to oust her -- may have fabricated e-mail correspondence.  The company then initiates an investigation that then results in confirmation that she did, in fact, fabricate the correspondence.  So your chronology is correct.  It's just there was a identification in May.

And, by the way, it's not May 1st.  There's -- I think on the demonstrative that Mr. or Attorney Apton's going to use it says May 1st.  It's not May 1st.  It's May is what's disclosed.

There is then an investigation to figure out exactly what is going on, which then confirms the fabrication.  And then it's disclosed.  So that's right, Your Honor.

THE COURT:  Okay.  All right.  I think that that covers my questions for you, but I'm happy to hear any other additional presentation you'd like to make.

MS. SMITH:  Um, I'm happy to -- so, no, thank you, Your Honor.  I'm happy to sit down and let you handle your -- plaintiff questions and then come back if anything else.

THE COURT:  Sure.

MS. SMITH:  Thank you, Your Honor.

THE COURT:  Attorney Apton.  So let's start with the

idea that the Form 483 would have required the exclusion of certain participants at Dr. Meyer's site and what specific facts are alleged to get you to that conclusion, especially in light of the EIR being issued and the investigation closed.

MR. APTON:  So, Your Honor, with respect to the EIR, that was issued some three years later.  An investigation is not meant to go on to perpetuity.  It came to an end.  And I should note that it came to an end after the company agreed to redo the trial and scrap the data from TRANQUILITY II.  So at that point it was moot.  Of course it would come to an end.

If this EIR was to mean what defendants want it to mean, it would make sense if the EIR was issued within the 45-day deadline.

THE COURT:  So I think you're just wrong on that point.  I mean, my reading of the regulation is that it's issued within 45 days of the investigation being closed.  There appears to be nothing that I've seen that's convincing to suggest they need to do it within 45 days of the company's response to the 483.  What am I missing?

MR. APTON:  What we're overlooking here is we're assuming that Dr. Meyer's response was sufficient, and it wasn't.  It was woefully deficient.

THE COURT:  That's your view.

MR. APTON:  That's --

THE COURT:  But when the FDA closes the investigation

and you have an allegation that says "When an EIR is issued, it means that the issues from the investigation are resolved," why don't those two things mean that the response was actually sufficient?

MR. APTON:  Because it wasn't the response that prompted the closure of the EIR or the closure of the investigation.  As we've alleged -- and we're entitled to our allegations to be accepted as true at this stage --

THE COURT:  Your nonconclusory allegations have to be accepted as true.

MR. APTON:  Absolutely so, Your Honor.  To that end, we have our expert who says the Meyer response shows that these patients should not have been -- should not have been included, that the data was not going to be accepted by the FDA.

THE COURT:  So why should I be considering your expert's opinion at this point when it's an opinion and it's not that your expert is opining about specific facts she has observed from the record?

MR. APTON:  Because in the *Altimeo* decision from the Second Circuit, 2021, when the court says we must be careful not to mistake heightened pleading standards for impossible ones, it goes on to then consider an expert in Chinese law that opines as to how long this registration process would have taken.  And from that fact, from that opinion, expert opinion, the court does draw the inference as to when defendants knew

certain events were going on.

THE COURT: Right. But the expert there, then, is opining on how long this would take in the ordinary course; right?

MR. APTON: Yes.

THE COURT: A fact based on the expert's experience. Here, the expert is simply saying "The FDA would have disregarded all of this evidence, all of these trial participants." What is the -- what is the fact on which the expert is relying that goes beyond reading the Form 483 and the response?

MR. APTON: Well, I mean, it's the Form 483 and the response and also the experience that Dr. Wooten, our expert, has: over a hundred clinical trials, she's an FDA regulatory attorney for 20 years, certainly qualified to speak on this topic. And this is what's in the record.

My colleague, Ms. Smith, has offered a number of responses to your question that are her characterization, not what's in the record. These are the facts here. We have the FDA Form 483, we have the Meyer response, and we have Dr. Wooten's interpretation of that response.

And from that, we allege, with particularity, that had Meyer's response been sufficient, the investigation would have been closed -- maybe not in 45 days, 50, 60, 90. Three years? No. A lot occurred in the wake of that Meyer response,

including the redo of TRANQUILITY II.

THE COURT:  How is it three years?  I thought it -- her response is in January 2023, and we -- isn't the EIR issued in August of '24?

MS. SMITH:  Well, we believe that it was issued in March of 2025.  So that's two years?

THE COURT:  Okay.

MR. APTON:  The company disclosed it.  I have the Form 8-K here.  I understand, in conversations with Ms. Smith, there may be some confusion as to when the EIR was actually issued.  The fact of the matter, the company received notice of the EIR in March of 2025.

THE COURT:  Is there -- I'm recalling reference to an FDA website that has an earlier date.

MR. APTON:  Yeah, we put that in our pleading at some point to be prudent.  It was discovered in the course of our investigation.  It's unclear when the EIR was actually issued. We know that the company received it in March of 2025, that signed, sealed, delivered.  It was in an SEC filing filed with the SEC.

THE COURT:  Okay.  And I suppose it makes sense, then, to talk about the EIR and its import.

MR. APTON:  Sure.  So Your Honor, in your initial order on the motion to dismiss, you had this point right.  I think you considered it in connection with the May 2023

misrepresentation.  The fact that the investigation remained open, which it was, pushed the falsity analysis in our favor on that misrepresentation.  So that was on page 31 of Your Honor's order.  That fact remains.

The EIR, or the inspection investigation, was open throughout this entire period.  The timeline that I provided as a demonstrative shows just how long after.

And so to, I guess, go back to Your Honor's initial question, we have the Form 483.  We have the Meyer response, which contains a -- I mean, the cover letter to the Meyer response is certainly an admission as to Dr. Meyer's inexperience.  It would have set off alarm bells at any biopharmaceutical company that really needed strong data results on such a pivotal trial.

And then you have Dr. Wooten, our expert, who looks at the Meyer response and confirms, "Yeah, the FDA is not going to accept this data.  It should never have been included."

THE COURT:  All right.  So I guess my question for the EIR then is when it closes the investigation without any further action, you're saying the only reason it was issued was that the company had agreed to redo TRANQUILITY II.  And defendants take issue with that.  Where in your complaints are there facts to suggest that TRANQUILITY In-Care was really a redo of TRANQUILITY II because the data from Dr. Meyer's site for TRANQUILITY II was unusable?

MR. APTON:  Well, Your Honor, in the Form 8-K filed by BioXcel in March, they disclosed --

THE COURT:  March which year?

MR. APTON:  2025.

THE COURT:  March '25, I don't think I -- do I have that?

MR. APTON:  So, Your Honor, this was disclosed while the motions were pending.  I have a copy of the Form 8-K here, if the Court would like to take judicial notice of it.  Can I hand it in, if Your Honor would allow me to approach?

THE COURT:  What is defendants' position on that?

MS. SMITH:  I don't have any objection, Your Honor, to Your Honor looking at the form.

MR. APTON:  May I approach, Your Honor?

THE COURT:  Sure.  We'll mark it as Exhibit 1 from the hearing.

        (Plaintiffs' Exhibit 1, received in evidence.)

MR. APTON:  Thank you, Your Honor.  If I may direct your attention to the first paragraph on the second page.

THE COURT:  Sure.

MR. APTON:  It indicates that the FDA designated, quote, voluntary action indicated, closed quote, for the site. That's as firm as we're going to get in terms of confirmation that this EIR was issued in response to BioXcel's decision to scrap the data and redo the trial.

Now, in terms of what we have to show that it was a redo, Ms. Smith pointed out those paragraphs earlier, and Your Honor was certainly on it.  We have a chart -- I'm going to see if I can get you the third amended complaint cites real quick.

So starting at paragraph 225 and continuing to paragraph 227, that's for the proposed third amended complaint, you have the comparison of what TRANQUILITY II was and what the in-care trial is.

Now, Your Honor asked defendants, Why the change?  What happened to TRANQUILITY III?  And, again, looking at what's in the record and not -- I don't want to say we should disregard what Ms. Smith said, but what's in the record, we know that the trial, TRANQUILITY II trial, was not going to be accepted.  They redid or they announced a new trial following Type B meetings that look exactly the same, testing for the very similar, um, facilities, not at home.

What we suspect happened is that BioXcel, after running into trouble with TRANQUILITY II, tried to sidestep the whole mess by telling the FDA they were going to focus just at at-home treatment.  And the FDA said, "No, you can't do that.  You still need to prove in-care.  You need data on in-care before you do anything else."

That's what prompted them to go back and redo the TRANQUILITY II trial now dubbed TRANQUILITY In-Care.

THE COURT:  So let me get your take, then, on Attorney

Smith's take on this, which is that FDA was always expecting data from TRANQUILITY II and TRANQUILITY III for the sNDA. And when BioXcel pulled the plug on TRANQUILITY III, it was left with only the data for TRANQUILITY II, which it knew it would be insufficient because of its original proposal. And so that is why it went back with the proposal to do TRANQUILITY In-Care, because it was missing half -- at least half of the data that it said it was going to go forward with.

MR. APTON: Right. Your Honor --

THE COURT: TRANQUILITY III's data, not TRANQUILITY II's.

MR. APTON: That's not in the record. What's in the record is, once TRANQUILITY II data was unusable, they knew whatever happened with TRANQUILITY III, even if they had a stunning success of a trial, the FDA was never going to accept an sNDA package. They needed to redo this trial no matter what. So that's why they stopped TRANQUILITY III. There's no point in continuing with it.

THE COURT: If that's your theory, in one of the filings with the SEC, they explain that they stopped TRANQUILITY III I think because the patients in that care setting were experiencing more frequent agitation than they anticipated, and so they suspected it might be more of a chronic agitation. That's the explanation they give for scrapping TRANQUILITY III.

So if -- you know, I guess, what am I to make of the fact that that's the reason they give in an SEC filing and you haven't alleged that that's a false statement because the real reason for scrapping TRANQUILITY III was that TRANQUILITY II already was defunct and they needed to start over?

MR. APTON:  Well, I mean, Your Honor, look, we've alleged that these folks have made misrepresentations in SEC filings, that there may be an additional misrepresentation in an August 23, 2023, disclosure.  Very well could be, but it's not part of our case.  The August 2023 disclosure's a corrective disclosure for our theory of misrepresentations.

It very may well be that that is not the real reason why they stopped TRANQUILITY III, that that was their spin as to why they were stopping TRANQUILITY III, that they were doing their best to maintain a positive appearance to the market that they had some value going forward in terms of their clinical trial program collectively.

THE COURT:  So for TRANQUILITY II, even if all 32, as you allege, of Dr. Meyer's not properly enrolled or documented patients shouldn't have been in, she only had 40 percent of the trial.  And so if some percentage of hers can't be used, there's still others of hers that could be used plus 60 percent of the trial in another -- in other trial sites.  So why wouldn't that have been enough for trial -- for the defendants to reasonably believe that TRANQUILITY II still had enough

subjects that its data would still be usable?

MR. APTON:  So, Your Honor, every clinical trial is designed to have sufficient power, meaning that the tests will produce a result that are statistically significant and the outcome's not because of random chance.  TRANQUILITY II is supposed to have 150 patients.  32 is roughly 20 percent of the patient population, the ITT, intent to treat.  Without those 20 patients, the study is way underpowered.  And whatever results or outcomes are received by the remainder of the patients at the non-Dr. Meyer sites, it's not enough to prove anything statistically speaking, certainly not enough for the FDA.

THE COURT:  So that might be a place where expert testimony would put forward facts suggesting the trial wasn't powered enough; right?  I mean, if your expert had looked at this and said exactly what you just said, that 20 percent would not have been sufficient to power this trial, maybe that gets you over the hump.  But your expert doesn't say that.  The expert stops at step one, which is that these would be unusable.

MR. APTON:  Uh, that's an interesting comment, Your Honor.  I suppose if at some point we needed to amend, we can do that.  But we are way afar from what we need to do here.  I mean, we're just --

THE COURT:  So you think your allegations, as they're stated, are sufficient.

MR. APTON:  Yes, Your Honor.  And what I've said, I guess, because I've said them and didn't need the help of an expert, perhaps it's not Dr. -- worth Dr. Wooten's time, I guess, to say those facts.  But, I mean, that is the --

THE COURT:  But you -- I certainly don't know whether taking 20 percent out of a trial renders it insufficiently powered.

MR. APTON:  Sure.

THE COURT:  There's got to be some studies or FDA guidance about the number of people you would need and those sorts of things that I think would be the subject of expert testimony.

MR. APTON:  That's a point well taken, Your Honor.  But suffice it to say, without those 30 patients, the trial was going to be underpowered.

THE COURT:  Based on your allegations.

MR. APTON:  Based on my allegations as well as just, yeah, the protocol for the trial and their design for the trial, the TRANQUILITY II trial.  It's just -- underscoring that point is just how they replicated it, TRANQUILITY II, in the in-care trial:  same number of patients, same powering statistics.  It does show that this was a redo of the trial.

THE COURT:  So I thought I heard that TRANQUILITY II was 70 patients and that TRANQUILITY In-Care was more than 70.  Do I have that wrong?

MR. APTON:  I believe you do, Your Honor.  Paragraph 227 in our third amended complaint lists the --

THE COURT:  Oh, 150, okay.

MR. APTON:  Right.

THE COURT:  Defense counsel, if you could make a note of that, I'll need that question answered.

MS. SMITH:  I can clarify it.

THE COURT:  Okay.

MS. SMITH:  Thank you, Your Honor.

THE COURT:  So let's talk about your CW's allegations.  Certainly CW8 alleges some very serious misconduct by Dr. Meyer, and then you have your CW10 allegations saying that Dr. Mehta knew everything about the problems.  And that's where the quote ends, with TRANQUILITY II.

So why do those two things get you to a level of knowledge on the part of the defendants about the enrollment problems Segal was experiencing?

MR. APTON:  Well, Your Honor, those two by themselves is not what gets us to the knowledge level.  I'll talk about the CWs, but I just want to emphasize the 483 and the Meyer response, which defendants received, that's full-on knowledge right there.

These CW allegations give the Court, hopefully, a certain understanding of the dynamics, the context of what was going on there.  And we have CW8, who gives a laundry list of

48

quite shocking accusations against Dr. Meyer, and CW10, who shows that these guys, the defendants, were plugged in.  They were watching this every day.  And surely they would be.  After seeing that Meyer response, specifically the cover letter in which she says this was a great learning opportunity and she effectively apologizes for goofing it, they were all over this, certainly.

I mean, this trial --

THE COURT:  But the enrollment problems happened before the Meyer response; right?

MR. APTON:  That's true, Your Honor.

THE COURT:  So if they -- even if they were hypervigilant after the response, why is that relevant?

MR. APTON:  Because they would have gone back to see what was going on.

THE COURT:  They would have gone back.  Where's that in your --

MR. APTON:  Well, for example, it came to their attention in May that Dr. Meyer fabricated an e-mail given to the FDA during the audit.  That's --

THE COURT:  And at that point they open an investigation and address it.  So, I guess, why does the Form 483 response, in your view, evince their knowledge that these issues are not correctable when Dr. Meyer has put forward her reasons why she thinks, in fact, all of those patients were

properly enrolled?

MR. APTON:  Because these folks were highly experienced, Mehta, as well as Dr. Risinger, the chief medical officer.  These folks have done clinical trials before, a career of clinical trials.  They're looking at the same information that our expert looked at.  We allege that they walked away with the same inferences.

And we also allege that Mehta, in particular, had motive to sit on it, to pretend that the Meyer response was not as damning as we say it was.

THE COURT:  And the motive is that he had a trading plan that would allow him to trade in -- two months later in March and then five months later in June?

MR. APTON:  That he was going to be unloading those shares in June worth $1.87 million, roughly half of his annual compensation.  And to disclose these events, as we allege he should have, it would have created the stock price in advance of those sales.  He would have lost $1.87 million.

THE COURT:  So what is your response to defense counsel's argument that if I were to find scienter on the basis of your allegations regarding withholding or delaying disclosure because of the 10b5 plan's sell dates, that then basically there would be scienter in every case and the 10b5 safe harbor would go out the window?

MR. APTON:  That's not true, Your Honor.  I think the

trial against Terren Peizer in California -- he was just sentenced by Judge Dale Fischer, or back in June -- shows that 10b5-1 trading plans are not silver bullets.  Mr. Peizer was playing games with his trading plan, including canceling it, only to restart it again, just like Mehta did here.

There's, we allege, enough to show motive, which, considered holistically with the other allegations of knowledge, is more than enough to meet the standard at the motion to dismiss stage.

THE COURT:  Okay.  And what of Steinhart?  You just say it's highly suspicious that he entered into a trading plan in June of 2022 but didn't trade until nine months later.

MR. APTON:  Right.  So, Your Honor, the insider trading accusation for Steinhart is, candidly, not our strongest allegation against defendant Steinhart.  Mr. Steinhart was the CFO.  To the extent he fulfilled his duties at the company, and we believe he did, he was very focused on where money for the next 12 months was coming from.  And in order to get that money, they needed to meet regulatory milestones associated with the TRANQUILITY II trial and the BXCL501 drug, as it was.

When he presumably learned that they were not going to be timely filing an NDA, he then was certainly involved in having the company issue that going concern qualification.  We think he would have known, again given his role at the company

as CFO, he would have known about that delay as soon as it came on the radar.  This is talking about whether or not the company has enough money or not to survive for the next 12 months.

THE COURT:  Just remind me of the chronology though.  Does -- he trades before that going concern?

MR. APTON:  Oh.  Your Honor, my -- my whole schpiel about the going concern, it's to show that his knowledge of the concealed information, the illegitimacy of the trial data, separate and apart of the trading allegations.

THE COURT:  Oh, okay.  So he doesn't trade in proximity to the --

MR. APTON:  Well --

THE COURT:  -- going concern.

MR. APTON:  Let's see here, Your Honor.  That's a good question.  We have his trading schedule in the new complaint, third amended complaint, paragraph 344.  He trades in advance of the going concern qualification.  It looks like he trades on March 15th of 2023 and then March -- and then May 15th of 2023 for a total of one hundred seventy-six or so thousand dollars.  So that would be in advance of the going concern qualification that was issued in August but certainly during the time period when these guys, the defendants, knew that the Meyer response was insufficient, again, in part because the EIR was not issued when it should have been.

THE COURT:  All right.

Does the fact that TRANQUILITY In-Care, at least as of the date of your pleadings, hadn't yet started, what is the relevance of that?

MR. APTON:  Um, I would say there is no relevance, Your Honor.  I mean, they had gone through two Type B meetings at that point.  This was the end result of this whole debacle with TRANQUILITY II.  Again, they tried to pivot that home. FDA said, "No.  You need to redo the test or generate more in-care setting data."  And so this was the takeaway from both the Type B meetings.

BioXcel announces that "We're going to be doing in-care.  Here's the protocol."  And then it is a match.  It's a redo with the TRANQUILITY II.

THE COURT:  Do you need for -- going back to delayed disclosures and motive, is there an allegation in your proposed TAC that defendants had a role in delaying the disclosure, or am I -- or you asking the Court to just infer that based on, for instance, the role as the CEO, he would have had a role in delaying that disclosure because of the way his stock sales were going to be timed?

MR. APTON:  Yes, we do allege.  Paragraph 332 says that he was responsible for the false representations. Paragraph 335 we say that the trading plan, quote, gave him motive to withhold, closed quote, the information.

And then more generally in the party section, I

believe we have a paragraph saying that the individual defendants, including Mehta, were in control of the day-to-day affairs of the company, had power and control over the disclosures, etc., etc.  And if it's not there, it's also going to be in Count Two of the complaint most likely.  Yes.  So in several sections, Your Honor.

THE COURT:  Okay.  How do you response to defendants' argument that defendant Mehta sold only 14.5 percent of his available holdings and actually came out of the class period with more holdings than he went in with?

MR. APTON:  Your Honor, this is -- in an ordinary insider trading allegation, that's a valid point.  Someone's not going to commit insider trading and sell only 2 percent of their shares.  This is a different type of insider trading allegation where he's timing the disclosure of adverse information so as to benefit from predetermined sales.  So it was never in Mehta's control to say, when he entered that trading plan, "I'm going to sell 98 percent of my shares in June."

When he entered his trading plan -- I think it was earlier in 2022 -- he didn't know about the Form 483 that had not happened yet.  He didn't know about the Meyer response that had not been submitted yet, etc., etc.  So whatever was in that trading plan in terms of those timing and amount of shares, it was written.

THE COURT:  Right.  But that doesn't quite answer the question.  The question is:  If I'm to be -- if you want me to infer motive, is there really motive when, in fact, you know, he knew how many shares he held, he knew how many under his trading plan would be sold, and he only sold 14.5 percent?

MR. APTON:  Your Honor, under his trading plan, he didn't have the authority to increase the number of shares to be sold.  Once the trading plan was entered into, the only thing he had control of at that point was disclosure of adverse information.  Everything about his stock sales, the amount, the timing, that was all --

THE COURT:  Preordained.

MR. APTON:  Yeah.  So even if he wanted to dump all of his shares, he couldn't unless -- I mean, he could have done something egregiously illegal, and, you know, he'd be in jail.  But he didn't do that, so ...

THE COURT:  So --

MR. APTON:  He controlled what he could.  He sat on the bad information, waited for his predetermined stock sales to go forward, and then he disclosed it coincidentally in time with top-line data from TRANQUILITY II, tried to smooth things over, as we allege.  But this didn't fly.  In August of 2023, we have further information as to just how bad the data was, the effects it was having on their overall clinical trial program and so on.

THE COURT:  So your point is that 14.5 percent doesn't mean anything because it wasn't like he could have sold more during that period.

MR. APTON:  Right, Your Honor.  So in the cases we cite in our opposition of the motion to dismiss on this point -- I think it's *Docusign*, and there's an additional case --

THE COURT:  Case out of the Northern District of California.

MR. APTON:  -- which is out of California, then there's also a New York case in there.  Presently blanking on it.  It's a different type of insider analysis.

THE COURT:  When it's based on delay of disclosure as opposed to just when they sold.

MR. APTON:  That's correct, Your Honor.

THE COURT:  Okay.

MR. APTON:  Yeah.

Can I speak to -- does Your Honor have another question, or may I speak to the significance of the May fabricated e-mail?

THE COURT:  Sure.  Go ahead on that point.

MR. APTON:  So, you know, we allege what BioXcel says, that they learned of a fabricated e-mail given to the FDA in May of 2023.  We would want the Court to infer that means May 1st, which would be before the May 9th, 2023, misrepresentation

but in any event certainly before the June 8th, 2023, misrepresentation.  And those two misrepresentations, May 9th and June 8th of 2023, are highly unreasonable, and that's borrowing language from the *Schaeffer v. Nabriva* case.

By this point in time, we have the Form 483.  We have the Meyer response.  We have the lapsing of the EIR deadline.  We also have a fabricated e-mail.  Under what sort of set of circumstances did these guys, particularly Dr. Risinger, who's the chief medical officer, how could he possibly have believed that this data from the TRANQUILITY II trial was going to be acceptable or at least not subject to intense scrutiny such that some disclosure should have been made, instead of saying "The trial is completed"?  Or, in response to a direct analyst question about the legitimacy of the data, he goes, "Well, it depends on the data."  Yeah, it depends on the date, and he knew at that point in time that that data was sufficiently problematic.

THE COURT:  So why isn't "it depends on the data" basically wishy-washy enough to not be false?

MR. APTON:  I'm sorry.  Is Your Honor asking is it too wishy-washy to be false?

THE COURT:  Well, it's not -- it's not -- it's an equivocal statement; right?  "It depends on the data."  Isn't that literally true, that it did depend on the data?

MR. APTON:  Your Honor, it's literally true, but it's

a whopper of a half truth.  As Your Honor put in the first order on the motion to dismiss, that topic, the legitimacy of the data, has been, quote, put in play, closed quote.  You have an analyst asking directly on that topic, and you have his response, which indicates as if nothing out of the ordinary was occurring or known, when that is very untrue.

THE COURT:  Well, I think he says, "If they allow us to file it with TRANQUILITY II, we'll be ready to go basically if we don't need to generate anything."  So --

MR. APTON:  That's certainly a big "if."   So, yes, literally it's true.  I suppose there's some remote chance the FDA is going to let them file this data.  But in all likelihood, in all practicality, what?  99.9 percent certainty?  There's no way this data was going to be acceptable, especially after they told the FDA about a fabricated e-mail that was given to the FDA during the audit?  That's highly unreasonable conduct.

THE COURT:  And I might have asked you this already, but when Dr. Meyer responds to each of the observations in her letter, why is it that that letter couldn't have been the foundation of a reasonable belief by defendants that the errors were correctable and that those patients would still be enrollable?

MR. APTON:  Because, Your Honor, the explanation given by Dr. Meyer in her response is that the patient data, the data

that would have qualified them to be in the trial properly, did not exist.  She was post-dating, retroactively recreating notes to file.

THE COURT:  Well, defendant is saying she was creating notes to file based on things that were already in the file and should have been documented earlier.

MR. APTON:  Respectfully to Ms. Smith, this is Ms. Smith talking.  It's not what's actually in the record.

What's in the record is the Meyer response in the redacted form that we received it, as well as our expert's interpretation of that response, which under the *Altimeo* case should be considered at the motion to dismiss stage.

THE COURT:  Okay.  All right.  I think that covers my questions for you, but I'll let you make any additional points you'd like to make.

MR. APTON:  Nope, Your Honor.  That's all I have at this point.  Thank you.

THE COURT:  Thank you, Attorney Apton.

All right, Attorney Smith.  Let's start with where I left off with Attorney Apton, which is this issue of the Meyer response creating fresh documentation that didn't actually exist since she wasn't just pointing or documenting the file with information that was already there but not properly documented in the first instance.

MS. SMITH:  Yes, Your Honor.  The record reference for

that is in the Meyer response.  It's docket 130-2 at page -- docket page 10.  And if the Court looks at the bottom two sentences of the first paragraph, they explain that the basis for the notes to file, what was reviewed to create those notes to file, are "All subject's performance on testing scales as per protocol stipulation."  So what was gathered as required by the protocol were reviewed, and they were consistent with the diagnosis.  That's the first sentence.

And then the second sentence says "All laboratory and ECG results collected in screening to ensure that no other medical condition could be contributing to" -- redacted -- "were also reviewed."

So that's the indication that what she was reviewing to create the notes to file are the items enumerated in the response.

THE COURT:  What about the observation that certain people were not tested with urinary screens for drug use as of the time they were enrolled?  That seems like an area where a note to file wouldn't fix that issue, although I know she justifies it by saying, "Nobody had a drug history, and we tested them during the trial."  But doesn't it remain the fact that those people did not undergo a specific test that they were supposed to have underwent before being enrolled?

MS. SMITH:  Yes, Your Honor.  So, yes, that is a deviation from what should have happened in the trial, that is

correct.  And then the explanation is sort of given as to why these were minor protocol deviations as opposed to major issues that would cause those patients to be excluded from the trial.

One thing I think is particularly notable -- I know Your Honor's looked at sort of the ultimate conclusion -- each of the protocol deviations was reported to the IRB.  That's reflected in the Meyer response at page, I think, 12 or 13.  The IRB is the Institutional Review Board.

And so what's happening, she's saying, "Look, we did this wrong.  We're reporting it to you."

And if you go and look at the Meyer response then later, in connection with Observation 3B, she also reports the delay in reporting the serious adverse event to the IRB.  And then it says, in the IRB said the patient was cleared to continue in the study.

So it suggests those errors at least are being reported, and nobody is saying you got to stop the study, that these are serious problems and these patients need to be excluded.  So I think that implies that those are minor protocol deviations that are then immediately corrected and reported.  And, of course, none -- as explained; right?  None of the patients were actually determined to have a substance abuse disorder.  But, yes, there was a minor protocol deviation.

THE COURT:  So based on plaintiffs' expert's experience as an FDA regulator and someone who participated in 100 clinical trials, is her statement that these patients would have been excluded, or should have been excluded, a statement of fact that I should consider?  Or why do you still consider it to be a statement of opinion that falls outside of what the Second Circuit says can be considered for a motion to dismiss?

MS. SMITH:  So it's an opinion because she's opining on what the FDA would or would not do.  What the FDA would or would not do is an opinion.  What the FDA does is a fact.

And so she's still clearly just offering an opinion about "This is what I think the FDA is going to do about this." That's just an opinion.  It's based on fact, sure, but it's still a classic expert opinion and belied by the record we have today, which is the issuance of the EIR response with no further action taken on that issue and the patients have not been excluded from any -- they haven't been rejected at this point.  At least that's our argument -- right? -- based on the record that we have.  There's no indication that the patients that had enrollment issues are not going to be considered by the FDA as part of ultimately an approval package.  They infer it, but that's not alleged.

The other thing I would just remind Your Honor is the case that they rely on in the Second Circuit predates the *Bristol Myers* case, which is a Second Circuit case dated in

2022.  And we would submit that's the correct standard and makes the distinction that the Court has been making between facts and opinions.

THE COURT:  Okay.  Tell me again why TRANQUILITY In-Care is not simply a redo of TRANQUILITY II.

MS. SMITH:  I would like to clarify the patient issue that was raised.  So TRANQUILITY II and TRANQUILITY III were each designed to have 150 patients.  Obviously, those patient populations would be divided up between placebo and nonplacebo patients.  So immediately half of those patients are not getting the drug.

Then you take TRANQUILITY III off the table, and all you're left with is the patients that participated in TRANQUILITY II that received the drug.  And even then there were two doses.  So it's obviously going to be a smaller number.

So I guess the discrepancy is there are 150 patients in the trial.  We agree with that.  The 70 number is the number of patients in TRANQUILITY II that received the 60 milligram dose of IGALMI.  That's the drug.  Much easier to say than the number.  And that's where the 70 comes from.

And just to -- it also comes from the plaintiffs' complaint that these two studies were always going to be combined for the sNDA.

THE COURT:  II and III.

MS. SMITH:  Yes, II and III.

So paragraphs 71 and 72 of the second amended complaint, in paragraph 71 plaintiff alleges defendants launched TRANQUILITY II and TRANQUILITY III with the intention of using the data from both of those trials to support an sNDA application, blah, blah, blah.  And then 72 goes on to provide a little bit more detail around that.

But that's where the facts come from that show these were always going to be two trials that then work together. TRANQUILITY In-Care is a combination of the two because now they have to redo it to put everything together for the FDA.

Now, the FDA does say, "We want additional data." They don't say "We're throwing out your old data.  You can't rely on it."  They just want to see more data.

THE COURT:  And the fact that TRANQUILITY III is scrapped allegedly because the patients in that trial might have more chronic agitation comes in one of defendants' SEC disclosures.

MS. SMITH:  Yes.

THE COURT:  Can I take that to be true, or can I -- when we're looking at judicial notice, I think I simply take it it's a representation made by the defendants.  But I think you're asking me to take it for its truth, that that really is the reason that TRANQUILITY III was scrapped.

MS. SMITH:  Um, point -- so I will answer Your Honor's

question.  Point one is the plaintiffs don't allege otherwise. I know Attorney Apton suggested that that was potentially misleading, standing here in court today, but that is not alleged to be a false statement in the case.  So I think that's a relevant fact.

Number two, that is what was disclosed.  I do think the plaintiffs' proposed -- actually, both complaints, second amended complaint and third amended complaint, rely on developments in the development program for the truth of the matters asserted.  I mean, they are relying on those things incorporated by reference in their complaint for the proposition what happened through the FDA process.  And so for the plaintiffs to be able to rely on that regulatory history for the truth of the matter, it means those matters are incorporated by reference.  And I think the Court could, under the incorporation by reference doctrine, take that for the truth of the matter asserted.

I don't think the Court needs to because the plaintiff hasn't alleged it was false or misleading; and, therefore, there's no reason for the Court to conclude there was anything wrong with that statement.  But there's also incorporation by reference.

THE COURT:  But what I seem to have here is plaintiffs -- is sort of two versions of the facts, I mean, plaintiffs saying, based on their allegations, that

TRANQUILITY -- it was the failure of the data in TRANQUILITY II that caused the company to eventually start up TRANQUILITY In-Care.  And I have defendants saying, "No.  In fact, it was the failure of TRANQUILITY III.  So we couldn't go forward as we planned with II and II being the support for our sNDA application."

So is that -- why wouldn't that be a question of fact better suited for discovery and further stages in the litigation?

MS. SMITH:  So point one is plaintiffs do not allege any basis for the Court to conclude that there was any reason for defendants to scrap TRANQUILITY III, other than the one that's disclosed.  They haven't alleged that that was for the purpose of allowing them to redo all of the trials to go in front of the FDA.  That's not an allegation they make.  So I don't think there's a factual dispute about that.  They don't contest that particular conclusion.

Setting aside TRANQUILITY III, there's also nothing in the record that actually shows that TRANQUILITY In-Care is, in fact, a redo of TRANQUILITY II.  The FDA -- what is in the record is that the FDA wants more data.  That doesn't mean they're not going to consider the other data, but they're saying it's not enough.  "We want more."

So I think they want to infer from that that the FDA said "We're not going to look at the other data."  But there's

no support for that.  There's nothing that ever said that the FDA said "We're not going to consider your data from TRANQUILITY II."

THE COURT:  All right.  Any further rebuttal?

MR. APTON:  Yes, Your Honor.  To the point about this TRANQUILITY II being redone, BioXcel explicitly states -- and we have this in our complaint -- that In-Care is, quote, substantially similar to TRANQUILITY II.  It's paragraph 222 in our third -- I'm sorry -- 228 in our third amended complaint. The person who says this is Vincent O'Neill.  He was chief of product development and medical officer.  On April 10th, 2024, again he says, quote, The design of our upcoming TRANQUILITY In-Care trial largely mirrors TRANQUILITY II, closed quote.

I feel like I'm negotiating against myself here because all the facts in our complaint weigh heavily in favor of TRANQUILITY II was redid as TRANQUILITY In-Care.

THE COURT:  Now, you want me to draw the inference that that was because the TRANQUILITY II data was not going to be usable.

Defendants say:  In fact, the reason that they came up with TRANQUILITY In-Care was that TRANQUILITY III's data was not going to be used to support an sNDA application.

Where in your complaint is that hypothesis debunked?

MR. APTON:  Your Honor, if we were to, you know, create a column, two columns, on one hand we have this litany

of data legitimacy issues, again, 483, Meyer response, open EIR, fabricated e-mail.  And on the other hand we have argument from Attorney Smith that says "Well, it could have been this. They don't say it wasn't."  That's not even part of our case.

The only context August 23, 2023, has is that it's a corrective disclosure and that it further conveys to investors -- sorry -- August 14th, 2023 -- is that it further conveys to investors just how serious the data legitimacy issues are.

So we're not about to set out and say "Oh, these reasons in the August disclosure are false" or "It's not what they said."  It's not part of our case.  It very well could be another case.  But we're not here on that issue today.

And as Your Honor questioned two versions of facts, why is this not a matter of discovery?  And so many of the topics we discussed today are matters for discovery.  We have the facts in our complaint, which, as Your Honor knows, are entitled to every favorable inference and accepted as true; and then we have Attorney Smith's rebuttal, which for the most part is attorney argument, not based on facts in the record.  She may very well be right, but we won't know until we get into discovery, which I would submit that we certainly need to do on this case.

Your Honor, back to one other point here about our expert and whether Dr. Wooten is giving fact or opinion, it is

fact based on what the Meyer response says.  These patients, because of these protocol violations, having not considered these tests before admitting them into the study, were not supposed to be in the study.  The FDA would not have considered them.  It's not as if she's extrapolating and going three steps ahead.  She's not opining as to any ultimate issue in the case.

All she's saying is that, because of the seriousness of these protocol violations, there was no determination as to whether these patients should have been enrolled or even could have been enrolled in the study.  And based on what CW8 has told us, they should not have been.

THE COURT:  And the FDA has never said that none of those patients should have been enrolled; correct?

MR. APTON:  Your Honor, the FDA would never say that.  I mean, this is -- the FDA -- even in -- I've done a number of these cases in correspondence between the FDA and sponsors by pharmaceutical companies.  Even final meeting minutes their wording is so subtle.  It's analogous to fed speak.

So the FDA's never going to publicly say "These patients should not have been" -- only when there's a criminal enforcement act would you maybe see something in the final decree.  But, again, it's neither admitted or denied, etc., etc.

So for us to have to meet that standard in order to prove falsity, that's precisely what *Altimeo* says we don't need

to do at the motion to dismiss stage.  The PSLRA carries these heightened standards, but they're not supposed to be impossible.

THE COURT:  So in plaintiffs' view, do I need to be caring about or worrying about why TRANQUILITY III was scrapped?

MR. APTON:  No.  Caring, certainly not.  Your Honor probably has a lot to consider.  All we need to know is what the plaintiff alleges, which is TRANQUILITY II was so fundamentally irrepairable that the entire sNDA plan, scrapped, kaput, reset.

THE COURT:  I guess what I'm having trouble with is that the plausible alternative explanation for the sNDA being scrapped is that TRANQUILITY III's data comes out instead of TRANQUILITY II's data being unusable.  So that's really where I'm -- what the difficult issue is for me here.

MR. APTON:  But there's nothing to say that TRANQUILITY III data was bad or -- the data never even came out.  The program was shut down.  Once these data legitimacy issues came to light, they hit the brakes full stop. TRANQUILITY III was killed before it even had a chance to do anything.

Again, even if TRANQUILITY III was so stupendous, the overall package, the clinical data package, was not going to be sufficient because removal of those 30 some odd patients, 20

percent of TRANQUILITY II patients, was going to leave TRANQUILITY II underpowered and incapable of proving anything of statistical significance.

THE COURT:  All right.  Anything further, Attorney Apton?

MR. APTON:  No, Your Honor.  Thank you.

THE COURT:  Okay.  So, as is my practice, I'll have the parties order the transcript of the oral argument and split the cost evenly so that I have it to refer to as I'm preparing a decision.

I think this series of motions poses closer questions than the first time around; so I'm going to be looking carefully at all of the issues and parsing the parties' papers and arguments very closely.

Thank you.  The Court will stand in recess.

I should say one other thing.  Plaintiffs' exhibit with the timeline, I'll mark that as Exhibit 2 for the hearing so that we have a record of it.

(Plaintiffs' Exhibit 2, received in evidence.)

(Proceedings concluded at 3:48 p.m.)

C E R T I F I C A T E


TONYA HILLS, ET AL.,

VS.

BIOXCEL THERAPEUTICS, INC., ET AL.

NO. 3:23-CV-915 (SVN)



I, Julie L. Monette, RDR, CRR, CRC, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.



/S/ JULIE L. MONETTE
_____
Julie L. Monette, RDR, CRR, CRC
Official Court Reporter
450 Main Street - Clerk's Office
Hartford, Connecticut 06103
(860) 212-6937