**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| TONYA HILLS and OKLAHOMA LAW ENFORCEMENT RETIREMENT SYSTEM, individually and on behalf of all others similarly situated,<br>            *Plaintiffs*, | ) ) ) ) ) | 3:23-CV-915 (SVN) |
| | ) | |
|             v. | ) | |
| | ) | |
| BIOXCEL THERAPEUTICS, INC., VIMAL MEHTA, RICHARD STEINHART, and ROBERT RISINGER,<br>            *Defendants*. | ) ) ) ) | September 29, 2025 |

**RULING ON DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT AND PLAINTIFFS' MOTION FOR LEAVE TO FILE A THIRD AMENDED COMPLAINT**

Sarala V. Nagala, United States District Judge.

In this securities fraud putative class action, Plaintiffs Tonya Hills ("Hills") and Oklahoma Law Enforcement Retirement System ("OLERS"), on behalf of themselves and all others similarly situated, assert claims against Defendants BioXcel Therapeutics, Inc. ("BioXcel" or the "Company"), Vimal Mehta (BioXcel's Chief Executive Officer), Richard Steinhart (BioXcel's Chief Financial Officer), and Robert Risinger (BioXcel's Chief Medical Officer) (together the "Individual Defendants," and, with BioXcel, "Defendants"). Plaintiffs allege that between March 9, 2023, and August 11, 2023, Defendants made materially misleading disclosures which caused the artificial inflation of BioXcel's stock value, in violation of Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and that they suffered losses when those disclosures were corrected and the stock's value fell significantly.

Pending before the Court are Defendants' motion to dismiss Plaintiffs' second amended complaint and Plaintiffs' motion for leave to file a third amended complaint that maintains the allegations of the second amended complaint and adds additional factual allegations. As discussed at the oral argument on the motions, the Court has applied Defendants' arguments for dismissal of the second amended complaint to Plaintiffs' third amended complaint, in addition to considering Defendants' arguments regarding futility asserted in the briefing associated with the motion for leave to amend. It concludes that Plaintiffs have plausibly pleaded their claims for securities fraud in the third amended complaint, with respect to certain statements made by Defendants. Accordingly, for the reasons that follow, Defendants' motion to dismiss the second amended complaint is DENIED AS MOOT and Plaintiffs' motion for leave to file the third amended complaint is GRANTED IN PART.

## I.    PROCEDURAL HISTORY

Plaintiffs initiated this putative class action on July 7, 2023. Complaint, ECF No. 1. Following the Court's appointment of Plaintiffs Hills and OLERS as co-Lead Plaintiffs and of lead class counsel, *see* Order, ECF No. 79, Plaintiffs filed an amended complaint on December 5, 2023, *see* Am. Compl., ECF No. 90, which Defendants sought to dismiss, *see* Mot. to Dismiss, ECF No. 106. The Court granted Defendants' motion to dismiss the amended complaint, finding that although Plaintiffs had pleaded sufficient facts to support the determination that two of Defendants' statements were misleading, Plaintiffs failed to sufficiently allege scienter. *Hills v. BioXcel Therapeutics, Inc.*, No. 3:23-CV-915 (SVN), 2024 WL 3374145 (D. Conn. July 11, 2024).

Plaintiffs then filed a second amended complaint, *see* Second Am. Compl., ECF No. 130, which Defendants again sought to dismiss, *see* Second Mot. to Dismiss, ECF No. 134. While that motion to dismiss was pending, Plaintiffs filed a motion for leave to file a third amended complaint,

*see* Pls.' Mot. to Amend/Correct, ECF No. 141, which Defendants opposed on grounds of futility only, *see* Defs.' Opp'n, ECF No. 143.

## II.    FACTUAL BACKGROUND

Plaintiffs' proposed third amended complaint, ECF No. 142-1, alleges the following facts, which are taken as true for purposes of a motion to dismiss, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and by extension, for the purposes of the futility standard used to assess a motion for leave to amend, *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) ("An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).").

BioXcel is a clinical stage biopharmaceutical and biotechnology company that focuses on finding new therapeutic uses for pre-existing drugs through, among other methods, artificial intelligence.  ECF No. 142-1 ¶¶ 1, 87–89.  BioXcel's repertoire includes four chemical compounds, but its most advanced research and development plans relate to BXCL501, a chemical compound that can be used to treat agitation in various patient populations and that is approved to treat agitation in patients with schizophrenia and bipolar disorders.  *Id.* ¶¶ 90–92.  During the Class Period, BioXcel's leadership team included Defendants Vimal Mehta as Chief Executive Officer ("CEO"), Richard Steinhart as Senior Vice President and Chief Financial Officer, and Robert Risinger as Chief Medical Officer of Neuroscience.  *Id.* ¶¶ 15–17.

### A.    TRANQUILITY II Clinical Trial

In December of 2021, BioXcel announced that it was embarking on a "pivotal Phase III trial," TRANQUILITY II and TRANQUILITY III, as part of its effort to secure FDA approval for BXCL501 to be used to treat agitation in patients with Alzheimer's disease.  *Id.* ¶¶ 2, 95, 97, 109–12.  The TRANQUILITY II clinical trial was designed in consultation with the FDA and required 150 participants to ensure the conclusions from the trial would permit researchers to understand

"the differences between the test groups and the control groups." *Id.* ¶ 99.  The trial also included seven specific participant inclusion criteria, which were to be measured, documented, and analyzed before the start of the study, and ten participant exclusion criteria, which were to be assessed before enrollment.  *Id.* ¶¶ 100–04.

To fund these research efforts, BioXcel entered into financing agreements with Oaktree Capital Management, L.P. ("Oaktree") and Qatar Investment Authority ("QIA") in April of 2022, which the Company announced in a press release.  *Id.* ¶¶ 122–23.  As part of the announcement, BioXcel explained that that these funding agreements would extend its "cash runway" into 2025. *Id.*  But under the terms of the agreements, the funding would become available to BioXcel only "upon satisfaction of certain conditions," including meeting certain regulatory, financial, and patent-related milestones.  *Id.* ¶¶ 125–28.  Among the relevant regulatory milestones was receiving approval "from the FDA of an [New Drug Application] in respect of the use of BXCL 501 for the acute treatment of agitation associated with Alzheimer's Disease."  *Id.* ¶ 127.  Due to the Company's financial instability, its need to meet regulatory approval benchmarks in order to pay back Oaktree and QIA and access additional financing, and its ongoing cash flow issues, the TRANQUILITY trials were essential to BioXcel's overall success.  *Id.* ¶¶ 2, 120–21, 127–28, 131, 133, 135–39, 141.

BioXcel engaged Segal Trials, a "second-rate clinical trial company," to conduct the TRANQUILITY II and III trials because it believed Segal Trials would "enable it to speed up the TRANQUILITY II and III trials" and thus allow BioXcel to meet its funding benchmarks.  *Id.* ¶ 139.  The principal investigator at the Segal Trials site that enrolled forty percent of the TRANQUILITY II trial participants was Dr. Caitlin Meyer, an inexperienced researcher who had never overseen a clinical trial.  *Id.* ¶¶ 3, 113, 117, 140.  Because of her "incompetence and

inexperience," Dr. Meyer improperly failed to follow protocol when enrolling patients, including by making "no effort to evaluate the results" of the enrollment tests for at least twenty-five patients to ensure they were eligible to participate in the study, assuming such tests were ever even performed. *Id.* ¶ 119. Several confidential witnesses, including Confidential Witness ("CW") 8 and CW 9, both Segal Trials employees working on the TRANQUILITY II trial in 2022, aver that Dr. Meyer pressured them to enroll patients in TRANQUILITY II, regardless of whether the eligibility criteria were met, and engaged in actions to enroll unqualified participants, such as by intentionally inducing agitation episodes. *Id.* ¶¶ 50–75, 147–51. As the study sponsor, BioXcel was responsible for monitoring Segal Trials and Dr. Meyer. *Id.* ¶¶ 162–67. Indeed, CW 10, a Segal Trials employee who "worked closely" with Defendant Mehta, stated that Mehta had known "'pretty much everything' about the problems with TRANQUILITY II." *Id.* ¶ 78.

B. FDA Site Inspection & Form 483

Between December 5, 2022, and December 21, 2022, the FDA conducted a site inspection of Dr. Meyer's TRANQUILITY II clinical trial site. *Id.* ¶¶ 169, 173. Site inspections allow the FDA to verify the accuracy, reliability, and integrity of clinical trial data submitted to the FDA and to evaluate compliance with FDA regulations, among other purposes. *Id.* ¶¶ 155–56, 170. In "rare instances" after an investigation, the FDA will issue a Form 483 if an inspector has observed conditions that may constitute violations of statutes or regulations. *Id.* ¶ 157. When a Form 483 is issued, both the site sponsor and the principal investigator are notified and must collaborate to resolve any identified issues. *Id.* ¶¶ 158, 167.

On December 21, 2022, the FDA issued a Form 483 to Dr. Meyer, which outlined flaws in the trial. *Id.* ¶¶ 174–88; *see also* Form 483, Pls.' Ex. A, ECF No. 142-2. The Form 483 listed three "observations" by the FDA: (1) 4 of 37 subjects had not provided consent using consent forms approved by the Institutional Review Board; (2) Dr. Meyer had failed to prepare or maintain

adequate case histories for 25 of 37 subjects reviewed, such that there was not sufficient documentation to show that those subjects met all inclusion criteria for the study; and (3) Dr. Meyer had not followed dosing protocol for 4 of the subjects and failed to report one Serious Adverse Event ("SAE") within a 24-hour time period, as required by the trial protocol.[1] ECF No. 142-2; *see also* ECF No. 142-1 ¶¶ 174–88. The Form 483 notes that it "do[es] not represent a final Agency determination regarding . . . compliance." ECF No. 142-2 at 2. It also provides that, if the receiving entity objects to the observation or plans to implement a corrective action in response to the observation, it can discuss those measures with the FDA. *Id.*

Dr. Meyer responded to each of the FDA's Form 483 observations on January 13, 2023. ECF No. 142-1 ¶¶ 192–208; *see also* Meyer Response, Pls.' Ex. B, ECF No. 142-3 at 5–14. In a cover letter accompanying the response, Dr. Meyer acknowledged that she was "an early career researcher conducting [her] first study as Principal Investigator," described the FDA review as a "learning experience," and acknowledged that the observation provided her "with an opportunity to better understand [her] role as a Clinical Investigator." ECF No. 142-1 ¶ 193; ECF No. 142-3 at 5. Each response reflected explanations for the alleged violations and reassurances that her actions did not undermine the accuracy of the study data and, when possible, had been corrected. ECF No. 142-1 ¶¶ 196–207; ECF No. 142-3 at 6–14. Nonetheless, Plaintiffs contend that the "violation[s]" identified in the Form 483 observations "undermined the integrity of the entire TRANQUILITY II study." ECF No. 142-1 ¶ 208. They assert this determination is supported by the fact that the FDA did not issue an Establishment Inspection Report ("EIR"), which Plaintiffs

---

[1] Additionally, in May of 2023, BioXcel learned that Dr. Meyer "[m]ay have fabricated email correspondence around the time of the FDA inspection, purporting to demonstrate that [she] timely submitted to our pharmacovigilance safety vendor a report of an SAE *from a different subject than the one cited in the FDA Form-483,* and purporting to show that the vendor had confirmed receipt." ECF No. 142-1 ¶ 189 (emphasis in original). Plaintiffs allege that this possible dishonesty "calls into question the integrity of any results generated by Dr. Meyer's trial site and any document or data she touched." *Id.* ¶ 191.

allege is a "full report from the FDA inspector given to the site facility 'once the agency concludes that the inspection is closed,'" until August 1, 2024.[2]  *Id.* ¶ 195.  BioXcel knew about Dr. Meyer's response when it was submitted to the FDA.  *Id.* ¶ 270.

    C. <u>BioXcel's Corrective Disclosures regarding the Form 483</u>

    BioXcel first publicly disclosed the existence of the Form 483 on June 29, 2023, in a Form 8-K filed with the Securities and Exchange Commission ("SEC").  *Id.* ¶¶ 235–36.  With respect to the Form 483, the Form 8-K disclosed that the FDA had performed an inspection and issued a Form 483 with observations "related to the principal investigator's failure to adhere to the informed consent form . . ., maintain adequate case histories for certain patients . . ., and adhere to the investigational plan in certain instances."  *Id.* ¶ 236.  It further disclosed that the principal investigator timely responded to the FDA observations, and that the FDA investigation remained open.  *Id.*  On an analyst call the same day, Defendant Risinger acknowledged BioXcel had known about the Form 483 since December of 2022, and that its issuance led to an increase in monitoring at the relevant site.  *Id.* ¶ 238.

    The June 2023 Form 8-K also disclosed that in May of 2023, the Company learned that that Dr. Meyer may have fabricated correspondence to the FDA to appear compliant with SAE protocol (on a separate occasion than the SAE violation detailed in the Form 483).  *Id.* ¶¶ 191, 236.

---

[2] Plaintiffs contend that the FDA must issue an EIR within forty-five days of an entity's response to a Form 483.  *See* ECF No. 142-1 ¶ 195.  Thus, according to Plaintiffs, the late issuance of an EIR suggests that Dr. Meyer's response to a Form 483 was not satisfactory.  *Id.*  But Plaintiffs' understanding is contradicted by the applicable FDA regulations themselves.  FMD-145 - Release of the Establishment Inspection Report, Document Number DIR-000067 provides that an EIR must be "transmitted within 45 calendar days of the determination that the inspection is closed per 21 C.F.R. § 20.64(d)(3)."  Per 21 C.F.R. § 20.64 (d)(3), "closed" in this context means, "when a final decision has been made not to take such action or such action has been taken and the matter has been concluded."  As Plaintiffs cite no source to support their assertion that because the FDA did not issue an EIR within 45 days of Dr. Meyer's response to the  Form 483, BioXcel would have known that her response was insufficient—and as the text of the regulations themselves do not support that conclusion—the Court is not required to accept the allegations related to an EIR (or lack thereof) as true.  *See In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405–06 (S.D.N.Y. 2001) ("a court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice.") (collecting cases).

BioXcel initiated an investigation into this reported anomaly, and, as of June 29, 2023, had "recently received confirmation" that Dr. Meyer had fabricated the email, which was provided to the FDA during the December 2022 inspection. *Id.* ¶ 236. The Company stated that it was investigating "protocol adherence and data integrity" at Dr. Meyer's site, and would retain a third party to audit data from that site. *Id.* Further, it stated it had notified the FDA of all findings and intended to take corrective measures to "validate the integrity of the data generated by this investigator for the TRANQUILITY II trial." *Id.*

BioXcel also disclosed a new risk factor in the same Form 8-K indicating that the issues with the TRANQUILITY II clinical trial could impact FDA approval of BXCL501 for the treatment of acute agitation in Alzheimer's patients, that the issues could prevent the FDA from considering the data from the clinical trial, that BioXcel may need to conduct a new trial, and that all of this could have "a material adverse effect on the Company, its financial condition, results of operations and prospects." *Id.* ¶ 237. Analyst reports noted that these disclosures "overshadowed" the positive study data released that same day. *Id.* ¶ 240–45 (describing reactions of different analysts). The price of BioXcel stock immediately fell, from $17.67 to $6.39 per share, a 63.8 percent drop, on unusually heavy trading volume. *Id.* ¶ 239.

On August 14, 2023, BioXcel made several additional announcements. First, it announced in a press release that, based on "recent events," it would likely be unable to meet the "milestones required to access the additional capital under the financing agreements" with Oaktree and QIA, and that it would be engaging in a "strategic reprioritization, which includes a reduction in force of more than 50%." *Id.* ¶¶ 247, 250. It further stated in a Form 10-Q filed with the SEC that there was "substantial doubt" about its ability to "continue as a going concern for a period of at least 12 months." *Id.* ¶ 253. In an earnings call, Mehta announced that BioXcel had requested a meeting

with the FDA to discuss its entire TRANQUILITY program. *Id.* ¶ 251. BioXcel also disclosed a new risk factor in its August 14, 2023, Form 10-Q, which noted that TRANQUILITY II developments "may impact the timing of [the Company's] development plans for, and prospects for seeking or obtaining regulatory approval of, BXCL 501" to treat agitation in Alzheimer's patients. *Id.* ¶¶ 248, 307. Again, the stock price declined from $7.40 per share to $4.33 per share, a 41 percent drop. *Id.* ¶ 258.

Plaintiffs' putative class consists of all investors who purchased the allegedly artificially inflated common stock of BioXcel between March 9, 2023, and August 11, 2023. *Id.* ¶ 349.

### D. False or Misleading Statements

Between the start of the class period and the allegedly corrective disclosures on June 29 and August 14, 2023, Defendants also made other disclosures about TRANQUILITY II and BioXcel's financial health, in addition to those discussed above. *Id.* ¶ 259. Plaintiffs allege that six of these statements, made during presentations, earnings calls, and in SEC filings were false and/or materially misleading, largely because they made statements about the TRANQUILITY II study but failed to disclose "the integrity issues identified by the FDA." *See id.* ¶¶ 259–79. The specific statements are discussed further below.

Plaintiffs further allege that Defendants acted with scienter in making these statements because they knew, or recklessly disregarded, that these statements were false or misleading. *See id.* ¶¶ 282–319. Additionally, Plaintiffs allege the Individual Defendants had motive and opportunity to mislead investors, which provides additional grounds for finding that Defendants acted with the necessary scienter. *See id.* ¶¶ 320–48. These allegations are discussed in more detail below.

### III.    LEGAL STANDARD

At oral argument, the parties agreed that the Court should consider both Plaintiffs' motion for leave to file a third amended complaint and Defendants' motion to dismiss the second amended complaint jointly.  The same legal standard governs the futility analysis under Fed. R. Civ. P. 15(a) and dismissal under Fed. R. Civ. P. 12(b)(6).

#### A.    Rule 15(a) Leave to Amend & Rule 12(b)(6) Dismissal for Failure to State a Claim

Under Federal Rule of Civil Procedure 15(a), leave to amend shall be "freely give[n]… when justice so requires."  Courts in the Second Circuit have interpreted this provision as requiring a grant of leave to amend unless, as is relevant here, such amendment would be futile.  *See, e.g.*, *Lucente*, 310 F.3d at 258.  An amendment to a complaint is considered futile if the amendment fails to state a claim or would be subject to a successful motion to dismiss on some other basis. *See, e.g.*, *id.*; *Faryniarz v. Ramirez*, 62 F. Supp. 3d 240, 249 (D. Conn. 2014).  "The party opposing a motion to amend bears the burden of establishing that amendment would be futile."  *Brach Fam. Found., Inc. v. AXA Equitable Life Ins. Co.*, No. 16-CV-740 (JMF), 2018 WL 1274238, at *1 (S.D.N.Y. Mar. 9, 2018).

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a case or cause of action for failure to state a claim upon which relief can be granted.  When determining whether a complaint states a claim upon which relief can be granted, highly detailed allegations are not required, but the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678.  This plausibility standard is not a "probability requirement," but imposes a standard higher than "a sheer possibility that a defendant

has acted unlawfully." *Id.* In undertaking this analysis, the Court must "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citation omitted).

The Court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions," *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (internal quotation marks and citation omitted), and "a formulaic recitation of the elements of a cause of action will not do," *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Consequently, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

B. Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 9(b)

To state a claim for securities fraud, a plaintiff must "satisfy the heightened pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b)." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 304 (2d Cir. 2015) (citation omitted). Federal Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." In the context of securities fraud, this means a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).

## IV.     DISCUSSION

In their proposed third amended complaint, as with their prior complaints, Plaintiffs have advanced two causes of action: a Section 10(b) of the Securities Exchange Act claim brought against all Defendants (Count I) and a Section 20(a) of the Exchange Act claim brought against the Individual Defendants only (Count II). *See* ECF No. 142-1 ¶¶ 363–78. Section 10(b), codified at 15 U.S.C. § 78j(b), provides that it is unlawful for any person, directly or indirectly, by the use of interstate commerce or mail, to "use or employ . . . any manipulative or deceptive device or contrivance" in violation of SEC rules. Section 20(a), codified at 15 U.S.C. § 78t(a), provides that every person who controls a company that or another person who violates SEC rules shall be jointly and severally liable with the company or other person. As Plaintiffs' Section 20(a) claim rises and falls with their Section 10(b) claim, *see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007), the Court focuses first on the latter claim.

### A.     Count One: Section 10(b) Claim

To state a claim for securities fraud under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), a plaintiff must plead "(1) a misstatement or omission of material fact; (2) scienter; (3) a connection with the purchase or sale of securities; (4) reliance; (5) economic loss; and (6) loss causation." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 98 (2d Cir. 2021) (citation omitted). Defendants contend Plaintiffs have not adequately pleaded the first, second, and sixth elements of their Section 10(b) claim—misstatements, scienter, and loss causation. *See generally* Defs.' Br., ECF No. 134-1, at 14–48.

#### 1.     Actionable Misstatements or Omissions

SEC Rule 10b-5, which implements Section 10(b), makes it unlawful to, among other things "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were

made, not misleading." 17 C.F.R. § 240.10b-5(b).  For an omitted fact to rise to the requisite level of materiality, there must be a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (citations omitted); *see also Rombach*, 355 F.3d at 172 n.7 (noting that in considering whether an omission is material, the Court assesses whether "defendants' representations, taken together and in context, would have misled a reasonable investor." (citation omitted)).  "Once a company speaks on an issue or topic, there is a duty to tell the whole truth."  *See Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014).  "That is, when a company does speak, it assumes 'a duty to be both accurate and complete,' *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002), and adequate disclosure is required to make other statements, 'in light of the circumstances under which they were made, not misleading,' *Meyer*, 761 F.3d at 250."  *Gimpel v. Hain Celestial Grp., Inc.*, No. 23-7612, slip op. at 32 (2d Cir. Sept. 29, 2025).  Whether a statement is misleading is evaluated not only by its "literal truth," but by its "context and manner of presentation."  *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (citation omitted).  Ultimately, then, the "test for whether a statement is materially misleading under Section 10(b) is not whether the statement is misleading in and of itself, but whether the defendants' representations, *taken together and in context*, would have misled a reasonable investor."  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (internal quotation marks and citation omitted) (emphasis in original).

As Plaintiffs contend that all of the challenged disclosures were false because of the Company's failure to disclose the Form 483, the Court incorporates by reference its discussion in its ruling on Defendants' prior motion to dismiss that there is no standalone duty to disclose Form 483 letters.  *See Hills*, 2024 WL 3374145, at *8.  By way of summary, there are generally two

types of cases in which omission of a Form 483 renders a statement misleading:  cases in which the Form 483 "clearly contradicts the statement being made," and cases in which there is "additional factual matter to corroborate the allegedly serious nature of the omitted Form 483," such that a "strong inference" can be drawn of the misleading nature of the statement.  *Id.* (citing *Schaeffer v. Nabriva Therapeutics plc*, No. 19 Civ. 4183 (VM), 2020 WL 7701463, at *12 (S.D.N.Y. Apr. 28, 2020)).  The Court analyzes each of Defendants' allegedly false or misleading statements against this standard.

      a.   Paragraphs 260 through 263: March 9, 2023, and March 16, 2023, Patient Enrollment Statements

Plaintiffs first challenge two statements relating to enrollment of the TRANQUILITY II trial:  (1) Defendant Mehta's statement on a March 9, 2023, earnings call, in which he stated that, "The TRANQUILITY II trial is fully enrolled"; and (2) a statement included in BioXcel's March 16, 2023, Form 10-K signed by Defendants Mehta and Steinhart, which stated that "[p]atient enrollment is complete for TRANQUILITY II."  ECF No. 142-1 ¶¶ 260–63.  They contend that the representations that TRANQUILITY II was "fully enrolled" or and that its patient enrollment was "complete" are false because Defendants were on notice that numerous participants at Dr. Meyer's site may have been improperly enrolled in light of the unresolved Form 483 observations and the CWs' representations about improper enrollment.  *Id.* ¶¶ 261, 263.  The Court previously held that Mehta's statement that the trial was "fully enrolled" was not actionable.  *See Hills*, 2024 WL 3374145, at *14.[3]

The Court now agrees with Plaintiffs that these enrollment-related statements are actionable, based on the new allegations in the proposed third amended complaint.  Previously,

---

[3] Plaintiffs did not previously advance a theory that the March 16, 2023, Form 10-K statement that patient enrollment was complete was misleading.

the Court held that Plaintiffs had not alleged that the trial was not fully enrolled, *see id.*; now, Plaintiffs do.  ECF No. 142-1 ¶ 261 (noting that because thirty-two patients should have been excluded, "the TRANQUILITY II trial had enrolled only 118 out of 150 patients and was therefore not 'fully enrolled'"); ¶ 263 (noting that because thirty-two patients should have been excluded, "at best, the TRANQUILITY II trial had enrolled only 118 out of 150 patients and therefore 'enrollment' was not 'complete.'").[4]  This allegation is supported by the facts that forty percent of study participants were enrolled at Dr. Meyer's site, *see id.* ¶¶ 140, 236, 240, meaning 60 of 150 TRANQUILITY II participants were under Dr. Meyer's oversight, and that, based on the Form 483, more than half of the individuals at Dr. Meyer's site and more than 20 percent of the total enrollment of the study could possibly have been impacted by the FDA's observations, including by ultimately requiring their exclusion from the study.   Specifically, four patients were included in the study who had not signed the consent form approved by the Institutional Review Board; four patients did not receive a  urinalysis within the appropriate time frame prior to dosing of the study drug,  which was required to screen for substance abuse or other conditions that would impact study results; and twenty-five patients lacked proper documentation concerning whether they were properly evaluated for and actually satisfied the inclusion and exclusion criteria.  *Id.* ¶¶ 175–88. Importantly, Dr. Meyer's January 2023 response did not dispute that these deficiencies occurred; instead, it attempted to explain why the participants were still eligible to participate and the integrity of the study was intact.  ECF No. 142-3 at 5–14.

---

[4] While paragraphs 261 and 263 reference 32 patients who allegedly should have been excluded from the study, the Form 483 referenced 4 patients who did not sign the proper consent form; 25 patients for whom there was insufficient documentation to show they met all of the inclusion criteria and none of the exclusion criteria; and 4 patients as to whom the required urinalysis was not timely conducted, resulting in the possible exclusion of *33* patients, not *32* patients.  *See* ECF No. 142-1 ¶¶ 175–85.  It is possible that one patient was included in more than one of the Form 483's observations, or that Plaintiffs simply did the math wrong.  Either way, whether 32 or 33 patients would have been required to be excluded is not consequential, as either is a significant number of trial participants, given that the entire trial consisted of only 150 patients.  *Id.* ¶ 99.

Although the Form 483 observations do not explicitly contradict the proposition that the trial was fully enrolled, the statements that "enrollment was complete" and the trial was "fully enrolled" are misleading when considering the context of the Form 483 observations and their potential implications for TRANQUILITY II enrollment. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 250. BioXcel knew about the FDA's audit (and, by extension, the Form 483), in December of 2022. ECF No. 142-1 ¶ 238. Thus, by March of 2023, Defendant Mehta, and, by extension, BioXcel, knew that there were possible issues with the enrollment at Dr. Meyer's site as identified by the Form 483, and that these issues could potentially result in exclusion of a significant number of patients from the study. Although Dr. Meyer had responded to the Form 483 in January of 2023, and tried to explain why the FDA's observations did not undermine the integrity of her site's data, it was unknown as of March of 2023 how the FDA would react to her response.[5] Thus, Defendants' statements indicating that "enrollment is complete" or that the trial was "fully enrolled" fail to account for the real possibility that several enrolled participants may have needed to be excluded, such that enrollment would not actually be complete. An average stockholder could reasonably interpret these statements as indicating that Mehta and BioXcel had no reason to anticipate that the study on which BioXcel's financial viability turned was experiencing any enrollment issues whatsoever. Given the possibility that several study participants could ultimately be excluded, Mehta's and BioXcel's failure to disclose the Form 483, in conjunction with their statements regarding the completion of enrollment, renders those statements materially misleading.

Moreover, Plaintiffs now include allegations from two CWs—CWs 8 and 9—who worked with Dr. Meyer at Segal Trials to enroll patients in TRANQUILITY II, stating that Dr. Meyer had

---

[5] That the FDA issued the EIR in August of 2024 does not negate the Court's conclusion. At the time of Defendants' March 2023 statements, Defendants could not have known what the outcome of the investigation would be.

fabricated data in order to enroll patients who were not otherwise qualified to participate in the study, including by overriding the observations of clinical raters like CW8 and purposefully aggravating patients so that they would present symptoms of agitation and thus qualify for inclusion. *Id.* ¶¶ 51–66, 74–75. *See Blanford*, 794 F.3d at 305 (noting that CW allegations are taken at true at the pleading stage so long as the CWs "are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged") (citation omitted). Both CWs also reported significant pressure from Dr. Meyer to enroll patients, including financial incentives to do so. *Id.* ¶¶ 54–55, 72–73. As CW8 also stated that BioXcel "actively monitored the enrollment data and results of TRANQUILITY II" and CW10 stated that Mehta "had known 'pretty much everything' about the problems with TRANQUILITY II," it is reasonable to infer that Defendants knew of the potential enrollment issues at Dr. Meyer's site raised by CW8 and CW9, particularly as CW8 went as far as to report their concerns to the FDA. *Id.* ¶¶ 56–69, 78. These new CW allegations further support the conclusion that Defendants' statements about full and complete enrollment were misleading. *See Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 178–79 (2d Cir. 2020) (affirming district court's holding that confidential witness's information about witnessing enrollment of ineligible individuals and pressure to enroll patients rendered statement that patient enrollment was complete misleading).[6] The Court recognizes that the CW in *Abramson* was employed directly by the company defendant and allegedly reported his concerns about improper

---

[6] The Court previously held that Mehta's statement that "the data cleaning and verification process ha[d] begun," ECF No. 142-1 ¶ 260, suggested that "there were risks the data might not be as-expected, since it needed to undergo a cleaning and verification process." *Hills*, 2024 WL 3374145, at *14. In light of the proposed third amended complaint's new allegations noting that Dr. Meyer admitted to the deficiencies identified by the Form 483 (with accompanying explanations) and the CWs' allegations concerning improper enrollment procedures, the Court cannot read the "data cleaning and verification process" statement in the same light it previously did. Now, if anything, the statement supports Plaintiffs' claims, as it doubles down on the idea that the trial was fully enrolled and progressing toward the data cleaning and verification process without issue, despite that Defendants were aware of the distinct possibility of enrollment problems.

enrollment directly to the company's president (a named individual defendant). *See id.* at 178. Here, although CWs 8 and 9 worked for Segal Trials, the Court draws the reasonable inference that the Company was aware of the potential enrollment issues at Dr. Meyer's site, taking all of the CW allegations together, in combination with Company's admitted knowledge of the observations of the Form 483. *See, e.g.*, ECF No. 142-1 ¶¶ 78 (CW10 reporting Mehta's knowledge of "'pretty much everything' about the problems with TRANQUILITY II"); 21–22 (CW1 reporting "artificial pressures from senior management" to "find sites and get people enrolled" to meet a deadline of starting data analysis for the trial by July of 2023 and describing a Company employee as reporting that Segal Trials' TRANQUILITY II site was "trying to get paperwork cleaned up"); 26 (CW2 reporting that the Company's executives thought engaging Segal Trials would result in a faster study, despite that Segal was not a "'legit' clinical research operator"); 32–33 (CW3, a Senior Director at the Company, reporting that Mehta knew Dr. Meyer and could get "a lot of data from them for minimal investment" and that the Company did not "check much on the reputation of the investigator"); 44–46 (CW7, the Company's Head of Chemistry, Manufacturing and Control Regulatory Affairs, stating Mehta was a "hands-on CEO," that company executives, including Mehta, were involved in clinical site selection "more than expected," and that the Company "wanted to get the work done fast"); *see also id.* ¶¶ 50–86 (describing statements from Segal Trials CWs); 174–88 (detailing Form 483 observations); 238 (Risinger admitting the Company knew of the FDA's audit in December of 2022 and was "monitoring" Dr. Meyer's site "even more closely" as a result).

The Court's conclusion that Defendants' enrollment-related statements are misleading is also bolstered by the newly-included opinions of Plaintiffs' expert, Dr. Alyson Wooten, who practiced as an FDA regulatory attorney, has more than twenty years' experience with the process

of conducting clinical trials to support FDA drug approvals, has been involved with more than one hundred clinical trials, and who currently leads a pharmaceutical compliance practice that audits and advises clients on the response to and impact of FDA investigations, including the impact of FDA Form 483 observations. *Id.* ¶ 210. Dr. Wooten's opinion that the patients referenced in the Form 483 would need to be excluded from the study is based on her significant experience with FDA investigations of clinical trials and her review of materials relevant to the case, including Dr. Meyer's response. ECF No. 142-1 ¶¶ 210–14. Dr. Wooten explains that the failure to obtain proper consent before initiating the study; the failure to adhere to study protocol requiring urinalysis to rule out substance abuse or other potential conditions that could influence the study results; and the failure of Dr. Meyer's response to affirmatively state that twenty-five patients were evaluated to determine if they met the inclusion/exclusion criteria means that these all of these patients should have been excluded from the study. *Id.* ¶¶ 212–14.

The Court concludes that it may consider Dr. Wooten's opinion as supporting Plaintiffs' allegations that Defendants' statements were misleading. While "'opinions cannot substitute for facts under the PSLRA,'" "it is permissible for a plaintiff to bolster a complaint by including a nonconclusory opinion to which an expert may potentially testify." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 354 (2d Cir. 2022) (quoting *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006)). Dr. Wooten's opinions do not stand alone as a substitute for facts; instead, they supplement the third amended complaint's factual allegations concerning the Form 483's observations, Dr. Meyer's response, and the CWs' statements. *See Bristol-Meyers Squibb Co.*, 28 F.4th at 354 (noting that an opinion that is based on particularized facts sufficient to state a claim for fraud is permissible). Dr. Wooten's conclusions that the patients at issue should have been excluded from the study bolster Plaintiffs' allegations that, indeed,

Defendants' comments that the trial was fully enrolled would have misled reasonable investors. Defendants remain free to challenge her opinion at a later stage in the case, of course.

For these reasons, the Court finds that both Defendant Mehta's March 9, 2023, statement, and BioXcel's March 16, 2023, statement in the Form 10-K are actionable.

    b. Paragraph 264: March 16, 2023, Risk Disclosure Statements

Next, Plaintiffs allege that the following risk disclosure statement in BioXcel's Form 10-K for the year ending December 31, 2022, was materially misleading:

> We rely on third parties to conduct our preclinical and clinical trials. If these third parties do not successfully perform their contractual legal and regulatory duties or meet expected deadlines, we may not be able to obtain regulatory approval for or commercialize our product candidates and our business could be substantially harmed.
>
> [...]
>
> If we or any of our CROs [clinical research organizations] fail to comply with applicable GCPs [good clinical practices], the clinical data generated in our clinical trials may be deemed unreliable and the FDA . . . may require us to perform additional clinical trials before approving our marketing applications. . . . Our failure to comply with these regulations may require us to repeat clinical trials, which would delay the regulatory approval process.
>
> If CROs do not successfully carry out their contractual duties . . . or if the quality or accuracy of the clinical data they obtain is compromised due to the failure to adhere to our clinical protocols, regulatory requirements or for other reasons, our clinical trials may be extended, delayed or terminated and we may not be able to obtain regulatory approval for or successfully commercialize our product candidates.

ECF No. 142-1 ¶ 264.  The Court previously held that this statement was actionable because a reasonable investor may have concluded that the risk disclosed by this statement, which the Court characterized as a risk of third-party noncompliance, had already occurred by the time the statement was made.  *Hills*, 2024 WL 3374145, at *11–12.

Upon further review of the applicable case law, the Court now agrees with Defendants that this statement is not actionable because the risks of delayed or denied regulatory approval—the appropriate risks on which to focus—had not yet materialized when the statement was made.

Recently, in *City of Hialeah Employees' Retirement System v. Peloton Interactive, Inc.*, __ F.4th __, 2025 WL 2457758, at *8 (2d Cir. Aug. 27, 2025), the Second Circuit concluded that a risk disclosure statement providing that, if the company "fail[ed] to accurately forecast consumer demand," it "may experience excess inventory levels" which "may result in inventory write-downs or write-offs and the sale of excess inventory at discounted prices, which would cause our gross margins to suffer" was actionable because, at the time the statement was made, "the *specific financial consequences* described in these disclosures were not merely hypothetical but had already materialized and resulted in significant disruption" to the company's business. (Emphasis added.)  The Second Circuit's focus on the "then" portion of the "if-then" statement in *City of Hialeah* suggests that the Court's original focus on whether the "if" portion of BioXcel's disclosure had already occurred—*if the third parties do not successfully perform their contractual legal and regulatory duties*—was incorrect.  Instead, the Court should have examined whether the "then" portion of the statement—delayed or denied regulatory approval—had occurred at the time the statement was made.  As Plaintiffs do not allege that delayed or denied regulatory approval had materialized at the time of the statement, this risk disclosure statement was not misleading.[7]

  c. Paragraphs 267 through 273: March 16, 2023, Cash Flow Statement

In the same Form 10-K as the risk disclosure statements, Plaintiffs also challenge BioXcel's statement that it anticipated that it would have sufficient funding for at least twelve months.  ECF No. 142-1 ¶¶ 267–73.  The Court previously determined that Plaintiffs had not pleaded sufficient facts to demonstrate why this statement was false or misleading, despite that Defendants updated their position in an August 2023 disclosure.  *Hills*, 2024 WL 3374145, at *13.

---

[7] The Second Circuit's analysis in *City of Hialeah* casts doubt on the portions of the holdings of the district court opinions on which this Court previously relied.  *See Hills*, 2024 WL 3374145, at *12 (citing *Sec. & Exch. Comm'n v. DeFrancesco*, 683 F. Supp. 3d 367, 373–74 (S.D.N.Y. 2023) and *In re Tenaris S.A. Sec. Litig.*, 493 F. Supp. 3d 143, 161 (E.D.N.Y. 2020)).

Although Plaintiffs once again assert that Defendants knew they could not satisfy the requirements of the funding agreements and thus would not have access to the anticipated funding streams, they again fail to allege sufficient facts to support this conclusion.

In response to the Court's ruling on the prior motion to dismiss, the proposed third amended complaint now details what regulatory milestones were necessary to unlock the additional capital supplied by Oaktree and QIA, including FDA approval of an NDA for the use of BXCL501 for treatment of Alzheimer's agitation before December 31, 2024. *See* ECF No. 142-1 ¶ 127. But this alone is insufficient to make the statement false or misleading. As the Court noted in its prior ruling, Plaintiffs have still failed to show that issues with the study data as of March 2023 plausibly demonstrate an inability to meet the required milestones by December 31, 2024. Plaintiffs have demonstrated that, as of March of 2023, BioXcel was aware of possible problems with the study based on the Form 483, that Dr. Meyer had responded to those possible problems, and that the FDA had issued no final determination regarding their observations. But Plaintiffs allege no facts indicating that the study could not be repeated, if needed, to satisfy the funding requirement in the time remaining before the funding deadline. In fact, Plaintiffs admit that a trial cycle only lasts twelve weeks, which suggests that at the time this statement was made, it could have been plausible to entirely repeat the trial and still meet the necessary milestones. *See* ECF No. 142-1 ¶ 227.

The August 14, 2023, statements do nothing to remedy this issue, as Plaintiffs provide no facts to suggest that the determination regarding financing reached in August of 2023 was known to Defendants at the time of their March 16, 2023, statements. Even where the events associated with the Form 483 may have led to subsequent financial challenges reported in August of 2023, Plaintiffs have not alleged facts showing that Defendants had reason to believe as much in March of 2023. Absent allegations supported by particularized facts indicating that Defendants knew

such information at the time the statements were made, the Court cannot find that this statement is false.

Moreover, the Court incorporates by reference its previous conclusions that, to the extent the statement at issue is one of opinion, it is not actionable, and, additionally, the statement is protected by the PSLRA safe harbor.  *Hills*, 2024 WL 3374145, at *13.

    d.    Paragraphs 274 through 277: May 9, 2023, Trial Completion Statements

With regard to Defendant Risinger's May 9, 2023, statements at the Bank of America Global Healthcare Conference that the trial was "completed," that the "last patient has completed," and that the "data is being locked and undergoing verification," the Court affirms its prior ruling that these statements were materially misleading because they omitted any reference to the Form 483 and the associated open investigation.  The Court incorporates and adopts its prior reasoning by reference, *id.* at *15, and notes that its discussion in this ruling concerning the misleading nature of the March 9, 2023, enrollment-related statements further supports this conclusion.

    e.    Paragraphs 278 and 279: June 8, 2023, sNDA Statements

Finally, Plaintiffs again allege that Defendant Mehta's sNDA remarks at the June 8, 2023, Jefferies Healthcare Conference, were misleading when he stated that whether and when BioXcel can file an sNDA "depends on the data. How well is efficacy data as well as safety. . . We will have a conversation with the FDA, ask them what we need to file the SNDA, and then fill those gaps and file it.  If they allow us to file it with TRANQUILITY II, we'll be ready to go, basically, if we don't need to generate anything."  ECF No. 142-1 ¶ 278.  For the same reasons it previously found this statement not actionable, it is still not actionable.  *See Hills*, 2024 WL 3374145, at *16. As previously held, Defendant Mehta provided several caveats within this statement that suggest that he did not anticipate that the approval would be guaranteed based on this data, including his statement that the timing would "depend[] on the data" and that there was a possibility that BioXcel

would need to "generate" something or otherwise "fill . . . gaps" in order for the sNDA application to be filed. These caveats sufficiently warn that approval is not a foregone conclusion and that there may be more work to be done. Thus, for this reason and for the reasons stated its prior ruling, the Court cannot find that this statement was materially misleading.

### 2. Scienter

The Court also concludes that Plaintiffs have adequately pleaded Defendants acted with scienter in making the March 9, 2023, enrollment-related statements and May 9, 2023, trial completion statements.

Under the PSLRA, plaintiffs must state with particularity the "facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007) (citation omitted). There must be a "strong inference that the defendant acted with the required state of mind." *Id.* at 314 (citing 15 U.S.C. § 78u–4(b)(2)). In the Second Circuit, a plaintiff can plead scienter by "'alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.'" *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020) (quoting *ATSI Commc'ns*, 493 F.3d at 99). The Supreme Court has held that, in order for an inference of scienter to qualify as "strong," it "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

"[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 326. The appropriate inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23 (emphasis in original). And, "at a motion to dismiss phase, a tie on scienter goes to the plaintiff." *In re Teva Secs. Litig.*, 671 F.

Supp. 3d 147, 186 (D. Conn. 2023) (citing *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012)).

Plaintiffs argue they have met their burden of alleging scienter both because Defendants had the motive and opportunity to commit the fraud and because there is strong circumstantial evidence Defendants consciously misbehaved or acted recklessly. *See* ECF No. 142-1 ¶¶ 282, 320. Although the Court acknowledges that it is a very close question, the Court finds that Plaintiffs have met their burden by showing that circumstantial evidence permits a strong inference of scienter.

### a.  Motive and Opportunity

First, the Court holds that Plaintiffs' allegations of motive an opportunity are insufficient, standing alone, to allege scienter. As with the prior versions of the complaint, Plaintiffs again allege that Defendants' motive to commit fraud turned on BioXcel's dependency on the TRANQUILITY II trial to receive "critical funding" from Oaktree and QIA, and personal financial gain for BioXcel's "insiders" who allegedly "engaged in significant highly unusual and suspiciously timed insider trading during the Class Period." *Id.* ¶ 320. But Plaintiffs again fail to allege sufficient facts to support either allegation. Thus, for the reasons stated in the Court's prior ruling, *see Hills*, 2024 WL 3374145, at *17–19, and as supplemented below, the Court cannot find that Plaintiffs have established the necessary motive and opportunity to constitute scienter.

In assessing scienter, it is generally undisputed that individuals in corporate leadership have an opportunity to commit fraudulent acts by nature of their role within a company. *See Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001); *see also Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 36 (S.D.N.Y. 2019). Thus, scienter often turns on motive. To establish motive, Plaintiffs must assert "a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit*, 264 F.3d at 139. Corporate officers'

misrepresentation of corporate performance to inflate stock prices while they sell their own stock shares can be sufficient motive from which to infer scienter. *Id.* (citing *Novak v. Kasaks*, 216 F. 3d 300, 307–08 (2d Cir. 2000)); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74–75 (2d Cir. 2001) (finding that motive was sufficiently pleaded where allegedly fraudulent statements were followed by defendant selling 80 percent of his holdings for a profit); *Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) (holding that Plaintiff sufficiently pleaded motive where defendants' misrepresentations occurred alongside insider trading because "[t]he allegation supports the inference that [defendant] withheld disclosures that would depress his stock until he had profitably sold his shares."). Moreover, while motives that are "generally possessed by most corporate directors and officers"—such as a desire for the corporation to appear profitable or the desire to keep stock prices high to increase officer compensation—are insufficient, *Kalnit*, 264 F.3d at 139, allegations that a company made misrepresentations related to a need "to fundraise to survive" can be sufficient. *Skiadas v. Acer Therapeutics, Inc.*, No. 1:19-CV-06137 (GHW), 2020 WL 3268495, at *11 (S.D.N.Y. June 16, 2020).

Here, to start, Plaintiffs fail to sufficiently allege motive based on their allegations concerning BioXcel's dependency on the TRANQUILITY II trial to unlock the next amount of "critical funding" from Oaktree and QIA. In order to unlock a second tranche of funding, BioXcel had to receive approval from the FDA for the use of BXCL501 for the acute treatment of agitation associated with Alzheimer's Disease, ECF No. 142-1 ¶ 127; Plaintiffs assert that Defendants were dependent on such funding to "sustain the Company's operations," *id.* ¶ 120.

Although these allegations approach the line for finding adequate motive, they fall short. As the Court held in its ruling on the prior motion to dismiss, "none of the challenged statements, and certainly none of the actionable statements, involve BioXcel or the Individual Defendants

misrepresenting that BioXcel had" in fact achieved the required FDA approval, "so as to suggest they were positioned to unlock the additional funding." *Hills*, 2024 WL 3374145, at *17. Plaintiffs fail to allege how the motive to receive the next tranche of funding from Oaktree and QIA actually could have incentivized the statements at issue, when that funding was contingent on a specified FDA approval that was not realized. *Id.* Thus, Plaintiffs' first theory of motive fails to create a strong inference of scienter.

Plaintiffs' second theory of motive is a closer call, but again is not sufficient alone to create a strong inference of scienter. A plaintiff can demonstrate motive to commit fraud by showing that corporate insiders made misrepresentations "in order to sell their own shares at a profit." *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 256 (S.D.N.Y. 2020) (citation omitted). The simple fact that stock was sold is not enough, however—a plaintiff must also demonstrate that the sales were unusual or suspicious. *Id.* This inquiry can turn on a number of factors, including: "(1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants selling; (5) whether sales occurred soon after statements defendants are alleged to have known were misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5-1 plans." *Id.*; *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 74–75.

Regarding the last of these factors, a Rule 10b5-1 trading plan can provide a defense to a securities fraud action. Such plans, among other things, specify the amount of stock to be sold and the date of sale; include a written formula or algorithm for determining the amount of stock to be sold and the date of sale; and do not permit the seller to exercise any subsequent influence over "how, when, or whether to effect purchases or sales." 17 C.F.R. § 240.10b5-1. In securities fraud

27

cases, it is "well established that, ordinarily, trades pursuant to 10b5-1 plans do not raise a strong inference of scienter." *See Villare v. Abiomed, Inc.*, No. 19 Civ. 7319 (ER), 2021 WL 4311749, at *21 (S.D.N.Y. Sept. 21, 2021). But if there is evidence to suggest that defendants delayed disclosure of material information until after their 10b5-1 trading date, scienter can be inferred from such suspiciously timed sales. *See Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 885 (N.D. Cal. 2023); *see also Rice as Tr. of Richard E. & Melinda Rice Revocable Fam. Tr. 5/9/90 v. Intercept Pharms, Inc.*, No. 21-CV-0036 (LJL), 2022 WL 837114, at *20 (S.D.N.Y. Mar. 21, 2022) (suggesting that the timing of planned 105b-1 sales may be viewed as suspicious where they happen before a meaningful disclosure).

Plaintiffs' motive and opportunity allegations turn on their theory that Defendants Mehta and Steinhart suspiciously timed the disclosure of the Form 483 and its impact on the TRANQUILITY II study so as not to disrupt profits that they would earn from the planned stock sales associated with their 10b5-1 trading plans. *See* ECF No. 142-1 ¶¶ 332–48. But these theories are not supported by the alleged facts.

The plans at issue here were entered into approximately nine and seven months *before* the start of the class period, reducing their value for purposes of pleading scienter. *Cf. Blanford*, 794 F.3d at 309 (recognizing that where 10b5-1 trading plans are entered into during the class period to take advantage of an inflated stock price, they provide no defense to scienter allegations). All stock sales made by Defendants Mehta during the class period were made pursuant to 10b5-1 trading plans entered into on August 31, 2022; all stock sales made by Defendant Steinhart were made pursuant to a 10b5-1 trading plan entered into on June 23, 2022. ECF No. 142-1 ¶¶ 334, 346.

Nonetheless, Plaintiffs contend that the sales are suspicious on a theory of delayed disclosure: they believe Defendants Mehta and Steinhart withheld the bad news of the Form 483 and its consequences until June 29, 2023, because they knew that, under their 10b5-1 plans, they were scheduled to sell shares in March, May, and mid-June of 2023. Specifically, Plaintiffs allege Defendant Mehta sold shares on March 14, 2023, several months after he learned about the Form 483 and a few months before the June 29, 2023, disclosure, and he sold shares on June 16, 2023, just thirteen days before the June 29, 2023, disclosure, which subsequently tanked the BioXcel stock price. ECF No. 141-2 ¶¶ 332, 335. Plaintiffs further allege Defendant Steinhart also sold shares of BioXcel stock during the class period, on both March 15, 2023, and May 15, 2023, after he learned about the Form 483 but before the June 29, 2023, disclosures. *Id.* ¶¶ 344–45.

While this timing may be suspicious, any suspicion is overshadowed by the relatively small proportion of available holdings sold by these Defendants and the fact that both ended the class period with more holdings than they held at the start of the period. Plaintiffs' operative complaint omits these facts, and Plaintiffs ignore them in their opposition. *See* ECF No. 134-1 at 39–40 (noting, based on publicly-filed SEC Forms 3s and 4s, that Defendant Mehta sold 14.5 percent of his available holdings and had a net gain of 4,794 shares and exercisable options during the class period and that Defendant Steinhart sold only 3.8 percent of the total shares he could have sold and acquired over 500 more shares than he sold during the class period); *Fishbaum v. Liz Claiborne, Inc.*, 189 F.3d 460, 1999 WL 568023, at *4 (2d Cir. 1999) ("[I]nferences of scienter can be undermined when an insider's sales of stock are offset by even larger stock acquisitions during the relevant time period."). Further, Plaintiffs provided no evidence to support the conclusion that either of these sales were "dramatically out of line with prior trading practices," such that a strong inference of scienter could be found. *See In re BioMarin Pharma. Inc. Sec.*

*Litig.*, No. 3:20-cv-06719-WHO, 2022 WL 164299, at \*14 (N.D. Cal. Jan. 6, 2022). Thus, Plaintiffs' second theory of motive also fails to create a strong inference of scienter, though the motive allegations can be considered when evaluating the totality of the circumstantial evidence, as described below.

b.  Circumstantial Evidence of Conscious Misbehavior or Recklessness

Plaintiffs have, however, sufficiently alleged circumstantial evidence to support a strong inference of scienter.

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant." *Kalnit*, 264 F.3d at 142 (citation omitted). However, the "strength of the circumstantial allegations must be correspondingly greater." *Id.* (citation omitted). Courts may look to circumstances such as whether defendants "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Blanford*, 794 F.3d at 306 (citation omitted). "The inquiry regarding scienter is necessarily case-specific, and the conclusion rests on a practical judgment about whether, taking all of the allegations collectively, it is at least as likely that Defendants acted with scienter." *City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132, 2013 WL 1197755, at \*16 (S.D.N.Y. Mar. 25, 2013); *see also Tellabs*, 551 U.S. at 322–23. The total weight of the circumstantial allegations must be considered "*together with* the allegations of motive and opportunity." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137–38 (2d Cir. 2021).

Where allegations of recklessness stem from an FDA Form 483, the existence of a Form 483 that could possibly contradict a public statement does not inherently establish recklessness. *Nabriva Therapeutics plc*, 2020 WL 7701463, at \*12. Rather, plaintiffs must plead

30

more to explain why the nondisclosure of the form was highly unreasonable, such as by showing that public statements substantially contradicted the observations on the Form 483. *Id.*

Plaintiffs allege the following circumstantial evidence supports an inference of recklessness:[8] (1) Defendants' knowledge that Dr. Meyer was engaging in intentional protocol violations to meet enrollment requirements, ECF No. 142-1 ¶¶ 283–85; (2) Defendants' knowledge of the Form 483 letter and the Meyer Response, *id.* ¶¶ 286–98; (3) Defendants Mehta and Risinger's extensive experience with clinical trials, such that they would have understood that the protocol violations would have invalidated the research data, *id.* ¶¶ 300–05; (4) the Company's heavy reliance on FDA approval for BXCL501 for continued funding, *id.* ¶¶ 309–11; and (5) Defendants Mehta and Risinger's hands-on involvement in the progress of BXCL501, *id.* ¶¶ 315–19. The Court also considers Plaintiffs' allegations regarding Defendant Mehta's and Defendant Steinhart's sale of stocks, as a scienter inquiry requires the Court to consider all alleged facts collectively. *Tellabs*, 551 U.S. at 322–23. Taken together, the Court finds that this evidence supports a finding of scienter because "the inference of scienter [is both] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

First, the Court finds that Plaintiffs have alleged sufficient facts to show that Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Blanford*, 794 F.3d at 306. Plaintiffs allege Defendants were aware of the Form 483 and its implications for enrollment and data reliability. They allege that Defendants were required

---

[8] Plaintiffs also assert circumstantial evidence related to the FDA's alleged forcing of Defendants to repeat TRANQUILITY II under the name TRANQUILITY In Care, *see* ECF No. 142-1 ¶ 306; alleged intent based on future updates to BioXcel's risk disclosures, *see id.* ¶¶ 307–08; and Defendants' alleged knowledge based on their preparation for conversations with analysts, *id.* ¶¶ 312–14. But these allegations are merely conclusory. Thus, the Court declines to consider these allegations in its evaluation of circumstantial evidence. *See Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir. 2006) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss." (second alteration in original) (citation omitted)). Additionally, for the reasons discussed above, the Court does not consider BioXcel's failure to receive an EIR, as it finds Plaintiffs' interpretation of EIR-related regulations inaccurate.

to receive notification of the issuance of a Form 483 and collaborate with the site to address the problems that led to its issuance. *See id.* ¶¶ 290–91; *see also id.* ¶ 287 (Risinger admitting to analyst that the audit occurred in December of 2022 and that the Company was "monitoring that site even more closely" as a result).  Defendants were also aware of Dr. Meyer's response to the FDA made on January 13, 2023, *id.* ¶ 296, in which she admitted the deficiencies the FDA had observed nearly two months before of their March of 2023 misleading statements.  Although Dr. Meyer's response attempted to explain why the issues were not fatal to the specific patients' participation in the trial, Plaintiffs allege that Defendants Mehta and Risinger had extensive experience with clinical trials, such that they would know there were significant issues with the trial that could impact enrollment and completion throughout the class period.  *See id.* ¶¶ 300–05.  And Defendants admitted that in the wake of the Form 483, they increased their oversight of Dr. Meyer's site, again suggesting that they understood the significant implications of the Form 483 for the clinical trial and/or that Dr. Meyer was facing issues complying with protocol.  *Id.* ¶¶ 238, 287.  Moreover, as discussed above, the information provided by the CWs supports an inference that Defendants were aware of the enrollment-related issues at Dr. Meyer's site.  Yet they made public statements suggesting that there were no issues with patient enrollment and that the trial had been completed.

Second, Plaintiffs also have alleged sufficient facts supporting the reasonable conclusion that Defendants failed to check information they had a duty to monitor.  Pursuant to 21 C.F.R. § 312.50, sponsors like BioXcel "are responsible for selecting qualified investigators, . . . ensuring proper monitoring of the investigation(s), [and] ensuring that the investigation(s) is conducted in accordance with the . . . protocols contained in the [Investigational New Drug Application]."  *See also* ECF No. 142-1 ¶¶ 162–63.  As part of this obligation, Plaintiffs allege that Defendants had a duty to "conduct audits of its clinical trial sites and investigators to ensure that the clinical

investigator and all research team members . . ." are complying with the required practices and protocols. *Id.* ¶ 289; *see also id.* ¶ 165. Given the alleged widespread enrollment irregularities at Dr. Meyer's site, which prompted one employee of Segal Trials to report the issues directly to the FDA, *see id.* ¶¶ 57–67, it is reasonable to infer that Defendants either were aware of these issues or should have been aware of these issues—and of the falsity of their statements regarding this trial's enrollment and completion—had they been upholding their monitoring duties.

Third, Plaintiffs also have alleged sufficient facts showing that Defendants benefitted in a concrete and personal way from the purported fraud. Although the stock trading allegations noted above are not sufficient to establish motive on their own, they do still permit an inference that Defendants acted with scienter as Defendants did benefit from the purported fraud. *See In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th at 137–138 (requiring the consideration of the circumstantial allegations together with allegations of motive and opportunity); *Koplyay v. Cirrus Logic, Inc.*, No. 13 Civ. 790(CM), 2013 WL 6233908, at *8 (S.D.N.Y. Dec. 2, 2013) (considering allegations of personal gain from stock sales as part of the analysis of circumstantial evidence); *Hutchins v. NBTY, Inc.*, No. CV 10–2159 (LDW) (WDW), 2012 WL 1078823, at *6 (E.D.N.Y. Mar. 30, 2012) (same). In particular, the time proximity between Defendant Mehta's June 16, 2023, sale of stock pursuant to his 10b5-1 plan and the subsequent disclosure of the Form 483 a mere two weeks later suggests that the corrective disclosure may have been intentionally delayed so that the stock sale could occur before the anticipated stock price drop that was likely to result from the disclosure.

The Court acknowledges that Plaintiffs have pleaded no facts specifically alleging that Defendant Mehta engaged in actions to delay the June 29, 2023, corrective disclosure. But in his role as CEO, it can reasonably be inferred that he played a role in determining when to disclose

such information, particularly given that he participated in the shareholders' call on June 29, 2023, to elaborate on the disclosure (along with Defendant Risinger). *See* Defs.' Ex. 6, ECF No. 134-10, at 2. Similarly, although to a lesser degree, Defendant Steinhart also benefitted from selling his stock at an artificially inflated price while the Company failed to disclose the Form 483 to shareholders, and participated in the June 29, 2023, shareholders' call. *See* ECF No. 142-1 ¶¶ 344–45; ECF No. 134-10 at 3.

Weighing these allegations together as it must, the Court finds that they support the conclusion Plaintiffs have pleaded an inference of scienter that is at least as compelling as the non-culpable inference that can be drawn from the proposed third amended complaint. *Tellabs*, 551 U.S. at 314. In so holding, the Court is mindful of the Second Circuit's admonitions that "even securities plaintiffs need not prove their entire case within the confines of the complaint," and that courts must "be careful not to mistake heightened pleading standards for impossible ones." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 161 (2d Cir. 2021). Further, it is mindful that "at a motion to dismiss phase, a tie on scienter goes to the plaintiff." *In re Teva Secs. Litig.*, 671 F. Supp. 3d at 186 (D. Conn. 2023). Taken as a whole, Plaintiffs' allegations demonstrate, for purposes of the pleading stage, that Defendants intended to deceive and defraud their investors with respect to the enrollment and completion status of the TRANQUILITY II trial, on which the Company's future so heavily depended.

### 3. Loss Causation

Finally, the Court holds that Plaintiffs have adequately pleaded loss causation with respect to the June 29, 2023, corrective disclosure, which Defendants do not challenge. Plaintiffs have not, however, adequately pleaded loss causation as to the August 14, 2023, corrective disclosure.

In actions under the PSLRA, plaintiffs have the burden of proving that the act or omission of the defendant "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. §

78u-4(b)(4).  "Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (internal quotation marks and citation omitted).  In other words, "loss causation has to do with the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant."  *Id.* at 174; *see also In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 510 (2d Cir. 2010) (noting that private securities fraud actions are not meant to "provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause").  "The loss causation requirement is intended to fix a legal limit on a person's responsibility, even for wrongful acts."  *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir. 2001) (citation omitted).  To plead loss causation based on a corrective disclosure, a plaintiff must allege that the "misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  *Lentell*, 396 F.3d at 173, 175 ("[T]o establish loss causation, 'a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered." (alteration in original) (citation omitted)).

Defendants do not challenge loss causation as to the June 29, 2023, disclosure.  *See* ECF No. 134-1 at 46–48, Defs.' Reply Br., ECF No. 137 at 14–15; *see also* Defs.' Opp'n to Mot. to Amend, ECF No. 143, at 15 n.7.  Therefore, the Court finds that Plaintiffs have adequately pleaded loss causation for the June 29, 2023, corrective statement.

Defendants do, however, challenge loss causation in relation to the August 14, 2023, alleged corrective disclosure.  As to this latter alleged corrective disclosure, the Court finds that Plaintiffs have failed to establish loss causation because they did not show that any information disclosed on that date provided new details related to the alleged material misrepresentations.

Because the content of the June 29, 2023, corrective disclosure is relevant to the Court's analysis of the August 14, 2023, statements, the Court begins by recounting the June 29, 2023, disclosures. On June 29, 2023, BioXcel issued a Form 8-K that disclosed, for the first time, issues with the TRANQUILITY II clinical trial, including the existence of the Form 483 and Dr. Meyer's fabricated email, and reported that the Company was "in the process of conducting an investigation" into the issues at Dr. Meyer's site including related to protocol adherence and data integrity. *See* ECF No. 142-1 ¶ 236. BioXcel also disclosed a new risk factor indicating that the issues with the TRANQUILITY II clinical trial could impact FDA approval of BXCL501 for the treatment of acute agitation in Alzheimer's patients, that the issues could prevent the FDA from considering the data from the clinical trial, that BioXcel may need to conduct a new trial, and that all of this could have "a material adverse effect on [BioXcel], its financial condition, results of operations and prospects." *Id.* ¶ 237. In considering these statements, Plaintiffs allege that "analysts recognized right away that problems of this magnitude . . . could lead to significant delays, or even the Company's absolute disability, in getting FDA approval for BXCL501 for Alzheimer's and dementia patients." *Id.* ¶ 241.

On August 14, 2023, BioXcel issued a press release announcing a "Strategic Reprioritization." *Id.* ¶¶ 246–47. The press release stated that, "[b]ased on recent events, the Company is not likely to be in a position to meet the milestones required to access additional capital under the [Oaktree and QIA] financing agreements." Additionally, BioXcel issued a Form 10-Q that disclosed a new risk factor noting that "[d]evelopments relating to our TRANQUILITY II Phase 3 trial may impact the timing of our development plans for, and prospects for seeking or obtaining regulatory approval of, BXCL 501…" and that the Company was facing "substantial doubt" about its "ability to continue as a going concern" for a year. *Id.* ¶¶ 248, 253.

Plaintiffs' theory of the case centers around BioXcel's failure to disclose the Form 483. As the Court concluded above, Defendants' March and May 2023 statements regarding clinical trial enrollment and completeness were misleading because they did not reflect that the Form 483 had been issued or that it potentially impacted trial enrollment or completeness. But Defendants disclosed the Form 483 as part of the Company's June 29, 2023, corrective disclosure. In doing so, Defendants recognized that the issues with the trial could inhibit their ability to get FDA approval for BXCL501 and the Company's financial condition moving forward. Further, in the wake of the June 29, 2023, corrective disclosure, financial analysts warned that the TRANQUILITY II trial issues could delay or disable the full clinical trial. *See* ECF No. 142-1 ¶ 241. Thus, it is reasonable to infer that, following the June 29, 2023, corrective disclosure, shareholders were on notice of the potential that the enrollment-related issues discussed in the Form 483 could inhibit or otherwise limit the availability of funding available pursuant to the Oaktree/QIA funding agreement.

Against that backdrop, the August 14, 2023, "corrective disclosure" does not support a finding of loss causation, because "the subject of the fraudulent statement or omission"—here the Form 483 and data integrity issues it presented—had already been disclosed as of the June 29, 2023, corrective disclosure. A finding of loss causation turns on whether Plaintiffs' investment loss was caused by Defendants' material misrepresentation or omission. *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d at 510; *Lentell*, 396 F.3d at 174. But here, the omission was corrected as part of the June 29, 2023, disclosure announcing the Form 483 and its possible implications for the clinical trial. At that point, Plaintiffs were aware that the clinical trial data—and thus the likelihood of any FDA approval—may be in jeopardy. What Defendants reported on August 14, 2023, constitutes an admission that the concerns they had warned about as part of their June 2023

corrective disclosure had, in fact, materialized by August.  While it is regrettable that the August disclosure led to further financial losses for the Company and its shareholders, it does not constitute a corrective disclosure for loss causation purposes because Defendants were not correcting any prior misleading or omitted statements based on its content.  *See DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 459 (S.D.N.Y. Aug. 8, 2018) (where initial reports "let the cat out of the bag" and "[s]ubsequent reports merely confirmed what the market already knew," the later reports were not properly considered corrective disclosures for loss causation purposes).

For these reasons, the Court finds that loss causation is adequately pleaded only as to the June 29, 2023, corrective disclosure.

B.  Count Two: Violation of Section 20(a) of the Exchange Act

Defendants' only argument asserting that Plaintiffs' Section 20(a) of the Exchange Act violation claim should be dismissed relies on Plaintiffs' alleged failure to assert a claim under Section 10(b).  *See* ECF No. 134-1 at 48; *see also generally* ECF No. 143 (addressing only the Section 10(b) claim).  As the Court has determined that Plaintiffs have stated a claim under Section 10(b), and as Defendants assert no other arguments for dismissing Plaintiffs' Section 20(a) claim, Plaintiffs' motion for leave to amend is granted with respect to their Section 20(a) claim.

V.    **CONCLUSION**

For the reasons described herein, Defendants' motion to dismiss is DENIED AS MOOT and Plaintiffs' motion for leave to file the third amended complaint is GRANTED IN PART.  The Clerk shall docket ECF No. 142-1 as the Third Amended Class Action Complaint, though the parties are on notice that Plaintiffs may only proceed in the action as to those statements that this ruling finds were plausibly misleading, and as to damages only with respect to the June 29, 2023, corrective disclosure.  Defendants shall file their answer to the third amended complaint by October 14, 2025.

As the automatic stay on discovery provided in the PSLRA applies only during the pendency of a motion to dismiss, *see* 15 U.S.C. § 78u-4(b)(3)(B), the Court orders the parties to file a joint Rule 26(f) report by October 27, 2025.

**SO ORDERED** at Hartford, Connecticut, this 29th day of September, 2025.

  */s/ Sarala V. Nagala*
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE