**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| TONYA HILLS and OKLAHOMA LAW ENFORCEMENT RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br>Plaintiff,<br>v.<br>BIOXCEL THERAPEUTICS, INC., VIMAL MEHTA, RICHARD STEINHART, and ROBERT RISINGER,<br>Defendants. | Civil Action No.: 3:23-cv-915<br>The Honorable Sarala V. Nagala<br>The Honorable Robert A. Richardson<br>CLASS ACTION |

**THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION (NEW) .......... 1

II. JURISDICTION AND VENUE .......... 3

III. PARTIES .......... 4

A. LEAD PLAINTIFFS .......... 4

B. DEFENDANTS .......... 4

C. CONFIDENTIAL WITNESSES .......... 6

1. CW1 .......... 6

2. CW2 .......... 8

3. CW3 .......... 10

4. CW4 .......... 11

5. CW5 .......... 12

6. CW6 .......... 13

7. CW7 .......... 13

8. CW8 (NEW) .......... 15

9. CW9 (NEW) .......... 21

10. CW10 (NEW) .......... 22

11. CW11 (NEW) .......... 23

IV. FACTS .......... 25

A. BACKGROUND OF BIOXCEL .......... 25

B. BIOXCEL DECIDED TO REPURPOSE BXCL501 TO TREAT AGITATION IN ALZHEIMER'S PATIENTS .......... 26

C. BIOXCEL ANNOUNCED CLINICAL TRIAL STUDIES TO GAIN FDA APPROVAL OF BXCL501 FOR THE TREATMENT OF ALZHEIMER'S RELATED AGITATION .......... 28

D. THE DETAILS OF BIOXCEL'S PIVOTAL PHASE III CLINICAL TRIAL, TRANQUILITY II ........ 28

E. DEFENDANTS TOLD INVESTORS THAT THE TRANQUILITY II TRIAL WOULD BE USED TO SUPPORT AN sNDA FOR BXCL501 ........ 32

F. BIOXCEL HIRED AN INEXPERIENCED AND UNQUALIFIED PRINCIPAL INVESTIGATOR TO RUN TRANQUILITY II ........ 33

G. BIOXCEL'S FINANCING DEPENDED ON OBTAINING REGULATORY APPROVAL FOR BXCL501 FOR TREATMENT OF AGITATION IN ALZHEIMER'S PATIENTS ........ 35

H. UNDER FINANCIAL PRESSURE, BIOXCEL RUSHED THE TRANQUILITY II PIVOTAL TRIAL ........ 39

I. BIOXCEL HIRED SEGAL TRIALS TO ACCELERATE THE TRIAL (NEW) ........ 43

J. THE FDA'S CLINICAL TRIAL COMPLIANCE REQUIREMENTS ........ 46

1. Bioresearch Monitoring ........ 46

2. A Form 483 and Its Consequences ........ 47

3. A Sponsor's Responsibility ........ 48

K. THE FDA INVESTIGATED DR. MEYER'S TRIAL SITE AND ISSUED A FORM 483 ........ 49

L. DR. MEYER FABRICATED AN EMAIL TO HIDE A SECOND UNREPORTED SAE ........ 53

M. DR. MEYER'S RESPONSE TO THE FDA (REVISED) ........ 54

N. PLAINTIFFS' EXPERT'S CONCLUSIONS REGARDING THE IMPLICATIONS OF THE FORM 483 AND THE MEYER RESPONSE ........ 58

O. POST CLASS PERIOD EVENTS CONFIRM THAT THE TRANQUILITY II STUDY CANNOT BE USED TO SUPPORT AN sNDA FOR BXCL501 (NEW FACTS ADDED) ........ 60

V. THE TRUTH IS REVEALED ........ 67

A. JUNE 29, 2023 ........ 68

B. AUGUST 14, 2023 ........ 72

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ........ 76

A. MARCH 9, 2023: TRANQUILITY II TRIAL WAS "FULLY ENROLLED" (NEW FACTS ADDED) ... 76

B. MARCH 16, 2023: "PATIENT ENROLLMENT IS COMPLETE FOR TRANQUILITY II." (NEW FACTS ADDED) ... 77

C. MARCH 16, 2023: RISK DISCLOSURE ABOUT THIRD PARTY COMPLIANCE WITH LEGAL AND REGULATORY DUTIES (NEW FACTS ADDED) ... 78

D. MARCH 16, 2023: STATEMENT THAT BIOXCEL HAD ENOUGH CASH FOR THE NEXT TWELVE MONTHS ... 80

E. MAY 9, 2023: STATEMENT THAT THE TRANQUILITY II TRIAL "IS COMPLETED" (NEW FACTS ADDED) ... 83

F. JUNE 8, 2023: STATEMENT REGARDING TRANQUILITY II BEING USED TO SUPPORT AN sNDA FOR BXCL501 ... 84

VII. SCIENTER ALLEGATIONS ... 85

A. THE INDIVIDUAL DEFENDANTS KNEW, OR RECKLESSLY DISREGARDED, THAT THEIR STATEMENTS WERE FALSE AND MISLEADING (REVISED) ... 86

1. BioXcel Pushes for an Expedited Trial (NEW) ... 87

2. The Form 483 Letter ... 88

3. The Meyer Response to the Form 483 ... 90

4. BioXcel's Failure to Timely Receive an EIR (REVISED) ... 91

5. Defendants' Experience with Clinical Trials ... 92

6. The FDA Forced Defendants to Repeat TRANQUILITY II ... 94

7. BioXcel Updated Its Risk Disclosures in August 2023 ... 94

8. The Success and Funding of the Company Depended on Approval for BXCL501 for Alzheimer's Patients ... 95

9. Discussions with Analysts About TRANQUILITY II Trials ... 95

10. Defendants Mehta's and Risinger's Hands-On Involvement (NEW FACTS ADDED) ... 97

B. MOTIVE AND OPPORTUNITY ... 98

1. Funding from Investors ... 98

2. Unusual and Suspiciously Timed Insider Sales and Bonuses Tied to Performance ........ 99

a. Defendant Mehta ........ 101

b. Defendant Steinhart ........ 104

VIII. CLASS ACTION ALLEGATIONS ........ 105

IX. PRESUMPTION OF RELIANCE ........ 107

X. INAPPLICABILITY OF STATUTORY SAFE HARBOR ........ 109

XI. LOSS CAUSATION ........ 109

XII. COUNTS ........ 110

XIII. PRAYER FOR RELIEF ........ 113

XIV. DEMAND FOR TRIAL BY JURY ........ 114

Lead Plaintiffs Tonya Hills ("Hills") and the Oklahoma Law Enforcement Retirement System ("OLERS"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, allege the following upon personal knowledge as to Lead Plaintiffs and Lead Plaintiffs' own acts, and information and belief as to all other matters. Lead Plaintiffs' information and belief is based upon, *inter alia*, Lead Counsels' investigation, which included review and analysis of: (a) regulatory filings made by BioXcel Therapeutics, Inc. ("BioXcel," "BTAI", or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases, presentations and media reports issued and disseminated by the Company; (c) analyst and media reports concerning BioXcel; (d) other public information regarding the Company; (e) investigative interviews with former BioXcel employees having first-hand knowledge of the Company's business operations; and (f) consultation with industry experts experienced in clinical trials. This action asserts claims arising under the United States securities laws on behalf of all investors who purchased the common stock of BioXcel during the Class Period of March 9, 2023 through August 11, 2023, both dates inclusive.

Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION (NEW)

1. This is a securities fraud action concerning a biotechnology company, BioXcel, which had pinned its future on commercializing a single product: BXCL501. In fact, BioXcel's funding from two third-party investors depended on obtaining FDA approval to market BXCL501 as a treatment for agitation in Alzheimer's patients.

2. BioXcel embarked on a pivotal Phase III trial, TRANQUILITY II, which it planned to use to support a supplemental new drug application ("sNDA") to market BXCL501 to Alzheimer's patients. However, BioXcel's dire financial condition meant that the Company

needed to get BXCL501 on the market as fast as possible. Consequently, according to former employees of BioXcel, the Company engaged Segal Trials to manage TRANQUILITY II because of its ability to expedite the trial. The pressure that BioXcel placed on Segal Trials to complete the trial fostered an environment where regulatory violations were committed for the sake of expediency. Confidential witnesses who worked at Segal Trials reported multiple instances of misconduct, including manipulation of patient enrollment data and the artificial induction of agitation.

3. During the course of the trial, the U.S. Food and Drug Administration (the "FDA") audited the trial's key test site where 40% of enrolled patients (i.e., 60 patients) were being evaluated. Dr. Caitlin Meyer, an inexperienced investigator who had never before overseen a clinical trial, served as the principal investigator of the trial site.

4. Following an investigation that included eight site visits over the course of two weeks, the FDA concluded that Dr. Meyer had committed serious protocol violations. Among other transgressions, she enrolled patients in the study: (i) before determining whether they met the inclusion and exclusion criteria, (ii) without obtaining proper informed consent, and (iii) without properly administering urinalysis tests. These violations were summarized in a Form 483, dated December 21, 2022. *See* Exhibit A, attached hereto. In addition, it was later discovered that Dr. Meyer lied to the FDA during the course of the investigation by fabricating an email in an attempt to demonstrate that she had timely reported a serious adverse event, when in fact she had not.

5. Dr. Meyer responded to the FDA's Form 483 on January 13, 2023 (the "Meyer Response" or "Response"). *See* Exhibit B, attached hereto, and *infra* ¶¶ 147-163. Her response confirmed that four patients did not provide proper informed consent; three patients were not

properly tested for drug and alcohol use prior to the study; and up to 25 patients were not properly evaluated for having Alzheimer's Disease prior to enrollment. As a result, data generated by these patients would be excluded from analysis in any sNDA submitted to the FDA. Indeed, now more than 18 months following Dr. Meyer's response to the FDA, the FDA has never closed out its investigation that resulted in the Form 483, and BioXcel is in the midst of repeating TRANQUILITY II, which it now calls TRANQUILITY In-Care.

6. Despite knowing these facts, Defendants assured analysts and investors that the study was progressing as planned, and BioXcel would be able to satisfy the regulatory milestones necessary to obtain funding to continue operations. Defendants waited six months to disclose the truth to investors, and timed the disclosure deliberately to allow BioXcel's Chief Executive Officer ("CEO"), Defendant Vimal Mehta ("Mehta") to realize millions of dollars in gains from exercising his options pursuant to a trading plan that had pre-established when these transactions would occur.

7. Investors, in contrast, who had been told by Defendants that BXCL501 was well on its way to regulatory approval, were stunned to learn that the trial data was virtually useless, and suffered hundreds of millions of dollars in losses as the price of BioXcel stock plummeted.

## II. JURISDICTION AND VENUE

8. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)).

9. Pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, this Court has jurisdiction over the subject matter of this action.

10. Pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), venue is proper in the Judicial District. Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

11. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. LEAD PLAINTIFFS

12. Lead Plaintiff Hills is an experienced individual investor. Hills resides in Tampa, Florida, and possesses a bachelor's and master's degree in psychology from Auburn University, as well as a Juris Doctor from Stetson Law School. She has a personal real estate portfolio and also serves as President of Spencer Farms, Inc., which is a land development company. As set forth in the certification previously filed with the Court (ECF No. 30), Hills purchased shares of BioXcel common stock at artificially inflated prices during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws and false and/or misleading statements and/or material omissions alleged herein.

13. Lead Plaintiff OLERS is a defined benefit pension fund headquartered in Oklahoma City, Oklahoma, that administers retirement benefits on behalf of members of the law enforcement profession of the state of Oklahoma and their families. OLERS manages approximately $1.07 billion in assets. As set forth in the certification previously filed with the Court (ECF No. 29), OLERS purchased shares of BioXcel common stock at artificially inflated prices during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws and false and/or misleading statements and/or material omissions alleged herein.

### B. DEFENDANTS

14. Defendant BioXcel was incorporated under the laws of Delaware on March 29, 2017, and its headquarters are located in New Haven, Connecticut. BioXcel was spun off from

BioXcel Corporation, which was formed in 2006. BioXcel's common stock was first publicly traded in 2018, and it trades under the symbol "BTAI" on the NASDAQ exchange. The Company raised approximately $60 million in its initial public offering ("IPO"). In addition, the Company has secured an additional $500 million in funding through private sources.

15. Defendant Vimal Mehta has served as BioXcel's CEO since May of 2017. Defendant Mehta co-founded BioXcel Corporation, and has served as its Chairman of the Board since 2005 and its CEO since September 2014. As of September 30, 2023, Defendant Mehta, through his ownership of BioXcel LLC, beneficially owns approximately 31.5% of the Company. Some of Defendant Mehta's other positions include Senior Vice President of Business Development at Inpharmatic Ltd. and Jubilant Life Sciences and Business Development Management at CuraGen Corporation. Defendant Mehta has a Ph.D. in chemistry from the University of Delhi, India and completed a Post-Doctoral Fellowship in chemistry at the University of Montpellier, France.

16. Defendant Richard Steinhart ("Steinhart") has served as the Company's Senior Vice President and Chief Financial Officer ("CFO") since October of 2017. Prior to joining BioXcel, Steinhart served as Vice President and CFO at Remedy Pharmaceutics and Senior Vice President of Finance and CFO of Mela Sciences. Steinhart has also served as an independent consultant to biotechnology and medical device companies. Steinhart is a member of the Board of Directors of Actinium Pharmaceuticals, Inc. and Atossa Genetics, Inc. He has B.B.A. and M.B.A. degrees from Pace University.

17. Defendant Robert Risinger ("Risinger") has served as the Company's Chief Medical Officer ("CMO") of Neuroscience since May of 2021. Risinger has also served as the Senior Vice President of Clinical Development at BioXcel from December of 2018 to May of

2022. Prior to that, Risinger served as Vice President of Clinical Development at NeuroRx Pharmaceuticals and as the Senior Medical Director of Clinical Development at Alkermes. Additionally, he held roles at Bristol Myers Squibb, Ortho-McNeil Janssen Medical Affairs, and Johnson & Johnson. Risinger has a B.S. in Chemistry and Biology from Allegheny College and an M.D. from the University of Pittsburgh School of Medicine. The FDA lists Defendant Risinger as the "Study Chair" for the TRANQUILITY II clinical trial. According to his biography on BioXcel's website, "Dr. Rob Risinger has extensive experience leading clinical development from first in human through Phase 1-4 clinical trials to create a successful commercial product. His expertise includes designing and executing high quality translational studies within Phase 1 and 2 that provide insight and rapidly navigate development to successful registration trials."

## C. CONFIDENTIAL WITNESSES

### 1. CW1

18. CW1 worked at BioXcel from November 2020 to October 2023. From November 2020 to October 2022, CW1 was an Executive Director and Head of Medical Science Liaisons at BioXcel Therapeutics. CW1 then became a Medical Strategy/Medical Director at BioXcel and served in this position from August 2022 to October 2023.

19. CW1 stated that the clinical trial was being carried out at an investigation site in Florida. CW1 further stated that the principal investigator – Dr. Caitlin Meyer – had never previously been in charge of a clinical trial. While Dr. Meyer was an associate investigator for other principal investigators, she had never run a trial before. CW1 stated that it seemed strange, "that we would put our most important study in the history of the company with a novice, and that 40% of patients would be there."

20. CW1's statements pertaining to Dr. Meyer were confirmed by Dr. Meyer herself in the Meyer Response to the Form 483. Specifically, in her cover letter to the FDA, Dr. Meyer stated:

> I would first like to express my appreciation to Dr. Lyght for conducting the Inspection and providing me with an opportunity ***to better understand my role as a Clinical Investigator and the practical application of the regulations and guidelines that govern the conduct and oversight of human subject research***. . . . As an early career researcher ***conducting my first study as Principal Investigator***, this learning experience has been invaluable and I am committed to carrying the lessons learned as a result of this inspection forward in all career endeavors.

*See* Exhibit B.

21. According to CW1, "there were time pressures, so it was allowed to go. The clinical team was under strict orders that the initial high-level results needed to be in by the end of June, because there were milestones to show investors that the study was wrapped up – that a filing package to the FDA could be prepared with the goal of getting it in to the FDA by the end of 2023 – which meant the data analysis needed to start by July." CW1 stated that, "it was apparent that artificial pressures from senior management put a lot of stress on the clinical team, to find sites and get people enrolled, to meet these deadlines."

22. CW1 stated that there were weekly leadership team meetings at BioXcel, which included Dusan Kostic, Head of Medical Communications Alix Bennett, Head of the Medical Science Liaison ("MSL") team Colin Watson, Head of the Managed Care Field Team Sonja Hockett, and Biostatistician Heather Robinson ("Robinson"). CW1 reported that Robinson's role was technically in medical affairs, but she performed statistical work for clinical teams and would give others updates about how things were going. According to CW1, Robinson would periodically comment that the TRANQUILITY II trial site at Segal Trials was, "trying to get paperwork cleaned up. We're working with them."

23. BioXcel was positioned to received funding from two third party investors, Oaktree Capital Management, L.P. ("Oaktree") and Qatar Investment Authority ("QIA"), based on the Company's ability to achieve regulatory milestones. According to CW1, one of BioXcel's two primary investors "had, for the end of 2023, significant milestones that needed to be met, both for commercial sales and clinical studies." CW1 was told that, "if not completed, either new funding wouldn't be available or, potentially, the company would have to kick back some money." CW1 reported that pressure related to the investor had been "bandied about for most of the whole year, especially because sales numbers were so low." These numbers were discussed on the weekly brand update calls, which were attended by the CEO. CW1 asserted that "it was already kind of known that there was no way [we] were going to be able to meet that important metric, in terms of gross sales volume." According to CW1, that is why there was pressure to get the study done and submit to the FDA.

**2. CW2**

24. CW2 served as a Senior Director of the MSL team at BioXcel from January 2021 to September 2022. CW2 described their function as an MSL as, "pre-approval, we talk to thought leaders or people who are experts in the area of the drug we're getting ready to launch."

25. CW2 retired from BioXcel in September 2022 but was familiar with the TRANQUILITY studies. According to CW2, Defendant Risinger was the person assigned to work with the monitor of the clinical trial site.

26. CW2 stated that the TRANQUILITY studies had been carried out by Segal Trials, which is a company that conducts clinical trials throughout its six research facilities in South Florida. According to CW2, Segal Trials was not a "legit" clinical research operator. CW2 believed the Company "screwed up" by engaging Segal Trials to conduct the TRANQUILITY II study. Specifically, CW2 stated that BioXcel carried out the study, "in a Segal Trials place, instead

of a legit place, where patients already were." The C-suite level executives "thought it was going to be faster, doing it at Segal." When CW2 learned that BioXcel had decided to use Segal Trials, CW2 recalls calling either Defendant Risinger or one of his direct reports and saying, "What happened? I thought we were going with this super legit facility."

27. CW2's observations are confirmed by the Meyer Response which admit that Dr. Meyer had no experience in running clinical trials, and did not have a solid understanding of her "role as a Clinical Investigator." Further, the overall sloppiness with which the TRANQUILITY II study was conducted under Dr. Meyer's leadership – failure to timely report SAEs, failure to document results of tests used to determine inclusion/exclusion criteria, failure to administer drug screening tests during the proscribed time period, failure to obtain proper informed consent – all point to the fact that Segal Trials was not "legit."

28. CW2 reported that prior to the study's launch, the MSL team was looking for a top in-house key opinion leader ("KOL"). A KOL is a trusted, well-respected influencer with proven experience and expertise in a particular field. In healthcare, these thought leaders could be physicians, hospital executives, health system directors, researchers, patient advocacy group members, and more. KOLs in the pharmaceutical industry often consult with clinical trial sponsors in order to help inform clinical trial design. CW2 and their team recommended an Alzheimer KOL, Marc Agronin, from Miami Jewish Hospital. CW2 thought Agronin was perfect because his office was outside a residential facility with a lot of Alzheimer patients. That way, they'd "have a KOL and patients, all in one place." CW2 and her team introduced him to Cedric Burg, BioXcel's former Head of Clinical Operations. According to CW2, "next thing you know, we're ghosted and Cedric's leaving."

29. Having worked in the pharmaceutical industry for 23 years, CW2 has some personal knowledge of the process that triggered issuance of the Form 483 Letter. According to CW2, FDA visits are triggered by red flags, such as "super-fast enrollment or a lack of reporting … or if they're not getting Adverse Event reports." CW2 stated that the FDA usually does not get involved in monitoring clinical trials until companies are close to filings, and therefore something must have triggered the audit that resulted in the Form 483 Letter. CW2 noted that BioXcel would have been in regular communication with the FDA, even before the study began. Meetings between BioXcel and the FDA would have been attended by "[Research and Development ("R&D")] senior leadership, like the CEO and COO, and maybe somebody in commercial would sit in." CW2 stated that "anyone in R&D, under Risinger … legal, of course … and also the regulatory team" would have received the Form 483 letter. Defendant Risinger confirmed that the Company knew about the FDA investigation and Form 483 Letter during the June 29, 2023 analyst call.

30. When it came to financing, CW2's perception was that Defendants, "were always trying to meet with money people. Always, always, always. Always trying to get more money. I had never seen that before. My personal opinion is they were always trying to get money and always bragging about how much money they got, and then they'd pay themselves." CW2 continued that, "[a]ll [Mehta] was interested in was money, money, money, money … It was widely discussed, with some teams."

**3. CW3**

31. CW3 was a Senior Director at BioXcel for two years from 2020 through 2022. CW3 oversaw the drug supply and reported to David Hanley, former senior vice president of global pharmaceutical development and operations, who in turn reported to Defendant Mehta.

32. CW3 was aware of compliance issues at the TRANQUILITY II clinical trial site. CW3 stated, "I'm not surprised it happened, because they went with somebody who gave them the best deal." According to CW3, it was internally known that the principal investigator at the site, i.e., Dr. Caitlin Meyer, "was somebody known to the CEO and others, and they could get a lot of data from them for minimal investment." CW3 had learned this information from an officer of the Company, whom CW3 said is still employed at the Company. CW3 stated that it was common knowledge that the CEO knew the principal investigator.

33. According to CW3, in hiring this principal investigator for the "good deal," "it felt like they were cutting corners. They didn't check much on the reputation of the investigator, and so on." CW3 reported that there was "a lot of skepticism" from a specific BioXcel officer about this principal investigator, i.e., Dr. Meyer. Moreover, concerns about Dr. Meyer were widely held, "with people familiar with the study."

34. CW3 reported he has heard trepidation "a couple times, from a couple different people … just, regarding the study." According to CW3, "there was a lot riding on the study" and one of the concerns surrounding the study was whether the trial was being conducted properly.

35. CW3's observations are confirmed by the Meyer Response which admits that Dr. Meyer had no experience in running clinical trials, and did not have a solid understanding of her "role as a Clinical Investigator."

**4. CW4**

36. CW4 was a former Associate Director of Financial Planning & Analysis ("FP&A") and Head of FP&A at BioXcel from January 2022 through February 2023. CW4 reported "directly to the CFO, with a dotted line to Vice President of Finance, Scott Szilagvi." His day-to-day activities included "regular FP&A reporting, system implements, getting reports composed to budget."

37. According to CW4, the Company was "burning cash." CW4 spoke frequently with his colleagues about the rate the Company was spending cash. CW4 explained that he prepared financials in Excel, and the file was provided to the Vice President of Finance, Scott Szilagyi ("Szilagyi") and the CFO, Defendant Steinhart. CW4 stated, "I used to provide a worksheet of different scenarios, like, if we would get additional funding from Oaktree – or different scenarios. I was just concerned with how much money we spent, compared with what we were getting." These were done at least once a month. If Szilagvi or Steinhart needed something more urgent, CW4 would do an update.

38. CW4 continued: "We were constantly analyzing how much we would get from Oaktree. We wanted to see how long we would last, if we didn't get funded." CW4 would provide Steinhart and Szilagvi with monthly reports on performance and "on an ad hoc basis." According to CW4, Steinhart "wanted to know how long we'd last, with or without investment." CW4 prepared spending reports at least twice a month.

**5. CW5**

39. CW5 was an Executive Director at BioXcel from July of 2020 to April of 2022. CW5 oversaw research programming and worked one level below the Vice President. CW5 served as a "medical monitor on some developmental studies." CW5 "would look at safety data and make look good things that we were writing, for the purposes of conducting studies." CW5 reported directly to Defendant Risinger. CW5 reported that Risinger, "was kind of monolithic" and that "he just ran everything." CW5 also said that Risinger made "all the development decisions … on a microscopic level." According to CW5, Risinger attended meetings with other C-suite level executives "every day."

**6. CW6**

40. CW6 was an Institutional Sales Specialist at BioXcel from November of 2022 to June of 2023.

41. CW6 was part of the sales team that was attempting to sell BXCL501 for its FDA-approved use in patients with schizophrenia and biopolar disorders. CW6 reported that, "as sales people, we were really just trying to get this drug off the ground. But we really didn't have any traction. People weren't interested. We were presenting in ER settings. But there you need immediate sedation – and IGALMI doesn't work for like 30 minutes."

42. CW6 reported skepticism about BioXcel's ability to financially sustain itself. CW6 stated, "[f]rom the beginning, [BioXcel] said they had enough [funding] to sustain until 2023," but CW6 did not believe that. In reference to drug sales, CW6 stated, "they sold a couple boxes here, a couple boxes there." CW6 went on to state, "I was making $165,000 a year. I think most people were making $160,000 a year. I didn't know how they were going to do it. I just kept scratching my head, and immediately started looking elsewhere, because I thought, 'This isn't going to come to fruition.'"

**7. CW7**

43. CW7 was the Head of Chemistry, Manufacturing and Control ("CMC") Regulatory Affairs from July of 2020 to March of 2022. CW7's job entailed making sure that BioXcel manufactures a drug supply "on a timely basis, and that how" it is manufacturing the drug supply adheres to the NDA (New Drug Application).

44. According to CW7, Defendant Mehta was "involved" in choosing sites and vendors for clinical operations. CW7 described Defendant Mehta as "a hands-on CEO. In meetings he always came across as a very hands-on CEO." CW7 stated that company executives "were involved in site selection," and that "compared with other CEOs" CW7 worked with, Defendant

Mehta's involvement in clinical site selection was "more than expected. He was involved." CW7's impression of Defendant Mehta's involvement comes from the fact that they attended several meetings together, and even if he was not present at a meeting, often the other attendees were told, "this is a request from Vimal [Mehta]," and "we have to run it by Vimal [Mehta]." According to CW7, Defendant Mehta was "more hands-on than other CEO's" that CW7 has worked for. According to CW7, "[e]ven the smallest amount of contracts had to be signed off by Vimal [Mehta] or Richard [Steinhart]. I'm not used to that. Usually there's a cap for every position, but not with them. Usually you say, 'This position can approve up to $50,000. This position can approve up to $100,000. But at BioXcel, pretty much every contract had to be signed by Richard [Steinhart] and sometimes by Vimal [Mehta]."

45. CW7 described weekly team meetings. There were weekly minutes issued after every meeting. The meeting was attended by clinical operations, medical affairs, and Chetan Lathia and Rob Risinger. Vice presidents, senior directors and executive directors attended as well. Defendant Mehta was "in and out" but received minutes of these meetings.

46. CW7 reported that, "[t]here was a great deal of interest to start the dementia study. They wanted to get it done quickly. To get the data. That's as far as I heard at meetings. The CEO and the whole board was very active and involved in meetings." CW7 further stated that Defendant Mehta was "interested in this study because it was important to us; important to the company's survival." CW7 explained that there was "always" a discussion about getting clinical trials done quickly. "They wanted to get the work done fast." Further, CW7 stated that "the timeline that [former head of clinical operations] Cedric Burg came up with they pretty much found unacceptable. They wanted it to be done faster, and they found a CRO who would do it with the timeline the CEO expected it to be."

47. CW7 also spoke about Chetan Lathia, who is a Senior Vice President and head of translational medicine, pharmacology and regulatory affairs at BioXcel, and was also "head of preclinical" research. Lathia "had a responsibility" and "made sure the CEO was aware of any changes, or if he thought something couldn't be done or would need a longer timeline, or if a regulatory strategy was devised or changed during a meeting," Lathia "would make sure [Mehta] was aware."

48. CW7 also reported that in March of 2022, "a lot of people" left BioXcel, including Cedric Burg. CW7 stated that, "at small companies, you really have to have a lot of trust in the management, which I didn't, per se."

49. In regard to BioXcel's finances, CW7 reported that there were "rumors going around" and that "there were people that were not happy with how finances were being handled."

**8. CW8 (NEW)**

50. CW8 worked as a Clinical Rater at Segal Trials from February of 2022 until the beginning of October of 2022. Specifically, CW8 worked as a Clinical Rater on the TRANQUILITY II clinical trial, where CW8 administered tests to patients during the enrollment process to evaluate their symptoms of dementia and agitation. CW8 also assessed patients during the trial for symptoms of agitation. For example, according to CW8, "before a patient would get a dose, I would do a rating," meaning that before a patient was administered a dose of BXCL501, CW8 would measure and report their symptoms.

51. CW8 reported working with Dr. Meyer on TRANQUILITY II. Specifically, CW8 reported that after they would assess whether a potential patient had symptoms of dementia or agitation, Dr. Meyer would "redo" CW8's assessment to give patients specific "rates, even if they were untrue." In fact, Dr. Meyer would change a clinical rater's score to falsely indicate that a patient experienced agitation, even when they had not.

52. According to CW8, "principal investigators are not supposed to override a rater in this manner," but "Dr. Meyer wanted to do everyone's job for them to get the results that she wanted." If someone pushed back against Dr. Meyer's fabrication of data, Dr. Meyer "would dismiss them and say 'if you're not going to do it I will.'" If CW8 refused to input Dr. Meyer's fraudulent rating scores, Dr. Meyer would complain that CW8 "was stopping the process" and would also call CW8 "incompetent" and "berate and embarrass" them.

53. One example of Dr. Meyer altering a rater's assessment involved the suicide risk assessment scale, which is used to evaluate suicidal ideation and behavior in patients. If a patient showed a significant risk of suicide, they could not be enrolled in TRANQUILITY II. However, according to CW8, "Dr. Meyer would change the numbers or tell the clinical raters that they were misinterpreting the scale, in order to make it look like a person did not have any [suicide] red flags that would prevent them from being enrolled."

54. CW8 reported that employees at Segal Trials were pressured and incentivized to enroll patients in TRANQUILITY II as quickly as possible. In fact, CW8 reported that Dr. Meyer's main goal was to get more people enrolled in TRANQUILITY II in order to receive promised bonuses. CW8 noted that the employees "were promised a bonus if they made sure the [enrollment] numbers were really good" and that Dr. Meyer would frequently talk about how the employees could win a contest for achieving the highest levels on enrollments. CW8 consistently received emails from management at Segal Trials that noted how many patients were enrolled and how many patients were dosed. These emails offered some award for enrolling a certain number of patients by the end of the week. CW8 said the employees were sometimes offered "gift cards" or a "$200 bonus" and "various incentives." At one point, management at Segal Trials was pushing "everyday" for employees to get enrollment numbers up.

55. CW8 also reported that the employees were told that keeping their jobs was contingent on delivering BioXcel positive results. Dr. Meyer specifically said to CW8 that "if we wanted paychecks, BioXcel needed to get what they wanted," i.e., a fully enrolled TRANQUILITY II trial.

56. CW8 chose to disclose this unethical conduct. First, they reported the misconduct to Segal Trials in a meeting that included Bonnie Segal, the co-founder and president of Segal Trials. However, according to CW8, Segal Trials had already been aware of these issues but had not taken any actions to address them. CW8 then decided to alert the FDA of the misconduct occurring within the TRANQUILITY II.

57. On September 20, 2022, CW8 notified the FDA of "serious concerns" with TRANQUILITY II and "unethical clinical research" that needed to be investigated in order to protect "vulnerable senior citizens and dementia patients." CW8 told the FDA that they "have had face to face contact and witnessed unethical things while enduring intimidation, retaliation, a hostile work environment and more." CW8 reported their concerns to the FDA because these violations "have led and/or may lead and continue to lead to potential harm, injury or worse."

58. CW8 outlined numerous concerns with Dr. Meyer's management of TRANQUILITY II for the FDA. First, CW8 reported that "vulnerable human subjects" in the TRANQUILITY II trial were "being taken advantage of by being enrolled when not even clinically appropriate, which not only endangers that particularly vulnerable person, but also can expose them to injury (whether minimal or fatal)." According to what CW8 told the FDA, this eventually "results in data for purposes that can result in FDA or other government medical agency approval" but this approval would be "based on a lie" and the drug "may not be effective and may even pose a healthy safety issue."

59. CW8 also told the FDA that Dr. Meyer was "fabricating the data and participation of subjects" and "falsifying [] medical records." According to CW8, it seemed like Dr. Meyer was "cooking the books" by "aggressively enroll[ing] subjects into the trial, regardless of the ones who did not meet criteria by not scoring in the appropriate assessment tool range." CW8 reported that "answers to questions would be changed" and "scores would be altered."

60. Moreover, CW8 told the FDA that if they attempted to push-back against Dr. Meyer's fabrication of the results, Dr. Meyer would respond by saying that they were "stopping the process to meet our enrollment goals." CW8 also stated that the staff was "being coerced, intimidated and pressured into partaking in unethical clinical trial practices and procedures."

61. On October 2, 2022, CW8 again spoke to the FDA. This time, CW8 provided more details about the compliance and ethical violations occurring within TRANQUILITY II. CW8 again noted that there were "diagnoses being given that are false or being added to a patient's medical history in bad faith." If a potential subject did not qualify for enrollment in TRANQUILITY II because they lacked a proper diagnosis, Dr. Meyer "stated she could assess them and diagnose dementia easily." For example, CW8 reported that Dr. Meyer would give "a regular dementia diagnosis" to patients who should have been "medically disqualified due to a diagnosis of Parkinson's Disease or Vascular dementia," because their memory loss was not attributable to probable Alzheimer's disease. According to CW8, Dr. Meyer "always found a solution to justify stretching the truth."

62. CW8 also reported to the FDA that Dr. Meyer felt frustrated with a patient "who scored multiple times too low to meet criteria to be enrolled" and was "upset" when an employee kept "reporting results from assessments that did not meet criteria." In these types of instances, Dr. Meyer would step in and "rate[] the subject" herself so the paperwork and data would support

a patient's enrollment in the trial, even if they should not have been enrolled. CW8 reported that Dr. Meyer would often be "taking over, talking to the patient alone" and "doing things outside her scope such as rating."

63. CW8 noted to the FDA that they were "pressured by staff and management to keep going to re-visit previously disqualified subjects due to a diagnosis of having an intellectual disability" and "just give it one more chance" to see if they could be enrolled because "their medical chart aligned perfectly with the meeting criteria" if it weren't for that "pesky diagnosis."

64. CW8 also explained to the FDA that if Dr. Meyer did not like the result of an assessment or scale, she would "complain about the competence of the employee" and would "tell the other staff to cross out things or just cross them out herself." Dr. Meyer would "make edits and/or instruct staff to grab new forms and re-write as she demanded." Dr. Meyer was falsifying data during both the enrollment process and trial.

65. According to CW8, in order to boost enrollment numbers, Dr. Meyer went so far as to purposefully aggravate patients so that they would present symptoms of agitation. CW8 stated that Dr. Meyer directed employees to "get the subject[s] as upset as possible on purpose" in order to fabricate an episode of agitation. CW8 reported that one method of doing this was to "have the patient endure multiple uncomfortable needle sticks to draw blood" while simultaneously asking the patient "to do something cognitively draining such as counting backwards from 82, by threes." Even if the patient refused, employees "were expected to keep trying to upset" the patients by asking complex questions "such as spelling words backwards and rushing them to answer faster or demand answers despite their confusion or stammering searching for a way to respond." After that, a staff member would report that incident and use it as an

opportunity to dose the patient for displaying agitation, even though that agitation had been purposefully fabricated by the employee.

66. Another way that Dr. Meyer would attempt to fabricate episodes of agitation, CW8 told the FDA, was by withholding antibiotics from elderly patients who suffered from UTIs. Agitation is a symptom of UTIs, and according to CW8, "knowing and/or suspecting they were suffering, the doctor would say she was not allowed to treat the patient with antibiotics." Time would go by and patients would suffer with agitation caused by an untreated UTI. According to CW8, the agitation caused by the UTI was "being represented as random incidents of agitation, which would be represented as a reason to warrant dosing."

67. CW8 finished their communication with the FDA on October 2, 2022 by noting that TRANQUILITY II suffered from a "lack of data integrity, lack or and/or need for proper regulatory oversight" and noted that staff regularly undermined "the integrity of the clinical trial process" by "enrolling other subjects who did not meet pre-established criteria."

68. Shortly after speaking with the FDA, CW8's employment at Segal Trials was terminated. They believed this was in retaliation to talking with the FDA.

69. CW8 stated that BioXcel actively monitored the enrollment data and results of TRANQUILITY II. For example, BioXcel would send emails to CW8 and other Segal employees about BioXcel's stock price and note how results from TRANQUILITY II could affect the stock price. BioXcel sometimes sent these emails multiple times a day. CW8 found this odd and wondered what relevance the stock price had to their job. CW8 recalled townhall meetings attended by members of BioXcel. CW8 also reported that Dr. Risinger was present at these meetings and was "Dr. Meyer's mentor."

### 9. CW9 (NEW)

70. CW9 worked as a Clinical Research Coordinator ("CRC") and Rater at Segal Trials from March of 2022 until November of 2022. CW9 worked exclusively on the TRANQUILITY II trial. A CRC manages clinical trials by recruiting patients, collecting data and ensuring compliance with regulatory protocols. A rater is responsible for administering tests to a patient and scoring a patient's condition or response to these tests.

71. CW9 reported that they left Segal Trials in November 2022 because, "I personally didn't feel it was being conducted in an ethical manner, so I started looking for work, and terminated my contract early." According to CW9, "there was just a lot that was being asked that went against GCP [or Good Clinical Practice] guidelines." For example, CW9 stated that Segal Trials was "really fixed on quick enrollment." In fact, the CW9's supervisors would "basically just giv[e] us messaging of: 'get people to enroll in this trial, no matter what it takes. Get people to sign consent, and we can work to make them fit inclusion and exclusion criteria.'" CW9 felt uncomfortable about their supervisor's willingness to engage in regulatory and ethical violations.

72. To motivate employees to increase enrollment in TRANQUILITY II, CW9 reported that, "we would have these competitions between teams, to see who could get the most people enrolled. So there were regular emails, advertising the competition, getting people to work weekends … getting as many people as possible." CW9 received emails "from various people on the project team," pressuring raters to enroll participants in the trial. CW9 stated that these emails came in at least "on a biweekly basis." The emails included "updates and incentives: 'If you stay late, we'll buy the team dinner. If you work weekends,' there were various bonuses." Some of the emails included graphics of racecars to emphasize that they were trying to hit their enrollment numbers quickly. CW9 had never encountered such a competition in their experience in clinical trials, stating "that was very unfamiliar to me."

73. CW9 noted that the pressure to enroll patients was "very high" and spoke to the agreement between BioXcel and Segal Trials. CW9 stated, "the agreement between BioXcel and Segal was that they were going to enroll, I wanna say, like 70% of the trial – which was, honestly, kind of unheard of."

74. CW9 also reported that they felt pressure to change ratings. They explained, "often, there were goals set around patient dosing visits. For patients to receive a dose of medication, they had to present somehow agitated. So it was not uncommon for one to be asked to go back and check the patient again, to see if they got increasingly more agitated. To see if they could dose." CW9 would re-visit patients "typically, at least one to three times."

75. After issuing a rating, CW9 recalled that, "other staff members of the team – other people, who were not raters – asking, 'Are you sure about your rating?' and things like that." These questions made CW9 feel uncomfortable. CW9 brought up their concerns to their to sub-investigator and supervisor. However, these complaints "kind of got dismissed." When CW9 made a comment that "people not in ratings shouldn't comment on my job," an HR complaint was filed against them. CW9 recalled that HR would say, "just don't do it again." CW9 stated that, "I will say, as I was nearing the end of my time there, the more I said and the more uncomfortable I was, the more I was getting HR complaints, basically saying I wasn't being a team player. So that was kind of the final straw…. I was very unhappy, during that time in my life." This was the second such incident with HR. "I was done, after the second one," said CW9.

**10. CW10 (NEW)**

76. CW 10 worked at Segal Trials as a Project & Clinical Rater Director from January 2022 to March 2023. CW10 was an experienced rater who trained other raters in the TRANQUILITY II trial.

77. CW10 stated that they provided Defendant Mehta with updates about TRANQUILITY II "pretty much every week."

78. CW10 worked closely with Defendant Mehta. CW10 reported that Defendant Mehta had known "pretty much everything" about the problems with TRANQUILITY II. CW10 recalled that when the FDA conducted its inspection in 2022, "when the FDA was there, I met with [Mehta] every single day." CW10 further stated that, "from when the inspector was there – [the inspector] would come in mornings, and stay 'til the afternoon, and I'd meet with the BioXcel team starting at like 4:00."

**11. CW11 (NEW)**

79. CW11 worked as a CRC at Segal Trials from April 2022 until August of 2022. CW11 worked on TRANQUILITY II in southern Florida. CW11 described their role as "kind of like a conductor in a band." They would "help with eligibility [and] get patients in with physicians." CW11 reported that even though they were a coordinator for just four months, "it felt like four years," due to "a lot of quality control issues." According to CW11, "it just seemed like what our sponsor wanted from researchers and our sites – it seemed like there was a disconnect" that left "a lot of room for error." The sponsor of TRANQUILITY II was BioXcel.

80. CW11 reported witnessing regulatory violations during the trial. Specifically, CW11 stated, "from my own experience, some of my coworkers were very dishonest, in their reporting." CW11 "saw a nurse practitioner say a patient refused [treatment], when we missed it. It was a deviation. So it was false data. And I called that out." CW11 "saw this more than once" and noted that no one would take "responsibility" for these "untruthful" actions. According to CW11, "there was always an air of, 'this company is shady.'"

81. CW11 also worked with Dr. Meyer and noted that, "be to be honest, her oversight was lacking." According to CW11, Dr. Meyer was "'Capital B' Busy" and "it seemed like she was stretched thin" despite being "new to the company."

82. CW11 experienced "a lot of failing around" within Segal Trials and questioned "has anybody actually done a clinical research study before?" CW11 noted that a lot of people involved in the trial were "very new to clinical research. New to eligibility criteria, and stuff." CW11 felt that the employees at Segal Trials were not properly trained, stating that "we would catch deviations all the time, in the beginning, because they didn't train us to do protocol properly, and proper documentation. Because nobody taught us how to do it properly." CW11 further stated that "every single person on that study, practically, was either new or not experienced in clinical trials. When they were like, 'Hey, you're not doing this correctly,' it became chaotic and overwhelming. It seemed like record-keeping was just abysmal."

83. CW11 reported that the Clinical Research Associate ("CRA") would often notice errors in the paperwork for TRANQUILITY II. A CRA is a healthcare professional in charge of overseeing a clinical trial and ensuring data accuracy and compliance with protocols and FDA regulations. CW11 stated that the CRA "check[ed] our records, check[ed] our notes. And, over time, they were constantly finding things – and consistent errors, so it showed a lack of training."

84. CW11 noted that Segal Trials "did train us, but they did not emphasize how thorough you need to be. You need to be extremely thorough." CW11 recalled that in August of 2022, Segal Trials attempted to do another training but the company still did not "emphasize more on how thorough you needed to be." CW11 felt like "the people doing these records were still making these mistakes and not doing good clinical practice." According to CW11, the people making mistakes were, "my team. Research assistants. The nurse practitioner. The people who

had their signature on the records." CW11 "was constantly finding mistakes. They were very, very careless." CW11 was "so uncomfortable" with their team and even reported that their team "often failed to maintain proper, like, informed consent."

85. In terms of feedback from the CRA, CW11 said, "it seemed like we were doing a lot wrong" and "it just seemed like every month, there was a communication issue." CW11 stated that "it was just very stressful, to not know if you were doing the correct thing, at any time." According to CW11, the CRA was aware that the trial was not being conducted properly, "and they tried to intervene but it seemed like it was falling on deaf ears."

86. CW11 noted that they had been let go after a communication breakdown within their team. CW11 explained, "I would be like, 'we need to fix this, we need to fix that,' and I was getting ignored, and I started distancing myself." CW11 felt like they were often in conflict with my team members, like 'hey I'm trying to help them and I'm getting pushback.' On a personal level I felt like I was getting ostracized by the team." According to CW11, there was "a lot of personal infighting" and "it was a very stressful time. It seemed like nobody knew what they were doing."

## IV. FACTS

### A. BACKGROUND OF BIOXCEL

87. BioXcel is a clinical stage biopharmaceutical company. BioXcel was spun off from BioXcel LLC, which was formed in 2006. The Company was incorporated in Delaware on March 29, 2017. BioXcel's stock was first publicly traded in March of 2018. As of December 31, 2022, it employed approximately 185 full-time employees (including approximately 70 sales representatives). BioXcel announced on August 14, 2023 that it was reducing its employee count to 90. In addition to funding raised in the IPO, Defendant Mehta had raised approximately $500 million in capital to support the Company's R&D and commercial efforts.

88. According to the Company's 10-K for the fiscal year ended December 31, 2022, BioXcel "leverages existing approved drugs and/or clinically evaluated product candidates together with big data and proprietary machine learning algorithms to identify new therapeutic indications."

89. BioXcel boasted that it was using a novel strategy which employed artificial intelligence ("AI") in the drug development process. Specifically, the Company examines drugs that are, or have previously been in, Phase II or Phase III clinical trials and uses AI to find new uses for them. Defendant Mehta consistently lauded this unique process and attempted to differentiate BioXcel from its competitors.

90. BioXcel's entire product line derived from just four chemical compounds. BXCL501 and 502 were chemical compounds used to treat agitation, and BioXcel was looking for new indications for these in various patient populations. BXCL701 and 702 were potential oncology and leukemia therapies. BXCL501 was far ahead of the other three in terms of advancing through the clinical trial process and proceeding towards commercialization.

### B. BioXcel Decided to Repurpose BXCL501 to Treat Agitation in Alzheimer's Patients

91. BioXcel's sole commercially viable product, IGALMI, resulted from the use of AI in the drug development process. Specifically, by using AI, BioXcel was able to identify a new application for dexmedetomidine ("dex"), branded as Precedex, which was originally used as a sedative. BioXcel's newly discovered application for dex is labeled as BXCL501 and is for the acute treatment of agitation associated with neuropsychiatric disorders, such as schizophrenia and bipolar disorder. BXCL501 is an investigational, proprietary, orally dissolving, sublingual thin film formulation of dexmedetomidine, administered under the supervision of a health care provider, that is placed under the tongue or behind the lower lip. The FDA approved BXCL501,

branded as IGALMI, for the treatment of agitation in schizophrenia and bipolar patients in April of 2022.

92. BioXcel touted BXCL501 as one of its two most advanced clinical development programs at the Company. During the 4Q21 earnings call, on March 10, 2022, Defendant Mehta emphasized to investors that BXCL501, one of BioXcel's "lead product candidates," had "shown promising results through clinical development, including publication in prestigious journals, such as JAMA and JITC and we couldn't be more excited for the future of our neuro … franchise[]." Later during that same call, Defendant Mehta stated, "[a]nd as -- just to remind everyone, when we became a public company in March of 2018, we had selected these 2 assets, BXCL 501 and 701. [BXCL501] is very close to approval… So we are super excited for both the assets we have in our portfolio."

93. IGALMI, however, was experiencing minimal commercial success. The first IGALMI sales team was deployed in May 2022. In its Form 10-K for 2022, BioXcel announced that it had "expanded its institutional sales force to 70 representatives in December 2022" with the goal of "driv[ing] awareness" of IGALMI. Despite these efforts, the Company recognized only $375,000 in revenues in fiscal year 2022, $206,000 in revenues in the first quarter of 2023, and $457,000 in revenues in the second quarter of 2023.

94. Notably, CW6, an Institutional Sales Specialist at BioXcel, reported that IGALMI was difficult to sell. CW6 thus expressed skepticism about BioXcel's ability to financially sustain itself. CW6 stated that "[f]rom the beginning, [BioXcel] said they had enough to sustain until 2023." In reference to IGALMI drug sales, CW6 stated, "they sold a couple boxes here, a couple boxes there." CW6 went on to state, "I was making $165,000 a year. I think most people were making $160,000 a year. I didn't know how they were going to do it. I just kept scratching my

head, and immediately started looking elsewhere, because I thought, 'This isn't going to come to fruition.'"

### C. BioXcel Announced Clinical Trial Studies to Gain FDA Approval of BXCL501 for the Treatment of Alzheimer's Related Agitation

95. On December 15, 2021, BioXcel first announced that it had begun to evaluate BXCL501 for the treatment of acute agitation associated with Alzheimer's disease in a press release titled, "BioXcel Therapeutics Initiates Pivotal Phase 3 Program of BXCL501 for Acute Treatment of Agitation in Patients with Alzheimer's Disease."

96. According to this press release, 12 million Americans over the age of 65 are expected to be impacted by Alzheimer's Disease by 2040, and up to 70% of Alzheimer's patients experience agitation, "with an estimated 100 million agitation episodes occurring in the United States every year."

97. The press release further explained that BioXcel's clinical studies would consist of "two randomized, placebo-controlled, adaptive, parallel group pivotal trials" titled TRANQUILITY II and TRANQUILITY III. Defendant Mehta stated:

> We received FDA breakthrough therapy designation for BXCL501 in March 2021 based on our Phase 1b/2 TRANQUILITY study. Following multiple meetings with the FDA, we are pleased to announce the initiation of our Phase 3 program. This marks an important advancement in potentially bringing this novel treatment to the more than 4 million patients, who experience agitation as one of [Alzheimer's Disease's] most devastating symptoms. We are leading the development path for this innovative therapy and are confident in BXCL501's potential to treat acute, as well as intermittent, forms of agitation.

### D. The Details of BioXcel's Pivotal Phase III Clinical Trial, TRANQUILITY II

98. The website clinicaltrials.gov provides details about the TRANQUILITY II study, which is formally called "Dexmedotmidine in the Treatment of Agitation Associated with Dementia," including the key terms of the trial's FDA-approved protocol.

99. The study, which had been designed in consultation with the FDA, would last 12 weeks, during which patients would receive 28 doses of BXCL501. It was designed as a randomized, double-blind, placebo-controlled, parallel group, 3-arm study assessing efficacy, safety, and tolerability of two doses of BXCL501 in patients over 65 years old with acute psychomotor agitation. The study required that 150 patients participate, and be randomly assigned to one of three study groups. 50 patients received a 40µg dose of BXCL501, 50 patients received a 60µg dose of BXCL501, and 50 patients received a placebo. FDA clinical trials are designed to ensure that sufficient numbers of patients are enrolled so that the study is adequately "powered," meaning that conclusions can be drawn about the differences between the test groups and the control groups. If too few patients are enrolled, the study is "underpowered," meaning that no conclusions can be drawn.

100. According to the study protocol, there were 7 specific inclusion criteria, as follows:

- A diagnosis of probable Alzheimer's disease based on the National Institution on Aging and Alzheimer's Association ("NIA-AA") criteria (2018)
- Episodes of psychomotor agitation (e.g., kick, bite, flailing)
- Behaviors that are congruent with the International Psychogeriatric Association criterion for agitation representing a change from that subject's usual behavior
- A score of 15 to 23 on the Mini-Mental State Exam
- Subjects who read, understand, and provide written informed consent, or who have a legally authorized representative to provide consent on their behalf
- Deemed medically appropriate for study participation by the principal investigator and
- Agree to use a medically acceptable and effective birth control method.

101. The protocol required that these criteria had to be measured prior to the start of the study. For example, the Mini Mental State Examination ("MMSE") is an 11-question measure that tests five areas of cognitive function: orientation, registration, attention and calculation, recall and language. It is used as a screening tool for cognitive impairment with older adults. The test must be administered routinely, systematically and thoroughly. For purposes of TRANQUILITY II, the test had to be administered, and all results documented and analyzed, prior to enrollment in the study.

102. Similarly, the protocol required that 2018 NIA-AA criteria for diagnosing Alzheimer's disease be measured for each study subject prior to enrollment, particularly because the diagnosis was based on underlying pathology rather than symptoms. Specifically, a diagnosis of probable Alzheimer's disease requires the presence of amyloid plaques and tau tangles, which are abnormal structures found in the brain. The criteria also include biomarkers of neurodegeneration to help stage the disease. Tests for these criteria include specific types of PET scans and tests that measure amyloid and tau proteins in the fluid part of blood and cerebral spinal fluid. Rather than a patient simply being able to list out symptoms of Alzheimer's disease to receive a diagnosis, the 2018 NIA criteria requires invasive procedures to test for the disease. These procedures had to have been completed prior to enrollment in TRANQUILITY II.

103. In addition to the inclusion criteria, the protocol specified ten specific exclusion criteria, as follows:

- Subjects with dementia or other memory impairment not due to probable Alzheimer's disease
- Clinical diagnosis of probable Alzheimer's disease should not be applied when there is evidence of a cerebrovascular incident temporally related to the worsening of cognitive function
- Subjects with agitation caused by acute intoxication

- Subjects with significant risk of suicide or homicide per the investigator's assessment

- Subjects who are medically unstable or in recovery

- History of clinically significant syncope or syncopal attacks, orthostatic hypotension within the past 2 years, current evidence of hypovolemia, orthosatic hypotension, bradycardia

- Subjects who had a total score of >13 (i.e., high fall risk) on the Johns Hopkins Fall Risk Assessment Tool

- Subjects with laboratory or ECG abnormalities

- Subjects who have received an investigational drug within 30 days prior to Screening and

- Subjects who are currently suffering from substance abuse. Patients with a potential cause for delirium (relatively recent onset agitation and dementia).

104. As with the inclusion criteria, several of the tests to determine if a subject should be excluded from the trial were required to be administered, prior to subject enrollment.

105. For example, the Johns Hopkins Fall Risk Assessment Tool is a test used by medical staff to determine whether an older patient is at a low or high risk of falls. The assessment includes inquiries into a patient's age, fall history, elimination, bowel and urine, medications, patient care equipment, mobility, and cognition. If a patient receives a score of 13 or higher under this test, they are considered to have a high fall risk and should not have been enrolled in TRANQUILITY II. As with other tests, the Johns Hopkins Fall Risk Assessment Tool had to be administered, and its results analyzed, prior to enrollment in TRANQUILITY II.

106. The primary outcome measure of efficacy for TRANQUILITY II was an assessment of the absolute change from baseline in a patient's total score on the "Positive and Negative Syndrome Sale-Excited Component" test ("PEC"). The PEC test examines five behaviors associated with agitation: (1) poor impulse control; (2) tension; (3) hostility; (4)

uncooperativeness; and (5) excitement. Each is scored 1 (minimum) to 7 (maximum). The PEC test is the sum of these five subscales and patients' scores thus range from 5 (absence of agitation) to 35 (extremely severe).

107. The trial's secondary outcome measures were the PEC scales for each patient at each of 30 minutes post-dosing, 60 minutes post-dosing and 120 minutes post-dosing.

108. TRANQUILITY II was first registered with clinicaltrials.gov on February 28, 2022. On July 25, 2023, BioXcel requested a two-year extension of time to submit its result to clinicaltrials.gov. BioXcel has never submitted its results to clinicaltrials.gov, indicating that the results of the trial have never been finalized.

### E. DEFENDANTS TOLD INVESTORS THAT THE TRANQUILITY II TRIAL WOULD BE USED TO SUPPORT AN sNDA FOR BXCL501

109. Defendants launched TRANQUILITY II and TRANQUILITY III with the intention of using the data from both of these trials to support an sNDA application for the use of BXCL501 to treat agitation in patients with Alzheimer's disease. Defendants confirmed these intentions to BioXcel's investors during earnings calls and conference calls.

110. For example, during BioXcel's 1Q22 Earnings Call on May 9, 2022, Defendant Mehta told investors that:

> Our TRANQUILITY program for the acute treatment of agitation in patients with Alzheimer's disease is advancing well with first patient dosing in our TRANQUILITY II trial announced last week, we have designed an innovative strategy to rapidly enroll patients with top line data expected in the fourth quarter of 2022 or early next year.
>
> This, along with TRANQUILITY III patient enrollment initiating in the second half of the year, is helping position the franchise for our supplemental NDA sNDAs. We believe 501 may provide an effective treatment option for Alzheimer's disease-related agitation and indication for which despite an estimated 100 million episodes per year in the U.S. there are no FDA-approved therapies.

111. A few days later, on May 12, 2022, during the Bank of America Healthcare Conference, Defendant Mehta was asked, "[y]ou recently initiated dosing in the TRANQUILITY trial in Alzheimer's. What are your expectations from this indication and the opportunity there for IGALMI?" Mr. Harrison was referring to the newly launched TRANQUILITY II trial. Defendant Mehta responded:

> We have 2 trials ongoing. One is in the ALF when the dementia for the Alzheimer is in more mild state and their frequency may not be that much, which we are conducting the trial. We initiated that trial. We are already at first patient dose. and it's progressing very rapidly, and we plan to announce our data in Q4 or early next year.
>
> The second part of the trial is in the nursing home. These are the patients who have more moderate or more severe agitation, and they get more episodes, frequency of episode is different. So that's what we are capturing with our second Phase III trial. So overall, like trial design is done so that we can get the label for episodic as well as chronic intermittent. And that's what we are trying to do. ***And we are moving as fast as we can to build our case for the supplemental sNDA.***

112. Then, on August 9, 2022, during BioXcel's 2Q22 earnings call, Defendant Mehta referred to the TRANQUILITY trials when he stated that the "Alzheimer's program is progressing, and we will be ready to file an sNDA in that program after completion of 2 pivotal trials."

### F. BioXcel Hired an Inexperienced and Unqualified Principal Investigator to Run TRANQUILITY II

113. BioXcel engaged Segal Trials to conduct a portion of the TRANQUILITY II trial. Dr. Caitlin Meyer was the principal investigator of a site based in South Florida where 40% of patients enrolled in TRANQUILITY II were being treated and observed. Dr. Meyer began working on TRANQUILITY II in early 2022.

114. Dr. Meyer was born in 1989. She graduated from the University of Texas Southwestern Medical Center in 2016. She became a licensed Florida medical doctor on or about February 16, 2021, holding license number ME148998. She was previously licensed as a Limited

Physician (LP03581) and CSR-Limited Physician (CLP03581) in Rhode Island, but these licenses have expired.

115. Importantly, the American Board of Psychiatry and Neurology only certified Dr. Meyer as a psychiatrist on September 12, 2022, months ***after*** her involvement with TRANQUILITY II began. On or about this time, Segal Trials announced her certification on its LinkedIn page, describing Dr. Meyer as "our newest Principal Investigator." However, Dr. Meyer's involvement with TRANQUILITY II started months prior, as evidenced by the Meyer Response. Despite this, Dr. Meyer was the principal investigator of the TRANQUILITY II study, which required application and analysis of complicated and sophisticated tests to determine whether patients met the inclusion/exclusion criteria for the TRANQUILITY II study and to measure their agitation levels.

116. Dr. Meyer's publicly available professional biographies indicate that her areas of experience include depression, anxiety, women's mental health and ADHD.

117. In the Meyer Response, provided by Dr. Meyer to the FDA on January 13, 2023 (attached hereto as Exhibit B), Dr. Meyer speaks about her inexperience:

> I would first like to express my appreciation to Dr. Lyght for conducting the Inspection and providing me with an opportunity ***to better understand my role as a Clinical Investigator and the practical application of the regulations and guidelines that govern the conduct and oversight of human subject research***. . . . As an early career researcher ***conducting my first study as Principal Investigator***, this ***learning experience*** has been invaluable and I am committed to carrying the lessons learned as a result of this inspection forward in all career endeavors.

118. Thus, Dr. Meyer herself admitted to the FDA that she did not have a thorough "understand[ing of] her role as a Clinical Investigator," and that she was "conducting [her] first study as Principal Investigator." She viewed the TRANQUILITY II trial as a "learning experience."

119. Dr. Meyer's incompetence and inexperience are also evident by the way she handled the enrollment of patients. While it is possible that tests were administered to patients prior to enrollment to determine that they met the inclusion and exclusion criteria, the Meyer Response makes clear that there was no effort to evaluate the results of those tests for at least 25 patients before concluding that those patients had a diagnosis of probable Alzheimer's Disease prior to enrollment. It was not until after the FDA pointed out this glaring error that Dr. Meyer went back, analyzed the test results, and added notes to the patient files – all months after the tests had been administered and the patients enrolled.

### G. BIOXCEL'S FINANCING DEPENDED ON OBTAINING REGULATORY APPROVAL FOR BXCL501 FOR TREATMENT OF AGITATION IN ALZHEIMER'S PATIENTS

120. BioXcel's IGALMI was the only product that the FDA had approved for sale, but as of the Class Period it had yielded little revenue, as the patients it was indicated for – schizophrenia and Bipolar disorders – were slow to adopt it. With little to no revenue coming in from the sales of IGALMI, there was virtually nothing to sustain the Company's operations.

121. The dismal revenues from IGALMI created significant pressure for BioXcel to secure its new indication for BXCL501. Not only did it need to boost its revenue stream, but it was forced to rely on private loans to fund its commercial and developmental efforts, and disbursement of these funds, in turn, depended on BioXcel clearing regulatory hurdles for BXCL501's use in Alzheimer's and dementia patients.

122. On April 19, 2022, the Company issued a press release which disclosed that it had entered into an agreement for "$260 million strategic financing with Oaktree and Qatar Investment Authority." In the same press release, BioXcel highlighted that this "extends [the] Company's cash runway into 2025."

123. In its Form 10-K filed with the SEC on March 16, 2023, the Company further stated:

> In April 2022, we entered into financing agreements with affiliates of Oaktree Capital Management, L.P. and Qatar Investment Authority that provides for up to $260 million in gross funding to support the Company's commercial activities of IGALMI sublingual film and the expansion of clinical development efforts of BXCL501, which includes a Phase 3 program for the acute treatment of agitation in patients with Alzheimer's disease, and for general corporate purposes.
>
> On April 19, 2022 (the "Effective Date"), the Company entered into two strategic financing agreements: (i) a Credit Agreement and Guaranty (the "Credit Agreement") by and among the Company, as the borrower, certain subsidiaries of the Company from time to time party thereto as subsidiary guarantors, the lenders party thereto (the "Lenders"), and Oaktree Fund Administration LLC ("OFA") as administrative agent, and (ii) a Revenue Interest Financing Agreement (the "RIFA"; and together with the Credit Agreement, the "OFA Facilities") by and among the Company, the purchasers party thereto (the "Purchasers") and OFA as administrative agent. Under the OFA Facilities, the Lenders and the Purchasers agreed to, in the aggregate between the two OFA Facilities, provide up to $260,000 in gross funding to support the Company's commercial activities of IGALMI sublingual film. In addition, the OFA Facilities are intended to support the expansion of clinical development efforts of BXCL501, which includes a Phase 3 program for the acute treatment of agitation in patients with Alzheimer's disease, and for general corporate purposes. The Lenders and Purchasers are comprised of affiliates of Oaktree Capital Management, L.P. and Qatar Investment Authority.

124. This strategic financing agreement consisted of the following: (1) a Credit Agreement and Guaranty dated April 19, 2022 in the amount of up to $135 million (the "Credit Agreement"), (2) a Revenue Interest Financing Agreement in the amount of up to $120 million, and (3) rights to purchase shares of the Company's stock in the amount of approximately $5 million.

125. Pursuant to the Credit Agreement, Oaktree and Qatar agreed to loan BioXcel up to $135 million in senior secured term loans to be released in tranches bearing an annual interest rate of 10.25% payable quarterly. The $135 million was divided into three "tranches" referred to as Tranche A, Tranche B, and Tranche C. Tranche A comprised the first $70 million commitment,

Tranche B comprised a second $35 million commitment, and Tranche C comprised a third and final $30 million commitment.

126. Under the Credit Agreement, BioXcel was required to meet several milestones before the funds would be released. Specifically, Tranche A ($70 million) was accessible within 30 calendar days after the Company's receipt of approval from the FDA of an NDA with respect to BioXcel's BXCL501 product for the acute treatment of agitation associated with schizophrenia or bipolar I or bipolar II disorder. This had been accomplished with the FDA's approval of IGALMI, which was received on April 5, 2022. The $70 million in funding was thereafter released to the Company on April 28, 2022.

127. BioXcel could access the Tranche B funding of $35 million under the Credit Agreement prior to December 31, 2024, only "upon satisfaction of certain conditions, including receipt of certain regulatory and financial milestones." According to the Credit Agreement, ***the "regulatory" milestone included "BXCL 501 FDA Alzheimer's Approval," meaning "the receipt of approval from the FDA of an NDA in respect of the use of BXCL 501 for the acute treatment of agitation associated with Alzheimer's Disease***."

128. BioXcel could access the Tranche C funding of $30 million under the Credit Agreement prior to December 31, 2024, upon satisfaction of certain other conditions, which presupposed FDA approval of the BXCL501 sNDA. Specifically, the Company had to achieve a "specified minimum net sales of the Company attributable to sales of BXCL501 for a trailing twelve consecutive month period" in order to unlock Tranche C. The Credit Agreement did not disclose the net sales required for Tranche C funding, stating instead that BioXcel needed to certify "that net sales of the Borrower attributable to sales of BXCL 501 for the trailing twelve (12) consecutive month period exceed $[***]. For avoidance of doubt, if the product is out licensed in

ex-U.S. jurisdictions (such as the European Union), in such a case the calculation of such trailing twelve-month net sales will include the net royalties received by the Borrower on BXCL 501 net sales in such jurisdictions from the licensee."

129. With regard to the Revenue Interest Financing Agreement, BioXcel was to be provided access to $120 million, again to be released in tranches, for the near-term commercial activities of IGALMI, the development and commercialization of BXCL501, and other general corporate purposes. In lieu of interest payments, the Company will pay royalties ranging from 7.75% to 0.375% on net sales of BXCL501 in the U.S., subject to a cap of 175%.

130. The first tranche consisted of $30 million, and was available upon FDA's approval of IGALMI. The funds were released to the Company on July 8, 2022.

131. The remaining two tranches under the Revenue Interest Financing Agreement also required BioXcel to meet specified milestones, which included FDA regulatory approval of the sNDA for BXCL501 and specified minimum net sales of BXCL501 which could only be achieved if the sNDA was approved and BXCL501 was sold commercially to treat Alzheimer's patients.

132. During the 1Q22 earnings call on May 9, 2022, Defendant Mehta stated that BioXcel, "announced a $260 million strategic financing with Oaktree Capital and Qatar Investment Authority." Defendant Mehta continued, "[f]ull execution with financing will extend our cash runway into 2025…" A longer cash runway meant that BioXcel had more opportunity to pursue the development and commercialization of new drugs. As such, analysts paid attention to the cash runway projections from BioXcel. For example, in an analyst report dated May 11, 2022, UBS wrote that BioXcel's "recently announced $260mn in financing (Oaktree/Qia) provides a meaningful cash runway" and that it would take the company through new drug development which was "the sentient element of [UBS's] buy thesis."

133. But the strategic financing agreements dictated that BioXcel was only eligible to receive additional funding tranches once it satisfied certain conditions, including receipt of certain regulatory milestones associated with the TRANQUILITY II and TRANQUILITY III trials, and reaching specified minimum net sales attributable to sales of BXCL501 for a trailing twelve consecutive month period. Thus, BioXcel's liquidity, financial strength, and ultimate success depended on its ability to, first, secure FDA approval for BXCL501's new indication in Alzheimer's patients that would provide access to the Tranche B funding under the Credit Agreement and Guaranty and then, second, sell BXCL501 to Alzheimer's patients to meet the net sales requirements that would provide access to the Credit Agreement and Guaranty's Tranche C funding.

134. CW1, who was an Executive Director and Head of MSL at BioXcel until October 2023, stated that "there were milestones to show investors" that studies associated with the commercialization of BXCL501 for Alzheimer's and dementia patients were "wrapped up" by the end of 2023. Thus, the Company needed "high-level results" from the TRANQUILITY trials by the end of June. CW1 reiterated that BoXcel's two primary investors required "for the end of 2023, significant milestones" to be met, "both for commercial sales and clinical studies."

135. CW4, who was the head of BioXcel's FP&A group from January 2022 through February 2023, described the dire financial condition of the Company, stating it was "burning cash" and "constantly analyzing how much" additional funding it could get from private investors such as "Oaktree." It "wanted to see how long [it] would last if [it] didn't get funded."

### H. UNDER FINANCIAL PRESSURE, BIOXCEL RUSHED THE TRANQUILITY II PIVOTAL TRIAL

136. An analysis of the Company's publicly-reported financial information reveals that the Company was "burning through cash," as CW 4 stated. A summary of the Company's

quarterly short-term assets (in the form of cash and cash equivalents), total operating expenses, and cash flows is shown below:




137. Not only was the Company not profitable even after IGALMI's approval, but in fact it began hemorrhaging cash as it ramped up its sales efforts and embarked on the TRANQUILITY studies. In its Form 10-Q filed with the SEC on May 9, 2023, the cash flow statement shows that the funds from the first tranche of the strategic financing agreement had been fully accounted for, as of March 31, 2023. The Company recorded a net decrease of cash and cash equivalents in the amount of $28,204,000 for the three months ended March 31, 2023.

138. In its cash flow statement contained in the Form 10-Q filed with the SEC on August 14, 2023, the Company recorded a net decrease in cash and cash equivalents of $66,180,000 for the six months ended June 30, 2023.

139. BioXcel's dire financial condition and need to deliver data by specific deadlines from its TRANQUILITY trials to access the necessary funding from Oaktree and QIA caused Defendants to make costly mistakes. Principally, BioXcel engaged Segal Trials, a second-rate clinical trial company because it believed that this company would enable it to speed up the TRANQUILITY II and III trials. Segal Trials is a privately held network of six research sites in Florida conducting Phase I-IV research trials.

140. The principal investigator at the Segal Trials site in North Miami, where the TRANQUILITY II trials occurred, was an inexperienced investigator, Dr. Caitlin Meyer. In fact, she had never before overseen a clinical trial. Despite this, she became the principal investigator on TRANQUILITY II and was charged with enrolling and overseeing 40% of the patients enrolled in the study.

141. The Company's former employees confirmed that the Company's dire financial situation and need to satisfy its lenders explained Defendants' choice of Segal Trials and Dr. Meyer to conduct TRANQUILITY II. As reported by CW1, CW2, and CW4, Defendants placed an exceptional amount of significance on receiving financing. According to CW1, Defendants created pressure to get the TRANQUILITY trials done quickly in order to meet regulatory milestones that would ensure the receipt of funding. CW1 stated that, as of 2023, pressure related to these financers had been "bandied about for most of the whole year" and these numbers were consistently discussed in weekly brand update calls, where Defendant Mehta was present. CW2 reported that Defendants were abnormally concerned with money. According to CW2, Defendants were always trying to meet with money people and get more money. Moreover, as reported by CW4, Defendants were constantly analyzing how much they could get from Oaktree and how long BioXcel could last if it did not get the funding.

142. Defendants were also under pressure to keep their promises to the larger investing community. They were acutely aware that analysts and investors were eagerly awaiting positive news from the TRANQUILITY trials. Their exuberance fueled lofty stock valuations throughout most of the Class Period, when the stock traded above $30 per share for significant stretches.

143. Analyst reports reflected this enthusiasm. For example, on March 14, 2022, an analyst report issued by Berenberg Capital Markets stated that "[w]ith such broad application potential, BXCL501 could have blockbuster opportunity if it proved efficacy and received approval in all of the indications." Likewise, on May 10, 2022, an analyst report issued by Berenberg Capital Markets stated that "[o]btaining expanded labeling for BXCL501 as a potential treatment for three other neuropsychiatric disorders including agitation in dementia … could expand the market opportunity significantly." Also, December 5, 2022, an analyst report issued by Canaccord Genuity stated that, "[w]e await key data from the TRANQUILITY II Phase 3 for Igalmi in the acute treatment of agitation in Alzheimer's disease (AD) in 1H23. This indication, for which there are no currently approved products, presents a significantly larger market opportunity than Igalmi's approved indication."

144. On May 11, 2023, HC Wainwright issued an analyst report that noted BioXcel's revenue miss but states, "[d]espite the lackluster recent revenue data, we believe that investor focus remains on near-tear clinical data releases for BXCL501 (the original code designation for IGALMI), which could support label extensions into multiple additional niches that may drive considerable revenue accretion." On June 1, 2023, an analyst reported issued by Canaccord Genuity noted that, "[a] positive outcome on TRANQUILITY II would bolster investor confidence and be good for the company AND that stock."

145. In fact, the development of BXCL501 for the treatment of dementia related agitation was so important to investors that it overshadowed the news of IGALMI being approved for the treatment of agitation associated with schizophrenia or bipolar I or II disorder on April 6, 2022. For example, on April 6, 2022, an analyst report issued by UBS stated that, "[w]hile the approval of Igalmi is a big moment for the company and an incremental positive for the Buy thesis, the key to upside and central tenet of our Buy thesis is the opportunity in Alzheimer's dementia (data in '23)." The report went on to label "Phase 3 TRANQUILITY II data" as a key upcoming event. Also on April 6, 2022, an analyst report issued by Guggenheim acknowledged the approval of IGALMI but then went on to state that: "We also note that approval in other indications (e.g., Alzheimer's agitation) could facilitate an out-patient dosing, which could be a big deal for the drug as it would represent a much larger market opportunity and a bit different reimbursement dynamics.".

### I. BioXcel Hired Segal Trials to Accelerate the Trial (NEW)

146. As reported by CW2, despite the fact that Segal Trials was not a "legit" clinical research operator, BioXcel still engaged the company to manage a significant portion of TRANQUILITY II. CW2 further reported that BioXcel's c-suite level executives, "thought it was going to be faster, doing it at Segal." According to CW9, "the agreement between BioXcel and Segal was that they were going to enroll, I wanna say, like 70% of the trial," however using one company to conduct 70% of a clinical trial was "unheard of." Despite this, and under immense financial pressure to complete the trial, BioXcel chose Segal Trials, knowing that Segal would deliver the necessary results by any means necessary.

147. BioXcel's urgency to complete the trial placed significant pressure on Segal Trials and its employees. According to CW8, Dr. Meyer told her subordinates that "if we wanted paychecks, BioXcel needed to get what they wanted." Both CW8 and CW9 felt overwhelming

pressure from their supervisors, including Dr. Meyer, to ensure full enrollment of TRANQUILITY II and expedite patient dosing. CW8 reported that management at Segal Trials was pushing "everyday" for employees to get TRANQUILITY II enrollment numbers up. CW9 reported that their supervisors would "basically just giv[e] us messaging of: 'get people to enroll in this trial, no matter what it takes. Get people to sign consent, and we can work to make them fit inclusion and exclusion criteria.'"

148. Segal Trials even created a competition to motivate its employees to accelerate the progress of the trial, offering employees financial incentives, including bonuses and gift cards, for rapid patient enrollment. CW8 reported that Dr. Meyer's main goal was enrolling patients in TRANQUILITY II and would frequently talk about the competition and possible bonuses. CW9 reported receiving emails about the competition at least "on a biweekly basis" and that the emails included "updates and incentives. 'If you stay late, we'll buy the team dinner.' 'If you work weekends,' there were various… bonuses."

149. The urgency to complete TRANQUILITY II fostered an environment where study protocol violations became part and parcel of the study itself. For example, CW8 and CW9 reported that Dr. Meyer and other Segal Trials employees would manipulate data in order to justify enrolling ineligible patients in TRANQUILITY II. Specifically, CW9 reported that their supervisors at Segal Trials would "basically just give us messaging of: 'get people to enroll in this trial, no matter what it takes. Get people to sign consent, and we can work to make them fit inclusion and exclusion criteria.'" CW8 noted that Dr. Meyer was "cooking the books" by "aggressively enroll[ing] subjects into the trial, regardless of the ones who did not meet criteria by not scoring in the appropriate assessment tool range." CW8 stated that "answers to questions would be changed" and "scores would be altered." This resulted in Dr. Meyer enrolling patients

who should have been disqualified because of a lack of a proper dementia diagnosis, a lack of agitation symptoms, a significant risk of suicide, a diagnosis of Parkinson's Disease or a diagnosis of Vascular dementia. According to CW8, Dr. Meyer "always found a solution to justify stretching the truth."

150. Dr. Meyer and others at Segal Trials would also intentionally induce episodes of agitation in patients in order to justify: (1) their enrollment in the trial and (2) the dosing of the patient to expedite data collection during the trial. CW9 explained that "for patients to receive a dose of medication, they had to present somehow agitated." As such, according to CW9, "it was not uncommon for on to be asked to go back and check the patient again, to see if they got increasingly more agitated. To see if they could dose." CW8 reported that, in order to induce agitation, Dr. Meyer would have her subordinators to stick a patient with a needle multiple times to draw blood while asking the patient to do something cognitively draining. By artificially creating episodes of agitation, Segal Trials could enroll more patients, dose patients faster and get BioXcel results on an expediated timeline.

151. Regulatory violations at Segal Trials were not only tolerated but expected. Dr. Meyer and other Segal Trials supervisors frequently forced their subordinates to participate in their misconduct. Whenever an employee would attempt to speak out against Dr. Meyer or other Segal Trials supervisors, according to CW8 and CW9, they faced retaliation, whether through being berated, embarrassed or reported to HR for "not being a team player."

152. The pressure for BioXcel to complete TRANQUILITY II led the Company to hire Segal Trials. Segal Trials needed to give BioXcel what it wanted. By fabricating enrollment and trial data, Segal Trials was attempting to accelerate TRANQUILITY II at BioXcel's directive.

### J. THE FDA'S CLINICAL TRIAL COMPLIANCE REQUIREMENTS

153. As part of the FDA approval process, the FDA monitors clinical trials to ensure compliance with regulatory requirements, which in turn, ensure accurate safety and efficacy data.

154. The FDA's bioresearch monitoring protects the rights of a human research subject and the accuracy of the data produced by the study. As explained in more detail below, if a clinical trial site fails to adhere to regulatory requirements, the FDA may issue a Form 483 which details observations of deficient and improper conduct during the clinical trial. Throughout the development process of a drug, the drug's sponsor has the responsibility to ensure its that the clinical trials comply with regulatory requirements which will avoid the issuance of a Form 483.

#### 1. Bioresearch Monitoring

155. Bioresearch monitoring ("BIMO") is the FDA's compliance program that monitors clinical trials. The BIMO program serves to protect the rights, safety, and welfare of human research subjects in clinical trials; verify the accuracy, reliability and integrity of clinical trial data submitted to the FDA; and evaluate compliance with the FDA's regulations governing conduct in clinical trials, including regulations for information consent and ethical review.

156. Through the BIMO program, the FDA conducts inspections of clinical trials in order to determine the credibility and accuracy of clinical data that will be submitted to the FDA. When an NDA is not pending, the FDA only conducts onsite inspections if there is a reason to do so, such as for example, if concerns about data integrity or patient enrollment are brought to its attention. Generally, these inspections may involve interviews with the principal investigator of a clinical trial site as well as review of the principal investigator's processes, records, data and documentation. The standards against which these inspections are conducted are FDA regulations in Title 21 of the Code of Federal Regulations Parts 11, 312, 50, 54, and 56 (21 CFR §§ 11, 312, 50, 54, 56) and Good Clinical Practice ("GCP").

### 2. A Form 483 and Its Consequences

157. After the FDA conducts an inspection of a clinical trial site, in rare instances, it will decide to issue a written Form 483. The FDA issues a Form 483 when an FDA inspector has observed any conditions that may constitute violations of the FD&C Act, other Acts, or other FDA regulations. Typically, an FDA investigator will discuss their observations during the inspection with the principal investigator. After the inspection ends, the FDA investigator will present the Form 483 and discuss the observations with the principal investigator of the clinical trial site. However, it is in fact very rare for a clinical investigator to receive a Form 483 at the conclusion of an inspection and this only occurs in response to significant violations.

158. If a clinical investigator receives a Form 483, the FDA requires that corrective actions addressing each inspectional observation occur.

159. In response to the inspection findings that resulted in a Form 483, the FDA may pursue advisory, administrative or judicial actions. Some consequences of regulatory violations include clinical holds, which immediately suspends or imposes restrictions on an ongoing or proposed clinical study; Warning Letters issued by the FDA; disqualification of a principal investigator from participating in clinical studies.

160. If the investigator's response to a Form 483 is acceptable to the FDA, the FDA will close the inspection and/or audit with the issuance of an "Establishment Inspection Report" ("EIR"). The EIR confirms that the problems identified in the Form 483 were adequately resolved. Conversely, if the FDA refuses to issue an EIR, then the Form 483 remains open and unresolved.

161. The FDA's Field Management Directives ("FMD") are public-facing directives regarding the management of Office of Regulatory Affairs ("ORA"). FMDs are issued on the authority of the Associate Commissioner for Regulatory Affairs and approved by an Assistant Commissioner in ORA. FMD-145 states, in pertinent part, that "[t]o be eligible for EIR release

under the process outlined by this FMD, the inspection, domestic or foreign, performed by FDA or State and local authorities under contract with FDA, must be deemed closed in accordance with 21 C.F.R. § 20.64(d)(3) . . . Inspections resulting in agency action (e.g., Warning Letter, Untitled Letter, Seizure) are not eligible for release until the inspection is closed in accordance with 21 C.F.R. § 20.64(d)(3)." FMD-145 states further that, "FMD-145 letters shall be transmitted within 45 calendar days of the determination that the inspection is closed per 21 C.F.R. § 20.64(d)(3)."

**3. A Sponsor's Responsibility**

162. According to the FDA, a sponsor is a person that takes responsibility for and initiates a clinical investigation. This person can be either an individual or pharmaceutical company. BioXcel was the sponsor for the TRANQUILITY clinical trials. Defendant Risinger was the designated "Study Chair," according to the FDA.

163. 21 CFR § 312.50 states that "[s]ponsors are responsible for . . . ensuring proper monitoring of the investigation[s], ensuring that the investigation[s] is conducted in accordance with the general investigational plan and protocols contained in the [Investigational New Drug Application]."

164. Sponsors are responsible under FDA regulations for all of the clinical trial's operational aspects. This involves ensuring that the clinical trials be conducted properly for submission to the FDA and that the subjects' rights and welfare be protected.

165. Sponsors are required to monitor clinical trial sites and principal investigators through audits to ensure investigational activities are being carried out as planned, and in accordance with FDA regulations and GCP. BioXcel itself had a duty and an obligation to monitor the trial site and conduct its own audits to satisfy itself that the trial was being conducted in accordance with its approved protocols and all regulations. This oversight is crucial in ensuring

the adequate protection of the rights, safety, and welfare of the participants in the clinical investigation and the integrity of the data submitted to the FDA.

166. Typically, when a study sponsor engages a principal investigator, there is a contract in place that states that the study sponsor must be notified directly and promptly when a Form 483 Letter is issued. This contract is described in 21 CFR § 312.52: "A sponsor may transfer responsibility for any or all of the obligations set forth in this part to a contract research organization. ***Any such transfer shall be described in writing***." The FDA regulations also impose this notification obligation.

167. Once a Form 483 letter is issued, the sponsor of the study is required to participate in any corrective actions alongside the principal investigator.

### K. THE FDA INVESTIGATED DR. MEYER'S TRIAL SITE AND ISSUED A FORM 483

168. TRANQUILITY II's main clinical trial site faced serious compliance issues. Defendants knew this, and continued to mislead investors about the TRANQUILITY II study throughout the Class Period.

169. The FDA began its inspection of BioXcel's North Miami clinical trial site, headed by Dr. Meyer, on December 5, 2022. This inspection was done pursuant to the FDA's BIMO program, which is a comprehensive program of on-site inspections, data audits, and remote regulatory assessments designed to monitor all aspects of the conduct and reporting of FDA regulated research. Its primary purpose is to assure the quality and integrity of data submitted to the agency in support of new product approvals and marketing applications.

170. According to the FDA website, BIMO inspections focus on: (1) ensuring the protection of trial participants involved in clinical research; (2) studies are conducted according to applicable regulations; and (3) the reliability of data submitted in applications to FDA.

171. Here, BXCL501 was not a new drug; rather, the TRANQUILITY II trial sought to develop data that would be used in an application for a new indication. When the clinical trial does not involve a new drug, typically BIMO inspections are initiated by a whistleblower calling attention to data integrity issues.

172. The FDA investigation was performed by Dr. Richard A. Lyght, an FDA inspector. Dr. Lyght received his Doctorate of Pharmacy form the University of Maryland School of Pharmacy in 2010. According to his LinkedIn page, Dr. Lyght has been an FDA inspector since at least April 2011. His most recent title, which he has held since October 2016, is "Senior Regulatory Management Officer-Bioresearch Monitoring (BIMO) Specialist."

173. Dr. Lyght visited the TRANQUILITY II trial site located at 1065 Ne 125th Street, Suite 221, North Miami, FL on 8 dates during the period of December 5, 2022 to December 21, 2022. Specifically, the dates of inspection were December 5, 6, 7, 8, 9, 12, 14 and 21.

174. Dr. Lyght observed four violations and reported these in the Form 483 that he issued to Dr. Meyer, which each are discussed below. *See* Exhibit A.

175. **Observation 1: The IRB did not approve a written summary of what was to be said to the subject or the subject's legally authorized representative in a situation where a short form written consent document was prepared.**

176. Specifically: "Four out of 37 subjects reviewed were initially consented using a Spanish short form that was not approved by the Institutional Review Board ("IRB"). Furthermore, the short form used did not contain information describing the basic elements of informed consent to include risk sand study procedures."

177. Failure to provide proper informed consent cannot be retroactively remedied after patients are enrolled. Consequently, these four patients should have been excluded from the TRANQUILITY II study. Their data could not be used to support an sNDA.

178. **Observation 2: Failure to prepare or maintain adequate case histories with respect to observations and data pertinent to the investigation.**

179. Specifically, "25 out of 37 subjects reviewed and were randomized into the study and received investigational product did not have sufficient documentation to show that they met all inclusion/exclusion criteria. Three of these subjects' files contained documentation they potentially met exclusion criteria of having memory impairment or worsening of cognitive function unrelated to probable Alzheimer's Disease."

180. BIMO investigations usually start with the FDA asking to see the paperwork for the enrolled patients. Here, Dr. Lyght asked Dr. Meyer to produce the documentation to show that the patients enrolled in TRANQUILITY II met the inclusion criteria and did not meet the exclusion criteria for the study. He specifically reviewed 37 patient files. Of those 37 files reviewed, Dr. Meyer was unable to produce documents showing that 25 of them met all the inclusion criteria required by the trial. In fact, three of these patients' files showed that they potentially met the exclusion criteria of memory impairment unrelated to probable Alzheimer's Disease.

181. The fact that two-thirds of the patients reviewed at Dr. Meyer's trial site were missing critical information is a serious violation of both the trial protocol and FDA regulations.

182. The ability to demonstrate that patients meet the inclusion criteria and do not meet the exclusion criteria is central and critical to the integrity of the study. Consequently, data resulting from the 25 patients who were lacking this information could not be used to support an sNDA.

183. **Observation 3: An investigation was not conducted in accordance with the signed statement of the investigator and investigational plan.**

184. Specifically, "Four of the enrolled and randomized subjects, out of 37 subjects reviewed, were initially dosed with investigational product using a urinary drug screen ("UDS") completed more than (b)(4) prior to dosing contrary to the protocol established schedule of events to demonstrate subjects did not meet the exclusion criteria." These subjects were "randomized despite not having a current UDS." In other words, the UDS was administered outside of the timeframe established in the study protocol.

185. Again, this is a serious infraction. Dr. Meyer failed to establish through a UDS that 4 out of 37 subjects – more than 10% -- did not meet exclusion criteria. A UDS measures whether patients have drugs in their system, and could have been used to detect whether a patient exhibited ***three*** potential exclusion criteria: (1) subjects with agitation caused by acute intoxication; (2) subjects who have received an investigational drug within 30 days prior to Screening; and (3) subjects who are currently suffering from substance abuse.

186. The UDS must be administered and recorded within the time frame established in the study protocol. A UDS that is administered outside this timeframe is useless because it would not be able to conclusively demonstrate whether patients' agitation was due to alcohol or substance abuse, and it was important to know prior to the start of the study whether the patients were on any other investigational drugs. Failure to administer the UDS during the protocol's timeframe is not something that can be remedied, and these patients (and any others) should have been excluded.

187. Under this same Observation No. 3, Dr. Lyght also found that one subject "experienced a SAE event . . . which was not reported to the medical monitor or safety team until 11/16/22, outside of the required timeframe stated in the protocol."

188. Data from these four patients would not be able to support an sNDA.

### L. Dr. Meyer Fabricated an Email to Hide a Second Unreported SAE

189. In May 2023, BioXcel discovered that Dr. Meyer had falsified an email to the FDA. Dr. Meyer fabricated the email in an attempt to demonstrate that she had, in fact, reported the SAE within the required time frame, when in fact she had not. Specifically, BioXcel found that Dr. Meyer "[m]ay have fabricated email correspondence around the time of the FDA inspection, purporting to demonstrate that the investigator timely submitted to our pharmacovigilance safety vendor a report of an SAE ***from a different subject than the one cited in the FDA Form-483,*** and purporting to show that the vendor had confirmed receipt. We also confirmed that this SAE had been timely entered into the electronic data capture system, even though the SAE had not been separately reported to our pharmacovigilance safety vendor within the 24-hour timeframe required under the protocol. In connection with this ongoing investigation, we were made aware that the fabricated email correspondence was provided to the FDA by the principal investigator's employer during the on-spite inspection in December 2022."

190. Thus, Dr. Meyer did not timely report SAEs for not just one, but ***two*** patients in the study, and fabricated evidence to cover up the second.

191. The fact that Dr. Meyer was willing to fabricate evidence in an attempt to alleviate or remedy the problems that were uncovered during the FDA BIMO investigation is even worse than her failure to timely report two SAEs (which itself is a serious violation). Her willingness to lie to the FDA calls into question the integrity of any results generated by Dr. Meyer's trial site and any document or data that she touched.

### M. Dr. Meyer's Response to the FDA (REVISED)

192. By letter dated January 13, 2023, Dr. Meyer responded to the FDA's Form 483 observations. *See* Exhibit B. Lead Plaintiffs' counsel received the Meyer Response on July 30, 2024, in response to a FOIA request they submitted to the FDA.

193. The Meyer Response includes a cover letter in which Dr. Meyer highlights her inexperience with clinical studies:

> I would first like to express my appreciation to Dr. Lyght for conducting the Inspection and providing me with an opportunity ***to better understand my role as a Clinical Investigator and the practical application of the regulations and guidelines that govern the conduct and oversight of human subject research*** . . . . As an early career researcher ***conducting my first study as Principal Investigator***, this learning experience has been invaluable and I am committed to carrying the lessons learned as a result of this inspection forward in all career endeavors.

194. Thus, Dr. Meyer admitted that her understanding of her "role as a Clinical Investigator" was made "better" after Dr. Lyght's site investigation, and that the TRANQUILITY II Study was her ***first*** study as principal investigator, and that it provided her with a "learning experience."

195. Dr. Meyer proceeded to respond to each observation in the Form 483. Under FDA regulations, the FDA will issue an EIR within 45 days of receiving a response to its Form 483 report. An EIR is a full report from the FDA inspector given to the site facility "once the agency concludes that the inspection is closed," per FDA regulations (FMD-145 Release of the Establishment Inspection Report, Document Number DIR-000067, revised July 31, 2019). Because no EIR was issued by February 27, 2023 (i.e., 45 days following Dr. Meyer's Response dated January 13, 2023), BioXcel knew by February 27 that Dr. Meyer's Response was insufficient. In fact, the FDA did not issue an EIR during the remainder of the Class Period. Because the FDA never issued the EIR, the FDA never considered the observations listed in the Form 483 to be closed. And because the EIR was not issued as of February 27, 2023, the Company

knew at that date that Dr. Meyer's response to the Form 483 did not resolve the observations. The FDA finally issued its EIR on August 1, 2024, a full **eighteen months** past the time when an EIR would issue if the response were satisfactory.[1]

196. In response to Observation 1 – which was that "[f]our out of 37 subjects reviewed were initially consented using a Spanish short form that was not approved by the IRB. Furthermore, the short form used did not contain information describing the basic elements of informed consent to include risks and study procedures" – Dr. Meyer responded was follows:

> We acknowledge some deficiencies with the use of the short form occurred at the start of the study. Specifically, some procedures outlined in the [study protocol] did not occur. . . What specifically happened is that it is not clear from the observation is that for the four subjects, the site actually executed the consent process by providing the IRB-approved English long form as a summary, instead of the correct form. . . The site did not provide the information describing the basic elements of the informed consent in Spanish by using the IRB-approved short form. They did so verbally using the IRB – Approved English long form . . . The Spanish form should have been used because the subjects indicated they preferred Spanish language for the purpose of neurocognitive testing. All scales were conducted in Spanish for these subjects.
>
> The root cause of not following the IRB procedures with respect to the short form is that our internal [standard operating procedure] was deficient on the use of short forms for consenting subjects.
>
> There was no impact to subject safety, study conduct, or data integrity because the four subjects identified were bilingual and understood the information being conveyed to them during the informed consent process with the IRB-approved English long form, even though the information in the short form was not provided. ***Three (3) of 4 subjects were reconsented at a later date with the IRB approved Spanish short form***. No subjects withdrew their consent based on the information provided in the Spanish form and all three subjects continued on in the study.

197. Thus, Dr. Meyer admitted that consent was not properly obtained as to four patients, and for three of them, she attempted to correct this deficiency with retroactive consent, which is

[1] BioXcel states in its regulatory filings with the SEC that the EIR has not yet been received. However, a public database located on the FDA's website identifies August 1, 2024 as the date of the EIR, suggesting that an EIR was issued. Plaintiffs' counsel has requested a copy of the EIR via a Freedom of Information Act request and reserves the right to include information received in response, if any.

something that is not permitted by FDA regulations. The patients that did not give consent according to the IRB were not properly enrolled.

198. Observation No. 2 was that "25 out of 37 subjects reviewed and were randomized into the study and received investigational product did not have sufficient documentation to show that they met all inclusion/exclusion criteria. Three of these subjects' files contained documentation they potentially met exclusion criteria of having memory impairment or worsening of cognitive function unrelated to probable Alzheimer's Disease."

199. In response to Observation No. 2, Dr. Meyer stated that the inclusion criteria for probable Alzheimer's disease was updated by amendment to the TRANQUILITY II study protocol on November 18, 2022. The new criteria referenced that Alzheimer's disease "assessment is not readily available in the clinical community." Dr. Meyer further explained that the inclusion and exclusion criteria were discussed with the sponsor (i.e., BioXcel) during a site investigation visit on April 18, 2022. BioXcel "provided guidance" which resulted in a new "approach to diagnostic clarification."

200. Specifically, Dr. Meyer explained that patients without a pre-established and documented diagnosis of probable Alzheimer's disease were "evaluated during a screening visit utilizing . . . criteria for clinical diagnosis" of Alzheimer's disease. Patients' performance on testing scales were reviewed to determine if they were consistent with the diagnosis of Alzheimer's disease."

201. Dr. Meyer concluded that "[w]e acknowledge that the many factors exhibited to conclude a clinical diagnosis of" probable Alzheimer's disease "for each individual subject could have been summarized and documented in a clearer manner in the case histories. Therefore, for

each subject we generated a NTF [note to file] that summarizes the relevant information to conclude . . . that subjects met all inclusion/exclusion criteria."

202. Essentially, Dr. Meyer admits that where there was no documentation demonstrating these 25 patients had Alzheimer's disease, and clinical tests were performed at the trial site to determine if the patient had probable Alzheimer's disease. While it appears that certain tests were administered prior to enrollment, there was no evidence that Dr. Meyer or anyone else analyzed the results of those tests and made a determination, prior to enrollment, of whether the patients had Alzheimer's disease. Thus, Dr. Meyer retroactively re-created "notes to file" in an attempt to demonstrate that all the patients in fact had probable Alzheimer's disease.

203. Observation No. 3 was that, "Four of the enrolled and randomized subjects, out of 37 subjects reviewed, were initially dosed with investigational product using a urinary drug screen ("UDS") completed more than (b)(4) prior to dosing contrary to the protocol established schedule of events to demonstrate subjects did not meet the exclusion criteria." These subjects were "randomized despite not having a current UDS." In other words, the UDS was administered outside of the timeframe established in the study protocol.

204. Dr. Meyer's response to Observation No. 3a was to "acknowledge that per protocol, a repeat UDS was not obtained prior to dosing if" a certain amount of time had "passed since the initial UDS collected at screening visit, as required by the investigation al plan. The root cause of the problem was that the study coordinator at the time did not go back and check the dates of the original UDS prior to the first dosing visit."

205. Dr. Meyer attempted to downplay this issue. She noted that the purpose of performing UDS after a certain time "from the initial screening assessment is to ensure no new substance use disorder has developed in the screening window prior to the first dose. None of the

four subjects had a history of substance use disorder and 3 of the 4 subjects were negative in their original UDS for all substances of abuse." As with the missing documentation necessary to show inclusion/exclusion criteria, Dr. Meyer generated notes to file for each patient.

206. Observation No. 3 also found that one subject "experienced a SAE event . . . which was not reported to the medical monitor or safety team until 11/16/22, outside of the required timeframe stated in the protocol."

207. Dr. Meyer responded to this portion of Observation No. 3 by stating that "[w]e acknowledge that the [serious adverse event] was reported late because of an oversight error by the Principal Investigator who mistakenly did not submit the initial SAE to the Sponsor, Safety Team, and IRB." She further stated, "[o]f the 14 SAEs reported to date, this was the only report that was submitted outside of the required timeframe stated in the protocol."

208. Again, this is a very serious violation, evidenced Dr. Meyer's disorganization, inexperience and general incompetence in running clinical trials, and undermined the integrity of the entire TRANQUILITY II study.

### N. PLAINTIFFS' EXPERT'S CONCLUSIONS REGARDING THE IMPLICATIONS OF THE FORM 483 AND THE MEYER RESPONSE

209. Lead Plaintiffs consulted with an expert in FDA regulations and oversight of clinical trials, Dr. Alyson Wooten, to analyze the significance of these facts.

210. Dr. Wooten holds a Doctorate of Pharmacy, which she received *magna cum laude*, from Campbell University. Dr. Wooten also holds a Juris Doctorate from Temple University. Dr. Wooten has practiced as an FDA regulatory attorney, and has over 20 years of industry experience with the process of conducting clinical trials to support FDA drug approvals. Dr. Wooten has been involved with over 100 clinical trials throughout her career. Dr. Wooten currently leads a pharmaceutical compliance practice that routinely audits and advises clients participating in or

relying upon clinical trials data and the response to and impact of FDA investigations, including the impact of FDA warning letters and 483 Observations.

211. Dr. Wooten reviewed the TRANQUILITY II trial protocol (as provided on clinicaltrials.gov), the Form 483 Letter, the Meyer Response, BioXcel's SEC filings, including the Form 8-K dated June 29, 2023, Form 8-K filed on August 14, 2023, Form 10-Q dated November 14, 2023, Form 8-K dated March 12, 2024, Form 8-K dated April 10, 2024, and Form 10-Q dated May 9, 2024, earnings call transcripts from BioXcel's 2Q23 earnings call on August 14, 2023 and 4Q23 earnings call on March 12, 2024, and an analyst report from UBS dated February 21, 2024. Based on her extensive experience with FDA clinical trials, Dr. Wooten reached the following conclusions, which confirm Plaintiff's allegations above.

212. First, with regard to the three patients who did not sign proper informed consent forms prior to beginning the TRANQUILITY II study, the response provided to the 483 confirms that the form used with the four patients was not an IRB-approved consent form and describes that the SOP used to consent these patients was deficient. ***Proper consent was not obtained from these patients prior to initiating the study, and they should have been excluded from the study analysis***.

213. Second with regard to the four patients who did not receive urinary drug screenings during the time period required by the study protocol the response provided to the 483 confirms that the patients did not receive the required urinalysis within the appropriate time frame prior to dosing of the study drug. The purpose of the urinalysis is to screen for substance abuse or other conditions that would impact study results. ***These patients did not adhere to the study protocol and undergo the required urinalysis to rule out substance abuse or other potential conditions influencing the study results, and they should have been excluded from the study analysis***.

214. Third, with regard to the 25 patients that did not have sufficient documentation to show they met all inclusion/exclusion criteria, the response provided to the 483 indicates that the patient summaries and documentation were not clear or did not provide the details for how these patients met the inclusion/exclusion criteria. Specifically, the response states that they were providing "summaries" of "relevant information." However, there is no affirmative statement that these patients, at the time of enrollment, were evaluated to determine if they met the inclusion/exclusion criteria. ***According to Dr. Meyer's response to the Form 483, these patients were not properly evaluated to determine if they have met the inclusion/exclusion criteria, and they should have been excluded from the study analysis*.**

### O. Post Class Period Events Confirm that the TRANQUILITY II Study Cannot Be Used to Support an sNDA for BXCL501 (NEW FACTS ADDED)

215. Developments occurring after the corrective disclosures further demonstrate that the problems with TRANQUILITY II were severe, and could not – in fact still have not – been rectified.

216. Following the disclosure of the integrity issues with TRANQUILITY II, Defendants acknowledged that the study might never be used to support an sNDA. On August 14, 2023, during the analyst call to discuss second quarter 2023 results, Defendant Mehta was asked by Sumant Satchidanand Kulkarni from Canaccord Genuity Corp., "[d]oes your new cash runway include the potential to redo TRANQUILITY II in case the FDA says you will not be able to file on just what you have currently?" Defendant Mehta replied, "Sumant, we are not speculating on that. We are doing an audit, and we want to meet with the FDA and get the feedback, then we will be able to comment on it."

217. On August 14, 2023, on a Form 8-K filed with the SEC, BioXcel reported that "[a]n independent third party had been retained to initiate and perform a data integrity audit of the TRANQUILITY II clinical site where the principal investigator has engaged in misconduct."

218. In the same Form 8-K, BioXcel stated that it had "requested a meeting with FDA to discuss its TRANQUILITY program, including TRANQUILITY II, the data audit, TRANQUILITY II, and the data package that may be required to support submission of a supplemental New Drug Application (sNDA) seeking approval of BXCL501 for the acute treatment of agitation in mild to moderate dementia patients with probable Alzheimer's disease in the ALF [assisted living facility] and at-home setting."

219. In the same Form 8-K filed on August 14, 2023, BioXcel stated:

> Specifically, the Company plans to request feedback from FDA about the sufficiency of data from its TRANQUILITY I and II clinical trials, pharmacology, and toxicology package to support a potential sNDA submission seeking approval in the ALF and/or at-home settings. . . . The Company seeks feedback from the FDA as to whether any additional clinical studies may be required.

220. On October 4, 2023, the Company filed another Form 8-K in which it reported the following:

> The Company plans to review its TRANQUILITY clinical trial program with the [FDA] and to discuss the data package required to support submission of an sNDA for the approval of BXC501 for the acute treatment of agitation in mild to moderate dementia patients with probable Alzheimer's disease in assisted living facilities and at-home settings.
>
> The briefing book submitted to FDA for the meeting includes results from 11 double-blind, placebo-controlled, Phase 2 and 3 clinical trials evaluating the safety and efficacy of BLXC501. Trials with BXCL501 have enrolled more than 1,100 patients across multiple neuropsychiatric conditions and in healthy volunteers . . .

221. In the same Form 8-K filed on October 4, 2023, the Company also disclosed: "Ongoing Investigation and Third Party Audit in Connection with TRANQUILITY II Trial"

> The Company is continuing its previously disclosed investigation into protocol adherence and data integrity at a principal investigator's trial site in connection with the TRANQUILITY II trial, and an independent third party is auditing the data collected at that site. The Company's ongoing investigation and/or the independent audit may result in findings regarding the integrity of the trial data from this principal investigator's site, the accuracy of safety or efficacy findings, or the usability of the data in connection with a marketing application. Even if the Company's investigation and the independent audit conclude that data from the trial have not been compromised by the principal investigator's actions or other deficiencies at the trial site, ***the FDA may not accept or agree with the Company's conclusions or analyses, or may interpret or weigh their importance differently, and the Company may be unable to use some or all of the subject data generated at this clinical site to support a marketing application***. The Company can provide no assurance regarding the timing of the completion of its own investigation or the independent audit of the trial site or the FDA's views regarding the integrity of the data generated by the subject principal investigator for the TRANQUILITY II trial.

222. The Company met with the FDA on October 11, 2023. The meeting was a "Type B Meeting," which is a formal meeting that the FDA holds with a drug sponsors seeking regulatory approval. The purpose of the meeting is to allow the sponsor to request the FDA's formal guidance and positions on proposed clinical trials and/or regulatory approval packages, *i.e.*, NDAs. In advance of Type B meetings, sponsors submit detailed "briefing books" including the totality of the clinical trial data the sponsor has collected to date and intends to use for the anticipated NDA. The FDA requires submission of the "briefing books" in order to facilitate an open discussion with the sponsor concerning what additional clinical trial support is necessary for the submission of an NDA.

223. The Company reported on the results of the October 11, 2023 meeting with the FDA in a Form 8-K filed on February 8, 2024. Specifically, the Company reported the following:

> On November 14, 2023, the Company announced that it had received the final minutes from its meeting with the FDA held on October 11, 2023. Based on feedback from that meeting, the Company currently plans to conduct an additional Phase 3 trial of BXCL501 in its TRANQUILITY program to evaluate safety and to collect additional efficacy data in the at-home setting. The Company is also planning to hold a Type B Breakthrough Therapy Designation Meeting with the FDA on February 20, 2024 to obtain feedback on the design of its proposed at-home study in patients with dementia due to probable

> Alzheimer's disease, with a focus on caregiver-assessed efficacy endpoints, and to discuss the content and format of a proposed supplemental New Drug Application ("sNDA") submission to expand labeling for BXCL501 to include the acute treatment of agitation associated with dementia due to probable Alzheimer's disease. Subject to discussions with the FDA, the Company expects to initiate its Phase 3 TRANQUILITY II at-home trial in the first half of 2024 with topline results expected to be announced in the first quarter of 2025.

224. According to the Company's 2023 Form 10-K, on February 20, 2024, BioXcel and the FDA participated together in another Type B to discuss BioXcel's regulatory approval package for BXCL501. At the meeting, BioXcel proposed altering its approval package for BXCL501 to focus on treating Alzheimer's patients in the "at-home" setting as opposed to the "care setting" previously at issue, *e.g.*, assisted living facilities. In response, "the FDA reiterated its directive from the prior Type B meeting that [BioXcel] generate additional efficacy data, including repeat-dose efficacy data, to support an sNDA submission, as the FDA indicated that our proposed efficacy database, which currently includes the 70 patients who have been treated with 60 mcg of BXCL501 in TRANQUILITY I and TRANQUILITY II, would not contain substantial evidence of effectiveness absent additional data." The FDA further told BioXcel that it must "generate the necessary efficacy data in care facilities prior to conducting any trials in the at-home setting." The FDA included these directives in its "final meeting minutes," which constitute the "official record" of the meeting and serve to memorialize the FDA's directives for future reference.

225. On April 10, 2024, BioXcel announced that it is conducting a "TRANQUILITY In-Care" Pivotal Phase 3 trial with BXCL501 for agitation associated with Alzheimer's dementia. Vincent O'Neill ("O'Neill"), who was promoted to Chief of Product Development and Medical Officer in December 2023, stated: "The design of our upcoming TRANQUILITY In-Care trial largely mirrors TRANQUILITY II, which demonstrated positive efficacy and safety results with a 60 mcg dose of BXCL501."

226. Specifically, TRANQUILITY In-Care is a double blind, placebo-controlled study to evaluate the efficacy and safety of a 60 μg dose of BXCL501 over a 12-week period. The trial is expected to enroll a total of approximately 150 patients, 55 years and older, across the spectrum of Alzheimer's disease severity with mild, moderate, and severe dementia with MMSE scores of 0 to 25 who reside in skilled nursing facilities, memory care units, or assisted living facilities. The trial is expected to enroll patients with episodic agitation, with patients self-administering 60 μg of BXCL501 or placebo when agitation episodes occur over the trial period. The primary endpoint is expected to be a change from baseline in PEC total score at two hours post-first dose.

227. The TRANQUILITY In-Care trial utilizes the same endpoint and largely the same protocol as the TRANQUILITY II trial. The two trials are compared side-by-side in the following table:

| **TRANQUILITY II** | **TRANQUILITY In-Care** |
|---|---|
| Phase 3 Trial | Phase 3 Trial |
| Double-Blind | Double-Blind |
| Placebo-Controlled | Placebo-Controlled |
| 150 patients | 150 patients |
| Mild to moderately severe dementia in assisted living or residential facilities | Mild to severe dementia in nursing facilities, memory care units, or assisted living facilities |
| 65 years and older | 55 years and older |
| BXCL501 dose of 40 mcg or 60 mcg | BXCL501 dose of 60 mcg |
| 12 week duration | 12 week duration |
| Primary endpoint is change in PEC total score from baseline measured at two hours after initial dose and subsequent doses | Primary endpoint is change from baseline in PEC total score from baseline measured at two hours after initial dose |

228. On August 6, 2024, BioXcel held its 2Q24 earnings call. During this call, Defendant Mehta spoke in vague terms about the Company's progress and stated that, "[o]ur TRANQUILITY program plans with BXCL501 for Alzheimer's associated agitation are also progressing. This program could address a significant unmet medical need, and we are pleased to have received breakthrough therapy designation from the FDA for this indication." Later in the

call, O'Neill spoke more about TRANQUILITY. He stated that, "[p]lans for our TRANQUILITY program are also advancing with a focus on our tranquility In-Care trial." O'Neill reminded investors that TRANQUILITY In-Care's trial design "is substantially similar to TRANQUILITY II."

229. During the question and answer part of this call, Sumant Kulkarni from Canaccord Genuity asked, "[o]n TRANQUILITY In-Care, at what point do you expect to be able to let us know when data might be available?" O'Neill answered him by stating, "So for TRANQUILITY In-Care, today we're not in a position to provide specific timing."

230. Also on August 6, 2024, BioXcel filed its Form 10-Q for the quarterly period ended June 30, 2024. The Company provided more color on its October 11, 2023 meeting with the FDA. The 10-Q stated:

> In a Type B/Breakthrough Therapy designation meeting with the FDA on October 11, 2023, we reviewed our TRANQUILITY clinical trial program and discussed the data package required to support submission of an sNDA for the potential approval of BXCL501 for the acute treatment of agitation in patients with mild to moderate dementia due to probable Alzheimer's disease in the ALF and at-home settings. Specifically, we sought feedback from the FDA as to whether our data package consisting of TRANQUILITY I and II, along with the clinical pharmacology and toxicology programs previously discussed with the FDA, would be sufficient to support an sNDA submission for the potential use of BXCL501 to treat agitation in patients with mild to moderate dementia due to probable Alzheimer's disease in either the at-home or ALF setting, or, if not, what additional data would be required. Based on the FDA's feedback in this meeting, we understand that the FDA will require additional efficacy data, including repeat efficacy data, and that it requested long-term safety data. We therefore requested another meeting with the FDA to further discuss the additional data that would be required to support an sNDA submission.

231. Here, BioXcel confirmed that the data package from TRANQUILITY II was insufficient and the FDA required additional efficacy data, including repeat efficacy data. The Company also stated that, during its February 20, 2024 meeting with the FDA, the "the FDA

reiterated its prior comments that we generate additional efficacy data, including repeat-dose efficacy data, to support an sNDA submission."

232. On September 5, 2024, BioXcel filed a Form 8-K announcing that submitted its proposed protocol for the TRANQUILITY In-Care trial to the FDA. Specifically, the Company stated, "On September 5, 2024, BioXcel Therapeutics, Inc. (the "Company") submitted to the U.S. Food and Drug Administration (FDA) the Company's proposed protocol for its TRANQUILITY In-Care pivotal Phase 3 trial designed to evaluate the efficacy and safety of a 60 mcg dose of BXCL501 for agitation associated with Alzheimer's dementia."

233. On November 14, 2024, BioXcel held its 3Q24 earnings call. During this call, Defendant Mehta told investors that BioXcel had received feedback from the FDA on its proposed protocol for TRANQUILITY In-Care. Defendant Mehta stated, "[w]e are also continuing our planning for our TRANQUILITY In-Care trial to evaluate BXCL501 as a potential acute treatment for Alzheimer's related agitation. This represents a much larger, longer term growth opportunity. We recently received feedback from the FDA on our proposed protocol for the trial, which will be our second pivotal Phase 3 trial for this condition and which largely mirrors our TRANQUILITY 2 Phase 3 study." However, Defendant Mehta did not provide any more information on FDA's feedback or the progress of the trial. In fact, when Graig Suvannavejh, an analyst from Mizuho Securities USA LLC, asked, "what was the specific feedback that you got from the FDA? If you could provide any color on that?" O'Neill responded, "So, I mean, we don't typically give blow-by-blow details of FDA comments. What I can say, though, very comfortable in saying this, the feedback was direct, actionable, and really very concise. So, we're actually very happy with the feedback we received." Despite BioXcel's "comfort" with the FDA's feedback, the Company has still not initiated the TRANQUILITY In-Care trial.

234. On February 5, 2025, BioXcel published a press release titled "BioXcel Therapeutics Provides Clinical Business Update." In this update, the Company noted that it has "[d]eveloped plans for the TRANQUILITY In-Care trial of BXCL501 for agitation associated with Alzheimer's dementia (AAD)." However, again, BioXcel left out any specific details about when this trial would begin. The Company also stated that "BXCL501 is under investigation by BioXcel Therapeutics for the acute treatment of agitation associated with Alzheimer's dementia and for the acute treatment of agitation associated with bipolar I or II disorder or schizophrenia in the at-home setting. The safety and efficacy of BXCL501 for these investigational uses have not been established." To date, BioXcel has not commenced the TRANQUILITY In-Care trial, nor has the Company established the safety and efficacy of BXCL501 to treat agitation associated with Alzheimer's disease.

## V. THE TRUTH IS REVEALED

235. Defendants spent months misleading the public as to the legitimacy and progress of the TRANQUILITY II trials and, in turn, BioXcel's ability to access capital under its financing agreements with Oaktree and QIA. However, the truth was finally revealed in a series of corrective disclosures. First, on June 29, 2023, Defendants disclosed the issuance of the Form 483 by the FDA and the numerous compliance violations that occurred at the TRANQUILITY II clinical trial site. Second, on August 14, 2023, Defendants disclosed further the extent and severity of the protocol violations and investigator fraud and that, due to these issues, BioXcel was pausing the clinical trial program for BXCL501, undergoing a strategic reorganization, and would be issuing a "going concern" qualification due to it being unable to access additional funding under its financing agreements with Oaktree and QIA.

### A. JUNE 29, 2023

236. Before the market opened on June 29, 2023, BioXcel filed a Current Report on Form 8-K with the SEC disclosing, in relevant part:

> In December 2022, the U.S. Food and Drug Administration ("FDA") conducted an inspection of one of the clinical trial sites in the Phase 3 TRANQUILITY II clinical trial, where the principal investigator enrolled approximately 40% of the subjects participating in the trial. At the conclusion of this inspection, the FDA issued an FDA Form 483 identifying three inspectional observations. These observations related to ***the principal investigator's failure to adhere to the informed consent form approved by the Institutional Review Board for a limited number of subjects whose records the FDA reviewed, maintain adequate case histories for certain patients whose records the FDA reviewed, and adhere to the investigational plan in certain instances. For example, the FDA cited the principal investigator's delay in informing the sponsor's medical monitor or pharmacovigilance safety vendor of a serious adverse event ("SAE") for one of the subjects, which report was made to the Company's vendor outside of the 24 hour time period prescribed by the clinical trial protocol.*** The principal investigator for this clinical site responded to the FDA observations within the time period requested. The FDA inspection remains open, however, as the FDA has not issued an Establishment Inspection Report.
>
> In May 2023, it came to the Company's attention that ***this same principal investigator in the TRANQUILITY II clinical trial may have fabricated email correspondence purporting to demonstrate that the investigator timely submitted to the Company's pharmacovigilance safety vendor a report of an SAE from a different subject than the one cited in the FDA Form 483, and purporting to show that the vendor had confirmed receipt.*** Upon receipt of this information, the Company promptly initiated an investigation and recently received confirmation that the principal investigator fabricated the email correspondence related to the timing of the reporting of this SAE to the Company's pharmacovigilance vendor to make it appear as though this SAE had been timely reported to the pharmacovigilance vendor as required by the clinical trial protocol. The Company also confirmed that this SAE had been timely entered into the electronic data capture system, even though the SAE had not been separately reported to the Company's pharmacovigilance safety vendor within the 24 hour timeframe required under the protocol.
>
> In connection with this ongoing investigation, the Company was made aware that ***the fabricated email correspondence was provided to the FDA by the principal investigator's employer during the on-site inspection in December 2022.*** After unblinding of the data, the Company determined that the SAE that was the subject of this fabricated correspondence between the principal investigator and the Company's pharmacovigilance vendor occurred in a subject in the placebo arm. This principal investigator has not participated in any other clinical trial sponsored

> or conducted by the Company. Moreover, the study was designed such that trained study staff other than principal investigators were to conduct assessments of the primary efficacy measure.
>
> ***The Company is currently in the process of conducting an investigation into protocol adherence and data integrity at the principal investigator's trial site*** and is in the process of retaining an independent third party to audit the data collected at the site. The Company's ongoing investigation and/or the planned independent audit may uncover new findings regarding the integrity of the trial data from this principal investigator's site, the accuracy of safety or efficacy findings, or the usability of the data in connection with a marketing application. The Company plans to complete its investigation as soon as possible, although the Company can provide no assurance regarding the timing of the completion of its own investigation or the timing of the completion of the planned independent audit of the trial site. Further, ***the Company has notified the FDA of these findings*** and the steps it intends to take to validate the integrity of the data generated by this investigator for the TRANQUILITY II trial.

(Emphasis added.)

237. The company went on to disclose that "[i]n connection with the foregoing, the Company is providing the below supplemental risk factor." This risk factor states:

> ***Developments relating to the Company's TRANQUILITY II Phase 3 trial may impact the timing of the Company's development plans for, and prospects for regulatory approval of, BXCL501 for the acute treatment of agitation associated with dementia in patients with probable Alzheimer's disease.***
>
> The timing of the Company's marketing application and prospects for regulatory approval of BXCL501 for the acute treatment of agitation associated with dementia in patients with probable Alzheimer's disease may be adversely impacted by these developments. For example, even if the Company's investigation and the independent audit conclude that data from the TRANQUILITY II trial have not been affected or compromised by the principal investigator's actions or other deficiencies at the trial site, the FDA may not accept or agree with the Company's conclusions or analyses, or may interpret or weigh their importance differently. Further, if the Company or the FDA determines that there are issues with data integrity and/or compliance with good clinical practice requirements at the trial site, the Company may be unable to use some or all of the subject data generated at this clinical site to support a marketing application. If all or a substantial portion of such data were discarded, the TRANQUILITY II trial may no longer be adequately powered for statistical significance and the Company may need to conduct a new clinical trial. If the Company conducts a new Phase 3 trial, such trial may have different safety or efficacy results from the topline data the Company is announcing today. Topline data from the TRANQUILITY II trial, including results from

> subjects at this principal investigator's site, may not be predictive of the results in any new trial. Further, any investigation, disqualification or debarment of, or proceeding or action against the principal investigator, or any investigation, proceeding or action against the Company, could further delay development and approval of BXCL501 for this indication, and otherwise have a material adverse effect on the Company, its financial condition, results of operations and prospects.

(Emphasis in original.)

238. In an analyst call on June 29, 2023, an analyst from Mizuho asked, on behalf of Graig Suvannavejh, "[j]ust a few questions for me is that in the 8-K, you mentioned finding this out in December and then again in May, how come the company didn't disclose this sooner? What's the strategy there?" Defendant Risinger responded, "***The FDA did the audit back in December. We were aware of it, and we've been monitoring that site even more closely***."

239. On this news, BioXcel's stock price fell $11.28 per share, or 63.8%, dropping from $17.67 at the close of the prior trading day to $6.39 per share on June 29, 2023, on unusually heavy trading volume.

240. In reaction, analysts all but ignored the release of TRANQUILITY II's topline data and focused instead on the negative news concerning the integrity of the TRANQUILITY II study. For example, an analyst report issued by Canaccord on June 29, 2023 noted that while BioXcel also disclosed topline data from the TRANQUILITY II clinical trial, "any enthusiasm around the data was overwhelmed by the revelation in an 8-K filing that a principal investigator's (PI) actions at a site that enrolled 40% of study participants had led to an unresolved FDA Form 483, and a more recent incident that BTAI reported to the FDA." On that same day, Guggenheim issued an analyst report that stated, "[t]he positive study news will be overshadowed by the disclosure that a single PI who enrolled 40% of the patients in the study triggered the FDA to issue a Form 483." The report later stated that "Tranquility II data are clean, even if a bit underwhelming … but trial conduct and data integrity are a key focus."

241. Indeed, analysts recognized right away that problems of this magnitude jeopardized the positive topline data results from TRANQUILITY II that the Company was reporting, and in fact could lead to significant delays, or even the Company's absolute disability, in getting FDA approval for BXCL501 for Alzheimer's and dementia patients.

242. During the analyst call on June 29, 2023 that accompanied the announcement, the very first analyst to speak, Colin Nigel Bristow from UBS Investment Bank, stated, "Congrats on the data. You certainly kept us all waiting . . . I just wanted to touch on the 493. Can you talk about what gives you comfort that the findings won't impact your ability to seek approval on this data set? And then can you talk about if there's any other sites [sic] being inspected and why the inspection of the sort of [named] site is still showing up as open?"

243. The second analyst question also concerned the Form 483 Letter. Robyn Kay Shelton Karnauskas from Trust Securities, Inc., asked whether the "efficacy results hold up when you exclude" the 40% of the patients enrolled under Dr. Meyer. Ms. Karnauskas further noted that she had "not seen this in [her] career" and asked whether "there is any precedent for 483 like this having an impact on approvability." Defendant Risinger noted that the FDA might "repeat the efficacy, let's say analysis with individual subjects that may be out of question."

244. Sumant Satchidanand Kulkarni, an analyst from Canaccord Genuity Corp., asked what was "the earliest" the Company could "announce the results of an independent audit of the data? . . . Asked another way, I guess, how confident are you in your ability to interact with the FDA in the second half on a potential path for NDA submission?"

245. Another analyst asked, "if [the FDA] were to exclude the safety portion [of the TRANQUILITY II study], what's your confidence that they won't exclude all of these patients from this one site?"

### B. AUGUST 14, 2023

246. On August 14, 2023 (pre-market), in conjunction with its 2Q23 earnings, BioXcel issued a press release announcing a "Strategic Reprioritization" concerning its drug development programs. The press release along with other commentary from Defendants Mehta, Steinhart, and Risinger further revealed to analysts and investors the severity of TRANQUILITY II's protocol violations and the negative ramifications BioXcel would suffer as a result.

247. In pertinent part, BioXcel's press release stated as follows:

> NEW HAVEN, Conn., August 14, 2023 — BioXcel Therapeutics, Inc. (Nasdaq: BTAI), a biopharmaceutical company utilizing artificial intelligence approaches to develop transformative medicines in neuroscience and immuno-oncology, today announced its financial results for the second quarter ended June 30, 2023, and a strategic reprioritization to strengthen its focus and significantly reduce operating expenses.
>
> . . .
>
> Following a comprehensive review of the business, the Company has determined to focus on high-potential agitation-market opportunities using its innovative, AI-based clinical drug development platforms. The Company intends to reduce more than 50% of its cash burn to approximately $80 million on a go-forward annualized basis. The Company will also be reducing its workforce from approximately 190 to 80 employees. These actions include a shift in commercial strategy for IGALMI™ in the institutional setting, a reduction of in-hospital commercialization expenses, a suspension of programs no longer deemed core to the Company's business, and a shift in focus to develop BXCL501 for use in the at-home setting in the treatment of agitation in schizophrenia, bipolar disorders, and in patients with mild to moderate dementia due to probable Alzheimer's disease.
>
> "We are shifting our primary focus to development in the at-home setting while maintaining our value-creating core capabilities ranging from AI innovation to commercialization," said Vimal Mehta, Ph.D., CEO of BioXcel Therapeutics. "Our AI-driven drug re-innovation approach has led to the capital-efficient development of product candidates in underserved therapeutic areas. We intend to prioritize our resources to develop BXCL501 for use in assisted living facility (ALF) and at-home settings and continue to advance our neuroscience pipeline. Unfortunately, this reprioritization requires us to reduce our workforce. We are grateful to all employees for their contributions and will support those who are impacted through their transitions."
>
> . . .

> Net Loss: BioXcel Therapeutics had a net loss of $53.5 million for the second quarter of 2023, compared to a net loss of $37.7 million for the same period in 2022. The loss for the quarter included approximately $6.1 million in non-cash stock-based compensation.
>
> Cash and cash equivalents totaled $127.5 million as of June 30, 2023. As noted above, the Company is undertaking a strategic reprioritization, which includes a reduction in force of more than 50%, that is expected to reduce expenses significantly. In the absence of additional capital becoming available to the Company under the strategic financing agreements or otherwise, the Company estimates that its current cash and cash equivalents will last through mid-2024.
>
> The Company's previously disclosed cash runway projection assumed the full utilization of its strategic financing agreements ($155 million of potential additional availability) with Oaktree Fund Administration LLC and Qatar Investment Authority. Based on recent events, the Company is not likely to be in a position to meet the milestones required to access additional capital under the financing agreements. The Company has initiated discussions with its strategic financing partners to amend the agreements. Successful modification of these agreements could further extend the Company's cash runway.

248. The Company also first disclosed a new risk factor in its Form 10-Q filed on August 14, 2023, which it has repeated in every subsequent SEC filing since. It reads:

> Developments relating to our TRANQUILITY II Phase 3 trial may impact the timing of our development plans for, and prospects for seeking or obtaining regulatory approval of, BXCL 501 for the acute treatment of agitation associated with dementia in patients with probable Alzheimer's disease.

249. During the earnings call later that same day, Defendant Steinhart revealed that BioXcel would not likely be able to obtain additional financing from Oaktree and Qatar because of TRANQUILITY II's protocol violations and, in turn, the delay it would case in terms of satisfying the regulatory milestones identified in the Credit Agreement and Guaranty. In pertinent part, Steinhart stated as follows:

> The Company's previously disclosed cash runway projection assumed a full utilization of its strategic financing agreements of $155 million with Oaktree Fund Administration and Qatar Investment Authority. ***Based on recent events, the Company is not likely to be in a position to meet the milestones required to access the additional capital under the financing agreements.*** The Company is exploring

> multiple ways to extend its cash runway and is already in discussions with its strategic financing partners to amend the agreements. Successful modification of these agreements could extend the company's cash runway.

250. Defendant Mehta also announced a "commercial reorganization" which would involve reducing the workforce from 190 to 80 employees. The remaining employees would focus on building "potential label expansions" and "support[ing] IGALMI."

251. Defendant Mehta also announced that the Company had "***requested a meeting with the FDA to discuss [its] entire TRANQUILITY program***. ***This will include both TRANQUILITY II, TRANQUILITY III clinical trials, the data audit and the data package that may be required to support submission of an sNDA*** seeking approval of 501 for the acute treatment of agitation in mild to moderate dementia patients with probable Alzheimer's disease. We hope to have an update on the TRANQUILITY program, including the audit and FDA meeting by the end of the year."

252. Defendant Steinhart announced that the Company's expenses for the second quarter 2023 increased from $17.9 million Q2 2022 to $27 million in Q2 2023. This was attributed, among other reasons, to increased expenses associated with TRANQUILITY II.

253. On August 14, 2023, BioXcel also filed a quarterly report on Form 10-Q. In pertinent part, BioXcel stated in its 10-Q for the second quarter of 2023:

> The Company's history of significant losses, its negative cash flows from operations, potential near-term, increased covenant-driven payments under its OFA Facilities (as defined in Note 8, Debt and Credit Facilities), its limited liquidity resources currently on hand, and its dependence on its ability to obtain additional financing to fund its operations after the current resources are exhausted, about which there can be no certainty, have resulted in management's assessment that ***there is substantial doubt about the Company's ability to continue as a going concern for a period of at least 12 months*** from the issuance date of the financial statements included in this Quarterly Report on Form 10-Q.

254. Defendants' statements on August 14, 2023 revealed to investors that TRANQUILITY II's protocol violations were more severe than initially represented when

reporting topline results on June 29, 2023. The confluence of protocol violations disclosed on June 29, 2023 had, in fact, resulted in the delay of BioXcel's development program for BXCL501 and, in turn, the Company's ability to meet its regulatory milestones under the Credit Agreement and Guaranty, *i.e.*, filing an NDA for BXCL501. Contrary to the risk of delay flagged by Defendants when the violations were first announced on June 29, 2023, investors and analysts alike learned that they had been and were severe enough to throw BioXcel's entire development program and regulatory approval process for BXCL501 off track.

255. Analysts following BioXcel reported immediately on the revelation. For example, on August 15, 2023, UBS lowered its 12-month price target for the Company from $48/share to $9/share, explaining in pertinent part that:

> On the call BTAI announced plans for a major strategic reprioritization, with the primary updates being 1) reduction in workforce/non-core programs with the goal of cutting cash burn by ~50% to ~ $80mn/yr, 2) refocusing Igalmi development and commercialization efforts for at-home use (vs. institutional setting), and 3) pausing the '701/OnkosXcel program (though continuing to evaluate options). BTAI expects its current cash will be sufficient to fund operations through '24. This action was likely catalyzed by the unfortunate situation with TRANQUILITY-II (T-2), in which there were data reporting issues . . . , which have added a layer of risk around the regulatory pathway for this indication. . . . In the near-term, the outcome of the external audit and FDA feedback around whether the T-2 data are submissible are critical updates, though the stock will likely remain pressured until the company can solve for its <12 month cash runway.

256. Similarly, on August 15, 2023, Canaccord Genuity lowered its price target for BioXcel from $75/share to $20/share, noting that:

> The main focus on the call, however, was BTAI's restructuring, and a shift in focus from commercializing Igalmi in the institutional setting to developing it for use in an at-home setting. . . . we are somewhat surprised by the pivot to an at-home use development case for Igalmi that we note still has some FDA-related risk as results from SERENITY III Part 1 were not clear-cut. . . . BTAI has retained an independent third-party to perform a data integrity audit of the affected TRANQUILITY II site. The company has put in a request to meet with the FDA to discuss TRANQUILITY II, its audit plan, and a data package to support an sNDA in the AD agitation setting.

257. The above analyst commentary illustrates and confirms that Defendants' statements on August 14, 2023 consisted of additional revelatory information concerning TRANQUILITY II's compliance violations first discussed on June 29, 2023. Although Defendants attempted initially to downplay the violations, their statements on August 14, 2023 revealed the true significance and magnitude of the violations to investors. Indeed, as the above analysts noted, the usability of the TRANQUILITY II data in toto was in jeopardy, thereby necessitating additional clinical trials that would require further capital expenditures and delay BioXcel's commercialization efforts for BXCL501.

258. The market reacted accordingly to this devastating news. BioXcel's stock price decreased from $7.40 per share at the close of trading on August 11, 2023 to $4.33 per share at the close of trading on August 14, 2023, a decline of $3.07, or 41%.

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

259. Throughout the Class Period, Defendants made statements about the TRANQUILITY II study, but omitted to disclose the integrity issues identified by the FDA. Thus, the following statements were materially misleading to investors in light of this omission.

### A. MARCH 9, 2023: TRANQUILITY II TRIAL WAS "FULLY ENROLLED" (NEW FACTS ADDED)

260. On March 9, 2023, Defendants held an earnings conference call to discuss BioXcel's operational and financial results for the fourth quarter of 2022. During the earnings call, Defendant Mehta stated, in pertinent part:

> Specifically, we expect to announce data from 2 Phase III pivotal studies for 501 in the second quarter. These studies include TRANQUILITY II trial and SERENITY III trials. Our TRANQUILITY program is designed to evaluate 501 for the acute treatment of Alzheimer's-related agitation; up to 100 million agitation episodes are estimated to occur annually in this patient population in the U.S. where currently,

> there are no approved FDA therapies. ***The TRANQUILITY II trial is fully enrolled*** and then – and the data cleaning and verification process has begun.

261. The statement that "[t]he TRANQUILITY II trial is fully enrolled" is false. In the context of clinical trials, the term "fully enrolled" means that the trial has met or exceeded its enrollment target under the trial protocol and, importantly, that all trial participants possess the requisite patient documentation showing they meet the trial protocol's inclusion and exclusion criteria, *i.e.*, they qualify for the trial and do not possess any disqualifying characteristics. When Defendant Mehta represented that the TRANQUILITY II trial was "fully enrolled," he misled investors because up to 32 patients out of 150 patients in the trial either did not have the documentation in their files to substantiate their inclusion in the trial, and/or had not received appropriate informed consent materials and/or had not been properly administered drug and alcohol screening. Consequently, the TRANQUILITY II trial had enrolled only 118 out of 150 patients and was therefore not "fully enrolled." Moreover, as reported by CW8 and CW9, in response to timing pressures from BioXcel, Dr. Meyer and the TRANQUILITY II supervisors fabricated enrollment data to ensure that patients met the inclusion criteria or avoided the exclusion criteria. However, this inclusion of ineligible patients in TRANQUILITY II meant that this trial, by its terms, was not fully enrolled.

### B. MARCH 16, 2023: "PATIENT ENROLLMENT IS COMPLETE FOR TRANQUILITY II." (NEW FACTS ADDED)

262. On March 16, 2023, BioXcel filed its Form 10-K for the period ended on December 31, 2022. Defendants Mehta and Steinhart signed the Form 10-K on behalf of BioXcel. In describing the TRANQUILITY program, the Company stated that "***[p]atient enrollment is complete for TRANQUILITY II.***"

263. This statement is false. In the context of clinical trials, the term "complete enrollment" means that the trial has met or exceeded its enrollment target under the trial protocol

and, importantly, that all trial participants possess the requisite patient documentation showing they meet the trial protocol's inclusion and exclusion criteria, *i.e.*, they qualify for the trial and do not possess any disqualifying characteristics. When the Company represented that the TRANQUILITY II "patient enrollment is complete" it misled investors because up to 32 patients out of 150 patients in the trial either did not have the documentation in their files to substantiate their inclusion in the trial, and/or had not received appropriate informed consent materials and/or had not been properly administered drug and alcohol screening. Consequently, at best, the TRANQUILITY II trial had enrolled only 118 out of 150 patients and therefore "enrollment" was not "complete." Further, CW8 and CW9's reports of Segal employees, including Dr. Meyer, fabricating data in order to enroll ineligible patients in the trial also meant that trial "enrollment" was not "complete" pursuant to the study protocol. In fact, BioXcel's claim that "enrollment" was "complete" was based on fraudulent enrollment practices intended to support that assertion. By representing that enrollment was "complete," Defendants led investors to believe that enrollment was completed in accordance with the TRANQUILITY II trial's study protocol, which was not true. By representing that enrollment was "complete," Defendants led investors to believe that enrollment was completed in accordance with the TRANQUILITY II trial's study protocol, which was not true.

### C. MARCH 16, 2023: RISK DISCLOSURE ABOUT THIRD PARTY COMPLIANCE WITH LEGAL AND REGULATORY DUTIES (NEW FACTS ADDED)

264. On March 16, 2023, BioXcel filed its Form 10-K for the period ended on December 31, 2022. Defendants Mehta and Steinhart signed the Form 10-K on behalf of BioXcel. The Form 10-K disclosed that BioXcel relied on third parties to conduct its trials while at the same time concealing that its primary investigator for 40% of the TRANQUILITY II patients had violated study protocols and that BioXcel had received the Form 483 as a result. Specifically, the 10-K

stated:

> ***We rely on third parties to conduct our preclinical and clinical trials. If these third parties do not successfully perform their contractual legal and regulatory duties or meet expected deadlines, we may not be able to obtain regulatory approval for or commercialize our product candidates and our business could be substantially harmed.***
>
> We have relied upon and plan to continue to rely upon third-party medical institutions, clinical investigators, contract laboratories and other third-party CROs to monitor and manage data for our ongoing preclinical and clinical programs. We rely on these parties for execution of our preclinical and clinical trials, and control only certain aspects of their activities. Nevertheless, we are responsible for ensuring that each of our studies is conducted in accordance with the applicable protocol, legal, regulatory and scientific standards, and our reliance on the CROs does not relieve us of our regulatory responsibilities. We and our CROs are required to comply with GCPs, which are regulations and guidelines enforced by the FDA, the Competent Authorities of the member states of the EEA and comparable foreign regulatory authorities for all of our products in clinical development.
>
> Regulatory authorities enforce these GCPs through periodic inspections of trial sponsors, principal investigators and trial sites. ***If we or any of our CROs fail to comply with applicable GCPs, the clinical data generated in our clinical trials may be deemed unreliable and the FDA, the EMA or comparable foreign regulatory authorities may require us to perform additional clinical trials before approving our marketing applications.*** We cannot assure you that upon inspection by a given regulatory authority, such regulatory authority will determine that any of our clinical trials comply with GCP regulations. In addition, our clinical trials must be conducted with product produced under cGMP regulations. ***Our failure to comply with these regulations may require us to repeat clinical trials, which would delay the regulatory approval process.***
>
> If any of our relationships with these third-party CROs terminate, we may not be able to enter into arrangements with alternative CROs or to do so on commercially reasonable terms. In addition, our CROs are not our employees, and except for remedies available to us under our agreements with such CROs, we cannot control whether or not they devote sufficient time and resources to our on-going clinical, nonclinical and preclinical programs. If CROs do not successfully carry out their contractual duties or obligations or meet expected deadlines, if they need to be replaced ***or if the quality or accuracy of the clinical data they obtain is compromised due to the failure to adhere to our clinical protocols, regulatory requirements or for other reasons, our clinical trials may be extended, delayed or terminated and we may not be able to obtain regulatory approval for or successfully commercialize our product candidates.*** As a result, our results of operations and the commercial prospects for our product candidates would be

> harmed, our costs could increase and our ability to generate revenues could be delayed.

265. These statements were misleading because Defendants presented the risk as only a hypothetical problem, but in fact, Defendants already knew that there were problems in the North Miami TRANQUILITY II trial site, and in fact, its key principal investigator had already failed to comply with regulations. Thus, the "quality [and] accuracy of the clinical data" obtained there was already "compromised." Moreover, as reported by CW8 and CW9, regulatory violations were widespread across the TRANQUILITY II trial sites managed by Segal Trials. Under pressure from BioXcel to expedite this trial, Dr. Meyer and other Segal Trials employees committed numerous violations of FDA-approved protocols for TRANQUILITY II and FDA regulations. Namely, Segal Trials employees manipulated data to make an ineligible patient appear eligible for enrollment in the trial. Segal Trials employees also induced agitation in elderly patients order to justify their enrollment and dosing. Since these regulatory violations had already occurred, presenting them as a hypothetical risk was false and misleading.

266. Furthermore, the statements were false because, as Defendant Mehta disclosed on August 14, 2023, the Company had requested a meeting with the FDA to discuss the "entire TRANQUILITY program," including the TRANQUILITY II clinical trial and the data audit. Thus, the risk disclosed in this statement had in fact already materialized, and had caused delays for the TRANQUILITY program.

### D. MARCH 16, 2023: STATEMENT THAT BIOXCEL HAD ENOUGH CASH FOR THE NEXT TWELVE MONTHS

267. On March 16, 2023, in its Form 10-K for the fiscal year ended 2022, the Company stated: "We expect that our cash and cash equivalents as of December 31, 2022 will be sufficient to fund our ongoing research and development efforts and commercialization efforts for at least twelve months from the date of the issuance of the consolidated financial statements included in

this Annual Report on Form 10-K." Defendants Mehta and Steinhart signed the Form 10-K on behalf of BioXcel.

268. This statement was false and misleading. On August 14, 2023, the Company revealed that this statement was false. Specifically, the Company announced that it intended to "reduce more than 50% of its cash burn to approximately $80 million on a go-forward annualized strategy," and reduce its workforce from 190 to 80 employees. It further stated: "***The Company's previously disclosed cash runway projection assumed the full utilization of its strategic financing agreements with Oaktree Fund Administration LLC and Qatar Investment Authority. Based on recent events, the Company is not likely to be in a position to meet the milestones required to access additional capital under the financing agreements.***" The "recent events" referred to in this disclosure were the problems with the TRANQUILITY II trial exposed in the Form 483 (December 21, 2022) and in the Meyer Response (January 13, 2023).

269. By January 13, 2023, the TRANQUILITY II trial was established to be so severely compromised that the FDA would not allow BioXcel to use it to support an sNDA for BXCL501 for treatment of agitation in Alzheimer's patients. Specifically, as disclosed by the Company in the preceding paragraph, BioXcel needed the Tranche B cash (totaling $35 million) from its funding agreement with Oaktree and Qatar in order to "fund [its] ongoing research and development efforts and commercialization efforts for" the next twelve months. But the funding agreements with Oaktree and Qatar specified that Tranche B promised therein would only become available once milestones, including "receipt of approval from the FDA of an NDA in respect of the use of BXCL 501 for the acute treatment of agitation associated with Alzheimer's Disease."

270. By January 13, 2023, Dr. Meyer had submitted the Meyer Response to the FDA confirming that she could not cure the deficiencies in the TRANQUILITY II trial noted in the

Form 483. Defendants knew about the Meyer Response when it was submitted to the FDA. Further, they knew it was deficient because the FDA did not issue an EIR indicating that the Meyer Response was acceptable within 45 days' time, which is its usual practice. In fact, the FDA had not issued an EIR regarding the Form 483 during the Class Period. Thus, by February 27, 2023, Defendants knew that the protocol violations had undermined the integrity of the TRANQUILITY II data to such a degree that BioXcel would be unable to rely on it for BXCL501's sNDA. Without the TRANQUILITY II study, the Company would not be able to file its sNDA for BXCL501 on its anticipated timeline, and the funding from the Oaktree and Qatar financing agreements would not be released. Without this funding, the Company faced an acute risk that it would not be able to continue as a going concern for the next twelve months.

271. To the extent the that the statement that the Company had sufficient cash to fund its ongoing research and development and commercialization projects for the next twelve months is considered to be forward-looking, it was not accompanied by meaningful cautionary language.

272. Specifically, Defendants include a risk factor in its Form 10-K for the year ended December 31, 2022 that states:

> Our estimate as to how long we expect our existing cash to be able to continue to fund our operations is based on assumptions that may prove to be wrong, and we could use our available capital resources sooner than we currently expect. . . . Our future funding requirements, both short-term and long-term, will depend on many factors, including: the scope, progress, timing, costs and results of clinical trials of our product candidates . . . . the costs, timing and outcome of seeking regulatory approvals.

273. Nowhere do Defendants state in their risk disclosure that the "estimate as to how long [they] expect [BioXcel's] existing cash to be able to continue" "is based on" the Company's ability to secure FDA approval to market BXCL501 to treat agitation in Alzheimer's disease, much less explain that this cash was dependent on the Company's ability to cure defects in a Form 483

issued by the FDA for its TRANQUILITY II study, or that the defects could not be cured as indicated in the Meyer Response.

### E. May 9, 2023: Statement that the TRANQUILITY II Trial "Is Completed" (NEW FACTS ADDED)

274. On May 9, 2023, during a presentation at the Bank of America ("BofA") Global Healthcare Conference, Gregory Allen Harrison ("Harrison"), an analyst from BofA Securities, Research Division asked: "… And then the other one that's a big focus among investors is TRANQUILITY II in Alzheimer's agitation. What should we be looking for in this update and in this setting?" Defendant Risinger answered, "***That trial is completed. The last patient has completed. The data is being locked and undergoing verification***. That trial was powered based on TRANQUILITY I, which showed efficacy not only for the primary measure, the same primary measure for TRANQUILITY II, but it also separated statistically on each and every secondary or confirmatory measure, the modified Cohen-Mansfield index, agitation-calmness evaluation scale, and both CGI improvement and severity. We have very high confidence in demonstrating not only efficacy, but also the safety in patients living in an assisted living or residential care setting."

275. Defendant Risinger's statement above was false and/or materially misleading. Although the trial had been "completed" by this point in time, the data was virtually unusable given the collective impact of the various protocol violations and investigator fraud that had already occurred. Indeed, Dr. Meyer's North Miami clinical trial site was responsible for 40% of the overall study patients and, as the Form 483 stated, she had violated informed consent regulations, enrollment protocols, patient record requirements, and misreported adverse event occurrences. Dr. Meyer had also falsified documentation provided to the FDA during the December 2022 audit.

276. Moreover, CW8, CW9 and CW11 reported instances of misconduct throughout the TRANQUILITY II trial cites operated by Segal Trials. Specifically, Dr. Meyer and other Segal Trials employee manipulated patient data and directed their subordinates to do the same. Defendants, including Mehta in particular, received updates regularly from Segal Trials and therefore knew about or recklessly disregarded the protocol violations occurring in the enrollment process. This allowed BioXcel to enroll ineligible patients in the trial and avoid the time-consuming process of finding new patients. This was done in response to BioXcel's urgency to expedite the trial. Additionally, due to this pressure, Segal Trial employees induced episodes of agitation in elderly patients in order to justify dosing them.

277. Defendant Risinger's statement created the materially misleading impression that the trial had completed as planned and in accordance with the study protocol, and that the data verification process was proceeding in line with ordinary practices. In truth, the trial had not been conducted pursuant to study protocol and the verification process that was then underway was of vital importance given the violations and fraud that had occurred earlier in the trial.

### F. JUNE 8, 2023: STATEMENT REGARDING TRANQUILITY II BEING USED TO SUPPORT AN sNDA FOR BXCL501

278. On June 8, 2023, during a presentation at the Jefferies Healthcare Conference, Chris Howerton from Jefferies Group LLC asked Defendant Mehta: "Okay. All right. Well, let's say, Vimal, we're going to get those stupendous data at the end of this month. Can you file an sNDA right after that? Or, I guess, what would be the regulatory expectations after that?" Defendant Mehta responded, "So that's a great question. ***It depends on the data***. How well is efficacy data as well as safety. And if you think about the need for these patients, 100 million episodes, even if it's half of the market and half of them are in nursing home or who are more frequent agitation, which we are doing capturing In TRANQUILITY II. We will have a conversation with the FDA,

ask them what do we need to file the SNDA, and then fill those gaps and file it. ***If they allow us to file it with TRANQUILITY II, we'll be ready to go, basically, if we don't need to generate anything***."

279. Defendant Mehta's statement of whether the FDA would allow BioXcel to file an sNDA with TRANQUILITY II was false and/or materially misleading. In response to the question posed by the Jefferies Group analyst, Defendant Mehta concealed the fact that the TRANQUILITY II data was already subject to intense scrutiny based on the protocol violations and investigator fraud that had occurred earlier in the trial. Further, Dr. Meyer had provided her response to the FDA, but it did not sufficiently address the FDA's concerns, and instead admitted to a series of infractions and attempted to correct deficiencies through retroactive "notes to file" rather than demonstrating that data and test results were analyzed prior to certain patients' admission into the study. Defendant Mehta's response did not disclose any of these facts, and thus it was misleading to suggest that the FDA might allow BioXcel to use the TRANQUILITY II Study data to support its sNDA for BXCL501. Likewise, Defendant Mehta did not disclose the existence of the violations and fraud that all but guaranteed the need to "generate" additional data. Instead, Defendant Mehta reassured analysts and investors that BioXcel would be "ready to go" in the event that the FDA "allow[ed] [BioXcel] to file" and did not require them to "generate" additional trial data. By concealing the violations and fraud, as well as the likelihood of needing to generate additional data, Defendant Mehta misled the public concerning the viability of BioXcel's regulatory approval package for BXCL501 based on the TRANQUILITY II trial.

## VII. SCIENTER ALLEGATIONS

280. As alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the company, or in their own name, were materially false or

misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt or access to information reflecting the true facts regarding the Company, their control over, or receipt, or modification of the Company's materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

281. The Individual Defendants knew or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity, or at least the reckless disregard, of the BioXcel personnel at the highest levels of the Company.

### A. THE INDIVIDUAL DEFENDANTS KNEW, OR RECKLESSLY DISREGARDED, THAT THEIR STATEMENTS WERE FALSE AND MISLEADING (REVISED)

282. In addition to the facts set for the above, the following facts demonstrate that the Individual Defendants had actual knowledge about the FDA inspection of the TRANQUILITY II trial conducted from December 5 to December 21, 2022, and about the Form 483 Letter issued to Dr. Meyer on December 21, 2022, which contradicts the statements Defendants made to investors. These facts also demonstrate that knew and encouraged the protocol violations occurring within TRANQUILITY II for the sake of a speedy trial. These violations were so severe that Defendants knew TRANQUILITY II would not withstand FDA scrutiny and would have to redo the trial. As such, Defendants were, at least, reckless in not disclosing this truth to investors.

### 1. BioXcel Pushes for an Expedited Trial (NEW)

283. Under immense financial pressure, and in an effort to receive funding from Oaktree and QIA, BioXcel needed TRANQUILITY II completed as quickly as possible. As such, BioXcel hired Segal Trials because it knew that Segal would be "faster" and deliver the results the Company needed. The fact that Segal Trials was not a "legit" clinical research operator was a feature for BioXcel, not a bug. BioXcel hired Segal Trials to deliver results by any means necessary. In fact, employees of Segal Trials understood that, according to CW8, "if we wanted paychecks, BioXcel needed to get what they wanted," i.e., a fully enrolled trial.

284. In order to keep up with BioXcel's demands, Segal Trials committed numerous protocol and regulatory violations. As reported by CW8 and CW9, employees at Segal Trials were encouraged to falsify enrollment data in order to enroll ineligible patients in TRANQUILITY II. CW8 even reported specific instances where Dr. Meyer manipulated a patient's enrollment data. Segal Trials employees falsified patient enrollment data to make it look like they met the criteria, as finding another eligible patient would have been time-consuming and would have disrupted BioXcel's objective to get this trial fully enrolled as soon as possible. Moreover, CW8 and CW9 also reported instances where their supervisors at Segal Trials instructed them and other employees to artificially induce episodes of agitation in patients, so that they could be enrolled in the trial and dosed with BXCL501. Again, Segal Trials carried out these violations in order to fulfill BioXcel's directive to complete the trial as quickly as possible.

285. Defendants knew that these protocol violations were occurring. CW7 reported that Defendant Mehta was "very hands-on" and active during meetings about TRANQUILITY II. CW10 corroborated the fact that Defendant Mehta was involved with TRANQUILITY II, stating that Defendant Mehta "knew pretty much everything" when it came to the problems with the trial. CW2 reported that Defendant Risinger worked with the monitor, i.e., Dr. Meyer, at Segal Trials'

clinical trial site and CW8 confirmed this and noted that Defendant Risinger was present at townhall meetings about TRANQUILITY II and was "Dr. Meyer's mentor." CW5 stated that Risinger "just ran everything." CW5 went on to state that Risinger made "all the development decisions … on a microscopic level." Given their involvement with TRANQUILITY II, Defendants knew exactly what was occurring at these clinical trial sites.

### 2. The Form 483 Letter

286. As previously explained, the FDA investigated the North Miami clinical trial site for the TRANQUILITY II study which resulted in issuance of the Form 483 Letter. The investigation occurred prior to the filing of an NDA. An investigation like this can occur prior to the filing of an NDA if it is triggered by complaints concerning the trial's data integrity. As such, this inspection would have been considered a "for cause" inspection.

287. Defendants admitted that they knew about the Form 483 Letter. Specifically, in response to an analyst question about why the Company delayed disclosing the Form 483, Defendant Risinger said on June 29, 2023, "The FDA did the audit back in December. We were aware of it, and we have been monitoring that site even more closely."

288. Furthermore, Dr. Meyer was required to report the inspection and the receipt of the Form 483 Letter to BioXcel. She was obligated both by FDA regulations and by any contract she most likely had in place with the Company. Thus, it is impossible that BioXcel would not have known about the Form 483 Letter.

289. A sponsor is required to conduct audits of its clinical trial sites and investigators to ensure that the clinical investigator and all research team members assisting in the conduct of a clinical trial are informed about their obligations and responsibilities as they pertain to GCP, the investigational plan, applicable regulations, FDA guidance, and institutional policies. By law, BioXcel either knew prior to or upon receipt of the Form 483 that: (1) the short-informed consent

form in Spanish that had been provided to research subjects, was not approved by the IRB, and did not include risks to subjects and study procedures (which would have been flagged by the IRB as missing); (2) the subjects who were enrolled in the study and received investigational product potentially met exclusion criteria; (3) certain aspects of the study were not being conducted according to the approved protocol; and (4) the SAE that was not reported within the timeframe required by the protocol.

290. Even without conducting its own audit, BioXcel knew about these compliance violations after the FDA conducted an inspection of the North Miami Site and subsequently issued the Form 483. Dr. Meyer was required to notify BioXcel of the inspector's arrival and inspection. Upon this notification, BioXcel was required to have staff on site, at least, during the close out meeting, where the FDA investigator discusses the content of the Form 483.

291. After the issuance of the Form 483, BioXcel and Dr. Meyer were expected to cooperate fully with the FDA to determine the cause and scope of these deficiencies and to assess their effect on the safety, effectiveness, or quality of the data submitted to the FDA and the effect on the rights, safety, and welfare of patients in the study. Typically, an internal review is conducted and involves an outside independent consultant(s) who is qualified by training and experience to conduct such a review. The corrective plan should be committed to in writing and submitted to the FDA. Any reports generated through this plan should also be submitted to the FDA for their review.

292. In addition, participating in the corrective actions of the Form 483 Letter was in the best interests of BioXcel. The failure to correct the problems could result in having to re-do significant portions of the TRANQUILITY II study or the complete halting of the study. Given

how important TRANQUILITY II was to BioXcel, it is inconceivable that the Company did not participate in developing and overseeing the corrective actions.

293. Indeed, the Company admitted that it knew of the severe consequences associated with failure to abide by FDA regulations or the study protocol. In its SEC filings, it stated that "we could encounter delays if a clinical trial is suspended or terminated by . . . the FDA or other regulatory authorities. Such authorities may impose a suspension or termination due to a number of factors, including failure to conduct the clinical trial in accordance with regulatory requirements or our clinical protocols, inspection of the clinical trial operations or trial site by the FDA or other regulatory authorities resulting in imposition of a clinical hold . . ."

294. The Company further acknowledges in its public filings that "delays in completing our clinical trials will increase our costs, slow down our product candidate development and approval process and jeopardize our ability to commence product sales and generate revenues."

**3. The Meyer Response to the Form 483**

295. Dr. Meyer's response to the Form 483 provides additional evidence of scienter. Defendants knew by no later than January 13, 2023 the following facts contained in the Meyer Response:

- 4 patients did not give proper consent and their data could not be used to support an sNDA;
- 4 patients were not screened properly for drug and alcohol abuse and their data could not be used to support an sNDA;
- Some subset of 25 patients did not have a documented Alzheimer's disease diagnosis at the start of the study. These patients were evaluated for symptoms of Alzheimer's disease to determine if they had "probable Alzheimer's disease," but there was no contemporaneous documentation of any analysis done on those test results to determine if they showed that the patients had probable Alzheimer's Disease prior to enrollment; instead, months after their admission, Dr. Meyer provided retroactive "notes to file", and these patients' data could not be used to support an sDNA;

- At least one SAE was not timely reported to the FDA due to an "oversight" by Dr. Meyer;
- TRANQUILITY II was Dr. Meyer's first experience serving as principal investigator of a clinical trial; and
- Dr. Meyer admitted that she was still learning to understand her role as the principal investigator.

296. Defendants were aware of Dr. Meyer's response and the contents within it when it was provided to the FDA.

297. Further, Defendant Risinger's statement to investors on June 29, 2023 that the Company was "monitoring [Dr. Meyer's] site even more closely" allows for the inference that they knew about the Meyer Response when it was sent to the FDA on January 13, 2023.

298. Defendants' knowledge of the Meyer Response gives rise to an inference of scienter that they knew, by at least January 13, 2023, that data from a significant portion of the TRANQUILITY II study would not be accepted by the FDA in support of an sNDA for BXCL501. The loss of up to 32 patients from a study designed to enroll 150 patients would render the study underpowered, making its results useless for purposes of an sNDA.

**4. BioXcel's Failure to Timely Receive an EIR (REVISED)**

299. The failure of the FDA to issue an EIR indicating that the Meyer Response satisfactorily resolved the observations in the Form 483 demonstrates that Defendants knew, by at least February 27, 2023 (when an EIR's issuance would be expected under FDA regulations and customs), that the Meyer Response did not resolve the observations. Consequently, Defendants knew that the data associated with the 32 patients cited therein would not be accepted by the FDA in support of an sNDA for BXCL501. Again, without these 32 patients, the study would be underpowered, making its results useless for purposes of an sNDA.

### 5. Defendants' Experience with Clinical Trials

300. While Dr. Meyer may have been inexperienced, Defendants Mehta and Risinger were not. Their experience would have allowed them to draw the conclusion, upon seeing Dr. Meyer's response to the FDA in January 2023, that the TRANQUILITY II study could not be used to support an sNDA for BXCL501.

301. Defendant Mehta has a Ph.D. in chemistry from the University of Delhi, India and completed a Post-Doctoral Fellowship in chemistry at the University of Montpellier, France. He has held positions with at least two other pharmaceutical companies, including his tenure as Senior Vice President with Inpharmatic Ltd. Defendant Mehta has worked in the pharmaceutical industry since 1989.

302. During his tenure at BioXcel, Defendant Mehta was involved with numerous clinical trials, including testing BXCL501 for the treatment of opioid withdrawal, and agitation associated with dementia, schizophrenia, bipolar disorder, and delirium. Defendant Mehta has also been involved in clinical trials testing BXCL701 for the treatment of pancreatic cancer and prostate cancer.

303. Defendant Risinger has a B.S. in Chemistry and Biology from Allegheny College and an M.D. from the University of Pittsburgh School of Medicine. Defendant Risinger has held positions with at least five other pharmaceutical companies, including his position as Vice President of Clinical Development at NeuroRx Pharmaceuticals and Senior Medical Director of Clinical Development at Alkermes. Defendant Risinger has worked in the industry since 1997. Defendant Risinger served as the Senior Vice President of Clinical Development at BioXcel from December 2018 to May 2022. Since May of 2021, Defendant Risinger has serves as the CMO of Neuroscience at BioXcel. According to his biography on BioXcel's website, Defendant Risinger, "has extensive experience leading clinical development from first in human through Phase 1-4

clinical trials to create a successful commercial product. His expertise includes designing and executing high quality translational studies within Phase 1 and 2 that provide insight and rapidly navigate development to successful registration trials."

304. According to clinicaltrials.gov, Defendant Risinger served as the "study chair" or "study director" of numerous clinical trials. Eleven trials are listed: (i) "A Study of Aripiprazole Lauroxil in Subjects with Schizophrenia or Schizoaffective Disorder," from 2015 to 2016; (ii) "An Extension of a Long-Term Safety Study of ALKS 9072," from 2013 to 2016; (iii) "Sub-Lingual Dexmedetomidine in Agitation Associated with Dementia (TRANQUILITY)," from 2019 to 2022; (iv) "Dexmedetomidine in the Treatment of Agitation Associated with Schizophrenia (SERENITY I)," in 2020; (v) "Dexmedetomidine in the Treatment of Symptoms of Acute Opioid Withdrawal," from 2020 to 2021; (vi) "Determining Efficacy and Safety of BXCL501 in Agitation Associated with Pediatric Schizophrenia and Bipolar Disorder," from 2021 and expected to end in 2024; (vii) "Dexmedetomidine in the Treatment of Agitation Associated with Dementia (TRANQUILITY II)," from 2022 to 2023; (viii) "An Efficacy, and Safety Study of BXCL501 For the Treatment of Agitation Associated with Dementia," in 2022; (ix) "Dexmedetomidine in the Treatment of Agitation Associated with Dementia (TRANQUILITY III)," from 2022 to 2023; (x) "Tachyphylaxis, Tolerance, & Withdrawal Post Treatment with Igalmi for Agitation in Schizophrenia or Bipolar Disorder," from 2023 to 2024; and (xi) "Dexmedetomidine in the Treatment of Agitation Associated with Schizophrenia and Bipolar Disorder (SERENITY III)," starting in 2022 and expected to end in 2025.

305. Both Defendants Mehta's and Risinger's vast experience with clinical trials meant that they understood the stringent requirements of running such trials and they knew what the FDA expected. Thus, Defendants Mehta and Risinger knew that Dr. Meyer's response to the Form 483

was not sufficient. They also knew that since the FDA investigation remained open for months after Dr. Meyer sent her response, these issues were not fixable.

### 6. The FDA Forced Defendants to Repeat TRANQUILITY II

306. BioXcel met twice with the FDA after the results of TRANQUILITY II had been released, in October 2023 and in February 2024. The outcome of these meetings was that the FDA forced BioXcel to repeat the TRANQUILITY II study, in a new study now known as TRANQUILITY In-Care. Further, BioXcel never reported the final results of TRANQUILITY II to clinicaltrials.gov, indicating that this study was never actually completed, and that it cannot be used to support an sNDA for BXCL501. The fact that BioXcel was never able to convince the FDA that TRANQUILITY II could be used to support an sNDA demonstrates that the integrity of the trial was severely undermined, lending further evidence as to the seriousness of the problems raised by the FDA site inspection.

### 7. BioXcel Updated Its Risk Disclosures in August 2023

307. In its quarterly report on Form 10-Q dated August 14, 2023, BioXcel included an additional risk warning titled: "Developments relating to our TRANQUILITY II Phase 3 trial may impact the timing of our development plans for, and prospects for seeking or obtaining regulatory approval of, BXCL501 for the acute treatment of agitation associated with dementia in patients with probable Alzheimer's disease."

308. The disclosure of this risk statement months after they learned about the Form 483 and the Meyer Response demonstrate that Defendants intended to mislead investors by withholding this information during the period of December 21, 2022 to June 29, 2023.

### 8. The Success and Funding of the Company Depended on Approval for BXCL501 for Alzheimer's Patients

309. BioXcel's continued existence was heavily dependent on its ability to gain FDA approval to proscribe BXCL501 to Alzheimer's patients. BioXcel had only one other commercially viable product, which was IGALMI, and which yielded disappointing revenues. The only other asset with any commercial potential it owned – the chemical called BXCL701 – was far behind BXCL501 in clinical trials and commercial development.

310. In addition, BioXcel was depending on loans from Oaktree and QIA that were conditioned on its ability to get FDA approval for BXCL501 for patient with Alzheimer's. Without such funding, BioXcel faced difficulty in continuing as a going concern, as it revealed on August 14, 2023.

311. The Company admitted that its success was heavily dependent on achieving approval for proscribing BXCL501 for Alzheimer's and dementia patients. It stated in its public filings, "[i]n the near term, we are dependent on the success of IGALMI and four of our product candidates, BXCL501, BXCL502, BXCL701 and BXCL702. If we are unable to complete the clinical development of our obtain marketing approval for our product candidates or successfully commercialize IGALMI and our other product candidates, either alone or with a collaborator, or if we experience significant delays in doing so, our business could be substantially harmed."

### 9. Discussions with Analysts About TRANQUILITY II Trials

312. Defendants knew that investors were especially interested in the TRANQUILITY II trials and its progress.

313. Questions from analysts about the TRANQUILITY trials were frequent. On March 10, 2022, during BioXcel's 4Q21 earnings call, Robyn Kay Shelton Karnauskas, a research analyst from Truist Securities, Inc., asked, "So on TRANQUILITY I and II, are you planning on reading

[at] the same time as you thought through how are you reading out and how you might disclose the data?" On August 9, 2022, during BioXcel's 2Q22 earnings call, Colin Nigel Bristow ("Bristow") from UBS Investment Bank stated, "it looks like TRANQUILITY 2 timing slipped a little from end of this year to first half of next. Just curious what's the rationale behind this." On October 18, 2022, during the BioXcel Commercial Day call, Bristow asked Defendants, "to talk through just the broader opportunity that you see in dementia" to which Defendant Mehta responded that "Alzheimer's dementia is a very large opportunity. As you know that we have 2 ongoing trials going on. And we see that as very strategic to building our agitation franchise." Next, during BioXcel's 3Q22 earnings call, Yatin Suneja ("Suneja") with Guggenheim Partners mentioned TRANQUILITY trials and asked Defendants, "[c]ould you just frame for us the expectations for that study is going to be down in the first half of 2023, what do you expect to show?" During BioXcel's 4Q22 earnings call on March 9, 2023, Sumant Kulkarni from Canaccord asked Defendants in regard to TRANQUILITY II, "[w]hat is a typical timeline for data verification and cleaning for a relatively quick trial like this?" On May 8, 2023, during BioXcel's 1Q23 earnings call, Suneja asked, "[a] question on the TRANQUILITY II. So I think the primary endpoint is at day 1, but the study is 3 months. Could you maybe articulate for us how did you come up with the 3-month study, at least in the open label? What sort of regulatory discussions were? And then in terms of filing requirements, help us understand what would be needed. Just curious how did you come up with the – what the negotiation of back and forth was with the FDA when you were designing the II and III TRANQUILITY II and III studies."

314. In the face of frequent questions from analysts, Defendants would have expected and prepared for these questions from analysts about the TRANQUILITY trials during earnings calls and conferences. In Defendants' preparation for these analyst questions, they would have

discovered the compliance violations at TRANQUILITY II's North Miami site and the resulting Form 483. Instead of disclosing the truth about TRANQUILITY II, Defendants chose to misrepresent the progress of the clinical trials to investors.

### 10. Defendants Mehta's and Risinger's Hands-On Involvement (NEW FACTS ADDED)

315. Both Defendant Mehta and Defendant Risinger were described by the CWs as very involved in BioXcel and the progress of BXCL501. CW2 reported that Defendant Risinger was the person assigned to work with the monitor, i.e., Dr. Meyer, at Segal Trials' clinical trial site.

316. CW7 reported that Defendant Mehta was "very involved" in choosing sites and vendors for clinical operations. CW7 went on to describe Defendant Mehta as a very "hands-on CEO." According to CW7, Defendant Mehta was very active during meetings about BXCL501.

317. CW10 corroborated the fact that Defendant Mehta was very involved in TRANQUILITY II, including the FDA's investigation and the problems it was uncovering. Specifically, CW10 stated that when the FDA conducted its inspection in 2022, "when the FDA was there, I met with [Mehta] every single day." CW10 further stated that, "from when the inspector was there – [the inspector] would come in mornings, and stay 'til the afternoon, and I'd meet with the BioXcel team starting at like 4:00." According to CW10, Defendant Mehta had known "pretty much everything" about the problems with TRANQUILITY II.

318. Moreover, CW5, who had worked directly with Defendant Risinger, reported that Risinger was "kind of monolithic" and that "he just ran everything." CW5 went on to state that Risinger made "all the development decisions … on a microscopic level."

319. Defendants Mehta's and Risinger's hands-on involvement at BioXcel means that they knew of the compliance violations that resulted in a Form 483 and how that would affect the filing of the NDA.

## B. Motive and Opportunity

320. The Individual Defendants, as well as other BioXcel insiders, had motive and opportunity to mislead investors for two reasons. First, BioXcel was receiving critical funding from private investors, which was contingent on the success of the TRANQUILITY II trial. Second, BioXcel insiders engaged in significant highly unusual and suspiciously timed insider trading during the Class Period, reaping millions of dollars in personal gains.

### 1. Funding from Investors

321. The Company's financial health was weak. BioXcel depended on loans from Oaktree and QIA to fund its operations, and BioXcel's ability to procure tranches of this funding was contingent on meeting certain performance milestones, including sales of BXCL501 and passing regulatory hurdles in securing FDA approval for BXCL501 to be indicated for Alzheimer's and dementia patients.

322. CW4, a former Associate Director of FP&A and Head of FP&A, who was employed by BioXcel until February 2023, stated that the Company was "burning cash." He was instructed to "provide a worksheet of different [financial] scenarios, like, if we would get additional funding from Oaktree." He further stated, "we were constantly analyzing how much we would get from Oaktree. We wanted to see how long we would last, if we didn't get funded."

323. Under the Company's financing agreements with Oaktree and QIA, BioXcel was set to receive up to $260 million in gross funding to support the Company's expansion of clinical developments of BXCL501, among others.

324. The financing agreements, in essence, consisted of: (1) a credit agreement for up to $135 million in a delayed draw term loan, (2) a revenue interest financing agreement for up to $120 million in a capped revenue interest on net sales of IGALMI and any other future BXCL501 products, and (3) up to $5 million purchase of the Company's common stock.

325. But BioXcel's ability to access all this funding depended on its ability to pass regulatory hurdles in securing FDA approval for BXCL501. CW1, a former Medical Strategy/Medical Director who was employed by BioXcel until October 2023, describes the effect of the funding agreements on the TRANQUILITY II Study. CW1 stated that "there were time pressures" associated with procuring data from TRANQUILITY II "because there were milestones to show investors." Specifically, the goal was to file a NDA application with the FDA by the end of 2023, which "meant the data analysis needed to start by July." CW1 reiterated that for at least one of Oaktree and QIA, "for the end of 2023, significant milestones . . . needed to be met, both for commercial sales and clinical studies. If not completed, either new funding wouldn't be available, or potentially, the company would have to kick back some money."

### 2. Unusual and Suspiciously Timed Insider Sales and Bonuses Tied to Performance

326. Rule 10b5-1(c) creates an affirmative defense to insider trading claims for trades made pursuant to a pre-existing binding agreement or plan ("trading plan" or the "plan"). *See* 17 C.F.R. § 240.10b5-1. However, a trading plan must meet specific requirements in order to serve as an affirmative defense.

327. Under 10b5-1(c)(B), the person using the trading plan as an affirmative defense must demonstrate that the plan:

> (1) Specified the **amount of securities** to be purchased or sold and the price at which and that **date** on which the securities were to be purchased or sold;
>
> (2) Included a written formula or algorithm, or computer program, for determining the amount of securities to be purchased or sold and the price at which and the date on which securities were to be purchased or sold; or
>
> (3) Did not permit the person to exercise any subsequent influence over how, when or whether to effect purchases or sale; provided, in addition, that any other person who, pursuant to the contract, instruction, or plan, did exercise such influence must not have been aware of the material nonpublic information when doing so…

328. Under 10b5-1(c)(C), the person asserting the affirmative defense must also demonstrate that:

> The purchase or sale that occurred was pursuant to the contract, instruction, or plan. A purchase or sale is not "pursuant to a contract, instruction, or plan" if, among other things, the person who entered into the contract, instruction of plan altered or deviated from the contract, instruction, or plan to purchase or sell securities (whether by changing the amount, price, or timing of the purchase or sale), or entered into or altered a corresponding or hedging transaction or position with respect to those securities.

329. Even further, Item 408 of Regulation S-K, which became effective on February 27, 2023, requires disclosure of:

> whether, during the registrants last fiscal quarter (the registrant's fourth fiscal quarter in case of an annual report), any director or officer (as defined in § 240.16a-1(f) of this chapter) adopted or terminated:
>
> > (i) Any contract, instruction or written plan for the purchase or sale of securities of the registrant intended to satisfy the affirmative defense conditions of Rule 10b5-1(c) (§ 240.10b5-1(c) of this chapter) (a "Rule 10b5-1 trading arrangement")…

330. It also requires the identification of:

> whether the trading arrangement is intended to satisfy the affirmative defense of Rule 10b5-1(c), and provide a description of the material terms, other than terms with respect to the price at which the individual executing the Rule 10b5-1 trading arrangement or non-Rule 10b5-1 trading arrangement is authorized to trade, such as:
>
> > (A) The name and title of the director or officer;
> >
> > (B) The date on which the director or officer adopted or terminated the trading arrangement;
> >
> > (C) The duration of the trading arrangement; and
> >
> > (D) The aggregate number of securities to be purchased or sold pursuant to the trading arrangement.

331. The information in the paragraphs below concerning Defendants Mehta's and Steinhart's sales of BioXcel common stock are taken from publicly-available trading data that Defendants were required to report to the SEC through its Form 4.

**a. Defendant Mehta**

332. Defendant Mehta avoided significant losses by prolonging the disclosure of the adverse information concerning the TRANQUILITY II trial. By falsely representing the progress and strength of the trial while concealing the serious protocol violations and investigator fraud that had occurred, Defendant Mehta was able to keep the price of BioXcel's stock artificially inflated long enough to sell millions of dollars of stock through his trading plan. Defendant Mehta made the following transactions involving shares of BioXcel stock:

| Date | Action | No. of Shares | Transaction Price per Share | Amount |
|---|---|---|---|---|
| 3/14/2023 | "Exercised" RSUs | 10,437 | $ 0.00 | ($ 0.00) |
| 3/20/2023 | Exercised call options | 30,000 | $ 0.41 | ($ 12,300.00) |
| 3/20/2023 | Open market sale | 24,667 | $ 18.20 | $ 448,939.40 |
| | Open market sale | 5,333 | $ 18.86 | $ 100,580.38 |
| | Open market sale | 3,896 | $ 18.22 | $ 70,985.12 |
| | Open market sale | 604 | $ 18.88 | $ 11,403.52 |
| 3/21/2023 | Exercised call options | 30,000 | $ 0.41 | ($ 12,300.00) |
| | Open market sale | 29,100 | $ 19.70 | $ 573,270.00 |
| | Open market sale | 900 | $ 20.15 | $ 18,135.00 |
| 5/14/2023 | "Exercised" RSUs | 15,000 | $ 0.00 | ($ 0.00) |
| 5/22/2023 | Open market sale | 6,500 | $ 25.79 | $ 167,640.85 |
| 6/14/2023 | "Exercised" RSUs | 2,609 | $ 0.00 | ($ 0.00) |
| 6/15/2023 | Exercised call options | 30,000 | $ 0.41 | ($ 12,300.00) |
| | Open market sale | 21,988 | $ 21.41 | $ 470,763.08 |
| | Open market sale | 8,012 | $ 21.90 | $ 175,462.80 |
| 6/16/2023 | "Exercised" RSUs | 30,000 | $ 0.41 | ($ 12,300.00) |
| | Open market sale | 24,987 | $ 20.01 | $ 499,989.87 |
| | Open market sale | 4,266 | $ 20.90 | $ 89,159.40 |
| | Open market sale | 747 | $ 21.89 | $ 16,351.83 |
| | | | **TOTAL** | **$ 2,642,681** |

333. As illustrated in the above table, Defendant Mehta sold 131,000 shares of BioXcel stock during the Class Period, yielding him $2,642,681 in proceeds and $2,593,481 in profits. Prior to the Class Period, Defendant Mehta had a total of 903,322 shares, which included exercisable options, pre-class period class A shares, vested RSUs and options exercised and sold. Had Mehta timey disclosed the protocol violations or investigator fraud that occurred during the TRANQUILITY II trial, these shares would have been sold at a fraction of the cost. Indeed, given the declines in BioXcel's stock price caused by the June 29, 2023 and August 14, 2023 disclosures ($11.28 per share and $3.07 per share, respectively), Mehta avoided approximately $1.87 million in losses he otherwise would have incurred had he timely disclosed the adverse information concerning TRANQUILITY II before proceeding with his insider trades during the Class Period.

334. Defendant Mehta entered into a 10b5-1 trading plan on August 31, 2022. In order to be a valid 10b5-1 trading plan that would qualify for insider trading immunity, Defendant Mehta had to specify in that trading plan the amount of shares to be sold, and the dates on which they would be sold. Thus, Defendant Mehta knew with certainty when he entered into the trading plan the number of shares he would sell and the dates on which they would be sold. This is because he was not permitted to exercise any discretion over the sales of his stock pursuant to the trading plan, per SEC regulations.

335. Defendant Mehta's 10b5-1 trading plan gave him motive to withhold from the public the integrity issues associated with the TRANQUILITY II study (or, at minimum, the risk of integrity issues), until after he sold stock in June 2023. For example, on June 15 and 16 of 2023, Defendant Mehta sold 60,000 shares and made $1,251,727. According to his Form 4, this transaction was made "pursuant to a plan that complies with Rule 10b5-1 entered into on August 31, 2022." Thus, Defendant Mehta knew that he was required to sell these shares and on these

dates under his trading plan. Therefore, there was motive for Defendant Mehta to withhold the problems with the TRANQUILITY II Study, including the issuance of the Form 483, Dr. Meyer's defective and insufficient response, and Dr. Meyer's fabrication of an email to cover up her tardiness in reporting an SAE, until *after* those sales were made. If Defendant Mehta had disclosed this negative information to the public before his pre-determined trades would have been executed, these sales would have happened anyway – as required per the terms of the trading plan and SEC regulations – and Defendant Mehta would have sold these shares at vastly reduced prices.

336. And then after the disclosure, once he benefitted from his scheme, Defendant Mehta canceled his trading plan. Assuming that his sales were made pursuant to a predefined schedule of sales, which is implied by the fact that his Form 4 indicated they were made pursuant to a trading plan, then Defendant Mehta's trading plan called sell 60,000 shares pursuant to call options or RSUs once per quarter (and approximately half way through the last month of each quarter, i.e., December 15 and 16, 2022, March 14 and 20, 2023, and June 14, 15 and 16, 2023). Thus, it would be expected that Defendant Mehta would have sold 60,000 shares in the middle of September.

337. Defendant Mehta's trading plan provided for the sale of up to an aggregate of 499,437 shares of Common Stock. However, as of September 28, 2023, 294,000 of those shares had remained to be sold. Thus, Defendant Mehta had shares available to be sold pursuant to the trading plan in September 2023, but he did not sell them.

338. Further, Defendant Mehta entered into a *new* trading plan on December 14, 2023. An insider cannot have more than one trading plan in effect for purposes of insulation from insider trading liability.

339. Because Defendant Mehta had 294,000 shares remaining to be sold under his trading plan, and because the regular pattern of selling 60,000 shares each quarter abruptly ended

on June 16, 2023, it appears that Defendant Mehta canceled his trading plan (which is permitted upon written instruction), thereby avoiding a large transaction in the middle of September 2023 at depressed prices.

340. The fact that Defendant Mehta had discretion to cancel his trading plan, and that he apparently did exercise that discretion at some point following the June 29, 2023 disclosure but before his next scheduled trade in September, 2023, explains the timing of the disclosure of the problems with the TRANQUILITY II trial.

341. BioXcel did not comply with the disclosure requirements for 10b5-1 trading plans pursuant to Item 408 of regulation S-K. BioXcel does not disclose whether Defendant Mehta's trading plan was "intended to satisfy the affirmative defense conditions of Rule 10b5-1(c)" nor does it disclose "the duration of the trading arrangement." *See* ¶ 273.

342. Defendant Mehta's total compensation for fiscal year 2022 was $4,559,195.

**b. Defendant Steinhart**

343. Prior to the Class Period, Defendant Steinhart had only sold his BioXcel stock on one occasion. On February 1, 2021, Defendant Steinhart exercised his options and purchased 3,750 shares of BioXcel stock at a strike price of $5.55 per share. He immediately sold all these shares in the open market at an average price of $48.15 per share, yielding him a profit of approximately $159,750.00.

344. During the Class Period, Defendant Steinhart made the following transactions involving shares of BioXcel stock:

| Date | Action | No. of Shares | Transaction Price per Share | Amount |
|---|---|---|---|---|
| 3/14/2023 | "Exercised" RSUs | 2,084 | $ 0.00 | ($ 0.00) |
| 3/15/2023 | Open market sale | 2,084 | $ 19.50 | $ 40,638.00 |
| 5/14/2023 | "Exercised" RSUs | 5,000 | $ 0.00 | ($ 0.00) |
| 5/15/2023 | Open market sale | 5,000 | $ 27.17 | $ 135,864 |
| 6/14/2032 | "Exercised" RSUs | 521 | $ 0.00 | ($ 0.00) |
| | | | **TOTAL** | **$ 176,502** |

345. Defendant Steinhart sold 7,084 shares of BioXcel stock during the Class Period, yielding him a net profit of $176,501.50.

346. Defendant Steinhart entered into a 10b5-1 trading plan on June 23, 2022. Despite this, Steinhart did not trade until 9 months later. This is highly suspicious and Steinhart's supposed trading plan cannot insulate him from liability.

347. Such sales by Defendants Mehta and Steinhart therefore support a strong finding of scienter.

348. Moreover, according to the Company's executive compensation plan, Defendant Mehta as well as other executive officers stood to gain annual bonuses upon achieving certain performance goals, which generally related to clinical trial performance, and completing certain financial and operational objectives, as well as an assessment of individual performance. In fact, Defendant Mehta received a bonus in the amount of $150,000 for the strategic financing agreements with Oaktree and QIA for fiscal year 2022.

## VIII. CLASS ACTION ALLEGATIONS

349. Lead Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired BioXcel common stock during Class Period of the March 9, 2023 through August 11, 2023, both dates inclusive and were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

350. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, shares of BioXcel common stock actively traded on

the NYSE. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by BioXcel or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

351. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of BioXcel;

(c) whether the Individual Defendants caused BioXcel to make false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the Defendants' conduct complained of herein artificially inflated the prices of BioXcel securities during the Class Period; and

(f) to what extent the members of the Class have sustained damages and what is the proper measure of damages.

352. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

353. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

354. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX. PRESUMPTION OF RELIANCE

355. At all relevant times, the market for BioXcel's common stock was open, well-developed, and efficient, for the following reasons, among others:

(a) BioXcel's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, BioXcel filed periodic public reports with the SEC and the NYSE;

(c) BioXcel regularly and publicly communicated with investors via established market communication channels, including through the regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or:

(d) BioXcel was followed by analysts employed by brokerage firms who issued reports about the Company and these reports were distributes to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

356. As a result of Defendants' materially false and misleading statements, BioXcel's common stock traded at artificially inflated prices during the Class Period. Lead Plaintiffs and other members of the Class purchased or otherwise acquired the Company's common stock relying upon the integrity of the market price of BioXcel's common stock and market information relating to BioXcel, and have been damaged thereby.

357. As a result of the foregoing, the market for BioXcel's common stock promptly digested current information regarding BioXcel from all publicly available sources and reflected such information in BioXcel's share price. Under these circumstances, all purchasers of BioXcel's common stock during the Class Period suffered similar injury through their purchase of BioXcel's common stock at artificially inflated prices and a presumption of reliance applies.

358. A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in part, grounded on certain of Defendants' that were misleading because they omitted to disclose the contents of the Form 483 Letter. Because Defendants' failure to disclose material adverse information regarding the TRANQUILITY II Study as well as information concerning Defendants' financing agreements and overall financial health – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X. INAPPLICABILITY OF STATUTORY SAFE HARBOR

359. The statutory safe harbor provided for forward-looking statements under certain circumstances is inapplicable to the false statements alleged in this Amended Complaint. The statements alleged to be false herein all related to then-existing facts and conditions. Further, to the extent that certain of the statements alleged to be false may be characterized as forward looking, they were not characterized as "forward-looking statements" when made and there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false, and/or the forward-looking statement was authorized or approved by an executive officer of BioXcel who knew that the statement was false when made.

## XI. LOSS CAUSATION

360. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiffs and the Class.

361. During the Class Period, Lead Plaintiffs and the Class purchased BioXcel common stock at artificially inflated prices and were damaged thereby. The price of the Company's common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof,

were revealed, causing investors' losses. The decline in the price of BioXcel's common stock was the direct result of Defendants' fraud finally being revealed to investors and the market.

362. The timing and magnitude of the declines in price of BioXcel common stock were not caused by changed market conditions, macroeconomic or industry factors, or non-BioXcel specific facts unrelated to Defendants' fraudulent conduct.

## XII. COUNTS

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against All Defendants

363. Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

364. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and did (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other Class members to purchase BioXcel securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

365. Defendants (i) knowingly or recklessly engaged in acts transactions, practices and courses of business in order to defraud Lead Plaintiff and the Class members; (ii) made various untrue statements of material facts; and (iii) engaged in devices, schemes and artifices to defraud in connection with the purchase and sale of securities. All Defendants named are sued either as primary participants in the illegal conduct charged herein or as controlling persons as alleged below.

366. During the Class Period, Defendants made false statements which they knew to be or recklessly disregarded the truth that they were false and misleading in that they contained

misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Specifically:

**i.** Mehta: Defendant Mehta made, or caused BioXcel to make, the false statements specified in ¶¶ 209, 211, 213, 216 and 225 above.

**ii.** Steinhart: Defendant Steinhart made, or caused BioXcel to make, the false statements specified in ¶¶ 211, 213, and 216 above.

**iii.** Risinger: Defendant Risinger made, or caused BioXcel to make, the false statements specified in ¶ 223, above

**iv.** BioXcel: Defendant BioXcel is responsible for all of the false statements specified in Section VI, above.

367. Each of the Defendants engaged and participated in the continuous conduct to conceal material information about BioXcel's ability to properly reserve for losses as specified herein. Defendants directly or indirectly issued quarterly and annual reports, SEC filings, press releases and other statements and documents, including statements made to securities analysts and the media that influenced the market for BioXcel's securities. Such statements were materially false and misleading in that they concealed the truth about BioXcel's finances and business prospects.

368. Defendants had actual knowledge of the materially false and misleading statements or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants committed said acts willfully or with reckless disregard for the truth. Additionally, each Defendant knew or recklessly disregarded the truth that material facts were being misrepresented as detailed above.

369. Evidence that Defendants acted knowingly or with reckless disregard for the truth lies within Defendants' knowledge and control. As the senior managers and/or directors of BioXcel, each of the Defendants (i) had control over the Company's public statements and filings; (ii) were privy to the creation and reporting of the Company's public filings; and (iii) had knowledge of the Company's dissemination of false information to investors, which they knew and/or recklessly disregarded was materially false.

370. The Individual Defendants are both directly and indirectly liable for the wrongs complained of herein. As a result of the dissemination of the false and misleading reports, filings, and releases, the market price of BioXcel securities was artificially inflated during the Class Period. Unbeknownst to them, Lead Plaintiffs and other members of the Class purchased or acquired securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

371. During the Class Period, Lead Plaintiffs and other members of the Class were unaware of the falsity of BioXcel's misrepresentations. Had they known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflate prices that were paid.

372. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act.

373. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**Against Defendants Mehta, Steinhart, and Risinger**

374. Lead Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

375. Defendants Mehta, Steinhart, and Risinger were controlling persons of BioXcel within the meaning of Section 20(a) of the Exchange Act as alleged herein. Due to their senior positions, each of the Defendants knew the adverse non-public information about BioXcel's misstatements about its reserves and false financial statements.

376. As officers and/or directors or a publicly owned company, Defendants Mehta, Steinhart, and Risinger had a duty to disseminate accurate and truthful information with respect to BioXcel's financial condition and results or operations. Defendants Mehta, Steinhart, and Risinger also had a duty to correct any materially false or misleading public statements issued by BioXcel.

377. During the Class Period, Defendants Mehta, Steinhart, and Risinger exercised their power and authority to cause BioXcel to engage in the wrongful acts complained of herein. In this capacity, they participated in unlawful conduct alleged which artificially inflated the market price of BioXcel securities.

378. By reason of the above conduct, Defendants Mehta, Steinhart, and Risinger are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by BioXcel.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs demand judgment against Defendants as follows:

(a) Determining that this action is proper under Rule 23 of the Federal Rules of Civil Procedure;

(b) Requiring Defendants to pay compensatory damages to Lead Plaintiff and the Class for all damages caused by Defendants' wrongdoing;

(c) Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

(d) Such other and further relief as the Court may deem proper.

## XIV. DEMAND FOR TRIAL BY JURY

Lead Plaintiffs hereby demand a trial by jury.

Dated: February 24, 2025

Respectfully submitted,

**GRANT & EISENHOFER P.A.**

*/s/ Caitlin M. Moyna*
Caitlin M. Moyna (*pro hac vice*)
Alexandra E. Forgione (*pro hac vice*)
485 Lexington Avenue
New York, NY 10017
Tel.: (646) 722-8500
Fax: (646) 722-8501
Email: dberger@gelaw.com
Email: cmoyna@gelaw.com
Email: aforgione@gelaw.com

*Counsel for Oklahoma Law Enforcement Retirement System and Co-Lead Counsel for the Class*

**LEVI & KORSINSKY, LLP**

Adam M. Apton (*pro hac vice*)
Devyn R. Glass (*pro hac vice* forthcoming)
33 Whitehall Street, 17th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com
Email: dglass@zlk.com

*Counsel for Tonya Hills and Co-Lead Counsel for the Class*